IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES KING,

        Plaintiff,        Case No.

v.

        Hon.

THE UNITED STATES OF AMERICA,
DOUGLAS BROWNBACK,
TODD ALLEN, and CONNIE MORRIS

        Defendants.

---

D. Andrew Portinga (P55804)
Patrick M. Jaicomo (P75705)
MILLER JOHNSON
Attorneys for Plaintiff
250 Monroe Avenue, N.W., Suite 800
Grand Rapids, MI 49503
(616) 831-1700
portingaa@millerjohnson.com
jaicomop@millerjohnson.com

---

## **COMPLAINT**

James King states the following Complaint against the United States of America, Douglas Brownback, Todd Allen, and Connie Morris:

### **The Parties**

1. Plaintiff James King is a resident of Grand Rapids, Michigan.

2. Defendant Douglas Brownback is employed as a special agent by the FBI.

3. Defendant Todd Allen is employed as a police detective by the Grand Rapids Police Department.

4. Defendant Connie Morris is employed as a police officer by the Grand Rapids Police Department.

## Jurisdiction and Venue

5. This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1346(b) because this dispute arises out under the Constitution and laws of the United States and involves a claim against the United States.

6. On September 14, 2015, James, through counsel, submitted an administrative claim on Standard Form 95 to the FBI under the Federal Tort Claims Act.

7. The FBI did not respond to the claim within six months and, as such, it was deemed denied on March 14, 2016.  28 U.S.C. § 2675(a).

8. Venue is proper in this district under 28 U.S.C. §§ 1391 and 1402(b) because the events giving rise to this action occurred in this district.

## Facts

9. James King is a 23-year-old, who came to Grand Rapids from Alpena to study computer science at Grand Valley State University.

10. During the summer of 2014, James worked two jobs, one installing DSL cable for Moss Telecommunications and the other working for the Greek Group, a local science education non-profit.

11. In the afternoon of Friday, July 18, 2014, James was walking down Leonard Street toward his job at the Geek Group.

12. He had worked at Moss that morning and had gone home for lunch. After lunch he left for his next job.

13. As James was walking, he came upon two men who were leaning against a black SUV near Tamarack Avenue.

14. One of these men was Todd Allen, an undercover Grand Rapids police detective.

15. The other was Douglas Brownback, an undercover FBI agent.

16. Both Allen and Brownback were in plain clothes; they were not uniformed; both were unshaven and wearing jeans and baseball hats; Allen was wearing sunglasses.

17. Unknown to James, Allen and Brownback were members of a joint fugitive task force between the FBI and the City of Grand Rapids and tasked with operating in West Michigan.

18. They were looking for a fugitive named Aaron Davison.

19. Davison was wanted for home invasion and had been seen in the area the previous day.

20. The description of Davison from which Allen and Brownback were working was very broad. They knew only that Davison was a 26-year-old white male with glasses between 5'10" and 6'3" tall.

21. Allen and Brownback had a seven-year-old driver's license photo of Davison and a more recent Facebook photo, where Davison's face was not visible.



22.     Allen and Brownback did not find Davison on July 18, 2014, but they did find James.



4

23. James was five years younger than Davison and did not bear a resemblance to either photograph of Davison.

24. Allen and Brownback determined, however, that James matched Davison's description because James was a white male with glasses between 5'10" and 6'3" tall.

25. Allen and Brownback were wearing lanyards with badges.

26. But James could not see what the badges were.

27. Neither Allen nor Brownback identified himself as a law enforcement officer to James.

28. James did not know that Allen and Brownback were law enforcement officers.

29. Allen asked James who he was.

30. James simply replied, "James."

31. Allen then asked James for identification.

32. James said that he did not have any.

33. Brownback then went behind James so that Allen was beside James and Brownback was behind him.

34. Brownback patted James's pants and asked him why he had a wallet.

35. Allen and Brownback then told James to get against the unmarked SUV and put his hands behind his head.

36. James initially complied.

37. Allen and Brownback both later stated under oath that, at that point, they had seized James—he was not free to leave; he was under arrest.

38. Allen and Brownback both also stated under oath that they decided to arrest James because he did not produce identification or answer their questions.

39. Brownback removed James's wallet.

40. James turned his head around to see what was happening, but one of the men shoved James's face back toward the SUV.

41. At that point, James believed he was being mugged and asked, "Are you mugging me?"

42. Rather than answer, Brownback grabbed James's arm.

43. James turned and ran.

44. He made it about three steps before Allen and Brownback tackled him to the ground.

45. James yelled for help, begging for passersby to call the police.

46. As Brownback restrained James, Allen put him in a chokehold from behind.

47. Allen choked James unconscious.

48. When he regained consciousness, in a panicked attempt to save his own life, James bit Allen in the arm that was still around James's neck.

49. Allen then started beating James in the head and face "as hard as I could, as fast as I could, and as many times as I could."

6

50. James continued screaming for help and for someone to call the police.

51. Several bystanders called the police.

52. Uniformed officers eventually arrived.

53. The bystanders stated that they did not know that Allen and Brownback were law enforcement officers.

54. One of the bystanders took video on her phone. The video does not show the beating, but it shows the aftermath, including the following exchanges:

>  Bystander 1:   I know, they were pounding him. [0:04]
>  Officer:       Todd, you alright? [0:18]
>  Bystander 1:   No, he's not alright, they were pounding him in the head. [0:20]
>
>  \*   \*   \*
>
>  Bystander 1:   . . . [T]hey were literally pounding him in the head . . . They were out of control, pounding him. [0:47]
>
>  \*   \*   \*
>
>  Bystander 2:   Yeah, they was fucking him up. [1:02]
>  Bystander 1:   They were pounding his head for no reason. They were being brutal. [1:03]
>  Bystander 2:   They was beating him up. . . . [1:07]

55. After uniformed officers arrived, the dashboard cameras on their squad cars picked up the following statements through their lapel microphones:

>  Bystander 1:   I was right there. I mean, they were literally pounding him in the head though. [Video # 674541 at 3:09]

7

\*   \*   \*

| | |
|---|---|
| Officer: | Do you have any weapons on you at all? [3:34] |
| James: | No sir, I thought they were trying to mug me. [3:37] |

\*   \*   \*

| | |
|---|---|
| Officer: | Send another ambulance. [3:57] |
| James: | Please guys, is he a real police? [3:59] |
| Officer: | Stay on your stomach; stay on your stomach . . . We've got an ambulance coming for you, okay? [4:01] |

\*   \*   \*

| | |
|---|---|
| Bystander 1: | They're all calling, "call the police; call the police." So, I was on the phone with 911 saying this guy was getting his face pounded. [5:47] |
| Officer: | He didn't know who these guys were? [5:54] |
| Bystander 2: | No, he didn't know who they were until we came across the street. And I was like, "Why y'all doing that?" . . . and he threw out his wallet . . . and he showed us that it was FBI- threw his wallet out on the ground . . . [5:56] |
| Bystander 1: | We saw no cars around that even looked remotely like a police car . . . [6:15] |
| Bystander 2: | But he did; he threw his wallet out after I asked him why was they doing it to him, and he said that he was FBI. [6:24] |

\*   \*   \*

| | |
|---|---|
| Bystander 1: | I was on the phone with 911 like "there's these two guys pounding this guy and everybody is screaming, 'Call 911!'" . . . [6:49] |

\*   \*   \*

| | |
|---|---|
| Bystander 1: | I do understand at times there needs to be excessive force. But he was pounding him, I mean pounding. Before we knew they were |

8

Case 1:16-cv-00343-JTN-ESC   ECF No. 1 filed 04/04/16   PageID.9   Page 9 of 17

> undercover, we thought they were going to kill him; they were bad.
> [Video # 674390 at 5:19]

56. Among the uniform officers who arrived on the scene was Grand Rapids Police Officer Connie Morris.

57. Morris ordered several bystanders to delete any video of the event, telling them:

> No, no, no, we got undercover officers there. No pictures. Delete it. Delete it. It's for the safety of the officers. Everybody has cameras . . . All we used to do was tell the story; we didn't have a picture to tell the story with, right? Did you delete it? . . . We don't need no pictures.

58. Morris confirmed that at least two bystanders deleted video of the event.

59. Because of Morris's actions, no video of the actual struggle between Allen and Brownback and James was ever discovered; only the aftermath remains.

60. James was transported from the scene to the emergency room, where he was given a CT scan.

61. Eventually, the police realized James was not the sought-after fugitive, Davison.

62. Instead of releasing James, however, police took him from the hospital to the Kent County Jail and booked him for assault with intent to do great bodily harm, aggravated assault of a police officer, and resisting arrest.

63. James's booking photo shows the severe swelling on his face as a result of the beating:

9



64.     Because James was booked on a Friday, he spent the entire weekend in jail and was only allowed to leave his cell for meals.

65.     James was released on bond the following Monday, after his parents posted bail.

66.     Upon his release, James visited another hospital for further examination.

67.     By that time, much of the swelling had gone down, but the whites of his eyes had turned almost entirely black and red:





 

68. Owing to the false and misleading statements of Allen and Brownback and the lack of video evidence to the contrary due to the actions of Morris, the prosecutor proceeded with charges against James and tried him for assaulting a police officer and causing injury (Allen), assaulting a police officer (Brownback), and assault with a dangerous weapon (for the handcuffs that Allen or Brownback was able to clasp to one of James's wrists while James was trying to escape).

69. If convicted of those felonies, James faced many years in prison.

70. James and his family spent their life savings on legal counsel to defend James.

71. Following a jury trial, James was acquitted of all charges.

72. As a result of Allen, Brownback, and Morris's actions, James was forced to drop out of Grand Valley State University.

73. He is currently working to become an electrician.

**Count I – Violation of Rights Secured by the Fourth Amendment**

(42 U.S.C. § 1983 - Defendants Brownback and Allen)

74. Plaintiff incorporates by reference the preceding allegations of his Complaint.

75. All of the actions taken by Brownback and Allen and referred to in the preceding allegations were done while acting under color of Michigan law – investigating a fugitive wanted under a state-law warrant – and caused the deprivation of James's clearly-established constitutional rights under the Fourth Amendment of the United States Constitution, including his:

    a. Freedom from unreasonable seizure;

    b. Freedom from unreasonable searches;

    c. Freedom from the use of excessive force; and

    d. Freedom from malicious prosecution.

76. Brownback and Allen's actions were intentional, knowing, malicious, undertaken in bad faith, and/or in gross and reckless disregard of James's constitutional rights.

77. As a direct and proximate result of the violation of his constitutional rights by Brownback and Allen, James suffered significant damages and is entitled to relief under 42 U.S.C. § 1983.

78. James's damages include pain and suffering, emotional and mental harms, legal expenses, lost wages, diminished future earning potential and medical expenses.

79. James seeks all relief allowed by law, including compensatory damages, punitive damages, and reasonable attorney fees.

**Count II – Violation of Rights Secured by the Fourth Amendment**
(*Bivens* – Defendant Brownback)

80. Plaintiff incorporates by reference the preceding allegations of his Complaint.

81. All of the actions taken by Brownback and referred to in the preceding allegations were done while acting in his capacity as a federal employee and caused the deprivation of James's clearly-established constitutional rights under the Fourth Amendment of the United States Constitution, including:

　　a.　Freedom from unreasonable seizure;

　　b.　Freedom from unreasonable searches;

　　c.　Freedom from the use of excessive force; and

　　d.　Freedom from malicious prosecution.

82. Brownback's actions were intentional, malicious, and/or in gross and reckless disregard of James's constitutional rights.

83. As a direct and proximate result of the violation of his constitutional rights by Brownback, James suffered significant damages and is entitled to relief under *Bivens v Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971).

84. James's damages include pain and suffering, emotional and mental harms, legal expenses, lost wages, diminished future earning potential, and medical expenses.

85. James seeks all relief allowed by law, including compensatory damages, punitive damages, and reasonable attorney fees.

### Count III – Violation of Rights Secured by the Fourth and Fourteenth Amendments
(42 U.S.C. § 1983 - Defendant Morris)

86. Plaintiff incorporates by reference the preceding allegations of his Complaint.

87. All of the actions taken by Morris and referred to in the preceding allegations were done while acting under color of Michigan law and had the effect of depriving James of his clearly-established constitutional rights under the Fourth and Fourteenth Amendments of the United States Constitution, including his freedom from malicious prosecution and his right to due process.

88. Morris's actions were intentional, malicious, undertaken in bad faith, and/or in gross and reckless disregard of James's constitutional rights.

89. As a direct and proximate result of the violation of his constitutional rights by Morris, James suffered significant damages and is entitled to relief under 42 U.S.C. § 1983.

90. James's damages include pain and suffering, emotional and mental harms, legal expenses, lost wages, diminished future earning potential, and medical expenses.

91. James seeks all relief allowed by law, including compensatory damages, punitive damages, and reasonable attorney fees.

### Count IV – Federal Tort Claims Act
(Defendant United States of America)

92. Plaintiff incorporates by reference the preceding allegations of his Complaint.

93. Brownback is an employee of the United States of America.

94. All of the actions taken by Brownback and referred to in the preceding allegations were done while acting within the scope of his employment.

95. Brownback's actions caused personal injury to James.

96. Brownback's actions amount to multiple torts recognized by Michigan law, including:

   a. Assault;

   b. Battery;

   c. False Arrest;

   d. False Imprisonment;

   e. Malicious Prosecution; and

   f. Intentional Infliction of Emotional Distress.

97. Brownback's actions were intentional, malicious, undertaken in bad faith, and/or in gross and reckless disregard of James's constitutional rights.

98. James submitted, through counsel, an administrative claim in writing to the FBI and it has been deemed denied by the FBI's failure to issue a

decision within six months; James's administrative claims are, therefore, exhausted.

## Prayer for Relief

WHEREFORE, Plaintiff seeks a judgment awarding him compensatory and punitive money damages against Brownback, Allen, and Morris, and compensatory money damages against the United States of America. James also seeks his attorney fees in bringing this action as well as any other relief that this Court deems appropriate.

                                       MILLER JOHNSON
                                       Attorneys for Plaintiffs

Dated: April 4, 2016        By   s/Patrick M. Jaicomo
                                       D. Andrew Portinga (P55804)
                                       Patrick M. Jaicomo (P75705)
                                Business Address:
                                       250 Monroe Avenue, N.W., Suite 800
                                       PO Box 306
                                       Grand Rapids, Michigan  49501-0306
                                       (616) 831-1700
                                       portingaa@millerjohnson.com
                                       jaicomop@millerjohnson.com