UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES KING,

                Plaintiff,

v.

UNITED STATES OF AMERICA et al.,

                Defendants.

_____/

Case No:  1:16-cv-00343

Hon. Janet T. Neff
United States District Judge

**DEFENDANTS DOUGLAS BROWNBACK, TODD ALLEN AND
UNITED STATES OF AMERICA'S BRIEF IN SUPPORT OF MOTION TO DISMISS,
OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT**

## INTRODUCTION

Special Agent Douglas Brownback and Detective Todd Allen (collectively, the "Officers") are federal task force officers assigned to pursue and apprehend dangerous criminals. This matter arises from their pursuit of fugitive Aaron Davison. The Officers approached James King in broad daylight with their badges visible, because they suspected that he was Davison. After King refused to provide his full name, acknowledged having a weapon, and claimed he had no identification, the Officers concluded that he was likely Davison. During the course of a pat-down, King attempted to flee and violently resist arrest. Consequently, the Officers became involved in a struggle to restrain King and to defend themselves. King bit Officer Allen, and Officer Allen then punched King to force him to release the bite. Eventually, but only with the help of a bystander, the Officers were able to subdue King. The Kent County Prosecutor charged King with assaulting, battering, wounding, resisting, obstructing, opposing, or endangering the Officers, and assault with a dangerous weapon. King waived his preliminary examination. The circuit court denied King's motion to dismiss and his motion for a directed verdict. After the three-day trial, the jury found King not guilty.

King now brings a laundry list of claims against the Officers and the United States. But each fails. King cannot bring § 1983 claims (Count 1) against the Officers because they were federal task force officers acting under the color of federal law. However, in any case, qualified immunity protects the Officers from both King's § 1983 (Count 1) and *Bivens* claims (Count 2). Accepting King's version of the facts as true, his claims fail all three parts of the qualified-immunity test: One, the Officers' conduct was reasonable and did not violate King's constitutional rights. Two, even if one assumes that King's rights were violated, they were not clearly established at the time, i.e. every reasonable officer would not have known that the

1

Officers' conduct was unconstitutional. Three, the Officers did not act in an objectively

unreasonable manner given the tense and rapidly developing circumstances.

King's claims against the United States should also be dismissed. Count IV lists six tort

theories against the United States under the Federal Tort Claims Act (the "FTCA"): assault,

battery, false imprisonment, false arrest, malicious prosecution, and intentional infliction of

emotional distress. The protections afforded law-enforcement officers under Michigan law when

they act in good faith bar each of these claims. Moreover, they also fail because the Officers

were at all times acting appropriately and within the law. Lastly, King's FTCA claims based on

Officer Allen's conduct must be dismissed because he failed to exhaust his administrative

remedies. King's administrative claim only sought relief under the FTCA based on Agent

Brownback's actions.

Accordingly, Agent Brownback, Officer Allen, and the United States (collectively, the

"Federal Defendants") respectfully request that this Court dismiss King's claims, or,

alternatively, grant them summary judgment.

## FACTUAL BACKGROUND

There is extensive testimony regarding the incident, including Kent County criminal trial

testimony of all three individuals involved as well as that of numerous additional witnesses.

King attached this trial testimony to his administrative claim, along with his medical records

(including Ex. A, King's Medical Records), GRPD Incident Reports, and an FBI report, and

referenced the administrative claim in his Amended Complaint.[1]  (Am. Compl. ¶ 6, ECF No. 30,

---

[1] In connection with a motion to dismiss, the Court can consider documents that are: "attached
to, incorporated by, or referred to in the pleadings;" documents "that are referred to in the
complaint and central to the plaintiff's allegations, even if not explicitly incorporated by
reference," and public records, without converting the motion to a summary judgment motion.
*Dobrski v. Ford Motor Co.*, 698 F. Supp. 2d 966, 974-75 (N.D. Ohio 2010) (citing *Greenberg v.*

PageID.107.)  Based on the undisputed testimony from the trial, as well as King's other statements, he cannot sustain his claims in this action.

### The federal Task Force fugitive investigation

Douglas Brownback is a Special Agent with the Federal Bureau of Investigation (the "FBI").  (Am. Comp. ¶ 2, ECF No. 30, PageID.107.)  At the time of the incident, he was assigned to the Grand Rapids Resident Agency Violent Crimes / Fugitive Safe Streets Task Force (the "Task Force").  (*Id.* ¶ 17, PageID.108.)  Todd Allen is employed as a detective with the Grand Rapids Police Department (the "GRPD"), but is a federally deputized Special Deputy U.S. Marshal, and works full-time with the federal Task Force.  (*Id.* ¶ 3, 17, PageID.107-08; Ex. B, Trial  Tr. Vol. 2, at 31-32[2] [hereinafter Trial Tr.]; Ex. C, Burns Decl. ¶ 2; Ex. 1 to Burns Decl., Oath of Office.)  The FBI provides Officer Allen with office space, a cellular telephone, a radio, a vehicle, and other law-enforcement equipment.  (Ex. C, Burns Decl. 2.)

In June 2013, the GRPD and the FBI signed the Memorandum of Understanding ("MOU") relating to the Task Force, which was in effect at the time of the incident.  (Ex. 2 to Burns Decl., MOU [hereinafter MOU].)  The Task Force's mission includes apprehending "dangerous fugitives where there is or may be a federal investigative interest."  (*Id.* ¶ 4.)  It focuses on violent criminals with active felony warrants.  (Trial Tr. Vol. 2, at 32.)  The FBI supervises the Task Force; an FBI supervisor is responsible for opening, monitoring, directing, and closing Task Force investigations.  (MOU ¶¶ 6, 11.)  The FBI maintains control over the Task Force's membership.  (*Id.* ¶ 66.)  The MOU provides that local and state law-enforcement personnel can be federally deputized.  (*Id.* ¶¶ 48-49.)  It also contemplates that Task Force

---

*Life Ins. Co. of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999) and other cases); *accord Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680-81 (6th Cir. 2011).

[2] The cited portions of the trial transcript and trial exhibits are attached to this Brief as Exhibit B.

members sued for common law torts arising out of their work can seek certification that they were acting within the scope of federal employment for purposes of the FTCA. (*Id.* ¶ 72.) Finally, it provides that Task Force members sued for constitutional claims under § 1983 or *Bivens* can request that the U.S. Department of Justice (the "DOJ") defend them under 28 C.F.R. § 50.15, which covers "federal employees." (*Id.* ¶ 73 (citing 28 C.F.R. § 50.15 (DOJ representation) and § 50.16 (private representation at federal expense).)

As part of these federal Task Force operations, the FBI opened an investigation into fugitive Aaron Davison, who was the subject of a state warrant for felony home invasion. (Ex. C, Burns Decl. ¶ 5; Am. Compl. ¶¶ 18-19, ECF No. 30, PageID.108-09.) Officer Allen created a document containing the basic information they had regarding Davison, including his photograph from the Secretary of State, his birth date, his age, the fact that he wears glasses and has a thin build, and the address he had robbed. (Trial Tr. Vol. 2, at 36; Trial Tr. Vol. 2, Ex. 1.)

Officer Allen subsequently created an updated sheet with a more recent photograph from Davison's Facebook page, and information he and Agent Brownback developed from speaking to local business owners and residents. (Trial Tr. Vol. 2, at 38, 39-41; Trial Tr. Vol. 2, Ex. 2.) This updated sheet included a height range, from 5'10" to 6'3",[3] and noted the following: Davison had been seen recently at a Ralph's Supermarket near Leonard Street and Alpine Avenue, at a Shell gas station in the same area, and walking westbound on Leonard Street from Leonard Street and Alpine Avenue. (Trial Tr. Vol. 2, at 40-41; Trial Tr. Vol. 2, Ex. 2.)

The Officers also learned during their interviews that Davison was usually seen in this area between approximately 2 and 4 pm each day. (Trial Tr. Vol. 2, at 41.) The gas station

---

[3] During their interviews, the Task Force Officers had learned that Davison likely was shorter than the height he provided the Secretary of State. (Trial Tr. Vol. 2, at 40-41.)

employee informed them that Davison typically came in and bought a pop during that time.  (*Id.* at 46-47.)  Clerks at Ralph's Supermarket had told them that Davison had short dark hair, was thin, wearing prescription-type glasses and looked more like the recent Facebook photograph than the older Secretary of State photograph.  (*Id.* at 46.)  On July 17, 2014, Davison had been seen wearing jeans and a white tank top.  (*Id.* at 51.)

Following their information, on July 18, 2014, the Officers were in the field wearing plain clothes and looking for Davison in the area of Leonard and Alpine.  (Trial Tr. Vol. 2, at 41-42 46, 48, Vol. 3, 47-49; Ex. D, Holland Decl. (attaching GRPD Incident Report No. 14-062446).)  Officer Allen had a neck badge, his gun, his magazine pouch, his flashlight, and a second badge next to his gun—all of which were visible.  (Trial Tr. Vol. 2 at 43-46, 54.)  Agent Brownback likewise wore a neck badge and a gun.  (*Id.* at 222-23.)

### *The Task Force Officers' encounter with King*

At around 2:30 p.m., the Officers saw an individual (later identified as King) with a thin build, within Davison's height range, with short dark hair and glasses, walking on foot in the area they expected Davison to be walking.  (Trial Tr. Vol. 2, at 50-51.)  The individual was wearing jeans, which also matched up with information the Officers had obtained.  (*Id.* at 51.)

Indeed, King admitted in his circuit court filings that he "matched the general description of Fugitive Davidson [sic]," "had a similar general description to the suspect," and "met the general description."  (Ex. E, King's Br. in Supp. of Mot. to Dismiss 1, 3, 4.)  After watching the individual for some time, the Officers felt that he bore a resemblance to the fugitive Davison and there was "a good possibility" that he was Davison.  (Trial Tr. Vol. 2, at 51, 223.).  They pulled into a parking lot and parked perpendicular to the sidewalk the individual was using.  (*Id.* at 53.)  As the individual walked up to the vehicle, they exited and made contact with him.  (*Id.* at 53.)

5

Both Agent Brownback and Officer Allen contend that they identified themselves verbally (*id.* at 53, 225); King asserts that they did not verbally identify themselves.[4]  For purposes of this motion only, the Federal Defendants will take King's allegations in this regard and others as true.

King acknowledges that the Officers had "badges around their chest, and [he] assumed some sort of authority" (Trial Tr. Vol. 3, at 50; *accord* Am. Compl. ¶ 25, ECF No. 30, PageID.110 (the Officers "were wearing lanyards with badges).)[5]  The Task Force Officers asked King his name and he said "James." (Trial Tr. Vol. 3, at 48-49; Am. Compl. ¶ 30, ECF No. 30, PageID.110.)  He refused to provide a last name.  (Trial Tr. Vol. 3, at 48-49; Am. Compl. ¶ 30, ECF No. 30, PageID.110.)  They then asked him for identification and he "said that he did not have any."  (Am. Compl. ¶ 30, ECF No. 30, PageID.110; Ex. E, King's Br. in Supp. of Mot. to Dismiss 2.)  To the contrary, King did have identification in his wallet, as he admitted at trial.  (Trial Tr. Vol. 3, at 60.)  The Officers asked him if he had a weapon and he acknowledged that he had a pocketknife, though he denied it was a weapon.  (*Id.* at 50.)  King was told to stand against the Officer's vehicle and put his hands on top of his head, and he initially complied.  (Trial Tr. Vol. 3, at 50; Am. Compl. ¶¶ 35-36, ECF No. 30, PageID.110.)  The Officers patted him down, first removing the knife.  (Trial Tr. Vol. 3, at 50-51.)  They informed King they were "looking for someone."  (*Id.* at 51.)

---

[4] King testified that the Task Force Officers did not identify themselves with language, but that he was not saying that the Officers were being untruthful when they testified that they identified themselves.  (Trial Tr. Vol. 3, at 65.)
[5] A freeze frame of bystander video immediately after the incident shows what both Officers were wearing and their badges are clearly visible around their necks. (Trial Tr. Ex. 8, at 00:00:45.)  The other witnesses also testified that the Task Force Officers were wearing badges. (*E.g.*, Trial Tr. Vol. 2, at 123.)

During the pat down, Officer Allen felt what appeared to be a wallet in King's pocket. (*See* Am. Compl. ¶ 34, ECF No. 30, PageID.110.)[6] Officer Allen commented on the wallet and questioned how there could not be identification in it. (Ex. E, King's Br. in Supp. of Mot. to Dismiss 2.) King testified that one of the Officers—he did not know who at the time of his trial testimony—removed the wallet. (Trial Tr. Vol. 3, at 51.) Both Officers testified that it was Officer Allen who touched the wallet. (Trial Tr. Vol. 2, at 64, 94-95, 227.)[7] The wallet was removed as part of the Officers' pat down. (*Id.* at 227, 243, 246; Trial Tr. Vol. 3, at 7-11.)

When Officer Allen removed the wallet, King yelled out and tried to turn and to face the Officers. (Trial Tr. Vol. 3, at 51-52.) It was apparently not until then that King contends he became suspicious that they were not legitimate law-enforcement officers. (*Id.* at 51.) King next claims that the Officers pushed him against their vehicle and that Agent Brownback grabbed his wrist. (Am. Comp. ¶ 42, ECF No. 30, PageID.111; Ex. E, King's Br. in Supp. of Mot. to Dismiss 2.) King then swung his wrist toward Agent Brownback. (Ex. E, King's Br. in Supp. of Mot. to Dismiss 2; Trial Tr. Vol 3, at 63) and tried to turn and run. (Trial Tr. Vol. 3, at 52, 63; Am. Compl. ¶ 43, PageID.111.) Officer Allen threw King to the ground. (Trial Tr. Vol. 3, at 52 ("I tried to run away . . . and was thrown to the ground.").)

At that point, "a fight ensued." (*Id.* at 53.) The Officers were trying to hold King down and he was trying to get away. (*Id.*) Agent Brownback managed to get a handcuff on one of King's wrists. (*Id.* at 72-73; Trial Tr. Vol. 2, at 229.) King kept fighting with the hand that had the handcuff on it (Trial Tr. Vol. 2, at 229), and he admitted that he may have hit the Officers

---

[6] The Amended Complaint incorrectly asserts that Agent Brownback patted the wallet; the trial testimony makes clear that Officer Allen was the one who performed the pat down and made contact with the wallet. (*Cf.* Am. Compl. ¶ 39, ECF No. 30, PageID.111 (asserting that Officer Allen removed the wallet).)

[7] There is no allegation that either Officer opened or searched the wallet during the incident.

with the handcuff (albeit unintentionally) as he was attempting to flee.  (Trial Tr. Vol. 3, at 73.)

King also testified that he began yelling for help and asking bystanders to call the police during

the fight.  (*Id.* at 53.)  Officer Allen placed him in what King described as a "headlock," at which

point King claims he had trouble breathing.  (*Id.*)  He testified that he lost consciousness for "10-

15 seconds."[8]  (*Id.* at 53-54.)  According to King's testimony, the Officers were unable to subdue

the now-unconscious man during that time period, and he came to, despite that Officer Allen's

arm allegedly was "pressing tighter and tighter" around his neck as he regained consciousness.

(*Id.* at 54.)

King then "bit into [Officer Allen's] bicep." (Trial Tr. Vol. 3, at 54; Am. Compl. ¶ 48,

ECF No. 30, PageID.111.)  It was not until after King bit into Officer Allen's bicep that Officer

Allen struck King.  (Trial Tr. Vol. 3, at 54.)  Officer Allen testified that he could feel the bite

tear his flesh.  (Trial Tr. Vol. 2, at 65-66.)  He then punched King in the head "several times,"

according to King.  (Trial Tr. Vol. 3, at 55.)  Officer Allen testified that this was to get King to

stop biting.  (Trial Tr. Vol. 2, at 67.)  From King's perspective, after this, he was unable to move

and was cuffed.  (Trial Tr. Vol. 3, at 55.)

The two Officers were unable to subdue King by themselves.  They yelled out to

bystanders for help, and asked for them to call for additional officers.  (Trial Tr. Vol. 2, at 104,

136.)  Johnny Pardee, a bystander, testified that he saw the two Officers struggling with King

and that the Officers were stating that they were cops and were asking for help.  (*Id.* at 122-23,

125.)  King's legs were flailing everywhere and he was kicking, and "going pretty crazy on the

ground." (*Id.* at 123, 125-26.)  Pardee came to assist; King kicked him in the face.  (*Id.* at 125.)

---

[8] As discussed below, King later told hospital staff that he did not lose consciousness.  (Ex. A,
King's Medical Records, KING-000054.)

Pardee grabbed King's legs and held them. (*Id.* at 123.) It was only then that the Officers were able to subdue and cuff King. (*Id.* at 76, 123, 231-32.)

Another bystander, Leah Buchanan, saw the end of the altercation but did not see the beginning. (*Id.* at 129.) She testified that she saw the badges around the Officers' necks. (*Id.*) They were telling King to stop resisting and were asking for help. (*Id.* at 136.) While her initial assessment about seeing Officer Allen hit King in the head was not favorable, she saw this from a distance. (*Id.* at 130, 133-34, 151, 156.) She testified that after she learned that King had been biting Officer Allen's bicep, this changed her mind about his actions.[9] (*Id.*)

After the Officers and Pardee finally subdued King, uniformed GRPD officers arrived. One of those officers, Officer Glen Brower, accompanied King to the hospital for examination. (*Id.* at 192.) Officer Brower testified that during this transport, King told him that the Officers had told him that they were detectives, but that he thought he was being robbed and that anyone could buy a badge and say they are a detective. (*Id.*) King testified that he did not remember the ambulance ride, but he had no reason to believe or disbelieve Officer Brower's recounting of his statements. (Trial Tr. Vol. 3, at 70.)

At the hospital, the emergency room physician documented that King "state[d] that he did not trust that the officer was actually undercover police and admit[ted] to fighting and resisting." (Ex. A, King's Medical Records, KING-000054-55.) King further told hospital staff that "he did bite 1 of the officers." (*Id.*) While King complained of facial discomfort, the record indicates that he "denies any loss of consciousness." (*Id.*) Tests were negative for any significant

---

[9] King quotes Buchanan's video comments in his Amended Complaint (PageID.112-13), but ignores the fact that once this late-arriving witness understood the context, including King's biting of Officer Allen, she changed her view regarding the force Officer Allen used.

injuries; he had some contusions and superficial abrasions, but no fractures. (*Id.*) The hospital released him to the custody of the GRPD with some Motrin. (*Id.*)

Officer Allen's bite injury was visible the day of the incident. (Trial Tr., Ex. 6.) And its extent and severity became more evident in the days that followed. (Trial Tr., Ex. 3, 4.) He also reported multiple blows to the back of his head, and suffered a concussion. (Trial Tr. Vol. 2, at 68-72.) Agent Brownback's injuries were less severe and included a sore chin and some scrapes. (*Id.* at 232-33.)

### *The criminal trial*

The Kent County Prosecutor charged King with (1) assaulting, battering, wounding, resisting, obstructing, opposing, or endangering Officer Allen and causing a bodily injury requiring medical attention, Mich. Comp. Laws § 750.81d(2); (2) assault with a dangerous weapon (the handcuffs), Mich. Comp. Laws § 750.82; and (3) assaulting, battering, wounding, resisting, obstructing, opposing or endangering Agent Brownback, Mich. Comp. Laws § 750.81d(1). (Trial Tr. Vol. 2, at 14-17; Trial Tr. Vol. 3, at 141-45.) King waived his preliminary examination. King moved to dismiss the charges, arguing that he had a right to resist the Task Force Officers because they lacked probable cause to arrest him, among other reasons. (Ex. E, King's Br. in Supp. of Mot. to Dismiss at 2-5.) His motion was denied and the case proceeded to trial.

At trial, Officer Allen, Agent Brownback, and King testified, along with several bystanders and GRPD Officer Brower. At the close of the prosecution's case, King moved for a directed verdict, but the judge denied the motion, stating that, "[i]t's this Court's opinion that there is sufficient evidence presented here, if believed by the jury, to sustain verdicts beyond a reasonable doubt on each one of the three counts." (Trial Tr. Vol. 3, at 43.)

**MOTION STANDARDS**

*Rule 12(b)(6)*

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal where the complaint fails to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To state a valid claim, a complaint must contain . . . allegations respecting all the material elements to sustain recovery under some viable legal theory." *LULAC v. Bredsen,* 500 F.3d 523, 527 (6th Cir. 2007). A court should dismiss a claim under Rule 12(b)(6) when the plaintiff has failed to plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (1009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim is facially plausible where it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the conduct alleged." *Id*. While the court should accept the complaint's factual allegations as true for purposes of Rule 12(b)(6), "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and the court need not accept legal conclusions, including those that are couched as factual allegations. *Id.*

The complaint must do more than just make an "unadorned the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 768 (citing *Twombly*, 550 U.S. at 555). The plaintiff is required to plead "'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Twombly*, 550 U.S. at 555 (quoting Fed. R. Civ. P. 8(a)(2)). His complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570). This requires "more than a sheer possibility that a defendant has acted unlawfully," and instead is satisfied only when a plaintiff pleads more than "facts that are merely consistent with a defendant's liability." *Id.* (citations and quotations omitted). Indeed, a complaint must have sufficient factual allegations

11

"to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citations omitted); *accord id.* at 556 (factual allegations must "possess enough heft to 'sho[w] that the pleader is entitled to relief.'" (internal citation omitted)). A defense may serve as a basis for a motion to dismiss for failure to state a claim "where the statement of the claim affirmatively shows that the plaintiff can prove no set of facts that would entitle him to relief" *Gibson v. Am. Bankers Ins. Co.*, 289 F.3d 943, 946 (6th Cir. 2002) (quotations omitted).

### *Rule 12(b)(1) Standard*

Dismissal under Federal Rule of Civil Procedure 12(b)(1) is proper if the plaintiff cannot meet his burden of establishing subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1); *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A challenge to subject-matter jurisdiction under Rule 12(b)(1) may be a facial attack, which challenges the sufficiency of the plaintiff's factual allegations; or a factual attack, which challenges the fact of subject-matter jurisdiction. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994); *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 324 (6th Cir. 1990). A facial attack is a challenge to the sufficiency of the complaint itself. *Ritchie*, 15 F.3d at 598. In resolving a factual attack, the district court may consider declarations, affidavits, and other evidence presented by the parties to determine whether it has jurisdiction. *Id.* Where a plaintiff improperly seeks to sue a federal officer under § 1983, the Court lacks subject-matter jurisdiction over the suit. *Amoakohene v. Bobko*, 792 F. Supp. 605, 607 (N.D. Ill. 1992).

### *Rule 56 Standard*

Defendants' position is that all of their arguments are properly addressed under Rule 12(b)(1) or 12(b)(6). However, to the extent that the Court deems it necessary, Defendants alternatively request summary judgment under Federal Rule of Procedure 56. *See* Fed. R. Civ. P. 12(d); *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). Summary judgment is

appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)).

The moving party has the initial burden of identifying the portion of the record that demonstrates there are no genuine issues of material fact as to an essential element of the claim. *Celotex v. Catrett*, 477 U.S. 317, 322-26 (1986); *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 613 (6th Cir. 2003). To withstand summary judgment, the non-moving party then must produce specific facts that demonstrate a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The court views the evidence in the light most favorable to the non-moving party. *Sutherland*, 344 F.3d at 613. But the non-moving party "may not rest upon its mere allegations." *Id.* "The existence of a mere scintilla of evidence in support of the non-moving party's position" is not sufficient to withstand summary judgment. *Id.* The non-moving party must present "significant probative evidence" to show that "there is more than some metaphysical doubt as to the material facts." *Id.* There must be evidence upon which the fact finder could reasonably find for the non-moving party. *Id.*

## ARGUMENT

**I.     King does not have § 1983 claims against Agent Brownback or Officer Allen.**

Section 1983 applies only to actions taken under color of state law. 42 U.S.C. § 1983. Here, Agent Brownback and Officer Allen were acting under the color of federal law, in their capacities as federal agents. Agent Brownback is a Special Agent employed by the FBI and assigned to its Grand Rapids Resident Agency Violent Crimes/Fugitive Safe Streets Task Force. (*See* Am. Compl. 2, 3, ECF No. 30, PageID.107-08; Ex. C, Burns Decl. 1-2.) Officer Allen is a federally deputized Special Deputy U.S. Marshal, also working full time with the Task Force. (*See* Am. Compl. 3, ECF No. 30, PageID.108; Ex. C, Burns Decl. 1-2.) The FBI provides

13

Officer Allen with office space, a cellular telephone, a radio, a vehicle, and other law-enforcement equipment. (Ex. C, Burns Decl. 1-2.)

The Task Force includes FBI agents, like Agent Brownback, and members of the GRPD, like Officer Allen. (Ex. C, Burns Decl. 1-2.) The MOU forming the Task Force makes it clear that the Task Force is supervised by the FBI, and that the FBI supervisor was responsible for opening, monitoring, directing, and closing the Task Force's investigations. (*Id.* at 2.) It also explicitly provides that Task Force members sued for claims under § 1983 or *Bivens* can choose to seek representation from the DOJ under 28 C.F.R. § 50.15, which covers "federal employees." *See* 28 C.F.R. § 50.15(a). The Task Force's mission includes "the apprehension of dangerous fugitives where there is or may be a federal investigative interest." (*Id.* at 2.)

On July 18, 2014, the Task Force had an open Preliminary Investigation related to fugitive Aaron Davison. (Ex. C, Burns Decl. 2-3.) As part of that federal investigation, the Officers came into contact with King. (*See id.*; Am. Compl. 3-7, ECF No. 30, PageID.108-12.)

Accordingly, because Agent Brownback and Officer Allen were federal officers engaged in a federal investigation, § 1983 does not apply. *Majors v. City of Clarksville*, 113 F. App'x 659, 659 (6th Cir. 2004) (§ 1983 claim against federal task force agents was "in reality a *Bivens* claim"); *Pike v. United States*, 868 F. Supp. 2d 667, 677 (M.D. Tenn. 2012) (claims arising from federal task force's actions "are plainly Bivens claims, not § 1983 claims"); *Aikman v. Cnty. of Westchester*, 691 F. Supp. 2d 496, 499 (S.D.N.Y. 2010) (same); *Ivey v. Lyman*, No. 902CV470, 2005 WL 1397134, at *2 (N.D.N.Y. June 1, 2005) (same).

The fact that a state arrest warrant was involved does not change this analysis. *See Love v. Mosley*, No. 1:14-CV-281, 2015 WL 5749517, at *8 (W.D. Mich. 2015), *adopted in* 2015 WL 5749508 (W.D. Mich. 2015); *Lawson v. McNamara*, 438 F. App'x 113, 114, 116 n.2 (3d Cir.

14

2011) (claims against task force officers for excessive force while they were attempting to arrest the plaintiff for "attempted murder and other state offenses" were *Bivens* claims, not § 1983 claims); *Amoakohene v. Bobko*, 792 F. Supp. 605, 608 (N.D. Ill. 1992) (dismissing § 1983 claims against task force officers, related to arrest for a municipal code violation, for lack of subject-matter jurisdiction).

In short, Count 1, which alleges § 1983 claims against Agent Brownback and Officer Allen, should be dismissed for failure to state a claim and lack of subject-matter jurisdiction. *See Amoakohene*, 792 F. Supp. at 608 (dismissing § 1983 claims for lack of subject-matter jurisdiction). Alternatively, the Officers respectfully request that the Court grant them summary judgment.

## II. Agent Brownback and Officer Allen are entitled to qualified immunity.

### A. General principles of qualified immunity, which is a threshold question.

Qualified immunity protects law-enforcement officers from suit in their individual capacities for actions taken in the line of duty unless their conduct violates clearly established constitutional rights of which a reasonable officer in their position would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity applies to claims under both *Bivens* and § 1983. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (*Bivens*); *Meals v. City of Memphis*, 493 F.3d 720, 729 (6th Cir. 2007) (§ 1983). The doctrine provides a true "*immunity from suit* rather than a mere defense to liability[.]" *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *Saucier v. Katz*, 533 U.S. 194, 200 (2001), *overruled on other grounds*, *Pearson v. Callahan*, 555 U.S. 223 (2009). It protects "all but the plainly incompetent or those who knowingly violate the law." *Saucier*, 522 U.S. at 202.

The purpose of qualified immunity is to allow government officials to carry out their duties without fear of personal liability or harassing litigation. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The doctrine recognizes that "police officers, acting reasonably, may err," and that "it is better to risk some error and possible injury from such error than not to decide or act at all." *Dunigan v. Noble*, 390 F.3d 486, 490-91 (6th Cir. 2004) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 242 (1974)).

Because the doctrine provides for immunity from suit, a defendant's entitlement to qualified immunity is a threshold question, and the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation," including discovery. *Mitchell*, 472 U.S. at 526. As a result, the immunity is "effectively lost if a case is erroneously permitted to go to trial." *Id.*

Qualified immunity generally applies unless "the contours of the asserted right were sufficiently clear that every reasonable official would have understood that what he was doing violated that right." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (citing *Ashcroft*, 131 S. Ct. at 2083). In a number of cases, Sixth Circuit panels have employed a three-part test for qualified immunity that asks: (1) whether "the officer's conduct violated a constitutional right," (2) "whether the constitutional right was 'clearly established' at the time of the violation;" and (3) "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Williams v. Ingham*, 373 F. App'x 542, 546-47 (6th Cir. 2010); *accord Meals*, 493 F.3d at 729; *Feathers v. Aey,* 319 F.3d 843, 848 (6th Cir. 2003); *cf. Pearson,* 555 U.S. at 236 (court need not address two-part test in sequence). Other Sixth Circuit panels have employed a two-part test,

16

and the Court of Appeals has noted but not yet resolved the inconsistency.  *See generally Occupy Nashville v. Haslam*, 769 F.3d 434, 442 n.16 (6th Cir. 2014) ("'Regardless of how the test is articulated, a defendant will only be held liable if his or her actions were objectively unreasonable in view of clearly established law.'")  The plaintiff bears the ultimate burden of demonstrating that the defendant is not entitled to qualified immunity.  *Cockrell v. City of Cincinnati,* 468 F. App'x 491, 495 (6th Cir. 2012) (once defendant claims qualified immunity, plaintiff "must show that the official violated a right so clearly established that every reasonable official would have understood that what he was doing violated that right") (quotation omitted); *Davenport v. Causey*, 521 F.3d 544, 550 (6th Cir. 2008).

Here, King's claims fail all three parts of the qualified-immunity test.

**B.      Agent Brownback and Officer Allen did not violate King's constitutional rights.**

*1.      The stop*

There was nothing improper about stopping King to confirm whether he was the fugitive the Officers sought.  The law allows police officers to contact citizens and briefly ask them questions even if the officers have no articulable reason for doing so.  *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008).   They also can temporarily detain citizens when they have a reasonable suspicion based on articulable facts that criminal activity is occurring—a so-called *Terry* stop.  *Id.* at 380; *Terry v. Ohio,* 392 U.S. 1, 30 (1968).  An officer can conduct such a temporary investigative seizure if he "reasonably suspects that the person apprehended is committing, or has committed a criminal offense." *Arizona v. Johnson*, 555 U.S. 323, 326 (2009).

In determining whether a *Terry* stop is permissible, the court looks at the totality of the circumstances to determine if the officer has a "'particularized and objective' basis for

17

suspecting legal wrongdoing." *Pearce*, 531 F.3d at 380 (quoting *United States v. Arvizu*, 534

U.S. 266, 273 (2002)).  The court is to view "the evidence in support of reasonable suspicion

using a common sense approach, as understood by those in the field of law enforcement."

*United States v. Clay*, 181 F. App'x 542, 544 (6th Cir.2006).  Officers may "draw on their own

experience and specialized training to make inferences from and deductions about the cumulative

information available to them that 'might well elude an untrained person.'" *Pearce*, 531 F.3d at

380.  The likelihood of criminal activity does not need to rise to the level of probable cause, and

the reasonable suspicion standard is "considerably short" of a preponderance of evidence.  *Id.*;

*accord Alabama v. White*, 496 U.S. 325, 330 (1990).  Reasonable suspicion "need not rule out

the possibility of innocent conduct." *Navarette v. California*, __ U.S. __, 134 S. Ct. 1683, 1691

(2014) (quotations omitted); *see also United States v. Hilton*, 625 F. App'x 754, 758 (6th Cir.

2015).  It requires only "a moderate chance of finding evidence of wrongdoing." *Hilton,* 625 F.

App'x at 758.

 Merely requesting identifying information in the course of a *Terry* stop does not violate

the Fourth Amendment. *United States v. Fernandez*, 600 F.3d 56, 60-61 (1st Cir. 2010) (citing

*Hiibel v. Sixth Judicial Dist. Ct.*, 542 U.S. 177, 185 (2004) ("In the ordinary course a police

officer is free to ask a person for identification without implicating the Fourth Amendment."));

*INS v. Delgado*, 466 U.S. 210, 216 (1984) ( "[I]nterrogation relating to one's identity or a request

for identification by the police does not, by itself, constitute a Fourth Amendment seizure.");

*Loza v. Mitchell*, 766 F.3d 466, 476 (6th Cir. 2014) (during a stop, officer can make reasonable

inquiries, including questions about the person's identity); *Baker v. Smiscik*, 49 F. Supp. 3d 489,

498-99 (E.D. Mich. 2014) ("After the officers disarmed Plaintiff, they asked for his

identification, which is both standard police practice and a request that raises no Fourth

Amendment concern.")  This is true even if state law does not require an individual to provide identification to an officer. *Combs v. City of Birmingham*, No. 12-14528, 2013 WL 4670699, at *1, *9 (E.D. Mich. Aug. 30, 2013) (even though Michigan lacks a law requiring citizens to provide identifying information to an officer during a lawful *Terry* stop, the officers' demand for proof that the plaintiff was 18 was lawful; "demanding and obtaining certain identifying information from a suspect may be a critical and legitimate component to a *Terry* stop").

In *Hiibel*, the Supreme Court stated that "[o]btaining a suspect's name in the course of a *Terry* stop serves important government interests" because "[k]nowledge of identity may inform an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder." 542 U.S. at 186.  In addition, an individual's refusal to provide proof of identification can compound reasonable officers' existing concerns that the individual may be the person for whom they are looking or may be engaged in criminal activity. *See Kowolonek v. Moore*, 463 F. App'x 531, 535 (6th Cir. 2012) (plaintiff's interaction with officer, including statement that he lived at residence but did not know where identification was, provided support for reasonable suspicion); *Chesney v. City of Jackson*, __ F. Supp.3d __, 2016 WL 1090372, at *16 (E.D. Mich. Mar. 21, 2016) ("[R]efusal to comply with a police officer's request for identification, without more, may provide probable cause to arrest the non-compliant individual for resisting and obstructing a police officer in the performance of his duties.")

Here, the Officers stopped King because they thought he might be the fugitive based on his appearance and conduct.  They had studied King with binoculars and driven past him to get a closer look. (Trial Tr. Vol 2 at 51, 53.)  It is indisputable that King matched the description of fugitive Davison; King admitted as much during the criminal proceedings.  (Ex. E, King's Br. in Supp. of Mot. to Dismiss 1, 3, 4.)  King was the same race and thin build, was a young man, had

short dark hair consistent with recent witness interviews about Davison and the Facebook photograph, was wearing glasses like Davison, and was within the height range the Officers had obtained from witnesses who had seen Davison very recently. (Trial Tr. Vol. 2, at 50-51; Trial Tr. Ex. 1, 2.) In addition, King was in the area Davison frequented, walking in the area that the Officers had been told Davison was last seen walking, and wearing clothing that was similar to the most recent description of Davison. (Trial Tr. Vol. 2, at 46-48, 50-51.) It was also the same time of day that Davison was known to frequent the intersection towards which King appeared to be walking. (*Id.*) All of this information was articulable, particularized, and objective; and based on it, the Officers developed a reasonable suspicion that King was the fugitive. The mere fact that they did not have a more definitive description does not render their efforts unreasonable based on the information they did have. *Dorsey v. Barber*, 517 F.3d 389, 397 (6th Cir. 2008) (physical description of the suspects as two black males, one with corn rows, and one with a white jersey and one with a blue jersey was not definitive, but the information available supported the formation of reasonable suspicion, and the location of their seizure was "consistent with the suspects' anticipated movement").

Even if in retrospect there are differences between the physical features of Davison and King, the Officers should not be faulted for failing to recognize such differences in the moment. *Hill v. California*, 401 U.S. 797, 802-04 (1971); *Wrubel v. Bouchard*, 65 F. App'x 933, 938 (6th Cir. 2003) (even if description of suspect did not identify plaintiff's distinctive facial features, this did not make it unreasonable to conclude that the plaintiff was the suspect, and generic description was consistent with plaintiff); *United States v. Marshall*, 79 F. 3d 68, 69-70 (7th Cir. 1996) (district court properly rejected the defendant's argument that the police should have attempted to get a closer look at him or consulted additional mug shots before arresting him).

Whatever differences there were, they were not large, particularly in view of the most recent information the Officers had. *See Martinez v. City of New York*, 340 F. App'x 700, 701 (2d Cir. 2009) (difference of more than two inches in height, 20 pounds, and different skin tone were not enough to sustain false arrest claim); *Valdez v. United States*, 58 F.Supp.3d 795, 816 (given similarities in physical descriptions, there was sufficient probability that plaintiff was target, despite minor differences in height, age, and weight). The Court, with the benefit of hindsight and ample time for assessment and study of differences, cannot substitute its judgment for that of the Officers on the scene; they had to make a decision before the individual went on his way. *See Marshall,* 79 F.3d at 69 (requiring more verification would have allowed "golden moment to pass," as suspect could have fled).

Here, the Officers made reasonable efforts to observe the individual before stopping him, including using binoculars to look at his face and driving by several times. (Trial Tr. Vol. 2, at 51, 53.) They reasonably believed that King was the suspect and their mistake was reasonable under the circumstances. As discussed below, King's conduct did not dispel this suspicion; it heightened it. The Court must give some "latitude for honest mistakes" that officers may make in the difficult task of finding and arresting fugitives. *See Maryland v. Garrison*, 480 U.S. 79, 87 (1987).

### 2. *The pat-down*

The decision to pat down King for weapons was also reasonable. Once an officer makes a permissible *Terry* stop, he can conduct a "reasonable search for weapons . . . where he has reason to believe that he is dealing with an armed and dangerous individual." *Pearce,* 531 F.3d at 380 (quoting *Terry,* 392 U.S. at 27.) Officers may take any steps that are "reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a

21

*Terry*] stop." *United States v. Davis*, 331 F. App'x 356, 360 (6th Cir. 2009) (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985); *see also United States v. Muhammed*, 604 F. 3d 1022, 1026 (8th Cir. 2010). Finally, courts recognize that officers face stressful and uncertain situations that require split-second decisions. *Michigan v. Long*, 463 U.S. 1032, 1052 (1983) (a *Terry* investigation "at close range" requires an officer to "make a quick decision as to how to protect himself and others from possible danger . . . officers are not required to "adopt alternative means to ensure their safety in order to avoid the intrusion involved in a *Terry* encounter").

The scope of a *Terry* search is "confined to a search reasonably designed to discover concealed weapons." *Muhammed*, 604 F.3d at 1026. An officer may, however, seize other evidence discovered during a pat-down search for weapons as long as the search "stays within the bounds marked by *Terry*." *United States v. Walker*, 181 F.3d 774, 778 (6th Cir. 1999) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993)).

To arrest King or do a further search of his person beyond the weapons search, the Officers needed to have "probable cause to believe that a criminal offense has been or is being committed." *Pearce,* 531 F.3d at 380. There is probable cause if the facts and circumstances the officer knows "warrant a prudent man in believing that an offense has been committed." *Id.* "Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence . . . have no place in the [probable-cause] decision. All we have required is the kind of fair probability on which reasonable and prudent [people,] not legal technicians, act." *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013) (citations and quotations omitted).

Here, the Officers believed that King was the fugitive, Davison, who was wanted for home invasion and who had been evading apprehension up to that point. When they asked King if he had any weapons, he admitted to having a knife. (Trial Tr. Vol. 3, at 50.) It was not

unreasonable for them to search for weapons, and they in fact found a knife during the search. As they continued the pat-down, Officer Allen also noticed what appeared to be a wallet and inquired about it. (Trial Tr. Vol. 2, at 64, 94-95, 227; Trial Tr. Vol. 3, at 51.)

Even assuming Officer Allen removed the wallet, he was well within the bounds of constitutional conduct in doing so. At that point, the Officers had more than mere reasonable suspicion that King was the fugitive. In addition to King's appearance, location, and mode of travel, he had refused to identify himself fully and denied having identification. (Trial Tr. Vol. 3, at 48-49; Am. Compl. ¶ 30, ECF No. 30, PageID.110.) It was reasonable for the Officers to view this behavior as highly suspicious and indicative of him being the fugitive. *See, e.g.*, *Smiscik*, 49 F. Supp. 3d at 498-99 (reasoning that plaintiff's failure to identify himself or produce identification "only compounded the concern that Plaintiff may be engaged in a criminal activity"); *Baker v. Schwarb*, 40 F. Supp. 3d 881, 891 (E.D. Mich. 2014) (including plaintiffs' evasive answers, when asked what they were doing, as part of the officers' reasonable suspicion).

This is true notwithstanding King's allegation that the Officers had not verbally identified themselves as law enforcement. He knew they had badges around their necks (Am. Compl. ¶ 25, ECF No. 30, PageID.110) and he "assumed some sort of authority" (Trial Tr. Vol. 3, at 50), but, nevertheless, he had refused to state his last name and lied about whether he had identification. (*Id.* at 49, 60, 71-72; Am. Compl. ¶¶ 29-32, ECF No. 30, PageID.110.) King had complied with their initial request to put his hands on his head and stand against their vehicle, which anyone would recognize as a standard police procedure. (Trial Tr. Vol. 3, at 50-51.) The Officers had asked him about weapons—another standard police inquiry—and he had admitted having a knife. (*Id.* at 50.) He had allowed them to pat him down and remove the knife. (*Id.* at 52.)

23

None of this would have caused any reasonable officer to suspect that King doubted they were

law enforcement.  When Officer Allen felt what appeared to be a wallet, there was even more

reason to believe that King was the fugitive, in that it appeared that he likely had lied about

having identification, in violation of 18 U.S.C. § 1001[10] (lying to federal officers) and in their

minds further enhanced the likelihood that King was the suspect they sought.  As a result, they

had probable cause to arrest him at that time, which would include the right to take out the

wallet.

In addition, the Officers had independently sufficient grounds under *Terry* to remove the

wallet as part of the weapons pat-down.  In *Muhammed*, the Eighth Circuit dealt with a similar

issue and concluded that the officer's pat-down and removal of a wallet during a *Terry* stop was

permissible.  604 F.3d 1027-27.  The officer there had testified that:

> during a pat-down search it is often difficult to tell whether an object is a weapon
> or might conceal a weapon merely by touching the object.  He stated that officers
> must generally "pull [the suspicious object] out and actually inspect it" to
> determine whether the object presents a safety concern.  He further testified that
> he was not certain what the hard four-inch long and three-inch wide object in
> Muhammad's pocket was, but he said that the item "felt like an object that could
> conceal a weapon."

*Id.* at 1026.  The court explained:

> [the Agent] then reasonably determined that the four-inch long and three-inch
> wide "hard object" in Muhammad's back pocket could be a weapon or could
> conceal a weapon that presented a threat to officer safety, such as a knife, box
> cutter or razor blade. . . .  Indeed, a dangerous weapon such as a small knife, box
> cutter or razor blade could have been concealed in the wallet itself.  Accordingly,
> this pat-down search stayed within the bounds of *Terry*, and the Fourth
> Amendment permitted Agent McCrary to remove the object from Muhammad's
> pocket.

---

[10] The arrest is lawful as long as there was probable cause to arrest "for some crime, even if the
crime for which there is probable cause is different from the stated crime of arrest."  *Amis v.
Twardesky*, 637 F. App'x 859, 861 (6th Cir. 2015).  Even if the Court considers this a relatively
minor offense, the Officers observed it and could lawfully arrest King for it.  *Atwater v. City of
Lago Vista*, 532 U.S. 318, 354 (2001).

*Id.* at 1027.

Similarly, here, Agent Brownback testified in the criminal case that, "[y]ou can't just stop once you find one weapon. You have to keep patting him down until you've done a thorough check to see if he has any weapons." (Trial Tr. Vol. 2, at 243.) The Officers testified that Officer Allen felt the bulge in King's pocket and reached in to see what it was. (*Id.* at 243.) Although the Officers thought it might be a wallet, removing the object was part of the check for weapons; they could not know for certain what the object was until they removed it from King's pocket. (*Id.* at 246.) As Agent Brownback testified, there are weapons that are designed to look like wallets, and he had seen examples of wallets that are designed to conceal weapons. (Trial Tr. Vol. 3, at 7-8, 10-11; Tr. Ex. 10.) It was when the Officers located this object—the apparent wallet—that they decided that they needed to "handcuff" and "restrain" King to determine his identity. (Trial Tr. Vol. 2, at 227-28; Trial Tr. Vol. 3, at 13.) But they were unable to complete the pat-down and identity check because of King's sudden reaction to the removal of the wallet, as he swung around towards Agent Brownback and attempted to flee. (Trial Tr. Vol. 3, at 19-20.) No one opened the wallet during the incident.

The fact that the Officers later learned that King was not the fugitive Davison does not change the analysis. When law enforcement arrested a person other than the one they sought, the detention is nevertheless valid under the Fourth Amendment if the officer (1) had probable cause to arrest the individual sought; and (2) they reasonably believed that the person arrested was the person sought. *Hill*, 401 U.S. at 802. When considering whether an officer's mistake was reasonable under the circumstances, "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment." *Id*. at 804. In *Hill*, the Supreme Court noted among other things that the plaintiff fit the description of the person for whom they were

looking, with the exception of a couple of inches of height and ten pounds in weight, that the plaintiff's response to the officers "was not convincing," and that even though he claimed a different name than the suspect, "aliases and false identifications are not uncommon." *Id.* at 803-04. The officers in *Hill* had probable cause for the arrest despite that they arrested the wrong person. Here, there is no issue about whether the Officers had probable cause to arrest the fugitive Davison—there was a warrant for his arrest. And their belief that King was Davison was reasonable based not only on his appearance, location, manner of travel, but also because of his evasive conduct and his apparent lie about whether he had identification.[11]

### 3. *The excessive-force claims*

The Fourth Amendment prohibits an arresting officer from using excessive force during an arrest. *Thacker v. Lawrence Cnty.*, 182 F. App'x 464, 470-71 (6th Cir.2006). But King cannot establish that the Officers did so here. An officer has the authority to use "some degree of physical coercion or threat thereof" during the course of an arrest, and therefore "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 396 (1989); *accord Lee v. Hefner,* 136 F. App'x 807, 812 (6th Cir. 2005).

A Fourth Amendment claim alleging violation of a plaintiff's right to be free from excessive force is properly analyzed under an objective reasonableness standard. *See Graham,* 490 U.S. at 397. The court must carefully review the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to

---

[11] The Officers' suspicion proved correct; King lied when he said that the did not have identification, as he admitted at trial. (Trial Tr. Vol. 3, at 60.)

evade arrest by flight." *Id.* at 396. These factors are not exhaustive, and the ultimate question

focuses on "whether the totality of the circumstances justifies a particular sort of seizure." *Id.*

The standard requires a measure of deference to the officers' on-the-spot judgments about the

level of force they needed in the circumstances they faced. *See id.* at 396 ("The 'reasonableness'

of a particular use of force must be judged from the perspective of a reasonable officer on the

scene, rather than with the 20/20 vision of hindsight"). The court must make allowances "for the

fact that police officers are often forced to make split-second judgments—in circumstances that

are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a

particular situation." *Id.* at 396-97.

<b>a.   King cannot plead any plausible excessive force claims against<br>Agent Brownback</b>

As a preliminary matter, King has failed to allege any excessive force claim against

Agent Brownback that can survive a plausibility analysis. A plaintiff is required to allege with

particularity what each defendant did to violate the Constitution. *Marcilis v. Twp. of Redford*,

693 F.3d 589, 596 (6th Cir. 2012) (dismissing claims against federal agents for failure to allege

details of their personal involvement, and only making categorical or collective allegations

against them as Defendants); *Dorsey*, 517 F.3d at 399 (each defendant's liability must be

assessed individually, based on his or her own actions). There is no *Bivens* (or § 1983) liability

based on a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 678. To the

contrary, "each Government official . . . is only liable for his or her own misconduct." *Id.*

Nothing in King's Amended Complaint is sufficient to allege a plausible excessive force

claim against Agent Brownback. It is undisputed that Agent Brownback was not involved in the

alleged headlock and did not strike or otherwise use any excessive force against King. (Pl.'s

Response to Brownback and Allen's Pre-Mot. Conf. Req. 3, ECF No. 42, PageID.156

27

(acknowledging that that Agent Brownback was not involved in the head restraint or striking King).) The only conceivable force King could allege by Agent Brownback would be grabbing his wrist, going with him as Officer Allen took King to the ground, and attempting to put handcuffs on him and control his legs and arms. Under the circumstances alleged here—where King admits that he did not cooperate, turned on the Officers, swung his wrist at Agent Brownback, and attempted to flee from them—the minimal force that Brownback allegedly used cannot possibly state a plausible excessive force claim.

Given Agent Brownback's lack of unreasonable force, King apparently seeks to impute Officer Allen's alleged actions to Agent Brownback by arguing that Agent Brownback is responsible because he failed to intervene. (Pl.'s Response to Brownback and Allen's Pre-Mot. Conf. Req. 3, ECF No. 42, PageID.156 (citing *Landis v. Baker*, 297 F. App'x 453, 464 (6th Cir. 2008)).) But the court must assess Agent Brownback's liability "individually based on his own actions;" he must have actively participated in the excessive force at issue, supervised the officer who used it, or owed the plaintiff a duty to protect him from it. *Pollard v. City of Columbus*, 780 F.3d 395, 402 (6th Cir. 2015).

The *Landis* case on which King relies is inapposite because the suspect in that case was not actively resisting arrest or fleeing; he was not belligerent or even verbally resistant at the time of the officer conduct that lead to the suspect's death. 297 F. App'x at 461. In addition, the undisputed facts here demonstrate that that, unlike the officers in *Landis,* Agent Brownback did not have reason to believe that Officer Allen was using excessive force, or the opportunity or means to prevent him from using the force he used. *See Turner v. Scott*, 119 F. 3d 425, 429 (6th Cir. 1997). Where an officer is himself actively involved in a struggle to bring a suspect under control, and is so focused on that task that he either did not notice or was not in a position to

intervene, the plaintiff cannot sustain a claim based on failure to intervene. *Sheffey v. City of Covington,* 564 F. App'x 783, 793-94 (6th Cir. 2014).

Here, Agent Brownback was occupied with trying to get handcuffs on King and controlling King's legs during the struggle. (Trial Tr. Vol. 2, at 76, 228-29, 231.)  He was positioned near King's mid-section.  (*Id.* at 229.)  This was an intense and fast-moving struggle, and there was no time for him to try to observe or intervene in what Officer Allen was doing. *See Sheffey*, 564 F. App'x at 793-94.  Finally, given that Agent Brownback and Officer Allen still had not managed to control King before a third party came to their aid, it would have made no sense for Agent Brownback to try to stop Officer Allen's efforts to control King, which, as explained above and below, did not involve any gratuitous violence or obviously excessive force given that King was resisting and biting Officer Allen.

### b.  Taking King to ground after he swung towards Agent Brownback and tried to flee

To the extent that King has identified specific uses of force, none rise to the level of constitutional violations, and each was reasonable in the tense and rapidly evolving circumstances the Officers faced.  When King swung his arm towards Agent Brownback and attempted to flee—both of which he has admitted—the Officers did not act unreasonably or excessively in throwing him to the ground. (Trial Tr. Vol. 3, at 52 ("I tried to run away . . . and was thrown to the ground.").)  They already had probable cause to seize King based on their reasonable belief that he was the fugitive.  And the amount of force they used was not excessive under Sixth Circuit law, which allows this level of force in dealing with a suspect who is resisting and fleeing.

Numerous decisions from courts in the Sixth Circuit have rejected similar excessive force claims where officers allegedly threw suspects down or tackled them while they were fleeing or

29

resisting.  For example, in *Lawrence v. Bloomfield Township*, 313 F. App'x 743, 748 (6th Cir.

2008), the officers did not act unreasonably when they removed plaintiff from a home by

grabbing him, dragging him out, and throwing him onto a bench.  He was belligerently and

defensively responding to them, denying them access to a doorway, and they had no reasonable

option but "to grab him as best they could and drag him to the bench."  *Id*. at 747, 748.

    In *Thacker,* the officers took a rifle from a witness to a fire and requested that he calm

down, but he would not do so.  182 F. App'x at 472.  The officers attempted to reach for him in

order to restrain him and then wrestled him to the ground.  *Id*.  The Sixth Circuit concluded that

plaintiff could not sustain an excessive force claim despite his allegation that the officers tackled

him in making the arrest.  *Id*. "[T]he deputies were attempting the arrest of an upset, loud, and

swearing individual who refused to calm down . . . the application of force caused all three to fall

to the ground where a struggle ensued, but that . . . result does not render the actions of the

deputies unconstitutional."  *Id*.  Similarly, pushing the plaintiff into the officer's cruiser was not

excessive even though it resulted in a cut, as the plaintiff was struggling and heatedly swearing at

deputies.  *Id*.

    Finally, in *Ryan v. Hazel Park*, 279 F. App'x 335 (6th Cir. 2008), the Sixth Circuit

concluded that an officer was reasonable in using a straight-arm bar takedown to force to the

ground a suspect who had fled and who the officer could feel pulling away and tensing up, and

who the officer believed would resist.  *See also Williams v. Ingham*, 373 F. App'x 542, 548 (6th

Cir. 2010) (pulling plaintiff from vehicle and taking him to the ground was not excessive, as

suspect had fled and force was necessary to neutralize a potential safety threat and control a

noncompliant suspect); *Hefner*, 136 F. App'x at 812-13 (rejecting excessive force claim where

the plaintiff accused the officer of forcing him to the ground, placing a knee on his back, and

then using a wrist lock and handcuffs, as officer could have reasonably suspected that the

plaintiff committed a crime and was resisting arrest and attempting to flee).

Here, there is no dispute that King turned on the Officers, swinging his wrist at Agent

Brownback, and then attempted to flee.  (Ex. E, King's Br. in Supp. of Mot. to Dismiss 2, Trial

Tr. Vol. 3, at 52, 63.)  He has admitted each of these points explicitly.  At that point, the Officers

had every reason to believe that he was the fugitive and was attempting to escape, and they were

well within constitutional parameters to take him to the ground with a grab or a tackle.  King has

not alleged anything particularly violent about the way they took him to ground and has not

alleged that any of his injuries were related to this aspect of the incident.  There is no basis on

which to conclude that taking him to the ground was excessive.

### c.      Attempting to subdue King, who was resisting violently

After the Officers took King to ground, he continued to struggle and fight, and the

Officers' efforts to subdue him were not excessive under the circumstances King alleges or has

previously admitted.  The amount of force the Officers used was not even sufficient to subdue

King, who was resisting violently—it was only when a bystander assisted by holding King's legs

that they finally gained control.  (Trial Tr. Vol. 2, at 122-27.)  Once they had control, the force

stopped, and they took no gratuitous actions against King.

### (1)      The head or neck hold

The head or neck restraint Officer Allen used during the incident was a reasonable use of

force to subdue a suspect who was resisting violently and attempting to flee.  Even if we accept

for purposes of this motion King's assertions that it was a chokehold and caused him to lose

consciousness, it was not objectively unreasonable under the circumstances.  Alternatively,

King's testimony that the hold caused him to lose consciousness for 10-15 seconds is not at all

plausible and is contradicted by King's contemporaneous statements to his medical providers on

the day of the incident, denying any loss of consciousness.  He experienced no injuries from the alleged hold.  Accordingly, the Court should reject this allegation as wholly implausible.

As an initial matter, head or neck restraints are not unreasonable in certain circumstances. The case law on this issue draws a distinction between use of such holds on individuals who are dangerous or actively resisting and those who are not.  While a chokehold is unreasonable when a suspect is fully restrained or does not present a danger, it is undisputed here that King was not restrained and was resisting violently.  He posed a threat to the Officers, as is clear from the injuries that he inflicted on them even after the alleged chokehold.

Because of King's active and strenuous resistance, the hold was not excessive under Sixth Circuit law.  *Lee v. City of Norwalk, Ohio*, 529 F. App'x 778, 782-83 (6th Cir. 2013).  In *Lee*, the Sixth Circuit determined that an officer's use of an alleged chokehold on a person who had been taken into custody but whose handcuffs had been removed did not constitute excessive force.  The plaintiff had been belligerently confrontational and was kicking and struggling with the officer and once the plaintiff was in handcuffs again, the officer stopped using force.  The court concluded that the chokehold was permissible because the officer had "a reasonable basis to believe that [the plaintiff] posed a sufficient threat that force was necessary to subdue her." *Id.* at 783.

The Sixth Circuit has equated neck restraints/chokeholds with tasers, and it has approved officers' use of tasers on individuals who were resisting to the degree that King was here.  In *Brown v. Weber*, 555 F. App'x 550, 554 (6th Cir.2014)*,* the court explicitly equated taser use with vascular neck restraints and stated that a vascular neck restraint is excessive "when the suspect [is] unarmed and non-threatening, but passively resist[ing] arrest."  It then clarified, however, that "[i]f a suspect actively resists arrest and refuses to be handcuffed," use of this level

32

of force to subdue the individual does not violate the Fourth Amendment. *Id.* (quoting *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir.2012) (holding there was no Fourth Amendment violation where an officer used a taser to subdue a suspect who had to be wrestled to the ground and who continued to resist arrest by kicking, screaming, and refusing to be handcuffed)).

Similarly, in *Sheffey,* the Sixth Circuit concluded that taser use was reasonable when the suspect was physically resisting and attempted to bite—the tasers were used during the struggle only to bring the suspect under control. 564 F. App'x at 791-92; *see also Johnson v. City of Lincoln Park*, 434 F. Supp. 2d 467, 470-71, 478, 480 (E.D. Mich. 2006) (repeated use of taser reasonable where plaintiff resisted and struggled, including biting the officer, kicking and thrashing). Thus, the Sixth Circuit precedent teaches that a neck restraint, like the one alleged here, is appropriate for a suspect who is actively resisting and refusing to be cuffed, just as a taser would be.

Other Circuit Courts of Appeal have granted qualified immunity in cases involving similar chokehold allegations to King's. For example, in *Duran v. Sirgedas,* 240 F. App'x 104, 130 (7th Cir. 2007), the Seventh Circuit rejected the plaintiff's excessive force claim against an officer who allegedly choked him and concluded that the officer acted reasonably in light of an escalating situation in which the plaintiff was able to resist the officers' efforts to arrest him.[12] Strikingly, the plaintiff contended he bit the officer because the officer was choking him. *Id.* at 117. Likewise, in *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1555-56 (11th Cir. 1993),

---

[12] The opinion initially concluded that this officer had waived his qualified immunity argument on excessive force, 240 F. App'x at 120, but on rehearing the court vacated this error and portion of its opinion, and issued an order with a new section of analysis concluding that the officer acted reasonably in view of the escalating situation and the plaintiff's continuing ability to resist. *Id.* at 130.

*modified*, 14 F.3d 583 (11th Cir. 1994), the Eleventh Circuit held that an officer was entitled to qualified immunity for using a chokehold during the arrest of a restaurant manager for interfering with a building code inspection. The officer had been told that the manager had recently resisted an arrest with violence, and when told he was under arrest, the manager acted in a way that the officer could have interpreted as resistance. In *Williams v. City of Cleveland, Miss.*, 736 F.3d 684, 686-88 (5th Cir. 2013), the Fifth Circuit determined that the officer did not violate a clearly established right by using a chokehold and the amount of force was reasonable because the arrestee had resisted even after being tasered several times and posed a threat of serious harm throughout the struggle. Finally, in *Liiv v. City of Coeur D'Alene,* 130 F. App'x 848, 852 (9th Cir. 2005), in view of the plaintiff's resistance and the tense circumstances at the time, the court found insufficient plaintiff's allegations that an officer choked him. *See also Gassner v. City of Garland*, 864 F.2d 394, 400 (5th Cir. 1989) (no excessive force claim given plaintiff's resistance to arrest; officer's use of chokehold and wrestling plaintiff to the ground before handcuffing him were reasonable), *abrogated on other grounds, Devenpeck v. Alford*, 543 U.S. 146 (2004).

A number of district court cases in this Circuit have found in favor of officers who utilized head and neck restraints against individuals who were actively resisting. For example, in *Armer v. Marshall*, No. 5:09-cv-00086-R, 2011 WL 2580359, *3-4 (W.D. Ky. June 28, 2011), the district court rejected a claim that a prison guard's use of a choke hold was excessive, despite an allegation that the guard choked the prisoner unconscious, where the prisoner had been creating a danger for another inmate, acting aggressively and threateningly toward guards, encouraging violence, and disregarding orders. There was no indication the guard acted maliciously or sadistically or with the intention of causing harm. *Id.* at *3. The district court

34

noted that numerous courts have found that using a choke hold to "bring a [sic] unruly, disruptive or fleeing prisoner under control is not per se excessive force." *Id.* at *4.

Similarly, in *Lewis v. Stellingworth*, 2009 WL 1384149, *7 (E.D. Mich. May 14, 2009), the district court concluded that after efforts at escalating force failed to subdue the plaintiff, the defendant-officers plausibly could have believed that placing plaintiff in a full-nelson headlock was necessary to transport him into an elevator.

In *Turner v. Viviano,* No. 04-CV-70509-DT, 2005 WL 1678895, at *10 (E.D. Mich. July 15, 2005), the district court rejected an excessive force claim based on an alleged chokehold, stating that even if the plaintiff felt choked or was subjected to a chokehold, there was no evidence that using such a hold was excessive given the lack of any severe injury and the fact that the plaintiff was fighting and refusing to submit to attempts to detain him. Even though one witness used the word "choke-hold" to describe the officer's actions, "the mere intoning of a phrase does not establish a genuine issue of fact that excessive force was used." *Id.*

Finally, in *Joy v. City of Dayton*, No. C–3–90–132, 1991 WL 1092505 (S.D. Ohio June 28, 1991), the district court granted summary judgment to the officers despite testimony that an officer placed a nightstick or flashlight over the plaintiff's throat in an effort to subdue him. It stated, "[E]ven if a flashlight or nightstick was used in subduing [him], there is still no evidence that excessive force was employed at this time." *Id.* at *4. The plaintiff alleged that the officer choked him, but the allegations and evidence did not indicate that the choking was excessive under the circumstances, or that it continued after plaintiff stopped resisting. *Id.*

Here, it is undisputed that King was actively and violently resisting arrest at all times relevant to the head or neck hold. He concedes that the Officers were trying to control him but that he was trying to get away. (Trial Tr. Vol. 3, at 53, 73.) The hold—whatever it was—was

35

not successful in bringing him under control; he continued to resist, causing significant injuries to Officer Allen. Even if King lost consciousness, no serious injury resulted; his medical records do not document any bruising or damage to his neck or windpipe. (Ex. A, King's Medical Records, KING-000054-55 (denying loss of consciousness, denying neck pain, and making no notation of any irregularity in his neck)). And the photographs from the scene and afterward show no sign of injury—or even redness—from the alleged hold. (Am. Comp. ¶ 63, 67, ECF No. 30, PageID.115-117; Trial Tr. Ex. 5; Ex. F, Pictures From Trial Tr. Ex. 5.) Even under King's version of the facts, Officer Allen released the hold after it proved insufficient to subdue King and King started biting him. (Trial Tr. Vol. 3, at 54.)

Alternatively, King's current version of the facts is "blatantly contradicted" by his own prior statements, and the Court cannot view as plausible his claim that he was choked to the point of losing consciousness for 10-15 seconds; such a claim is nothing more than a "visible fiction." *Chappell*, 585 F.3d at 906 ("[T]he court is not obliged to, and indeed should not, rely on the nonmovant's version where it is 'so utterly discredited by the record' as to be rendered a 'visible fiction.'" (quoting *Scott v. Harris*, 550 U.S. 372, 380-81 (2007)). There was no indication on the date of the incident that King was contending that he lost consciousness as the result of a chokehold—in fact, he denied it—and the new story he told at trial makes no sense at all.

As noted above, on the day of the incident, King told hospital staff that he never lost consciousness. (Ex. A, King's Medical Records, KING-000054.) King's Brief in Support of his Motion to Dismiss the criminal charges related to his assault and injury of the Officers did not mention a chokehold or a loss of consciousness (Ex. E), despite that he now contends that the entire reason he bit officer Allen was the alleged hold. Juxtaposing these admissions and background facts with King's current premise that the two Officers were unable to subdue him

36

for at least one, two, three, four, five, six, seven, eight, nine, ten (to fifteen) seconds of

unconsciousness (Trial Tr. Vol. 3, at 53-54) renders his claim in this regard completely

implausible and the Court should not credit it. Likewise, his claim that he blacked out, but that

the neck hold was getting "tighter and tighter" as he "came back too [sic]" (Trial Tr. Vol. 3, at

54) is nonsensical. If the hold was so tight that it made him lose consciousness, he would not

have been regaining consciousness as it got tighter.

### (2) Punching plaintiff while he severely bit Officer Allen

King's Amended Complaint focuses a great deal on Officer Allen's punching King in the

head area, but it is undisputed that: (1) Officer Allen never struck King until King bit him and

would not release the bite, and (2) Officer Allen stopped striking King as soon as he released the

bite. (Trial Tr. Vol. 3, at 54.) There was nothing gratuitous about the punches and they served

the legitimate purpose of protecting the officer from serious bodily harm. Under these

circumstances, the Court cannot conclude that Officer Allen's actions violated the Constitution,

notwithstanding the initial reaction of bystanders, who did not fully see or understand what was

really happening.

Numerous decisions in the Sixth Circuit have concluded that striking a suspect who is

actively and violently resisting is not unreasonable, particularly where the officers have a

reasonable concern for their own safety, as was the case here. For example, in *Rudlaff v.

Gillispie*, 791 F.3d 638, 641-42 (6th Cir. 2015), the Sixth Circuit concluded that using a taser and

knee strikes was not excessive where the suspect actively resisted and refused to be cuffed,

including swinging his arms in the direction of officer. The officers were permitted to use "the

amount of force necessary to ensure submission." *Id.* at 643. Here, even Officer Allen's strikes

were not enough and the Officers needed help from a bystander to finally gain control of King.

In *Frodge v. City of Newport*, 501 F. App'x 519, 522, 530-31 (6th Cir. 2012), it was reasonable

37

for the officer to strike the suspect with a baton and take him to the ground, as the suspect had

been fighting with another individual, ignored commands to stop, and was still locked in a fight

as officers tried to separate the individuals.  In *Williams*, the Sixth Circuit decided that it was not

a constitutional violation to use a baton and closed-fist blows, and then a taser after the blows

failed, during the arrest of a non-compliant suspect.  373 F. App'x at 544, 548.  In *Goodrich v.*

*Everett,* 193 F. App'x. 551, 556-57 (6th Cir.2006), the court determined that, even if the officers

were "kneeing and kicking" the plaintiff while handcuffing and attempting to gain control of

him, the force was not unreasonable in the context of an arrest where a reasonable officer could

have concluded that the plaintiff "was capable of violence and intended to flee."

Not only was King actively resisting the Officers, he was inflicting significant bodily

harm on Officer Allen.  Officer Allen had a right to protect himself, and he did not begin striking

Plaintiff until after the bite.  In that regard, the situation facing Officer Allen was more serious

and dangerous than in *Standifer v. Lacon*, 587 F. App'x 919 (6th Cir. 2014).  There, the Sixth

Circuit concluded that pushing plaintiff to the ground was objectively reasonable despite the fact

that it caused serious injury, as the officer did so only after plaintiff resisted, including kicking

the officer in the groin.  *Id.* at 924-25.  The plaintiff had just assaulted/obstructed him, there was

probable cause to believe she posed a danger to herself and others, and she admitted attempting

to evade going to the hospital.  *Id.*; *see also Jackson v. Wilkins*, 517 F. App'x 311, 316-17 (6th

Cir. 2013) (concluding that officers' use of tasers, and repeated punches and kicks was not

excessive where plaintiff had fled, ignored commands to get on the ground, and instead walked

towards an officer and fought with the officers, and when the plaintiff stopped resisting, the use

of force also stopped); *Jones v. City of Cincinnati*, 507 F. App'x 463 (6th Cir. 2012) (officers'

repeated striking and jabbing of plaintiff with their batons was objectively reasonable where

plaintiff had lunged at officer and swung at his head, refused to comply, grabbed an officer's neck, and grabbed a baton); *see also Duran,* 240 F. App'x at 118-20 (granting qualified immunity to officers who allegedly punched plaintiff with fists and kicked him, in light of fact that the plaintiff was actively struggling and resisting, including biting an officer).

The repeated strikes may have looked bad to bystanders who did not know why Officer Allen was doing it, but the strikes and their location[13] were simply a product of the fact that King continued to hold the bite, which was breaking Officer Allen's skin—through two layers of clothing. The Sixth Circuit has granted or upheld qualified immunity in many cases involving more strikes or a higher degree of force against suspects who were physically resisting. For example, in *Williams v. Sandel*, 433 F. App'x 353 (6th Cir. 2011), the Sixth Circuit granted qualified immunity despite 37 taser uses, baton strikes, the use of pepper spray, and a head injury to the plaintiff because he still remained unsecured and unwilling to comply with officers' efforts to secure him and they ceased using force once he was secured. It noted that this number of taser uses and strikes "taken alone and out of context" could seem somewhat unreasonable, but they were not unreasonable given the fact that the plaintiff still was unsecured and unwilling to comply despite all of the strikes and taser deployments. *Id.* at 362.

Finally, in *Okeke v. Rose*, 70 F. App'x 802, 803-04 (6th Cir. 2003), the Sixth Circuit adopted the district court opinion granting qualified immunity where the officers were unable to subdue a suspect who violently resisted arrest. They sprayed the plaintiff with mace; while they

---

[13] In *Schliewe v. Toro*, 138 F. App'x 715, 722 (6th Cir. 2005), the Court determined that striking the plaintiff in the face, breaking his jaw, was an instinctive and not unreasonable use of force on an individual who was erratic and trying to escape. Here, there is a much stronger case for the reasonableness of the officer's instinctive and self-protective reaction of striking the face of someone who is actively biting the officer's arm.

attempted to handcuff him, he bit an officer's finger, causing severe injury, and during the struggle the officers struck him with a baton, kicked him several times, and broke his arm. *Id.*

Here, King's attempt to remove the punches from the proper context of his violent resistance and biting must fail. Notably, Leah Buchanan, the bystander who was most vocal about her initial perception of excessive force—and most cited in Plaintiff's Amended Complaint—has acknowledged that the fact that King was biting Officer Allen before and during the strikes entirely changes her view of the situation. (Trial Tr. Vol. 2, at 133-34.) In fact, she testified for the prosecution at the criminal trial and believes the strikes were justified. (*Id.* at 128-160.)

Although King developed bruising on his face and eyes several days after the encounter, he had no serious or long-term injuries. The pictures in his Amended Complaint do not tend to indicate that the force was excessive, particularly when viewed against the backdrop of the violent and painful bite that King was inflicting on Officer Allen. *See Sandel,* 433 F. App'x at 363 (excessiveness of force turns on whether officer used gratuitous violence, not on the extent of the injury). The pictures merely show temporary bruising, and King's medical records state there was no serious injury. (Ex. A, King's Medical Records, KING-000054-56.)

Here, returning to the level of force factors in *Graham*, 490 U.S. at 396, each weighs in favor of the conclusion that the force was not unreasonable. First, as to the seriousness of the crime, there was a warrant for the fugitive for more than one incident of home invasion, which is a serious and potentially violent crime. *See Alfred v. Pousak*, No. 2:07-cv-15517, 2009 WL 1299568 (E.D. Mich. April 29, 2009), *affirmed*, 524 F. App'x 157 (6th Cir. 2013). In addition, King had swung his arm at Agent Brownback, actively resisted and fought with the Officers, and bit Officer Allen, all of which are serious and violent actions.

40

Second, as to the immediate safety threat, there was an obvious threat to officer safety given that King was resisting so strenuously, had swung at Agent Brownback, struck the Officers with the cuffs that were on one wrist, and was locked onto Officer Allen's arm in a serious and painful bite. In addition, the knife he had been carrying was on the sidewalk near the scuffle, and King also could have grabbed the Officers' firearms in the scuffle.

Finally, as to active resistance, King has admitted that he was actively resisting and attempting to flee. The Officers' actions were not excessive or gratuitous—in fact, they were insufficient to the task. They had to obtain bystander assistance before they were able to control King. The Court, therefore, should grant qualified immunity to the Officers on all of King's excessive-force claims.

### 4. *The Kent County prosecution*

King cannot meet the requirements for a malicious-prosecution claim, if such a claim even exists.[14] Under current Sixth Circuit standards for § 1983 claims, a Fourth Amendment malicious prosecution claim requires the plaintiff to prove that "(1) the defendant made, influenced, or participated in the decision to prosecute the plaintiff; (2) there was a lack of probable cause for the prosecution; (3) as a consequence of the prosecution, the plaintiff suffered a deprivation of liberty, apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor." *Buchanan v. Metz*, 647 F. App'x 659, 665 (6th Cir. 2016). Not

---

[14] In *Manuel v. City of Joliet*, S. Ct. Doc. No. 14-9496, the U.S. Supreme Court heard oral argument on October 5, 2016, concerning whether to recognize the existence of a Fourth Amendment malicious-prosecution claim within the context of § 1983. Even if the Court does recognize such a claim, it is not clear at this time what the elements of a claim would be. In addition, even if it recognizes a § 1983 malicious-prosecution claim, it is quite unlikely that it will extend the doctrine to the *Bivens* context, because that issue is not before the Supreme Court in *Manuel*, and because the Supreme Court has cautioned numerous times that special factors counsel hesitation in recognizing any new implied cause of action under *Bivens*; in most instances, a *Bivens* remedy is not justified. *Wilke v. Robbins*, 551 U.S. 537, 550 (2007).

only are King's allegations insufficient to state a claim, but there was probable cause for a prosecution and even if the court disagrees about probable cause, a reasonable officer could have believed that there was probable cause.

As an initial matter, King has failed to even allege a malicious prosecution claim. He was charged under Mich. Comp. Laws. §§ 750.81d(2) (resisting and obstructing a police officer causing injury), 750.81d(1) (resisting and obstructing a police officer), and 750.82 (felonious assault). (*See* Trial Tr. Vol. 3, at 142-45.) King acknowledges fleeing from, resisting, fighting with, and eventually biting a law-enforcement officer whose badge was visible at all times. He does not deny that a handcuff on his left hand may have struck the Officers during the struggle; in response to a question about whether he hit an officer with the handcuffs, he said, "I don't know. If it happened, it was unintentional." (*Id.* at 72, 73.) All King alleges is that the Officers—he does not say who—made some unspecified false and misleading statements in support of his prosecution. (Am. Compl. ¶ 68, ECF No. 30, PageID.117.) These conclusory allegations do not state a plausible claim under Rule 12(b)(6). They are so vague and non-specific as to both Officers that it is not possible to tell from the Amended Complaint what the Officers allegedly did that forms a basis for a malicious prosecution claim. *Iqbal*, 556 U.S. at 1949-50.

Unlike most malicious-prosecution cases, there is no probable cause testimony in this case upon which King could base a malicious-prosecution claim. The Officers did not testify at a preliminary examination, because King waived the examination (Ex. G, Preliminary Examination Waiver), essentially conceding the existence of probable cause. To the extent King relies on the trial testimony of the Officers, his claim fails. The Officers cannot be liable based on their trial testimony. Witnesses—including officers—are "absolutely immune from civil

42

liability based on their trial testimony in judicial proceedings," regardless of whether they were complaining witnesses. *Moldowan v. City of Warren*, 578 F.3d 351, 390 (6th Cir. 2009) (quoting *Briscoe v. Lahue*, 460 U.S. 325, 328 (1983)).

Regardless of the statements to which King might be referring, there was probable cause for an arrest and prosecution based on his actions towards the Officers. After briefing and oral argument, the Michigan circuit court denied a pre-trial motion to dismiss the charges that argued that the Officers' actions were unlawful and that this defeated an element of the charges. (Ex. E, King's Br. in Supp. of Mot. to Dismiss.) The circuit court subsequently found at trial that there was sufficient evidence for the case to go to the jury. (Trial Tr. Vol. 3, at 43.)

To overcome the weight of these determinations, King is required to show that the Officers "stated a deliberate falsehood or showed reckless disregard for the truth" and "that the allegedly false or omitted information was material to the finding of probable cause." *Kavanaugh v. Lexington Fayette Urban Cnty. Gov't*, 638 F. App'x 446, 455-56 (6th Cir. 2015). In other words, even if the Officers knowingly supplied false information, if the information was not material to establish probable cause, King has no claim. *Id.*; *Molnar v. Care House,* 359 F. App'x 623, 627 (6th Cir. 2009). With respect to materiality, the question is simply whether probable cause still existed without the allegedly false statement. *Garcia v. Thorne*, 520 F. App'x 304, 308 (6th Cir. 2013) (false statements about the suspect's address and the location of the crime were not material to probable cause for the crime of harboring a felon); *Burleigh v. City of Detroit*, 80 F. App'x 454, 458-59 (6th Cir. 2003); *Buchanan v. Metz*, 132 F. Supp. 3d 922, 933, 937-39 (E.D. Mich. 2015) (granting summary judgment despite allegations of false statements in support of warrant, as reasonable officer still could have concluded there was probable cause), *affirmed*, 647 F. App'x 659 (6th Cir. 2016). Here, King has not identified any

such statements in his Amended Complaint.  If we assume that he is referring to the issue of whether the Officers identified themselves verbally, probable cause still existed even if the Officers did not explicitly say that they were law enforcement.

The probable-cause inquiry focuses on whether, at the moment of the arrest, "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." *Thacker*, 182 F. App'x at 469.  An officer has probable cause if there was a "fair probability" that the suspect committed the offense. *Feathers*, 319 F.3d at 851; *accord Harris*, 133 S. Ct. at 1055.  He need not have evidence beyond a reasonable doubt. *United States v. Strickland*, 144 F.3d 412, 415-16 (6th Cir.1998).  Even officers who "reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Hunter*, 502 U.S. at 227.

Even if the Officers did not identify themselves with words, there still was probable cause for assault charges.  Michigan Complied Laws § 750.81d(1) and (2) do not require proof that the officers specifically identified themselves with words; these charges require that the defendant know "or have reason to know" that the officers were officers performing their duties. Mich. Comp. Laws §§ 750.81d(1), (2).  (Trial Tr. Vol. 2, at 14-15, 17.) *Corr*, 788 N.W.2d at 864 (listing among the defendant's "reasons to know" the fact that the officers "performed ordinary police functions during the stop," including checking identification, controlling the scene, etc.) And § 750.82 has no requirement at all relating to the law enforcement status of the officers; it is simply a charge of assault on "another person." Mich. Comp. Laws §§ 750.82.  (Trial Tr. Vol. 2, at 15-16.)  The Officers merely needed probable cause to arrest for "some crime, even if the crime for which there is probable cause is different from the stated crime of arrest." *Amis v.*

44

*Twardesky,* 637 F. App'x 859, 861 (6th Cir. 2015) ("[The officer's] subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." (quoting *Devenpeck*, 543 U.S. at 153, 155)).

The parties' undisputed conduct clearly establishes that the Officers were holding themselves out as law enforcement and that King understood that that is what they were representing themselves to be before he decided to resist. Their badges were out and visible the entire time. (Am. Compl. ¶ 25, ECF No. 30, PageID.110; Trial Tr. Vol. 3, at 50.) They conducted themselves consistent with the exercise of law-enforcement authority, asking King first about his identity and then about weapons, asking him to put his hands on his head and submit to a weapons pat-down, and telling him they were looking for someone. (Trial Tr. Vol. 3, at 48-51.) King initially complied with these basic law-enforcement requests, and he testified that he assumed they had "some sort of authority." (Am. Compl. ¶ 36, ECF No. 30, PageID.110; Trial Tr. Vol. 3, at 50.) King also testified at trial that he did not question the sincerity of their belief that they identified themselves to him. (Trial Tr. Vol. 3, at 65.) Thus, the answer to the narrow question of whether the Officers used words to identify themselves as law enforcement does not defeat the Officers' conclusion that there was probable cause for an arrest and charges. Additionally, as discussed in Part II.D below, even if the Court disagrees about their probable cause determination, they are still entitled to qualified immunity from the malicious prosecution claim because a reasonable officer could have believed there was probable cause for the charges.

Alternatively, King's allegation that the Officers did not identify themselves with words as law enforcement is so blatantly contradicted by the record, including King's own admissions, that the Court should disregard it. *See Chappell*, 585 F.3d at 906. At trial, King stated that the Officers initially did not identify themselves with language, but he also testified that he was not

saying that the Officers were being untruthful when they testified that they identified themselves. (Trial Tr. Vol. 3, at 65.) While being transported after the incident, King told the transporting officer, Officer Brower, that the Officers had told him they were detectives, but that he did not believe them. (Trial Tr. Vol. 2, at 192.) At trial, King testified that he had no reason to believe or disbelieve Officer Brower's recounting of this statement during transport. (Trial Tr. Vol. 3, at 70.) The medical record demonstrates that at the hospital, King "state[d] that he did not trust that the officer was actually undercover police and admit[ted] to fighting and resisting." (Ex. A, King's Medical Records, KING-000054.) In addition, the bystander testimony was clear that the Officers were identifying themselves as police during the struggle and asking for help, but that King continued to resist and to fight them. (Trial Tr. Vol. 2, at 122-23, 125, 136.) All of this points to the simple conclusion that the Officers identified themselves—consistent with King's initial cooperation—but that King decided at some point during the incident that he did not believe them or no longer wished to cooperate.

> ## C. Even if there was a constitutional violation, the rights at issue were not clearly established under the facts and circumstances at the time.

The case law discussed above establishes that the Officers' conduct did not violate the Constitution. But even if the Court disagrees with this conclusion, the Officers' conduct did not violate any clearly established law as of July 18, 2014. For an officer to have violated a clearly established right, "the right's contours [must have been] sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). The question the official confronted must have been "beyond debate." *Id.* The law should not be defined "at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.*; *see also Moseley,* 790 F.3d at 654 ("To avoid the

qualified immunity defense, plaintiff was required to plead facts making out a violation of a constitutional right clearly established in a particularized sense. That is, the right said to have been violated must be defined in light of the specific context of the case, not as a broad general proposition." (quotations omitted)); *Hagans*, 695 F.3d at 508 (noting that Supreme Court has repeatedly warned lower courts about this, and concluding that the plaintiff's assertion that the right to be free from excessive force was just "one floor down" from the words of the Fourth Amendment.").

The only way for King to attempt to show a violation of clearly established law is for him to state the law so abstractly and vaguely as to render it essentially meaningless in the specific factual scenario the Officers confronted. (*See* Pl.'s Br. in Opp'n to Def.'s Mot. to Stay 4, ECF No. 48, PageID.189 (arguing that his claims relate to violations of clearly established law because the right to be free from "unreasonable seizures" and "excessive force" is clearly established).) There were no cases in July 2014 to establish beyond debate that conduct like that of the Officers here ran afoul of the Fourth Amendment protections. As explained above, the cases demonstrate that the Officers did not violate King's constitutional rights.

### D. The Officers' actions were not objectively unreasonable in light of the clearly established rights at the time.

Even if King can identify some clearly established law that applies here and even if the Court ultimately concludes that the Officers' conduct violated the Constitution, King still cannot establish that the Officers' actions were objectively unreasonable in light of the law at the time and the circumstances they faced. Even if the Court disagrees—with luxury of hindsight and time for reflection—about how likely it was that King was the fugitive Davison, that does not mean that the Officers were objectively unreasonable to detain him for purposes of trying to

confirm his identity. Even if the Court disagrees about whether there was probable cause to arrest, the Officers had a good faith belief that there was.

With respect to the amount of force, qualified immunity turns on the reasonableness of the officer's perceptions at the time, not on whether subsequent circumstances would have revealed a less forceful alternative. *Illinois v. Lafayette*, 462 U.S. 640, 647 (1983) (the "reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative 'less intrusive' means"). Even if in hindsight the court concludes that the amount of force was unnecessary, the officer's conduct is judged from the "perspective of a reasonable officer on the scene[,]" and not with the benefit of 20/20 hindsight. *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 486 (6th Cir. 2007). "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct . . . and to protect all but the plainly incompetent or those who knowingly violate the law." *Dorsey*, 517 F.3d at 394. The Officers' conduct in this case, even if it was mistaken, does not fit in that category. Once they undertook the arrest, they had good reason to believe that the amount of force they used to take King to the ground and to try to subdue him was appropriate in view of the strenuousness of his resistance. And once King started biting, Officer Allen was correct in thinking he could defend himself.

Finally, with respect to the malicious-prosecution claim, regardless of whether King knew the Officers were law enforcement when he swung at them, kicked, and bit, the Officers are entitled to qualified immunity because they had good reason to believe that King violated the law by assaulting them. *See United States v. Gagnon,* 553 F.3d 1021, 1027 (6th Cir. 2009) (defendant can violate 18 U.S.C. § 111(a)(1) by performing a prohibited action without forcibly or intentionally creating physical conduct himself); *Feathers,* 319 F.3d at 852 (reasoning that the

officers "had good reason—in the form of [a] punctured finger—to believe that [plaintiff] had

bitten [an officer]"); *City of Lincoln Park*, 434 F.Supp.2d at 477-78 (probable cause for

assaulting officer existed where plaintiff threw punch at, struggled with, and bit an officer.)

Officers are entitled to qualified immunity on a malicious-prosecution claim "unless there is such

an utter lack in probable cause that no officer of reasonable competence would have concluded

that" the arrest or prosecution was appropriate. *Garcia*, 520 F. App'x at 308.

Here, the Officers had their badges out when they were directly involved in the

confrontation. (Trial Tr. Vol. 3, at 50.) They both witnessed the assault that formed a basis for

charges, including a charge that did not depend on a law-enforcement victim. And a reasonable

officer could have concluded that they did enough to give King reason to believe they were law

enforcement such that there was probable cause for an arrest and charges for resisting and

assaulting an officer.

In sum, qualified immunity protects the Officers. The *Bivens* and § 1983 claims against

should be dismissed for failure to state claim, or this Court should grant the Officers summary

judgment.

**III.    King's intentional-tort claims fail under Michigan law.**

Count IV lists six tort theories against the United States under FTCA: assault, battery,

false imprisonment, false arrest, malicious prosecution, and intentional infliction of emotional

distress. (Am. Compl. 16-17, ECF No. 30, PageID.121-22.) Each claim should be dismissed.

**A.    The Task Force Officers' protections under Michigan law bar Plaintiff's tort claims.**

Under Michigan law, an officer is shielded from tort liability if he can show that (1) the

challenged actions were undertaken during the course of employment and the employee was

acting, or reasonably believed that he was acting, within the scope of his authority; (2) the acts

were undertaken in good faith, or were not undertaken with malice; and (3) the acts were

discretionary, as opposed to ministerial. *Odom v. Wayne Cnty.*, 760 N.W.2d 217, 228-29 (Mich.

2008); *see Firestone v. Rice*, 38 N.W. 885, 889 (Mich. 1888) ("The sheriff cannot stop, when the

man is unknown to him, at the moment of arrest, to inquire into his character, or his intentions as

to escape, or his guilt or innocence of the offense charged against him. His duty is to take him,

to safely keep him, and to bring his body before a magistrate. If he does this without wantonness

or malice, it is not for a jury to find that his precautions were useless and unnecessary in the light

of after-acquired knowledge of the true character and intent of the accused, and to punish the

sheriff in damages for what honestly appeared to him at the time to be reasonable and right.") (no

claim for false imprisonment or assault and battery when sheriff arrested the wrong man). The

FTCA grants the United States this protection as well. *E.g.*, *Valdez v. United States*, 58 F. Supp.

3d 795, 828 (W.D. Mich. 2014).

The FTCA waives the United States' sovereign immunity only "in the same manner and

to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674; *accord*

28 U.S.C. § 1346(b)(1). This language "necessarily requires the Court to give the United States

the benefit of any authority the employee would have under state law—for example, the

authority of a police officer to exercise the force reasonably necessary to effect a lawful arrest."

*Valdez*, 58 F. Supp. 3d at 828. As this Court has explained:

> If the individual employee receives the benefit of special privileges, defenses, and
> immunities arising out of the employee's authority, so too should the United
> States receive the benefit of those privileges, defenses, and immunities. To read it
> otherwise would lead to the incongruous result of the United States opening itself
> to liability that would never be imposed on the individual employee as an
> individual defendant under state law. That opens the United States to risk beyond
> the vicarious liability the United States voluntarily undertook in waiving its
> sovereign immunity, and would expose the United States to liability that its
> employee would never have had.

*Id.* at 828–29; *accord Washington v. Drug Enforcement Admin.*, 183 F.3d 868, 874 (8th Cir.

1999) (applying Missouri law on police use of force during searches); *Jackson v. United States*,

77 F. Supp. 2d 709, 715 (D. Md. 1999) (applying actual malice requirement of Maryland law);

*McElroy v. United States*, 861 F. Supp. 585, 594-96 (W.D. Tex. 1994) ("When determining

whether the conduct of law enforcement officers constituted assault, false imprisonment, or false

arrest under the FTCA, the United States may invoke any defenses available to individual law

enforcement officers" under state law); *Nash v. United States*, 897 F .Supp. 180, 182-83 (E.D.

Pa. 1994) (applying Pennsylvania law for use of force by task force officers).

Here, each of the three elements is satisfied. First, the Officers' conduct was in the

course of their employment and under their authority as Task Force officers. (*See* Am. Compl. 2,

16, ECF No. 30, PageID.107, 121.) They were searching for a fugitive as part of an open FBI

investigation, when they encountered and attempted to arrest King. (Ex. C, Burns Decl. 1-3;

Trial Tr. Vol. 2, at 31-53, 219-23.)

Second, the undisputed facts show that the Officers acted "without malice" as Michigan

law requires. *Odom*, 760 N.W.2d at 225. "There must be some discretion reposed in a sheriff or

other officer . . . [a]nd this discretion cannot be passed upon by a court or jury unless it has been

abused through malice or wantonness or a reckless indifference to the common dictates of

humanity." *Id.* There is "willful and wanton misconduct . . . if the conduct shows intent to

harm, or . . . such indifference to whether harm will result as to be the equivalent of a willingness

that it does." *Id.* at 225. "In light of the unusual and extraordinary nature of police work, it is

improper to second-guess the exercise of a police officer's discretionary professional duty with

the benefit of 20/20 hindsight." *Norris v. Lincoln Park Police Officers*, 808 N.W.2d 578, 582

(Mich. Ct. App. 2011).  The good faith element is subjective in nature.  *Odom*, 760 N.W.2d at 229.

Viewing the evidence in a light most favorable to King, the Officers did not act in bad faith.  As explained in Part II above, the Task Force Officers acted within their constitutional authority at all times, or, at the very least, as a reasonable officer could have under similar circumstances.  *See Chesney v. City of Jackson*, 171 F. Supp. 3d 605, 633 (E.D. Mich. 2016) (the "same reasoning" applied to determine that plaintiff's constitutional claims fail applies to state tort claims); *Valdez*, 58 F. Supp. 2d at 829 (granting summary judgment because plaintiffs could not show not malice); *Latits v. Phillips*, 826 N.W.2d 190, 195-96 (Mich. Ct. App. 2012) (considering whether excessive force was used or a clearly established constitutional right was violated).  Moreover, the Officers' testimony at trial makes it clear that, in their minds, they were doing their best to apprehend the fugitive Davison and they did not believe that they acted improperly.  (Trial Tr. Vol. 2, at 31-121, 219-47; Vol. 3, at 3-21.)

For the purposes of this motion, the United States accepts King's version of the facts as true.  Brownback and Allen's testimony does disagree with King's on some points, e.g. whether the Officers verbally identified themselves.  But that fact is not sufficient to show malice.  *Bletz v. Gribble*, 641 F.3d 743, 748, 757-58 (6th Cir. 2011) (summary judgment proper notwithstanding the fact that the parties disputed whether the decedent was lowering his gun when he was shot); *Latits*, 826 N.W.2d at 195-96 (disagreement over number of shots fired insufficient to prevent summary disposition); *Burland v. French*, No. 305652, 2012 WL 2362442, at *1-7 (Mich. Ct. App. June 21, 2012) (dispute regarding how defendant, decedent, and plaintiff interacted did not prevent summary disposition); *Gentry v. Wayne Cnty. Deputy Sheriff Carmona*, No. 296580, 2011 WL 4810847, at *7-9 (Mich. Ct. App. Oct. 11, 2011)

(summary disposition was proper despite conflicting testimony over plaintiff's contact with the officer's firearm, visibility, and positioning during struggle); *Wilson v. Bixler*, No. 297045, 2011 WL 2424617, at *1-4 (Mich. Ct. App. June 16, 2011) (disagreement regarding statements made and details of struggle did not prevent summary disposition); *Mahl v. Maguire*, No. 287130, 2009 WL 3199153, at *3 (Mich. Ct. App. Oct. 6, 2009) ("The trial court was correct in finding there were differences between plaintiff's and defendant's versions of what happened. However, even when plaintiff's version is taken at face value, his allegations do not arise to the level of bad faith and reckless indifference required by case law."); *Thompson v. Carrollton Twp. Police Dep't*, No. 283772, 2009 WL 1564529, at *2 (Mich. Ct. App. June 2, 2009) (summary disposition was appropriate notwithstanding differing accounts) ("[I]nconsistencies in the reports and testimony was the norm, not the exception."); *see Rucinski v. Cnty. of Oakland*, No. 15-1844, 2016 WL 3613396, at *5 (6th Cir. July 6, 2016) (plaintiff's view that officers used excessive force did not prevent summary judgment).

Third, the acts at issue were discretionary, as opposed to ministerial. "Discretionary acts require personal deliberation, decision and judgment." *Odom*, 760 N.W.2d at 226 (quotations omitted). A law enforcement officer conducting ministerial acts "has a line of conduct marked out for him, and has nothing to do but follow it." *Id*. A ministerial act is one that constitutes "an obedience to orders or the performance of a duty in which the individual has little or no choice." *Id*. With regards to law enforcement officers, the Michigan Supreme Court has explained that:

> [O]fficers perform many discretionary acts each day. An officer must use his judgment to determine whether there is reasonable suspicion to investigate or probable cause to arrest and to determine the amount of force necessary to effectuate an arrest.

*Id.*; *accord Norris*, 808 N.W.2d at 582. The same types of discretionary acts are at issue in this case—the stop of King, the attempt to arrest him, and his prosecution.

**B.      This Court should dismiss King's assault and battery claims because the Task Force Officers only used reasonable force.**

Michigan law defines assault as "an attempt to commit a battery or an unlawful act which places another in reasonable apprehension of receiving an immediate battery." *Bletz v. Gribble,* 641 F.3d at 757 (quotations omitted). A battery is "an unintentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person." *Id.* (quotations omitted).

"The 'right to arrest and detain' carries with it the right to use reasonable force in case of resistance." *Delude v. Raasakka*, 215 N.W.2d 685, 688 (Mich. 1974). If an officer uses reasonable force, an action for assault or battery fails. *Id.*; *Atkins v. Twp. of Flint,* No. 246697, 2004 WL 1103979, at *4 (Mich. Ct. App. May 18, 2004) (affirming summary disposition because force used was reasonable); *Johnson v. City of Lincoln Park*, 434 F. Supp. 2d 467, 482 (E.D. Mich. 2006) (same).

Here, as explained above in Part II, Agent Brownback and Officer Allen used reasonable force in subduing and arresting King in the face of his violent resistance and attempts to flee. Accordingly, King's claims for assault and battery should be dismissed.

**C.      King's false-imprisonment and false-arrest claims must be dismissed because probable cause existed.**

A false imprisonment claim requires a plaintiff to demonstrate an "unlawful restraint on a person's liberty or freedom of movement." *Peterson Novelties, Inc. v. City of Berkley*, 672 N.W.2d 351, 362 (Mich. App. 2003). As such, "[t]he essence of a claim of false imprisonment is that the imprisonment is false, i.e., without right or authority to do so." *Moore v. City of Detroit*, 652 N.W.2d 688, 691 (Mich. App. 2002) (internal quotation omitted). The specific elements of false imprisonment are: "(1) an act committed with the intention of confining another, (2) the act directly or indirectly results in such confinement, and (3) the person confined is conscious of his

54

confinement." *Bletz*, 641 F.3d at 758.  Where probable cause to arrest is present, a false

imprisonment claim cannot be sustained. *Odom*, 760 N.W.2d at 229 (Mich. 2008); *Valdez*, 58 F.

Supp. 3d at 829.

Similarly, to make a claim for false arrest, a plaintiff must show that the defendant

participated in "an illegal and unjustified arrest" without "probable cause." *Walsh v. Taylor*, 689

N.W.2d 506, 514 (Mich. Ct. App. 2004).

Here, as explained in Part II above, probable cause was present.  Accordingly, King's

false imprisonment claim should be dismissed.

> **D.    King cannot demonstrate the elements of malicious prosecution.**

To succeed on a malicious-prosecution claim, the plaintiff has the burden of proving "(1)

the defendant has initiated a criminal prosecution against him, (2) the criminal proceedings

terminated in his favor, (3) the private person who instituted or maintained the prosecution

lacked probable cause for his actions, and (4) the action was undertaken with malice or a purpose

in instituting the criminal claim other than bringing the offender to justice." *Walsh*, 689 N.W.2d

at 516-17.

Here, as explained in Part II.B.4 above, elements 1 and 3 are not satisfied.  King has not

alleged facts showing what actions the Officers took to initiate his prosecution.  The Amended

Complaint only states that they made "false and misleading statements."  (Am. Compl. ¶ 68,

ECF No. 30, PageID.117.)  And, based on the undisputed facts, probable cause existed related to

King's arrest and prosecution for assaulting Agent Brownback and Task Force Officer Todd

Allen. *See Peterson Novelties*, 672 N.W.2d at 365 ("What is required is evidence that gives rise

to an inference that the defendant knowingly included false facts in his affidavit, without which

facts the prosecutor could not have concluded there was probable cause."); *Raggs v. Pittsfield*

*Charter Twp.*, No. 14-13946, 2016 WL 3626807, at *10 (E.D. Mich. July 7, 2016) (same).

Moreover, King has failed to allege what specific actions Agent Brownback and Officer Allen took to support the requirement of malice. *See, e.g.*, *Harris v. Fed. Asphalt Prod., Inc.*, 136 N.W.2d 43, 43–44 (Mich. Ct. App. 1965) ("Paragraphs 11, 15 and 17 of the amended complaint allege the prior action was brought without probable cause and with malice, but without factual allegations to support them, these are conclusions and are insufficient."). As explained above in Part III.A, the Amended Complaint's allegations are insufficient to show malice under Michigan law. *See, e.g.*, *Bletz*, 641 F.3d at 748; *Burnett v. City of Warren*, No. 05-74260, 2007 WL 655304, at *6 (E.D. Mich. Feb. 27, 2007) (granting summary judgment on state-law malicious-prosecution claim where the parties disagreed regarding the extent to which plaintiff had modified his license plate), *aff'd as modified sub nom. Burnett v. Kelley*, 274 F. App'x 427 (6th Cir. 2008) (affirming based on grounds stated by the district court, except that the district court should have held that defendant did not violate plaintiff's constitutional rights at all, rather than assuming a violation for the sake of argument).

### E. King's intentional-infliction-of-emotional-distress claim should be dismissed because the Task Force Officers acted within their authority.

The facts alleged in King's Amended Complaint are not sufficient to sustain a claim for intentional infliction of emotional distress. "Extreme and outrageous conduct is required to recover for the tort of intentional infliction of emotional distress." *Sawabini v. Desenberg*, 372 N.W.2d 559, 565 (Mich. Ct. App. 1985). The threshold for this showing is extremely high:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice", or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905, 908-09 (Mich. 1985).

Where an officer acts within his authority and arrests with probable cause, a plaintiff

cannot maintain an action for intentional infliction of emotional distress. *Walsh*, 689 N.W.2d at

517; *Sobczak v. Kaliniak*, No. 203484, 1998 WL 1988904, at *2 (Mich. Ct. App. Nov. 13, 1998);

*Turner v. Viviano*, No. 04-CV-70509-DT, 2005 WL 1678895, at *14 (E.D. Mich. July 15, 2005);

*see Roberts*, 374 N.W.2d at 909 ("The actor is never liable, for example, where he has done no

more than to insist upon his legal rights in a permissible way, even though he is well aware that

such insistence is certain to cause emotional distress." (quotations omitted)); *Burnett*, 2007 WL

655304, at *7 (granting summary judgment).

Here, as explained above in Part II, the Task Force Officers acted in accordance with

their rights as officers:  they had authority to stop King, to question him, and to use reasonable

force to apprehend him when he attempted to flee. *See Johnson*, 434 F. Supp. 2d at 482 (no

claim arising out of struggle to arrest minor plaintiff).

In short, Michigan law bars King's FTCA claims.  They should be dismissed for lack of

subject-matter jurisdiction and failure to state a claim, or, alternatively, summary judgment

should be granted to the United States. *See Milligan v. United States*, 670 F.3d 686, 692 (6th

Cir. 2012) (where the United States has not waived its sovereign immunity, the case should be

dismissed for lack of subject-matter jurisdiction); *Gibson*, 289 F.3d at 946 (a defense may serve

as a basis for a motion to dismiss for failure to state a claim "where the statement of the claim

affirmatively shows that the plaintiff can prove no set of facts that would entitle him to relief"

(quotations omitted)).

IV.   **King failed to exhaust his administrative remedies related to his FTCA claim based on Officer Allen's conduct.**

A plaintiff cannot file an FTCA suit until he has exhausted his administrative remedies.

28 U.S.C. § 2675(a). This requirement is jurisdictional. *Joelson v. United States*, 86 F.3d 1413,

1422 (6th Cir. 1996) ("Because Joelson does not allege that he has filed an administrative claim,

he has not satisfied the jurisdictional prerequisite to obtaining judicial review under the Federal

Tort Claims Act, and the district court properly dismissed this claim."); *Bumgardner v. United

States*, 469 F. App'x 414, 417 (6th Cir. 2012) ("Prior to filing a complaint under the FTCA, a

plaintiff must exhaust administrative remedies. This exhaustion requirement is jurisdictional."

(citations omitted)). One purpose of this requirement is to provide the federal agency with "a

fair opportunity to investigate and possibly settle the claim before the parties must assume the

burden of costly and time-consuming litigation." *McNeil v. United States*, 508 U.S. 106, 111–12

(1993).

Here, King submitted a detailed SF-95 to the FBI. (Ex. D, Holland Decl.)[15] That SF-95

states that the "basis of King's claim is set forth in the correspondence to Patrick Miles, United

States Attorney . . . attached as Exhibit A." (*Id.* at 1.) In the letter, King explicitly identifies the

claims that he is pursuing. He claims that Officer Allen and Agent Brownback's conduct

violated § 1983, or, in the alternative, they are liable under *Bivens*. (Ex. D, Holland Decl., Ex. A

to SF-95, Letter to Miles 6-8.) He then asserts that "[t]he United States of America is separately

liable for Brownback's action pursuant to the Federal Tort Claims Act." (*Id.* at 8.) In other

words, the SF-95 clearly identifies King and his counsel's deliberate choice to pursue liability for

---

[15] This exhibit includes a copy of King's SF-95 and several of its attachments. The remainder of
the SF-95's attachments—volumes 2 and 3 of the trial transcript and King's medical records—
are not included in this exhibit for the sake of brevity. The portions of those two attachments
that are pertinent to this Motion are included as separate exhibits.

Officer Allen's conduct under § 1983 and *Bivens* only. The FBI was not put on notice that it should investigate and consider settling FTCA claims arising from Officer Allen's conduct. Accordingly, King's SF-95 only exhausted his FTCA claims as to Agent Brownback's conduct—not Officer Allen's. *See, e.g., Frantz v. United States*, 791 F. Supp. 445, 452 (D. Del. 1992) ("Mere reference to a related cause of action without more does not provide sufficient notice of multiple claims or claimants addressed on a single form, even when the claims arise from the same factual occurrence. . . . Even if the Government inferred that a valid claim existed, it does not necessarily follow that the claim is being asserted at that time and on that form.").

The statute of limitations for filing an administrative claim related to under the FTCA is two years. 28 U.S.C. § 2401(b) (two-year statute of limitations). Because more than two years have passed since King's arrest in July 2014, any FTCA claim related to Officer Allen's conduct is now barred, and King's FTCA claims related to Officer Allen's conduct should be dismissed with prejudice here. *Id.*

Accordingly, the Court should dismiss the Allen-based claims for failure to state a claim and lack of subject-matter jurisdiction, or, alternatively, grant the United States summary judgment.

## CONCLUSION

For the foregoing reasons, the Federal Defendants respectfully request that the Court dismiss King's claims, or, alternatively, grant the Federal Defendants summary judgment.

59

Respectfully submitted,

PATRICK A. MILES, JR.
United States Attorney
Western District of Michigan

Date:  November 18, 2016

RYAN D. COBB
NICOLE L. MAZZOCCO
Assistant United States Attorneys
330 Ionia Ave. NW
Grand Rapids, MI 49503
(616) 456-2404
Ryan.Cobb@usdoj.gov
Nicole.Mazzocco@usdoj.gov

60