Exhibit B Part 1

1     If you discover that a juror has violated my
2 instructions, report it to my clerk.
3     You may take notes during the trial if you wish,
4 but, of course, you don't have to. If you do take notes,
5 you should be careful that it does not distract you from
6 paying attention to all of the evidence. When you go to the
7 jury room to decide your verdict, you may use your notes to
8 help you remember what happened in the courtroom. If you
9 take notes, do not let anyone except the other jurors see
10 them.
11     Your notes will not be examined by anyone, and
12 when your jury service concludes, your notes will be
13 collected and destroyed.
14     You can see that we have chosen a jury of
15 fourteen. After you've heard all the evidence and my
16 instructions, we'll draw lots to decide which two of you
17 will be dismissed in order to form a jury of twelve.
18     Possible penalty should not influence your
19 decision. It is the duty of the judge to fix the penalty
20 within the limits provided by law.
21     I may give you more instructions during the trial,
22 and at the end of the trial I will give you detailed
23 instructions about the law in this case. You should
24 consider all of my instructions as a connected series.
25 Taken all together, they are the law you must follow.

**13**

1     After all of the evidence has been presented and
2 the lawyers have given their arguments, I will give you
3 detailed instructions about the rules of law that apply in
4 this case. Then you will go to the jury room to decide on
5 your verdict. A verdict must be unanimous. That means that
6 every juror must agree on it, and it must reflect the
7 individual decision of each juror.
8     It is important for you to keep an open mind and
9 not make a decision about anything in the case until you go
10 to the jury room to decide the case.
11     Count 1: The defendant is charged with the crime
12 of assaulting, battering, wounding, resisting, obstructing,
13 opposing or endangering a police officer who was performing
14 his duties, and causing a bodily injury requiring medical
15 attention. To prove this charge, the prosecutor must prove
16 each of the following elements beyond a reasonable doubt:
17     First, that the defendant assaulted, battered,
18 wounded, resisted, obstructed, opposed or endangered a
19 police officer. *Obstruct* includes the use or threatened use
20 of physical interference or force, or a knowing failure to
21 comply with a lawful command. The defendant must have
22 actually resisted by what he said or did, but physical
23 violence is not necessary.
24     Second, that the defendant knew or had reason to
25 know that the person the defendant assaulted, battered,

**14**

1 wounded, resisted, obstructed, opposed or endangered was a
2 police officer performing his duties at the time.
3     Third, that the police officer's actions were
4 lawful.
5     I'll give you more detailed instruction in final
6 instructions and define the term *lawful* for you. But at
7 this time I need to see what evidence comes in, and then I
8 will give you a final instruction on *lawful* that fits the
9 trial.
10     Fourth, that such assaulting, battering, wounding,
11 resisting, obstructing, opposing or endangering caused a
12 bodily injury requiring medical attention or medical care to
13 the officer.
14     And just so we're clear here, Count 1 involves
15 Grand Rapids Police Officer Todd Allen.
16     Count 2: The defendant is charged with the crime
17 of assault with a dangerous weapon, felonious assault. To
18 prove this charge, the prosecutor must prove each of the
19 following elements beyond a reasonable doubt:
20     First, that the defendant either attempted to
21 commit a battery on Todd Allen or did an act that would
22 cause a reasonable person to fear or apprehend an immediate
23 battery. A battery is a forceful or violent touching of the
24 person or something closely connected with the person.
25

**15**

1     Second, that the defendant intended either to
2 injure Todd Allen or to make Todd Allen reasonably fear an
3 immediate battery.
4     Third, that at the time the defendant had the
5 ability to commit the battery, appeared to have the ability,
6 or thought he had the ability.
7     Fourth, that the defendant committed the assault
8 with a dangerous weapon, handcuffs. A dangerous weapon is
9 any object that is used in a way that is likely to cause
10 serious physical injury or death. Some objects, such as
11 guns or bombs, are dangerous because they are specifically
12 designed to be dangerous. Other objects are designed for
13 peaceful purposes but may be used as dangerous weapons. The
14 way an object is used or intended to be used in an assault
15 determines whether or not it is a dangerous weapon. If an
16 object is used in a way that is likely to cause serious
17 physical injury or death, it is a dangerous weapon. You
18 must decide from all the facts and circumstances whether the
19 evidence shows that the pair of handcuffs in question here
20 was a dangerous weapon.
21     Again, Count 2 involves Todd Allen, a Grand Rapids
22 police officer.
23     Court 3, which I'll read now, involves Federal
24 Bureau of Investigation Officer Douglas Brownback.
25

**16**

KING-000069

1      The defendant is charged with the crime of
2 assaulting, battering, wounding, resisting, obstructing,
3 opposing, endanger a peace officer of the Federal Bureau of
4 Investigation, who was performing his duties. To prove this
5 charge, the prosecutor must prove each of the following
6 elements beyond a reasonable doubt:
7      First, that the defendant assaulted, battered,
8 wounded, resisted, obstructed, opposed or endangered a
9 police officer. *Obstruct* includes the use or threatened use
10 of physical interference or force or a knowing failure to
11 comply with a lawful command. The defendant must have
12 actually resisted by what he said or did, but physical
13 violence is not necessary.
14      Second, that the defendant knew or had reason to
15 know that the person the defendant assaulted, battered,
16 wounded, resisted, obstructed, opposed or endangered was a
17 peace officer of the Federal Bureau of Investigation
18 performing his duties at the time.
19      Third, that the officer's actions were lawful.
20      Again, I'll define *lawful* in final instructions.
21      Mr. Kuiper, your opening statement, please.
22      MR. KUIPER: Thank you. I believe that the
23 evidence in this case is going to show that Officer Todd
24 Allen, who's an officer with the Grand Rapids Police
25 Department -- he's worked there 17 years -- was assigned to

**17**

1 the Fugitive Task Force, along the with Special Agent
2 Douglas Brownback, who works for the Federal Burden of
3 Investigation.
4      The Fugitive Task is designed to look for violent
5 criminals who have warrants and who know they have warrants.
6 They are unable to be apprehended by the plain detectives
7 that are working those cases or road patrol officers.
8      They were working the west side on or about
9 July 18, 2014, looking for a gentleman named Aaron Davidson.
10 They had received information that Mr. Davidson was in the
11 neighborhood of Alpine and Leonard a couple days prior to
12 July 18th.
13      They had a description of what he looked like,
14 which was a white male with short hair, approximately 6 feet
15 tall, slender build, with prescription glasses. They
16 received this information from a number of different people.
17      They checked with employees at Ralph's, which is a
18 grocery store near the intersection of Alpine and Leonard.
19 At that time, the same general description was given.
20      They checked, also, with employees at a Shell gas
21 station that is also located at the corner of Alpine and
22 Leonard. They give similar information that Mr. Davidson
23 was seen there on the 17th of July, 2014.
24      Mr. Davidson had an outstanding warrant for home
25 invasion, and the police hadn't been able to locate him at

**18**

1 all. The time that he was at both Ralph's and the Shell
2 station, the days preceding the 18th, was between 2:00 and
3 3:00 in the afternoon.
4      So, Officer Allen and Special Agent Brownback are
5 dressed in plain clothes. You're going to see some
6 photographs and a couple videos from the date in question.
7 They are dressed like normal civilians. However, they do
8 have a lanyard on with a badge on it, open carrying a
9 firearm, as well.
10      You're also going to see that the 18th is a
11 Friday. Leonard is very busy at this time, and the time
12 that they were surveilling the area of Leonard and Alpine
13 was between two and three o'clock in the afternoon,
14 consistent with the information they'd received that this
15 Aaron Davidson character was in that neighborhood.
16      On that date, they saw someone walking eastbound
17 from Tamarack on Leonard, and that is in the direction of
18 the intersection of Alpine and Leonard. That gentleman
19 happened to be the defendant. He was a white male,
20 approximately 6 feet tall, prescription glasses on, thin
21 build, and he had his shirt off.
22      The officers, with the information they had said,
23 *That looks like the guy that we're looking for.* They have
24 photographs. They have photographs. They had an old
25 photograph they were relying on, a 2007 photograph of

**19**

1 Mr. Davidson, and also a more recent photograph of
2 Mr. Davidson, to indicate he had short hair, glasses. It's
3 a picture of him playing a guitar. And you will see those
4 photographs that the police utilized to try to ascertain the
5 identity of Mr. Davidson.
6      Obviously, he's on the run. They don't have
7 immediate access to what he exactly looked like,
8 Mr. Davidson, that is, as of July 18th, 2014. They had a
9 general description.
10      They see the defendant walking down the street.
11 It looks like Mr. Davidson, headed in the direction of
12 Alpine and Leonard. So, they decide they're going to make
13 contact with him and ascertain his identity to see if he is
14 Mr. Davidson.
15      Officer Allen gets out and holds his badge up and
16 says, *I'm with the Grand Rapids Police Department. I'm*
17 *Officer Todd Allen. We're looking for someone that matches*
18 *your description who has a warrant. We need to ascertain*
19 *your identity.*
20      He asks whether or not the defendant has any
21 identification on him. He says, *No, I don't.* Said, *Well,*
22 *we're going to need to ascertain your identity before we let*
23 *you go.* The defendant had a cell phone in his hand at that
24 time and Officer Allen says, *We need to take your phone*
25 *because* -- obviously, they're looking for violent criminals

**20**

KING-000070

**29**

1  James is still yelling to the people who are
2  starting to form a crowd, *Call the police. Call the police.*
3  *These guys are mugging me. These guys are mugging me.*
4  *Somebody call the police.*
5  While this is going on, James is then -- the two
6  very large officers -- and you'll get to see them -- are on
7  top of him. And James is going to tell you that, yes, he
8  bit one of the officers. And he will explain to you in
9  great detail why he did. He'll tell you why. And when you
10  hear that, you will understand.
11  Eventually, James hears the sirens and the police
12  arrive. James will tell you that he knows they are the
13  police because they arrive in marked cruiser. He knows they
14  are police because they are wearing uniforms.
15  The officer walks up to him and said, *What's going*
16  *on*, and James says, *They're mugging me, they're mugging me.*
17  You will hear that. You'll hear him say it in his very
18  labored and painful voice, *They're mugging me.*
19  You'll also find out that James is not the person
20  these guys are looking for. You'll get a chance to see the
21  picture of the alleged person they're looking for. And you
22  will also see that he doesn't even look like the person they
23  are looking for. He was just a young man who moved out here
24  from Alpena, who had come here to go to school, Grand Valley
25  State University, who was studying computer science, who

**30**

1  wants to study cyber security, who wants to be employed for
2  the government to help bring about cyber security, which is
3  a major concern right now, who was minding his business, and
4  these two gentlemen cause this whole situation.
5  So, after you've heard all the evidence, after you
6  have seen the exhibits, after you've had a chance to put
7  together all of the pieces, the only verdict you'll be able
8  to reach is not guilty. There is nothing whatsoever that
9  would be able to convince you beyond a reasonable doubt that
10  James knowingly and willfully was assaulting a police
11  officer.
12  And, if you listen to the instruction, one of the
13  instructions that he read was that the officers had to be
14  acting lawfully. The Judge will define that. You will also
15  come to the conclusion that what they were doing was not
16  lawful.
17  So, after you've heard all the evidence, the only
18  verdict you'll be able to reach is not guilty.
19  Thank you for your time.
20  THE COURT: Mr. Kuiper, your first witness,
21  please.
22  State your full name, please.
23  MR. ALLEN: Todd Allen.
24  THE COURT: Do you solemnly swear or affirm that
25  the testimony you're about to give in this matter will be

**31**

1  the truth, the whole truth, and nothing but the truth, so
2  help you God?
3  THE WITNESS: Yes, I do, sir.
4  THE COURT: Please be seated.
5  TODD ALLEN,
6  called by the People at 9:46 a.m., sworn by the Court, testified:
7  DIRECT EXAMINATION
8  BY MR. KUIPER:
9  Q.  Good morning, Officer Allen.
10  A.  Good morning.
11  Q.  Where are you currently employed?
12  A.  City of Grand Rapids Police Department.
13  Q.  How long have you held a position there?
14  A.  Approximately 17 years.
15  Q.  What's your current assignment?
16  A.  Currently assigned to our Detective Unit, to the Violent
17  Crime Fugitive Task Force, working with the FBI.
18  Q.  How long have you held a position in that capacity?
19  A.  About a year-and-a-half.
20  Q.  Would you explain to the jury what the Fugitive Task Force
21  is?
22  A.  Sure. The Fugitive Task Force is a joint project set up by
23  the FBI, working with local jurisdictions to help apprehend
24  violent criminals in our area.

**32**

1  There are two Grand Rapids detectives assigned to
2  the team, there's two FBI agents directly assigned to the
3  team, and there is also currently a part-time Ionia County
4  Sheriff Detective that's assigned to the team.
5  Our task, again, is working on strictly violent
6  crime. So, it includes home invasions, felonious assaults,
7  shootings, stabbings, murders. We respond to every bank
8  robbery in West Michigan. Our direct task, I guess, as the
9  task force, is to try to apprehend the violent criminals
10  that committed the crimes.
11  So, for us to be able to go after someone, a
12  felony warrant has to have been issued by the local
13  jurisdiction. And then we have to submit paperwork to the
14  FBI office, I guess, to grant the team permission to go
15  after the subject.
16  And then we track the subject, try and apprehend
17  the subjects. Once they are caught, whether we catch them
18  or somebody else catches them, once they're arrested, then
19  we pick up a new case, whether it's from -- the ones I'm
20  specifically helping out with are Grand Rapids criminals,
21  but we might pick one up from Holland, or Ottawa County or
22  Ionia County, and we have the Ionia County detective there.
23  So, it's kind of a joint team that works to
24  strictly focus on catching violent criminals that have an
25  active felony warrant.

KING-000073

1 Q. Are you generally the first line of law enforcement that

2 attempts to arrest these individuals with violent criminal

3 warrants?

4 A. No. Typically the way the process works in our detective

5 unit, is the detective, once they're assigned a case, they

6 will try and interview the suspect, try to get a statement

7 from the suspect. They'll typically have had contact with

8 the suspect or a witness, or boyfriend or girlfriend, or

9 family member of the suspect.

10　　　　Then whether they interview the person or not,

11 once a warrant is obtained for the suspect, typically the

12 detective will attempt contact again to try and get the

13 suspect to turn themselves in. Or, the detective will go

14 out and, himself or herself, with a partner, they'll try

15 and arrest the suspect. Or, they'll send a message out to

16 patrol officers or community officers that, *Hey, a warrant*

17 *has been issued for this person. Can you try and arrest*

18 *the suspect on this warrant?*

19　　　　So, typically the suspect or the fugitive that we

20 would get is past the detective trying to make contact,

21 past the patrol officer trying to make contact, past the

22 community officers trying to make contact. And the reason

23 why typically they're coming to our task force, is because

24 they are a flight risk, or they haven't been caught, or

25 they're unable to be caught, or they're refusing to

33

1 cooperate. So, that's why it's specifically assigned to us

2 to try to locate them.

3 Q. Hence, the title *fugitive*?

4 A. Correct.

5 Q. Do you know the name Aaron Davidson?

6 A. Yes.

7 Q. And were you working on apprehending him on July 18th of

8 2014?

9 A. Yes.

10 Q. Did you obtain any information about Mr. Davidson and his

11 potential whereabouts?

12 A. Yes. So, the way our process typically works is, perhaps a

13 week or two weeks will have past since the warrant was

14 issued for the suspect. They haven't been located, they

15 haven't turned themselves in, or maybe a detective has

16 information that the subject is attempting to flee the area

17 or just avoid the police. We'll pick up the case.

18　　　　I'll dig through every report that I can find

19 that has them on it, a relative on it, an ex-girlfriend on

20 it. We'll look at their driving record to see what

21 addresses they have registered to. We have past media and

22 informational data bases that the FBI has, of course, that

23 -- so, we'll develop some information about them,

24 specifically where they may be located or who they

25 associate with.

34

1　　　　Then we'll typically go out and try and canvass

2 the area. I'll try and make contact with family members,

3 I'll try and make contact with landlords. We'll check

4 local area businesses to see if the person has been

5 frequenting the area, and we'll try and develop a pattern

6 of where they're likely to show up or appear so that then

7 we can apprehend them.

8 Q. Oftentimes, or is it fair to say almost all the time, you

9 have not had direct physical contact with the suspect you're

10 looking for?

11 A. Yeah. Almost never, unless it's someone that, from my

12 years of being at the police department, maybe I have had

13 contact with them, you know, several years prior on a

14 different case, or something of that nature. But typically

15 we've never had contact with them before we attempt to

16 catch them. Correct.

17 Q. To your recollection, have you ever had contact with

18 Aaron Davidson prior to the 18th of July of last year?

19 A. Never met him, never even heard of his name before.

20 Q. Okay. I'm going to show you what I'm going to have marked

21 as People's Proposed Exhibits 1 and 2.

22　　　　(Exhibits 1 & 2 marked)

23 BY MR. KUIPER:

24 Q. Here's Proposed Exhibit Number 1. Let me get by a

25 microphone so Mr. Poelman can hear me.

35

1　　　　Do you recognize what's depicted in Proposed

2 Exhibit Number 1?

3 A. Yes. It's -- we call it a bio sheet. So, I actually

4 created this, and it's for our team.

5　　　　Again, we have two Grand Rapids detectives, two

6 FBI detectives. At this time, we also had a third FBI

7 agent that was assisting us on partial days. And then we

8 have an Ionia County detective on our team.

9　　　　So, we make a general rundown sheet of basic

10 information we have on the person that we're trying to

11 apprehend. If further information develops, you know,

12 we'll add to the sheet or take away from the sheet, or if

13 we learn of a new address for them or a new girlfriend that

14 the person is with, we'll add that to the sheet as -- as

15 the -- kind of the case file builds.

16 Q. Did you -- did you obtain or create that document, Exhibit

17 Number 1?

18 A. I did.

19 Q. Okay.

20　　　　MR. KUIPER: Your Honor, I'll move for admission

21 of Proposed Exhibit Number 1.

22　　　　MR. GREENE: No objection.

23　　　　THE COURT: Admitted.

24　　　　(Exhibit 1 admitted)

25

36

KING-000074

BY MR. KUIPER:

Q. Now that exhibit, underneath the photograph there, someone listed as Aaron Davidson, there's the year 2007?

A. Yes.

Q. Do you know where that photograph was from?

A. Yes. This is his Secretary of State photo.

Q. Okay. 2007, obviously there would have been seven years prior to the time you were looking for him?

A. Correct. At the time I made this sheet, that was the most recent photo that I could find of him. So, we knew that it was an older photo, but there's a likeness that we at least could have.

Q. Do you know approximately how old Mr. Davidson is or was in 2014?

A. Twenty-six.

Q. Okay. So that photograph, in 2007, would have been when he was a late teen?

A. Correct.

Q. I'm going to show you what's marked as People's Proposed Exhibit Number 2 now.

MR. GREENE: (Reviewing)

BY MR. KUIPER:

Q. Do you recognize what's depicted in that photograph, Officer Allen -- or Detective Allen?

A. Yes. It's a second bio sheet that I created.

37

Q. Okay. And you -- you created that document?

A. Correct.

Q. And that's in reference to Aaron Davidson?

A. Correct.

MR. KUIPER: Your Honor, at this point I move for admission of Exhibit Number 2.

MR. GREENE: Without objection.

THE COURT: Admitted.

(Exhibit 2 admitted)

BY MR. KUIPER:

Q. Would you describe for the jurors what's on that document?

A. Sure. Have they seen this yet?

Q. No.

A. Okay. So, this was just updated information that I had from my original document that I created for our team.

That is an updated, more recent current photo of the suspect that we're looking for. It has additional physical descriptors based on information that I had developed from talking to area business owners and area residents. It also has on it some information about his travel patterns and a different -- slightly different height description that I had to obtain from talking to various people. And that also came from the incident report from witnesses that observed the original suspect at the original time that the crime occurred.

38

Q. Do you know approximately when the original -- the crime for which he had a warrant occurred?

A. Sure. I can tell you. I have a copy of the original police report here.

MR. KUIPER: Your Honor --

THE WITNESS: It happened --

MR. KUIPER: -- I just ask, is it all right if Officer Allen refers to his file to refresh his recollection?

THE COURT: Sure.

MR. GREENE: (Nods affirmatively)

THE COURT: Go ahead.

THE WITNESS: The original incident happened June 17, 2014.

BY MR. KUIPER:

Q. The photograph that's depicted in Exhibit Number 2, where did you obtain that?

A. That is from Aaron Davidson's Facebook page.

Q. Was that the best photograph that you could get off of his Facebook page?

A. Yes, it was.

Q. Okay. It's fair to say you're trying to get the best description, the best photograph you can, to enable you to positively identify who this person is if you ever cross paths with him?

39

A. Yes. We're looking for the most accurate, current, up-to-date photo image of the suspect so that we know who we're going to encounter. And, of course, there's several reasons, obviously, why we want to get the correct person.

Obviously, there is significant amount of citizens and officer safety issues with the nature of our task force, trying to apprehend aggressive, violent criminals.

Q. Okay. Other than photographs that you already testified about, the information that's contained there in Exhibit Number 2, what pieces of information are contained in that document and how did you obtain them?

A. It has his name and his birth date and current age. There is a broader height description that says 5'10 to 6', and then it also says that it's possible he's 6' to 6'3.

That information was obtained because there were two witnesses. When the original incident occurred in June, two witnesses that described the suspect as being about approximately 5'10, and then I had also talked to -- information on the sheet -- I had talked to the clerks at Ralph's supermarket on the west side on Leonard Street. They had seen the suspect we were looking for.

They also described him as significantly shorter than 6'3. I had also talked to the Shell gas station owner at Alpine and Leonard. The Shell gas station owner said

40

KING-000075

1  that our suspect comes in there almost everyday, around
2  two to four o'clock, to buy a pop. And he said he had seen
3  him just the day prior. And he also described him as being
4  significantly shorter than 6'3.
5           There was also a group of people that we had
6  talked to that knew the suspect specifically. They said
7  they know him specifically by name, and they also said that
8  he's definitely not 6'3, that he's closer to 6' tall.
9           So, for my team, for our purposes of trying to
10  identify the suspect that we're looking for, Mr. Davidson,
11  I had put a broader description of him based on the
12  intelligence that we received.
13  Q.  Why is 6'3 on that document?
14  A.  Because -- which is oftentimes or sometimes inaccurate, but
15  that's the height that was taken from the Secretary of
16  State from his driver's license status, which, as everyone
17  knows you can go into the Secretary of State and you just
18  fill out a form and say, I'm 6'3, 210 pounds. They don't
19  measure you. They don't weigh you there. They just take
20  down your information.
21           So 6'3 is what Aaron Davidson had put on his
22  Secretary of State document.
23  Q.  So, you're trying to combine all the information you have
24  from people that know him, that have witnessed him, that
25  have seen him recently, and the information that you've

41

1  obtained from the Secretary of State's database?
2  A.  Correct.
3  Q.  Okay.
4           When you're out in the field attempting to look
5  for these fugitives, what type of attire do you wear?
6  A.  We are assigned a plain-clothes position. Based on the
7  nature of the job description that I gave you earlier, our
8  job is very surveillance intensive. So, we obtained
9  information on a suspect's possible whereabouts: a
10  girlfriend's address, a parent's address, where they
11  possibly might be working, sometimes a temporary job
12  status. So, we'll have to conduct surveillance to see if
13  we can see the suspect in the area, or at the business, or
14  at the residence.
15           We're assigned a plain-clothes assignment.
16  Typically, day-to-day I'll wear a pair of jeans and a
17  sweatshirt. I have my Grand Rapids Police Department
18  issued gun, badge, our extra bullet magazines or bullet
19  pouches. I have a flashlight, a set of handcuffs.
20  Sometimes I wear a hat if it's a sunny day. Sometimes I
21  wear sunglasses if it's a sunny day.
22           In the wintertime, I wear heavier boots just
23  because sometimes we're walking, trying to make contact
24  with businesses, and we might be doing surveillance in a
25  back alley.

42

1           We also have plain cars that are unmarked cars
2  that we use, again, just for surveillance purposes so that
3  we don't stick out like a sore thumb, because obviously the
4  people we're looking for, their intention is to not be
5  caught. They've already shown that pattern that they do
6  not want to be caught, so we have to use different --
7  different aspects, I guess, of being able to conduct
8  surveillance without giving our position away.
9  Q.  Okay. So, to summarize, can you tell the jurors -- let me
10  ask you this first. Were you working July 18, 2014?
11  A.  Yes. Yes, I was.
12  Q.  And, were you looking for Aaron Davidson on that day?
13  A.  Yes, I was.
14  Q.  Were you near the intersection of Alpine and Leonard in
15  Grand Rapids, Michigan?
16  A.  Yes, I was.
17  Q.  Was anybody assigned to work with you that day?
18  A.  Agent Brownback from the FBI.
19  Q.  Okay. What, if any, identifying features did you have to
20  identify the fact that you were a police officer?
21  A.  I have a neck badge, which I'm wearing if you want me to
22  show them.
23  Q.  Please.
24  A.  Sure. I wear it every day (displaying badge). My daughter
25  asks to put it on every night when I come home. She likes

43

1  to play with my *bad guy badge,* as she calls it. You don't
2  mind if I stand up?
3           THE COURT: Fine.
4           THE WITNESS: I have a neck badge. Any time we
5  exit our vehicle, I take it out if we're going to make
6  contact with someone. If I'm knocking on your door saying
7  I'm looking for a neighbor two doors down.
8  BY MR. KUIPER:
9  Q.  Can I stop you just a second there?
10  A.  Sure.
11  Q.  The gentleman in the back there, Mr. Poelman, I don't know
12  if he can pick you up. We need to make sure that everything
13  goes into the mike, Officer -- or Detective Allen, I'm
14  sorry.
15  A.  I want to make sure that, whoever I come in contact with,
16  obviously they know exactly who I am because I'm wearing a
17  pair of jeans and a sweatshirt, typically. And I have a
18  vest-type over that, that has various pockets in it, a
19  tactical vest, we call it. But it has various pockets,
20  just to put cleaning solvent and pens and paper, notes or
21  whatever, with us.
22           So, we'll have a neck badge that I wear everyday.
23  And this is a personal preference of mine, just based on
24  things that have happened across the country in law
25  enforcement, for target focus. It's called *target focus.*

44

KING-000076

1  It's when someone gets into a deadly encounter. If someone
2  sees a gun, your natural instinct as a human is to look
3  directly at the gun, not see what's going on elsewhere. So
4  it's a personal preference of mine. It's not required, but
5  I carry a second badge and I wear it everyday that I wear
6  -- I wear it next to my gun. And that's just so that, if
7  I'm -- I'm knocking on someone's door saying, *Hey, I'm*
8  *Detective Allen*, and you see the gun, you're going to be
9  looking at the gun, not looking at me, or listening to what
10  I'm saying.
11      You're just going to be probably looking at the
12  gun, so I have a badge here, as well, so that everyone
13  knows, law enforcement included. Because sometimes we work
14  with outside agencies. If we're working with Ottawa County
15  on a bank robbery or Muskegon on a bank robbery, which
16  happened very recently, I don't know their officers and
17  they don't know me, and here comes a guy out of a plain-
18  clothes vehicle doing surveillance. They know we are
19  there, but they don't know who we are.
20      So, I want to make sure that, if another officer
21  sees me coming out, they know exactly who I am, that I'm
22  very clearly law enforcement.
23  Q.  Okay. So they're not pulling their guns on you, thinking
24  you might be involved in some criminal activity?
25  A.  Correct. Correct.

45

1  Q.  Due to the fact you have the firearm?
2  A.  The firearm, and I have my extra magazines here
3  (indicating). I carry a flashlight here (indicating)
4  everyday, so it's very obviously in plain view.
5  Q.  Obviously you've testified you were wearing different
6  clothing on the 18th of July of last year, but did you have
7  all those identifying features that you've shown the jury,
8  on, on the 18th of July?
9  A.  Yes, I did.
10  Q.  Okay. At some point in your 2:30 in the afternoon, do you
11  remember what location you were on the 18th of July of last
12  year?
13  A.  Yes. We were — Agent Brownback and I were doing
14  surveillance in the area, driving the area of Leonard and
15  Alpine, because Mr. Davidson, who we were looking for, was
16  again seen by citizens that knew him personally. They said
17  that they last saw him walking westbound from that
18  intersection, from Leonard and Alpine. They said they saw
19  him walking with a Ralph's bag, westbound.
20      So, naturally, as any person would, we went to
21  Ralph's to see if they had also seen him. That's when the
22  clerks identified him, showed them both photos that we
23  have, and they said, *Yes*. Everyone that we spoke to said,
24  *Yes, he looks more like the current photo you have, the one*
25  *with him with the guitar. He has short dark hair. He's*

46

1  *much shorter than 6'3.* And they also described him as very
2  thin, wearing prescription-type glasses.
3      So, the Ralph's clerk also verified he was in the
4  area the day prior. And then we had spoke with the Shell
5  gas station clerk/owner on about two or three subsequent
6  days, and he also said that the suspect comes in everyday
7  between 2:00 and 4:00 and buys a pop. He also said that
8  the suspect leaves, going out the door, and he pointed
9  westbound.
10      So, we were driving the area, just attempting to
11  locate the suspect. As all of our intelligence indicated,
12  he would be on foot in the area, probably coming towards
13  Ralph's supermarket or the gas station, to buy a pop.
14          MR. KUIPER: Your Honor, before I ask him anymore
15  questions, I just ask if it's permissible at this point to
16  publish Exhibits 1 and 2 to the jurors.
17          THE COURT: Sure. Go ahead.
18          MR. KUIPER: Thank you.
19          (Publishing Exhibits 1 and 2 on overhead)
20  BY MR. KUIPER:
21  Q.  Now, this -- I'm showing you Proposed Exhibit Number 1.
22  That's the 2007 photograph you have from the Secretary of
23  State?
24  A.  Correct.
25  Q.  And that's where you got the height of 6'3 from that -- from

47

1  the database?
2  A.  Correct. That's the initial information that I had
3  obtained from the Secretary of State.
4  Q.  Can everyone see that?
5          THE JURY: (Nods affirmatively)
6  BY MR. KUIPER:
7  Q.  Now, showing Exhibit Number 2. That's the photograph -- the
8  best photograph you could get from Mr. Davidson's Facebook
9  account?
10  A.  Most current, correct.
11  Q.  Okay.
12  A.  Most current and best photo of any facial shot we had of
13  him, yes.
14  Q.  That's not a very good facial shot, is it?
15  A.  It's not, but it gives a more accurate description of what
16  we felt he would look like, based on the information we had
17  obtained from all the other people we spoke to. You know,
18  short dark hair, still wearing prescription glasses. Yes.
19  Q.  Did you see someone who you thought might be Aaron Davidson
20  at about 2:30 in the afternoon on the 18th of July?
21  A.  Yes, I did.
22  Q.  And were you positive that person was Aaron Davidson?
23  A.  No, we're not. We're never 100-percent positive until we
24  make contact with someone and verify their I.D., if they
25  have an I.D., or verify them through our computer database.

48

KING-000077

1  Q.  You saw someone who you thought might be him?

2  A.  Correct.

3  Q.  Do you see that person in the courtroom today?

4  A.  Yes, I do.

5  Q.  Would you point him out for the jurors, please?

6  A.  Sitting on the far right side of the table in the grey
7      blazer.

8          MR. KUIPER:  Your Honor, can the record reflect
9      that Detective Allen has identified the defendant?

10         THE COURT:  It may.

11         MR. KUIPER:  Thank you.

12 BY MR. KUIPER:

13 Q.  Was he in a little bit different clothing when you saw him?

14 A.  Yes, he was.  He was wearing blue jeans and he had no shirt
15     on.

16 Q.  And, did he have glasses on?

17         MR. GREENE:  Your Honor, I'm going object to the
18     leading questions.  I've been very patient, but now we're
19     getting into the crux of the matter.

20         THE COURT:  Well, the question, *Did he have
21     glasses on*, you are objecting to that?

22         MR. GREENE:  Yes.  Suggesting that.  He can ask
23     him, *What* was he wearing.

24         THE COURT:  Overruled.  I'll allow the question to
25     that.

49

1          MR. KUIPER:  Your Honor, if I'd ask, *Isn't it true
2      that he had glasses on*, that would be leading.  But, *Did he
3      have glasses on*, is not.

4          THE COURT:  Go ahead.

5  BY MR. KUIPER:

6  Q.  Did he have glasses on?

7  A.  Yes.  He was wearing prescription-type glasses.

8  Q.  Okay.  Did you attempt to make contact with him?

9  A.  Yes, we did.

10 Q.  Do you remember where that was in -- on Leonard?  Was it
11     near the intersection of Tamarack?

12 A.  Yes, it was.

13 Q.  Okay.  Would you describe to the jurors how you attempted to
14     a make contact with him?

15 A.  Sure.  Agent Brownback and I again were doing surveillance
16     in the area, driving the area.  We saw the defendant,
17     Mr. King, walking on foot.  He was walking eastbound on
18     Leonard, west of Tamarack, and he was walking towards the
19     intersection, which is only about a block-and-a-half away.
20     He was walking towards the intersection of Leonard and
21     Alpine, which is where all of our information was that the
22     suspect would be going.

23         He matched the physical description of what we
24     were looking for.  He was 5'10 to 6'3.  We could easily see
25     that he was a thin build, because he wasn't wearing a shirt

50

1  at all.  He had blue jeans on, which was the description we
2  had got from everybody that we had spoken to.  They had
3  said that the suspect, the day prior, was wearing blue
4  jeans and a thin white tank top -- often street lingo refer
5  to a wife-beater tank top -- and that he also has
6  prescription glasses.

7          Mr. King, again, was walking towards the
8  intersection that we were doing specific surveillance on,
9  looking for our target.  He was wearing blue jeans, no
10 shirt.  He had prescription glasses.  He had short dark
11 hair.

12         I looked at him -- as we do in our surveillance
13 mode, I looked at him through our binoculars for a
14 significant amount of time, handed the binoculars to my
15 partner, Agent Brownback.  He looked at him for a
16 significant amount of time.  We both felt strongly that
17 there was a very good possibility.

18         MR. GREENE:  Objection, your Honor.  He cannot
19 testify as to what Agent Brownback thought.

20         MR. KUIPER:  Your Honor, I will only offer what
21 Agent Brownback said to show the actions that they jointly
22 took.  And Agent Brownback will be available for
23 cross-examination.

24         THE COURT:  Well, just speak of what your feelings
25 were, and Agent Brownback can testify as to what his were.

51

1          THE WITNESS:  Sure.  I felt strongly that there
2  was a possibility that this was our -- our suspect that we
3  were looking for.

4          From our standpoint, again, when we're doing
5  surveillance, we typically don't get out unless it's someone
6  that we know or we feel strongly is our suspect, because we
7  don't want to give up our position, I guess you would say.

8          The negative things that could happen in our
9  typical surveillance mode, is the person we're looking for
10 sees us, jumps out on someone else to make contact with
11 them.  They obviously know there's some plain-clothes
12 surveillance officers in the area.  Now they're probably not
13 going to come back to the area.

14         So, unless we're pretty confident or feel strongly
15 that there is a good possibility that this is the person
16 we're looking for, we typically won't make contact with
17 someone.

18         Another standard way we would do it, is we would
19 ask patrol officers to assist us with the contact.  In this
20 instance, at the time that we were watching what turned out
21 to be Mr. King walking towards us, we felt it was our
22 suspect.  I felt it was our suspect.

23         At this exact time, our patrol officers were
24 working on a person that they had thought or that witnesses
25 thought was drowning in the river by the fish ladder, so all

52

KING-000078

1   of our patrol officers were tied up.  So, we had no one to
2   assist us making the contact.
3           So, we decided to make contact with him to verify
4   who he was, again, just to make sure that he was or was not
5   the suspect that we were looking for.
6   Q.  Okay.  So, you got out of your, your vehicle?
7   A.  Correct.  So, as the subject approached us on foot, we're
8   watching him walk up the sidewalk.  He was on the south
9   side of the sidewalk, walking east towards Alpine and
10  Leonard.  I drove -- we actually drove -- I drove, because
11  I was driving.  We drove around -- I drove around the block
12  several times, passing by, trying to get a better glimpse
13  of his face.  So, I passed him several times.
14          I pulled into a parking lot, perpendicular parked
15  to the sidewalk so that my engine block is right up on the
16  sidewalk so that the person that we're watching would walk
17  right up on us, very typical of the surveillance that I
18  have to conduct on a daily basis.  So, the subject walked
19  basically right up to our car.  I got out, Agent Brownback
20  got out, and I made contact with the person.  I identified
21  myself, said, *I'm Detective Allen with the Grand Rapids
22  Police Department.*
23          Being that I'm the initial person making contact,
24  the way our police tactics work, is we try not to confuse a
25  person by having multiple people speak at once.  So, I

                                53

1   identified myself, showed him my badge.
2           *I'm Detective Allen with the Grand Rapids Police
3   Department.  This is Agent Brownback with the FBI.  We're
4   on a Fugitive Task Force.  We're looking for a specific
5   person who is wanted on a felony warrant for a home
6   invasion.  You look like our person.  Do you have any I.D.
7   on you where we can verify who you are?  And that's how the
8   contact began.*
9   Q.  Before you go on, obviously you have a blazer on for court.
10  You were in plain clothes at that time?
11  A.  Correct.
12  Q.  And did you have the identifying features that you've
13  already shown the jury on at the time that you made contact
14  with the defendant?
15  A.  Yep.  The time I made contact with the defendant, again, I
16  had my badge, my neck badge.  I pulled it out to make sure
17  that it's easily seen.
18          So, I had my neck badge out, I had a long-sleeved
19  black undershirt on, and then I had a black — my black
20  tactical vest on, which is just a black sleeveless vest
21  with pockets on it, over.  And I had a pair of blue jeans
22  on, and then I had my belt badge and my gun, magazine
23  pouch, flashlight, all in plain view.
24  Q.  Do you recollect, did Special Agent Brown, if you saw him,
25  did he have any identifying features that anyone walking

                                54

1   down the street could tell he was an officer or a special --
2   an agent with the FBI?
3   A.  Yes, he wears a similar --
4           MR. GREENE:  Your Honor.
5           THE WITNESS:  -- gun belt array that I use.  They
6   have different weapons assigned to them for the FBI, because
7   that's their department.  That's their department's choice.
8   But he has a different gun belt, but he also has a neck
9   badge, which is a slightly different FBI neck badge.  And at
10  the time of making contact, he also opened up his FBI
11  credentials.  That it's just a billfold that opens up and it
12  has *FBI Agent* and a picture of him and some various
13  information about him, so.
14  BY MR. KUIPER:
15  Q.  Okay.  So, after you identify who you are and why you're
16  contacting the defendant, what happens after that?
17  A.  Well, again, I identified myself.  He asked again who I
18  was.  So, I again said, *I'm Detective Allen with the Grand
19  Rapids Police Department, and this is Agent Brownback.  We
20  work on an FBI Fugitive Task Force together.  And I again
21  said, We're looking for a specific person who is wanted on
22  a felony warrant for home invasion, and that we need to
23  verify who he was.*
24  Q.  Did you ask whether or not he had identification?
25  A.  I did, and he said he did not have any identification on

                                55

1   him.
2           At that point, I said, *Well, if you don't have
3   any I.D. on you, we're going to have to verify who you are
4   somehow to make sure you're not the person that we're
5   looking for.*
6           We asked him what his name was.  He said, *James.*
7   And Agent Brownback then asked him again who he was, and he
8   said James.  Then asked him, *Well, what is your last name,
9   James?*  He said, *I'm not gonna tell you what my last name
10  is.*
11  Q.  What did you do at that point?
12  A.  At that point, because he wasn't producing any
13  identification, because now he's refusing to tell us who he
14  was, based on my experience in 17 years of law enforcement,
15  typically you would think that this is probably our guy.
16  He's not cooperating with us, he's unwilling to show us his
17  I.D., and he's not -- he's refusing to tell us what his
18  name is.  So, I asked him to step towards my car so that
19  we're off of the sidewalk and away from the roadway.  I
20  said, *Hey, we're just -- again we're just going to have to
21  verify who you are.*  I asked him if he had any weapons on
22  him, and he said, Yes, I do.
23          So at that point it becomes an officer safety
24  issue.  Certainly, I don't know what kind of weapon he
25  might have on him, and we just have to make sure that he --

                                56

1   we disarm him of his weapons while we're conducting our
2   investigation, trying to figure out who he is -- or exactly
3   who he is.
4   Q.   How did you do that?
5   A.   So, at that point our standard police tactics, I had him
6        step over to the -- what would -- the way my car was
7        positioned, it would be my front left driver-side quarter
8        panel by the tire. Asked him to face away from me, asked
9        him to put his hands on his head.
10            Prior to doing that, he was walking with his cell
11       phone in his hand. I asked him to hand me his cell phone.
12       I held out my hand, he handed it to me, and I handed it
13       over to Agent Brownback. I did that for multiple reasons,
14       mostly for officer safety.
15            Certainly, we don't want someone getting on their
16       phone right away calling for other people to come, and then
17       we have to deal with a massive crowd, because there's
18       obviously a safety issue there. Second reason is -- it's
19       happened to me before -- in my experience, where whatever
20       object --
21            MR. GREENE: Objection, your Honor. Your Honor,
22       objection. Whatever happened to him before is totally
23       irrelevant here.
24            MR. KUIPER: It absolutely is relevant.
25            THE COURT: Overruled. It provides context.

57

1        Go ahead.
2        THE WITNESS: So I asked him to again hand me his
3   cell phone, because I didn't want him to use it as an impact
4   weapon of some sort to strike myself or my partner with.
5        He handed it to me, and I handed it over to
6   Agent Brownback. I asked him to put his hands on his head.
7   He did. He put his hands on his head. I told him I was
8   going to pat him down for weapons.
9        As I did, or as I began to, I had one hand on his
10  hands to keep them sturdy, then I felt a little knife pouch
11  on him. I removed the knife, asked him if this was the
12  weapon he was talking about, and he said, Yes.
13       I handed that to Agent Brownback. I continued to
14  search him -- or not search him, I continued to pat him down
15  for weapons. Again, not knowing. Originally, he never said
16  what weapon he had, and certainly you don't know if someone
17  has more than one weapon on him.
18       So, as I started to do that, Agent Brownback
19  was --
20  BY MR. KUIPER:
21  Q.   Can I --
22  A.   Go ahead.
23  Q.   Can I interrupt you just --
24  A.   Sure.
25  Q.   When you said that you grabbed his hands, they were on top

58

1   of his head. But are you trained to do that?
2   A.   Yes.
3   Q.   Okay. When you did that, did -- did you force him into the
4        car, slam him into the car at all?
5   A.   No, I did not.
6   Q.   Okay. So, his head was not touching your vehicle at that
7        time when you had hold of his hands?
8   A.   Correct. He's -- just if I could demonstrate for the jury
9        (demonstrating). I just had him stand, face away from me
10       so that he's not facing me directly to create a combative
11       situation where the suspect would have an advantage, but
12       had him face away from me, put his head on his head,
13       interlock his fingers.
14  Q.   Why don't we do it this way? I will be the defendant and
15       you show the jurors what you did.
16  A.   Sure.
17  Q.   Okay.
18  A.   (Demonstrating)
19  Q.   Let's say the front of the jury panel is your hood right
20       here (indicating).
21  A.   Okay. So, I had him step to the front quarter panel, where
22       the tire is at; asked him to place his hands on his head.
23       I gripped his hands in this manner here (indicating), that
24       way we have control of the subject. Should he try and pull
25       away, it gives us an advantage in terms of being able to

59

1   counter whatever aggressive move that he's going to make.
2   I've got control of his hands. We'll typically grab ahold
3   of his belt or his waistband, ask him to spread his legs a
4   little bit so we can have a better view and better stance,
5   as you will, for us to -- a sturdier stance to hold him
6   upright. We don't want him falling over, or anything like
7   that.
8        Then, again, he doesn't have a shirt on. He's
9   got jeans on. And then he had a knife pouch right here
10  (indicates), which I felt the knife pouch and I removed the
11  knife. I said, Is this the weapon you're talking about?
12  He said, Yes. Handed it to Agent Brownback, who is
13  actually on this side of me (indicates), handed it to him.
14       And then as I continued to pat him down, look for
15  weapons --
16  Q.   Let me stop you there, Officer Allen. When you say, this
17       side, everything here is being recorded. What side are you
18       indicating, your left or your right?
19  A.   The knife pouch is on his right side. Agent Brownback is
20       standing on my left side. So, I took the knife out of my
21       right hand, handed it to Agent Brownback, who is on my left
22       side.
23       As I was coming around to check for anything
24  stuffed behind his back, because now this is the first time
25  I'm seeing the subject's back, I notice that he had a large

60

KING-000080

1  wallet in his back pocket.  I tapped his wallet, I said,
2  *You're telling me that you don't have an I.D. on you when*
3  *you have this big wallet in your back pocket?*  I was
4  thinking, of course, this is probably our -- our subject
5  that we're looking for because, A, he was saying he didn't
6  have I.D. from the very get-go, then he's refusing to say
7  his name.
8          Now I can clearly see a wallet in his back pocket
9  and, as most people would, they carry their I.D. in their
10  wallet.
11  Q.  Do you -- up to there, other than not giving the last name,
12  was it fair to say that the defendant was pretty cooperative
13  with you?
14  A.  Yes.
15  Q.  Okay.  Did things change at that point?
16  A.  At that point he, and just slightly prior to that point,
17  when I removed the knife from his belt and said, *Is this*
18  *the weapon you're talking about,* he began to get a little
19  bit verbally combative.
20          Agent Brownback was again saying, in loose terms,
21  *Hey, man, why don't you just tell us your name, or, you*
22  *know, help us figure this out.*
23          Very typically, in our contacts that we have on a
24  daily basis, if I was making contact with you, thinking
25  that you're someone that I'm looking for, and --

61

1          MR. GREENE:  Objection, your Honor.  It's totally
2  inappropriate to be using a juror as an object of his
3  example.
4          MR. KUIPER:  Use me, Detective Allen.
5          THE COURT:  Overruled.  Go ahead.
6          THE WITNESS:  I would say, *Ma'am, do you have an*
7  *I.D. on you?  I'm looking for a very specific person.  I*
8  *just need to verify who you are to make sure you're not the*
9  *person we're looking for.*  You say, *Yes, I do have an I.D.*
10  *on me.*  I would just ask you, *Can you show me your I.D.?*  As
11  soon as you show me your I.D. and your name is a legitimate
12  driver's license, or an Op's card or some sort of legitimate
13  health card, or anything that has a photo with an actual
14  name on it, and I can say that, *I'm sorry.  Sorry for the*
15  *disruption in your day.  You're clearly not the person we're*
16  *looking for.*
17          At that point, because they're in the area,
18  because we're conducting surveillance in the area, because
19  we're most likely going to continue to conduct surveillance
20  in the area, I'll show you the photo of the person I'm
21  looking for.  And also, just to give you confidence that I'm
22  doing my job correctly, I'll say, *Here's the photo of the*
23  *person we're looking for.  She looks a lot like you.*  And
24  oftentimes they'll say, *Oh, yeah.  You're right.*  And I'll
25  tell you, *Make sure you keep an I.D. on you at all times*

62

1  because this person has a felony warrant.  There's probably
2  patrol officers and community officers, and other detectives
3  probably still looking for this person.  Just make sure you
4  have your I.D. on you so the next time you get stopped you
5  can show them, and then off you go.
6          Our contact would last maybe a minute, unless you
7  wanted to talk to me further.  You might say, *Oh, yeah, I*
8  *recognize that person.*  Then, of course, I'll say, *Hey, you*
9  *know, would you like to step to the side so that we're not*
10  *in public view or we're not next to the street.  Would you*
11  *like to help me out?  Would you like to give me some more*
12  *information, or what do you know about the person or have*
13  *you seen the person, or anything like that?*
14          So, we're very targeted specific.  I mean, I have
15  a rotation of about 10 people at any given time, unless some
16  emergency situation happens.  But those are the type of
17  people that I'm going to be looking for.
18          MR. GREENE:  Your Honor, I'm going to object to
19  the narrative.  It's impossible to cross-examine him on his
20  narratives if they go on and on and on.  Totally
21  unresponsive to the questions.
22          THE COURT:  Well, I think we've probably heard
23  enough on this.  Let's move on.
24  BY MR. KUIPER:
25  Q.  We'll move on.  We have a good understanding,

63

1  Detective Allen.  Thank you for that description.
2  A.  Okay.
3  Q.  Now, did the defendant become combative at about the time --
4          MR. GREENE:  Objection, your Honor.  That's a
5  leading question.
6          THE COURT:  Yes.
7          MR. KUIPER:  It's a foundational question, your
8  Honor.
9          THE COURT:  Just ask him what happened -- what
10  happened next.
11  BY MR. KUIPER:
12  Q.  What happened next?
13  A.  Sure.  So, when I tapped Mr. King's wallet and said, *You're*
14  *telling me you don't have an I.D. when you have this wallet*
15  *in your back pocket,* at that point he, Agent Brownback,
16  reached for his left hand -- Agent Brownback is on my left
17  side -- reached for his left hand to gain control of him.
18          At this point, when he reached for his hand, the
19  suspect pulled his left hand -- Mr. King pulled his left
20  hand out of my grip, punched at Agent Brownback's face;
21  then he spun on us, squared up on us.
22          At that point in time, Agent Brownback tried to
23  grab his other hand.  I grabbed -- a part of our defensive
24  tactic, how we're trained, I tried to grab ahold of his
25  neck to control his head, because we were in close

64

KING-000081

1   proximity to each other.  At that point in time, he began
2   punching in all different directions at myself and at
3   Agent Brownback.  I grabbed his neck.
4          Part of our defensive tactics that we're taught
5   is, if you can control a subject's head, you can typically
6   control their body.  At that point, he had tried to punch
7   Agent Brownback in the face.  He had tried to punch me.  I
8   grabbed his neck, I pushed him to the ground.  I tried to
9   maintain control of, again, his head, to control the rest
10  of your body.
11         As we got to the ground -- it's July, it was hot,
12  it was sunny -- the subject was sweating.  He had no shirt
13  on.  He was acting aggressive again -- still.  Agent
14  Brownback was trying to take him into custody.  Again, at
15  this point we felt that this was very highly our person
16  that we were looking for, or someone who committed a
17  different crime that just didn't want to be identified,
18  perhaps had warrants or maybe he did a different home
19  invasion, we don't know, but he was clearly not complying
20  at this point.
21         We went to the ground --
22  Q.  What happened when you went to the ground?
23  A.  At that point at the ground, we're again just trying to put
24  handcuffs on him to take him into custody.
25         Agent Brownback told him to stop punching, told

65

1   him he was under arrest.  I told him to stop fighting.  I
2   told him, you know, *We're the police.  Stop fighting.  Put
3   your hands behind your back.*  He was, again, sweaty, he was
4   rolling around on the ground.  We were in the grass now,
5   just off the parking lot, just off the sidewalk.  I would
6   say we were probably about 10 to 15 feet off the roadway,
7   so there's some concern.  There were cars passing by.
8          This was a Friday afternoon in the middle of
9   July, you know, about 2:30.  There's a lot of traffic.  So,
10  I was worried that he's going to run into the road or roll
11  in the road.  I'm trying to take him into custody.  I had
12  had my arm -- he had rolled onto his back, and I had my
13  hands on his head.  Then I had my arm wrapped around his
14  head, and I was trying to grab -- he's facing me now on the
15  ground.  I was trying to grab his left arm now to pull it
16  behind his back so that Agent Brownback can put handcuffs
17  on him.
18         As he's doing that, he immediately bit down on my
19  left bicep.  He began growling, grunting.  There was spit
20  coming out of his mouth.  He -- he bit down aggressively on
21  my arm.  It happened -- it lasted for well over a minute,
22  maybe going into two minutes.  I could feel the flesh of my
23  bicep, I could actually feel it -- if you think about when
24  you bite into a steak -- I could feel it tearing.  I
25  thought he was eating my bicep off.  He was completely

66

1   ripping my arm apart with his mouth.
2          I was yelling.  I yelled at him very
3   specifically, because I couldn't actually believe that it
4   was happening.  I've been in several fights in my career
5   with suspects, but I've never had one actually bite me or
6   try and eat me.  And I just very specifically told him,
7   *Stop biting me.  Stop biting me.  You're under arrest.
8   We're the police.  Stop biting me.*
9          At that point --
10  Q.  Well, let me ask you this:  Did you do anything to try to
11  get him off of -- his -- his bite off of your bicep?
12  A.  Yeah.  I -- I reached with my right hand -- I had to take
13  my hand off of his left hand -- I reached with my right
14  hand to try and grab his mouth area to pull him off from
15  me.  But he was biting so hard that, when I was pulling, it
16  was actually further ripping the flesh off my arm, and it
17  was -- it was -- it was furthering the bite.  And he
18  continued to bite harder.
19  Q.  Did you do anything else to try to get him off?
20  A.  I yelled several times.  And then I had no choice at that
21  point.  I started punching him as hard as I could, as fast
22  as I could, and as many times as I could, in his face, to
23  get him to stop biting me.
24         At that point in time, as I was punching him in
25  the face, I had now taken my hand off of his left hand, and

67

1   at that point in time we were kind of tucked together like
2   this (indicating).  He's biting my arm, I'm yelling at him
3   to stop biting me, I'm punchin' him in the face.  I'm
4   punchin' him right in the left side of his face, as he's
5   biting me like (indicating).
6          At that point in time, I felt some very specific,
7   very sharp blunt blows on the back of my head, and I had no
8   idea where they were coming from.  I stopped punching him,
9   and I looked up and he had somehow obtained a pair of
10  handcuffs.  I could very clearly see a pair of silver
11  handcuffs, which I thought were either mine that had fallen
12  off my belt or that he had gotten Agent Brownback's, and he
13  was punching me, smashing the back of my head with the
14  handcuffs, which were the sharp blows.
15         I grabbed his hand.  So I stopped punching him.
16  He is still biting me.  So the struggle, again, was going
17  on for several minutes.  I tried to pin his left hand that
18  he had the handcuffs with, down, and I -- I yelled at him
19  to stop hitting me with the handcuffs.  *Drop the handcuffs.
20  Stop hitting me with the handcuffs.*
21         At that point in time I --
22  Q.  Let me stop you there, Detective Allen.
23         If you were to see photographs of -- did you
24  sustain any injuries as a result of the bite?
25  A.  I did.  I had a large open bite wound.  He had -- he had

68

KING-000082

1    bitten through both layers of clothing that I had and --

2  Q.  If you saw photographs of them, would you recognize --

3  A.  Yes. I had our forensics person take a photo of the

4    injuries.

5         MR. KUIPER: (Furnishing to defense counsel)

6  BY MR. KUIPER:

7  Q.  I'm going to have these marked as People's Exhibits Number 3

8    and 4.

9         (Exhibits 3 & 4 marked)

10  BY MR. KUIPER:

11  Q.  There is 3 and there's 4. Do you recognize what's depicted

12    in those seven photographs?

13  A.  Yes. There's a photo of me. There's four photos

14    specifically of my bicep where the bite wound was. This

15    was taken the next day by our forensics person. There's

16    two photos of my hand. There was some swelling and some

17    abrasions on my hand that I had sustained from the fight.

18  Q.  Okay. From -- from punching?

19  A.  Correct.

20  Q.  And those fairly and accurately represent the injuries that

21    you suffered?

22  A.  Yes. This was taken the day after the incident, so it

23    didn't fully -- it doesn't fully -- I mean, my entire

24    bicep, from my elbow to my shoulder, all the way around was

25    swollen and black and blue and purple for two weeks.

                                    69

1  Q.  Okay.

2  A.  But this was taken the day after.

3         MR. KUIPER: Your Honor, I move for admission of

4    People's Proposed Exhibits 3 and 4.

5         MR. GREENE: No objection.

6         THE COURT: Admitted.

7         (Exhibits 3 & 4 admitted)

8         MR. KUIPER: And I move to publish them to the

9    jury, as well.

10         THE COURT: Go ahead, please.

11         (Exhibits 3 & 4 published)

12  BY MR. KUIPER:

13  Q.  This is Exhibit Number 3. This is the bottom left-hand

14    photograph. That's you the day after this incident

15    happened?

16  A.  Yes.

17  Q.  And that's your bicep?

18  A.  Yes.

19  Q.  And you can see black and blue around there?

20  A.  Yes.

21  Q.  And then these other photographs, the top left is a

22    close-up?

23  A.  Yes.

24  Q.  Top right photograph?

25  A.  Just from a different angle, same injury.

                                    70

1  Q.  And the bottom right-hand photograph?

2  A.  Yep. Same injury, just slightly different angle.

3  Q.  And then I'm going to show Exhibit Number 4 now, same order.

4    At the bottom left-hand photograph?

5  A.  Yep. Same injury, just a different angle.

6  Q.  You see the tape there with the Numbers 1 and 2 on it. Do

7    you know what that is?

8  A.  It's just -- it's a measurement tape that our forensics

9    uses so you can get a better visual image and depth

10    perception of the actual size of whatever they're measuring

11    and taking photos of. In this case, it's the bite mark on

12    my arm.

13  Q.  The top left?

14  A.  That is my right hand that you can see swelling to the back

15    of my hand, my fingers, and just a few abrasions on my

16    knuckle area.

17  Q.  The bottom right-hand photograph?

18  A.  Same hand, just a slightly different angle.

19  Q.  Other than the injuries that we see, the discoloration and

20    the bite, what physically did you feel on the arm as a

21    result of this bite?

22  A.  I had lost feeling in my arm for two days. There was some

23    slight nerve damage from the bite mark. I had a concussion

24    from getting hit in the hand with the handcuffs. I

25    experienced that for probably -- I've never experienced a

                                    71

1    concussion before -- but I experienced that for about a

2    week-and-a-half, which the doctors told me was pretty

3    typical of a --

4         MR. GREENE: Objection, objection, your Honor.

5         MR. KUIPER: Don't testify as to what the doctors

6    told you.

7         THE COURT: Sustained.

8         THE WITNESS: Okay. I had -- part of the symptoms

9    of the concussion, I had fallen down the stairs at my house

10    a couple days after the incident had happened. I just got

11    dizzy and fell down the stairs. I had a bowl of rice I was

12    taking downstairs to my daughter and my son, and thee rice

13    spilled all over the stairs.

14  BY MR. KUIPER:

15  Q.  And that never happened to you before?

16  A.  I've never had a balance issue before, no, or fainting

17    episodes.

18         There's another incident where I was driving down

19    the road with my family and -- a couple days after the

20    incident -- and I started getting dizzy and woozy. I had

21    to pull over and ask my wife to drive. I also had swelling

22    and inflammation to my right knee, and just overall pain

23    and soreness.

24  Q.  Okay. Well, where we left off in the narrative about the

25    fight was, after you'd put the hand down, I believe put the

                                    72

KING-000083

1  defendant's hand down with the handcuffs in them, would you
2  pick up and tell us what happened next?
3  A.  Sure.  At that point the suspect is still biting my arm.  I
4  was able to rip the handcuffs out of his hand, threw the --
5  threw the handcuffs on the side.  I had -- I was looking
6  around.  I had his hand pinned down now, and he's still
7  biting my arm.
8          I had looked around, and Agent Brownback was
9  struggling, trying to gain control of his other arm, which
10  would be his right arm, because he's still facing me.  He
11  was laying on his back on the ground, still slippery.  He's
12  kicking.  I can visually see him trying to kick
13  Agent Brownback.
14          At that point in time a van had pulled up on
15  Leonard and stopped.  There was a lady and another person
16  leaning out the passenger side of the vehicle.  I yelled
17  for the lady, *Call 911.  Call the 911.  We're the police.*
18  *Tell them the police need the police.  Call 911.*  She said,
19  *I'm actually on the phone.*  I said, *Well, tell them to*
20  *hurry up and get here.  Tell them we're detectives, that we*
21  *need help, to send cars immediately.*
22          Suspect is -- or Mr. King is still biting me.  I
23  still had control of his arm.  At that point in time
24  another lady came walking across the street.  I yelled at
25  her because, to me, it didn't seem like the people in the

73

1  van were actually calling.  They just kept -- from what it
2  appeared to me, they just kept watching what was going on.
3  So, I yelled at the lady, *Hey, can you call police?*  She
4  said, *I don't have a phone.*  Then she actually yelled at
5  Mr. King, *Hey --*
6          MR. GREENE:  Objection.  Objection, your Honor.
7          MR. KUIPER:  Excited utterance, your Honor.
8  Present sense impression and excited utterance.
9          THE COURT:  I'll allow it.  Go ahead.
10          THE WITNESS:  She actually yelled at Mr. King,
11  *Hey, stop fighting.  Can't you see they're the police?*
12  *Can't you see their badges?*  I mean, our badges were still
13  hanging around our neck.
14          At that point she came over.  I was still looking
15  around.  We weren't gaining control of him.  He was still
16  biting on my arm.  It was ripping -- it was literally
17  ripping the flesh out of my arm.  It was excruciating pain.
18  We were getting very -- I was getting very tired.  I was
19  getting dizzy from being hit in the head with the handcuffs.
20  I honestly felt at that point that I was losing the fight.
21  BY MR. KUIPER:
22  Q.  Do you have -- did you have -- you had your firearm on your
23  right hip at that time?
24  A.  I had my firearm on my right hip.  I'm still trying to
25  maintain control of his left arm because it's easily

74

1  accessible to my firearm, and at this point I felt like I
2  was losing the fight.  I couldn't gain control of him
3  because he was all sweaty.
4          He was still growling and snarling in a very odd
5  manner.  I felt like he was literally trying to eat me.
6          I looked again and I saw another subject coming,
7  a white male.  I yelled at him to help.  At this point we
8  were not gaining control of him.  This was going to
9  continue.  I yelled at him to help.  The person said, *What*
10  *can I do?*  I said, *Hey, grab my radio.*
11          At that point I didn't know where my radio was.
12  Agent Brownback wasn't able to call on his radio.  I didn't
13  know if the people in the van were calling for help.
14          The guy looked around, he handed me a portable
15  radio -- I don't know if it was mine or if it was Agent
16  Brownback's.  As he's still biting on me, I grabbed my
17  portable radio and I used our department 10 code.  It's
18  just a series of code numbers to call for help, and I
19  yelled, *1039*, which is officer in trouble, send help
20  immediately, emergency response.  But it's -- it's the *I'm*
21  *in trouble, it's an emergency, come right away.*
22          So, I yelled my call sign, which is -- *1450* is my
23  call sign number, to identify who I was.  I said, *1039*
24  *Leonard and Tamarack*, and I said it twice, I believe.

75

1          Then the radio got knocked out of my hand, or I
2  tossed the radio -- I'm not sure, but the radio came out of
3  my hand.
4  Q.  Did that -- did that white male that assisted you in getting
5  the radio, did he provide any further assistance?
6  A.  Yes.  Then he asked, *What can I do next?*  We asked him to
7  help gain control of him.  Agent Brownback asked him to
8  help grab his legs, because he was still kicking
9  Agent Brownback and throwing knees.  That person actually
10  helped control his legs so that now Agent Brownback didn't
11  have to deal with his legs; all he had to do was hold onto
12  his arm.
13          At that point, Agent Brownback was able to pull
14  his arm behind his back.  I'm still being bitten.  I
15  grabbed Mr. King's other arm, pulled it behind his head.
16  Agent Brownback was able to pull it behind his back.  And
17  at that point, with the assistance of the citizen
18  controlling his legs, at that point we were able to put the
19  handcuffs on him, and then at that point it ended.
20          I rolled over, completely out of energy, out of
21  breath.  He was in -- he was in handcuffs and under control
22  now.
23  Q.  Okay.  And approximately how long after this did it take for
24  any uniform police officers to arrive?
25  A.  Umm, when I called for the help, within a few seconds,

76

KING-000084

1   probably within 15 seconds or 20 seconds, I heard lights
2   and sirens, so I knew there were cars coming.
3       The emergency vehicles -- it was Friday afternoon
4   traffic. They were probably there within a
5   minute-and-a-half at that point.
6   Q.  All right.
7       MR. KUIPER: Can I have a few seconds, your Honor?
8       THE COURT: Sure.
9   BY MR. KUIPER:
10  Q.  Did you get a chance to open the wallet that you saw on the
11      defendant at all before that struggle?
12  A.  I did not.
13  Q.  Did you get a chance to after the struggle?
14  A.  I did not. Someone else -- the other officers that
15      responded to the scene took control of the scene. There
16      was a supervisor on-scene, as well. There were actually
17      multiple supervisors on-scene.
18          At that point I just sat on the side until the
19      ambulance came. The ambulance -- actually the medical
20      personnel. I asked them to address him first, Mr. King
21      first, because of the struggle and the mannerisms. We
22      wanted to make sure he was safe and not having any medical
23      issues, and then they attended to me right away, took --
24      took my shirt off and addressed my injury there, and they
25      were checking my vital signs and things of that nature.

77

1       But someone else was able to ascertain his I.D.
2   from his wallet.
3   Q.  I'm going to show you what I'm going to have marked as
4   People's Proposed Exhibits 5, 6 and 7. There are three
5   sheets containing eight photos. I want you to look at those
6   and see if you can identify what's depicted in those photos.
7   A.  Sure.
8       (Exhibits 5, 6 & 7 marked)
9   BY MR. KUIPER:
10  Q.  Do you recognize what's depicted in those photographs?
11  A.  Yes, I do. It's Mr. King laying on the ground handcuffed
12      as he was when we took him into custody. He's not wearing
13      a shirt, he's wearing jeans, as the description I provided
14      to you before.
15          His -- his, what appears to be prescription
16      sunglasses, are on the sidewalk. There's a pen. There's
17      what appears to be a cell phone, a wallet and some
18      miscellaneous items that are strewn about the ground.
19      There's also a picture of myself and a picture of the
20      injury to my arm.
21  Q.  And that picture was taken on January -- I'm sorry,
22      July 18, 2014?
23  A.  Correct. Immediately after the altercation occurred.
24          MR. KUIPER: Your Honor, I move for admission.
25      And I'll show Mr. Greene these.

78

1       MR. GREENE: (Viewing photos)
2   No objection.
3       MR. KUIPER: Your Honor, I move for the admission
4   of Exhibits 5, 6 and 7.
5       THE COURT: Admitted.
6       (Exhibits 5, 6 & 7 admitted)
7       MR. KUIPER: Ask to publish them to the jury.
8       THE COURT: Go ahead, please.
9       (Publishing Exhibits 5, 6 & 7)
10  BY MR. KUIPER:
11  Q.  This is Exhibit Number 5, the top photograph. Do you know
12      who's depicted in that photo?
13  A.  That's Mr. King. There's his glasses on the ground just
14      above and to the left of his head, and a few other items.
15  Q.  Then the bottom photograph?
16  A.  It's just a frontal shot of Mr. King as he's laying on the
17      ground.
18  Q.  That's the bottom photograph in Exhibit Number 5?
19  A.  Yep. That's just a frontal photo of Mr. King handcuffed on
20      the ground.
21  Q.  And the top photograph, Exhibit Number 6?
22  A.  Just a different angle with Mr. King on the ground, again,
23      still handcuffed.
24  Q.  Middle photograph of Exhibit Number 6?
25  A.  Photo of me with my shirt pulled back. There was -- I had

79

1   a long-sleeved shirt underneath that t-shirt, and they're
2   both pulled back to show the bite mark so they can take a
3   photograph of the bite mark.
4   Q.  Do you know where your lanyard is at this particular time?
5   A.  I had taken it off with the long sleeve, and my tactical
6   vest. I had taken them off so they could get any
7   obstructions around my neck away so that they could check
8   my vitals, and then, of course, to take my clothing off to
9   take a photo of the injury to my arm.
10  Q.  The bottom photograph in Exhibit Number 6?
11  A.  That's just a closer imagine of the bite mark. And you can
12      see the flashlight I have on my hip in the background.
13  Q.  Okay.
14  A.  Yep. Yes.
15  Q.  And the top photo in Exhibit Number 7?
16  A.  Just a different angle of Mr. King again, laying on the
17      ground handcuffed.
18  Q.  Middle photograph in Exhibit Number 7?
19  A.  That's an image of the grassy area where the struggle took
20      place; items strewn about that happened during the
21      struggling. And then you can actually see my car door and
22      the side profile image of my -- of my vehicle where we had
23      made contact with Mr. King by the front side of him.
24  Q.  The bottom photograph in Exhibit Number 7?
25  A.  Again, just a different angle of the same items, and the

80

**Page 81**

1 shadow of my vehicle in the upper left. But you could see
2 his glasses, his wallet. There's some other cars and
3 miscellaneous items.
4 Q. This here?
5 A. Yes.
6 Q. After what you've described your involvement was, were you
7 involved in any other investigation of this?
8 A. Of this incident?
9 Q. Yes.
10 A. No, I was not.
11 Q. And did you search his wallet at all?
12 A. I did not.
13 Q. Okay.
14      MR. KUIPER: Can I just have a few seconds, your
15 Honor? (Confers with detective)
16      I don't have anymore questions of Detective Allen.
17 Thank you.
18      THE COURT: Mr. Greene, how long do you expect to
19 take on cross?
20      MR. GREENE: Your Honor, actually, I need time to
21 set my computer up.
22      THE COURT: Well, I think it's about time for a
23 recess anyway. We've been at it for the better part of two
24 hours.
25

**Page 82**

1      We'll take a 15-minute recess, ladies and
2 gentlemen. You may go back.
3      (At 10:54 a.m., jury exits courtroom)
4      THE COURT: The jury is out. Anything further on
5 the record before we take a recess, Mr. Kuiper?
6      MR. KUIPER: Nothing from me, your Honor. Thank
7 you.
8      THE COURT: Mr. Greene?
9      MR. GREENE: No, your Honor.
10      THE COURT: Okay. Thank you.
11      (At 10:55 a.m., jury exits courtroom)
12      (At 11:18 a.m., jury resumes seats)
13      THE COURT: Be seated.
14      Mr. Greene.
15      MR. GREENE: Thank you, your Honor.
16              **CROSS-EXAMINATION**
17 BY MR. GREENE:
18 Q. Detective Allen, if I understand you, in your initial photo
19 -- and these have already been admitted -- of the -- your
20 initial photo of Mr. Davidson is this one right here
21 (indicating), is that correct?
22 A. Yes.
23 Q. This is what you were working off of, pretty much?
24 A. Initially, yes.
25 Q. Okay. And this is something you compiled?

**Page 83**

1 A. Correct. I obtained that from the Secretary of State, his
2 driver's license photo.
3 Q. And you're not telling this jury that the defendant looks
4 like him, are you?
5 A. I'm not telling the jury anything, no.
6 Q. In your mind, does he look like Mr. King?
7 A. Well, that looks like Mr. Davidson.
8 Q. I know. I'm asking you, Does that photo look like Mr. King?
9 A. Right now?
10 Q. Yes.
11 A. It's a white male wearing prescription glasses that has
12 similar features to him, but I wouldn't say it looks like
13 him.
14 Q. Okay. Matter of fact, your description is a white male
15 wearing glasses between the heights of 5'10 and 6'3, isn't
16 that correct?
17 A. Yes.
18 Q. Wouldn't that cover probably half the men in -- on Leonard?
19 A. I don't have a Grand Rapids census in front of me. I
20 couldn't answer that.
21 Q. Okay. This is the second photo that you created a sheet, a
22 data sheet or a fact sheet?
23 A. Yes.
24 Q. And you really can't see this person's face, can you?
25 A. You cannot.

**Page 84**

1 Q. So you cannot even compare any of those features with
2 Mr. King, can you?
3 A. With Mr. King right now?
4 Q. Correct.
5 A. His facial features, other than I can see that he's a white
6 male.
7 Q. Okay.
8 A. I can't compare those facial features to Mr. King as he's
9 sitting there, no.
10 Q. No. And you weren't able to do that on July 18th either,
11 were you?
12 A. Pardon?
13 Q. You were not able to compare the facial features in this
14 photo with Mr. King on July 18, 2014, were you?
15 A. I had access to both photos that you have there, combined
16 together, with that photo being a more accurate photo of
17 him, as well as the descriptions given to me by several
18 people in the neighborhood --
19 Q. Okay. Listen -- listen to my question. You were not able
20 to compare the features from this photo with Mr. King on
21 July 18?
22 A. From this specific photo, I was not.
23 Q. You were not. Just so we're clear, the features in this
24 photo do not represent Mr. King; do not look like Mr. King,
25 do they?

KING-000086

1  A.  I would say the hairstyle definitely does not look like
2     Mr. King.
3  Q.  Okay. The fact that the glasses, people wear glasses, so
4     any white male wearing glasses, you thought you should be
5     able to stop?
6  A.  I never said that.
7  Q.  Okay. Well, did you think that?
8  A.  I did not think that.
9  Q.  Now Mr. King was walking down Leonard, correct?
10  A.  Yes, he was.
11  Q.  And he was not committing any felonies, was he?
12  A.  No, he was not.
13  Q.  He wasn't committing any misdemeanors, was he?
14  A.  He was not.
15  Q.  He wasn't even committing any civil infractions, was he?
16  A.  He was not.
17  Q.  He was just walking down Leonard, minding his own business?
18  A.  Correct.
19  Q.  And you decided to stop Mr. King based on what?
20  A.  Based on everything that I testified to earlier.
21  Q.  Well, I'm asking you again, so you can tell me now. Did
22     you -- you've already acknowledged that the photos don't
23     look like Mr. King, correct?
24         MR. KUIPER: I'll object. It's been asked and
25     answered, what he based his stop on, your Honor.

85

1         MR. GREENE: Your Honor, it's cross-examination.
2         THE COURT: Go ahead, Mr. Greene.
3         MR. GREENE: Thank you.
4  BY MR. GREEN
5  Q.  You've already acknowledged he didn't look like the photos,
6     correct?
7  A.  I didn't say that.
8  Q.  Well, the jury knows what you said. He's not -- he wasn't
9     carrying a Ralph's bag, correct?
10  A.  He was not.
11  Q.  He was not leaving a Ralph's store, correct?
12  A.  He was not.
13  Q.  You didn't see him come out of a Shell, did you?
14  A.  He was not.
15  Q.  You just saw a white male with glasses walking down the
16     street, between the heights of 5'10 and 6'3?
17  A.  That matched other physical descriptions, and he was
18     walking towards the area of those businesses that you had
19     just mentioned, of which both of those businesses said that
20     the subject we were looking for --
21  Q.  Listen to my question. I'm saying --
22  A.  -- had just frequented the area within the last few days.
23  Q.  Detective --
24         MR. GREENE: I'm going object non-responsive, your
25     Honor, and ask the Detective to answer my questions.

86

1         THE COURT: Well, certainly try to answer as
2     directly you can, Mr. Greene's questions.
3         MR. GREENE: Thank you.
4         THE WITNESS: Okay.
5  BY MR. GREENE:
6  Q.  Now, when you saw Mr. King, he wasn't wearing a shirt?
7  A.  Correct.
8  Q.  So, you could tell that there were no weapons stuffed into
9     his waistband?
10  A.  I did not see one at the time. Correct.
11  Q.  Okay. And you pull up and you get out of your car?
12  A.  I did not. I testified before that I had drove past him
13     several times, trying to get a better perspective of him.
14     Then we parked into a parking lot to obtain a longer view
15     of him that I --
16  Q.  Detective, I've already gone forward to getting out of your
17     car. You've parked now, right?
18  A.  I'm sorry. I thought you were implying that I just
19     randomly jumped out of my car on him.
20  Q.  Well, his appearance didn't change when you drove by him,
21     did it?
22  A.  I'm sorry, what?
23  Q.  His appearance did not change when you drove by him, did it?
24  A.  No. But I was just trying to give myself multiple angles
25     to view him, trying to attempt to identify him.

87

1  Q.  So, he looked the same the second or third time you saw him
2     as he did the first, correct?
3  A.  And, when I parked, I actually got a better view.
4  Q.  Listen to my question. The question is: He looked the same
5     the second or third time you saw him as he did the first?
6  A.  Yes.
7  Q.  Thank you.
8         So, you park in front of, is it the Seventh Reform
9     Church?
10  A.  I'm not sure of the name of the establishment we parked in
11     front of.
12  Q.  It was -- it was a church?
13  A.  I could not verify that for you.
14  Q.  Now, after you stop and made contact with Mr. King, the
15     first thing he wanted to know was, who you were, correct?
16  A.  Yes.
17  Q.  And your first question to him was, *Do you have a weapon*,
18     isn't that correct?
19  A.  That is not correct.
20  Q.  Well, did you not ask him if he had a weapon?
21  A.  At a point in time, I did.
22  Q.  And, so you are interacting with a person you've stopped on
23     the street, and your first concern is not, *Do they have a*
24     *weapon?*
25  A.  My first concern was identifying myself to him, attempting

88

KING-000087

1 to --

2 Q. Listen to my question, Detective. Your first concern is not

3 whether or not they have a weapon?

4 MR. KUIPER: Objection. It's been asked and

5 answered, and it's argumentative.

6 MR. GREENE: Your Honor, it's not been answered,

7 and that's the reason I asked the second question.

8 THE COURT: Go ahead, go ahead.

9 MR. GREENE: Okay.

10 BY MR. GREENE:

11 Q. Your first concern when you contact an individual is not

12 whether or not they have a weapon?

13 A. Officer safety is always a primary concern.

14 Q. Primary, number one concern, isn't it?

15 A. Of course.

16 Q. Okay. So, that would have been the order that you would

17 have proceeded in, wouldn't it, to ask him if he had a

18 weapon?

19 A. I don't immediately on a regular basis jump out of a car

20 and ask people if they have a weapon, no. That is not how

21 I conduct normal daily business.

22 Q. Okay. But at some point you asked him if he had a weapon?

23 A. Yes. I already answered that.

24 Q. Okay. And he told you that he had a knife, correct?

25 A. He didn't say that. He said, *Yes.*

89

1 Q. Now, at the time that you approached Mr. King, you had no

2 arrest warrant for Mr. King, did you?

3 A. Not Mr. King, no.

4 Q. He wasn't wanted for anything?

5 A. I do not know that. I did not have specific knowledge, and

6 I had never seen or met Mr. King before in my life.

7 Q. Okay. You did not have any knowledge that he was wanted for

8 anything, did you?

9 A. I did not know that he was Mr. King.

10 Q. Well --

11 A. We were acting under the presumption that he was a subject

12 that we were looking for who had a felony warrant, named

13 Mr. Davidson.

14 Q. But he told you his name was James, correct?

15 A. At one point in time he said, *My name is James.*

16 Q. And that's not Aaron, is it?

17 A. No. James is James and Aaron is a separate name.

18 Q. Thank you.

19 Now, when you approached Mr. King, how do you

20 describe that contact? What type of police contact is that?

21 A. I guess I'm misunderstanding or --

22 Q. Well, is it a -- is it a voluntary citizen's contact?

23 A. That would be -- I think know where you're going now --

24 that would be what we would define as a subject stop.

25 Q. So, you actually detained him?

91

1 Q. Okay. Did he not tell you you had a utility knife?

2 A. He did not.

3 Q. And he pretty much showed you what a knife was, didn't he

4 not?

5 A. He did not.

6 Q. Okay. Now, if Mr. King was interested in doing you some

7 harm, he could have very well have said, *No, I don't have a*

8 *weapon,* could he not?

9 A. Could have said --

10 MR. KUIPER: I'm going to object, because it calls

11 for speculation, your Honor.

12 MR. GREENE: I don't think so. This is an officer

13 who does --

14 THE COURT: Overruled. Go ahead and answer it.

15 BY MR. GREENE:

16 Q. If he was interested in doing you some harm, he could have

17 very easily have not told you that he had a knife, correct?

18 A. I -- I can't get in the mind of Mr. King and say what he

19 would have said or would not have said.

20 Q. You can tell me whether or not a person with a weapon can do

21 harm to you.

22 A. They have the ability to do harm, yes.

23 Q. Okay. But he told you that he had a knife?

24 A. He did not. He said, *Yes,* when I asked him if he had a

25 weapon.

90

1 A. Correct. We stopped him, and he was detained.

2 Q. He was not free to leave?

3 A. At that point in time, no.

4 Q. Okay. And, as part of your stop, you can do a -- a *Terry*

5 pat-down, is that correct?

6 A. Correct.

7 Q. What is a *Terry* pat-down?

8 A. A *Terry* pat-down would be for us checking for or attempting

9 to locate or ascertain if the person that we have contact

10 with has a weapon or a dangerous instrument on them.

11 Q. Okay. And, so during your *Terry* pat-down, you found the

12 knife that Mr. King had indicated he had on his person?

13 A. Correct.

14 Q. Okay. You didn't find any other weapon?

15 A. Did not.

16 Q. You went down his left leg, correct?

17 A. I did not.

18 Q. Did you complete the pat-down?

19 A. I did not.

20 Q. So, you didn't find any weapon whatsoever?

21 A. I found a knife.

22 Q. And he had told you about that?

23 A. He said he had a weapon. He answered, *Yes.*

24 Q. And you removed the knife?

25 A. Yes.

92

KING-000088

1   Q.  Okay. Was there any other weapon on Mr. King?

2   A.  At that point I did not locate another weapon on him. But

3       at that point is when he started to struggle.

4   Q.  Just so we're clear on how you were dressed here, you were

5       not in a uniform, correct?

6   A.  Correct.

7   Q.  And neither was Special Agent Brownback in uniform?

8   A.  Correct.

9   Q.  The car you were driving was totally nondescript?

10   A.  Correct.

11   Q.  Did not in any way reveal itself to be a police car?

12   A.  That's correct.

13   Q.  Okay. This has already been admitted as Exhibit 6. Is this

14       a fair and accurate depiction of you that day?

15   A.  That is of me, yes. Of my clothing? No. Because as you

16       can see, on my right arm, the long sleeves.

17   Q.  Sir, I'm asking you if this is you. That was the question.

18   A.  No. You asked if it was an accurate description. You

19       didn't ask if it was me.

20   Q.  Was this photo taken of you of the 18th?

21   A.  Yes.

22   Q.  That was you wearing the hat, sunglasses?

23   A.  Yes, yes. That's what I was wearing that day.

24   Q.  Okay. You had a beard?

25   A.  Well, it's not a beard, it's a goatee. But some facial

<center>93</center>

1       hair, yes.

2   Q.  Facial hair.

3   A.  I would describe your facial hair as a beard.

4   Q.  All right. You had on a long-sleeved shirt?

5   A.  Yes. Black.

6   Q.  Over this shirt (indicating)?

7   A.  Correct.

8   Q.  And then you said you had a vest over that?

9   A.  A -- a black fabric vest, yes.

10   Q.  Okay. And, just so we're clear, this is the injury you

11       received to your bicep (indicating)?

12   A.  Yes. And I also had my department-issued bulletproof vest

13       on, as well. But that's not in the image either.

14   Q.  Okay.

15   A.  That was removed, again, to treat the injuries.

16   Q.  This is, though, a fair depiction with -- of those changes

17       of when you approached Mr. King?

18   A.  Yes.

19   Q.  Okay. And detective -- Special Agent Brownback was

20       similarly casually dressed?

21   A.  Yes.

22   Q.  Okay. Now I want to go to this pat-down that you're doing.

23       At some point did you not remove Mr. King's wallet from his

24       back pocket?

25   A.  I did not. I do not specifically remember removing the

<center>94</center>

1       wallet. I specifically remember patting the wallet or

2       tapping it.

3   Q.  So, Detective, you want the jury here to believe that you

4       have specific details about your badge, correct?

5   A.  Yes.

6   Q.  You have specific details about whether or not you have a

7       gun on, correct?

8   A.  Yes.

9   Q.  You have specific details about what clothing you're

10       wearing, correct?

11   A.  Yes.

12   Q.  You have specific details about removing a knife from his

13       front pocket, correct?

14   A.  Yes.

15   Q.  But you don't remember -- but you don't remember whether or

16       not you removed his wallet?

17   A.  I don't, because at that point in time, when I, again,

18       described it as when I tapped his wallet and commented to

19       him that, *You're telling me you don't have any I.D. when*

20       *you have this wallet in your back pocket,* is when he began

21       to fight.

22   Q.  Detective, you are not required to show I.D. in the State of

23       Michigan, are you?

24   A.  I'm sorry, what?

25   Q.  You are not required, when you are walking --

<center>95</center>

1              MR. KUIPER: Objection, your Honor. Any legal

2       question can be dealt with by the attorneys, who are trained

3       in law, and the Judge who rules on law.

4              MR. GREENE: May I --

5              MR. KUIPER: Detective Allen is not a --

6              THE COURT: I'll -- I'll allow him to answer from

7       his knowledge and experience.

8              MR. GREENE: Thank you.

9  BY MR. GREENE:

10   Q.  You're not required to carry I.D. on you in the State of

11       Michigan when you're walking, isn't that correct?

12   A.  No, you are not.

13   Q.  So, that is correct?

14   A.  Correct.

15   Q.  You're not required to carry I.D.?

16   A.  Correct.

17   Q.  Thank you. You're not required to produce I.D., isn't that

18       correct, when you're walking down a public highway in the

19       State of Michigan?

20   A.  I guess that would be dependent upon the circumstances, if

21       you are contacted by the police or not.

22   Q.  Well, a person who is contacted by you is not require to

23       produce I.D., are they?

24   A.  Not.

25              MR. KUIPER: I'm going to object, your Honor. I

<center>96</center>

KING-000089

1   mean, this is calling for legal conclusions and, again,
2   speculation. It is based on the circumstances. All of us
3   trained in the law know that.
4           MR. GREENE: Your Honor --
5           THE COURT: Again, I'll allow him to answer from
6   his knowledge and experience.
7           THE WITNESS: From a basic contact with a citizen,
8   circumstances completely different from our situation that
9   we're here for today, if I randomly walked up to a citizen,
10  or yourself, or any of the jurors, and asked them for I.D.,
11  they're not required to give an I.D.
12  BY MR. GREENE:          ·
13  Q.  Thank you. So, the answer is, *No*, you are not required to
14      produce I.D., isn't that correct?
15  A.  However, under this circumstance --
16  Q.  I'm not asking you about this circumstance, I'm asking you
17      what a citizen is required to produce.
18          Did you understand my question? And I believe you
19      answered.
20  A.  Well, it's an open-ended question.
21          THE COURT: Well, I believe he answered it, so
22      let's move on.
23          MR. GREENE: Thank you.
24  BY MR. GREENE:
25  Q.  Now, Detective, you do not want to remember whether or not

97

1   you removed the wallet, because you didn't have the
2   authority to remove the wallet, did you?
3           MR. KUIPER: I'm going to object. That's, again,
4   a question for the jury to decide, and it's a legal
5   question.
6           MR. GREENE: It is not.
7           MR. KUIPER: It's an improper question.
8           MR. GREENE: It is not, your Honor.
9           THE COURT: Well, I'll allow it, because he
10  doesn't remember removing the wallet, and you want to go
11  into whatever reason he may or may not have had for not
12  doing it or not remembering.
13          Go ahead.
14  BY MR. GREENE:
15  Q.  You had no authority to remove his wallet at this point, did
16      you?
17  A.  **Under these circumstances, at the point in time where he**
18      **becomes non-compliant and Agent Brownback reached for his**
19      **left hand and told him that he was going to be put under**
20      **arrest, at that point in time, when he's being taken into**
21      **custody, which that's what was -- we were attempting to do**
22      **when he was fighting, at that point in time, once he is**
23      **arrested -- or in handcuffs, is when I would attempt to.**
24  Q.  So, before that point you would not have had any authority
25      to remove his wallet, isn't that correct?

98

1   A.  **Under this circumstance, because he is under a subject**
2       **stop, which is based on the totality of the circumstances,**
3       **being that he physically appears to be our suspect, he's**
4       **verbally non-compliant, he's verbally combative, he's**
5       **becoming physically combative, we have other information**
6       **that he matches the physical description of our subject in**
7       **the area and we believed that he was the subject who had a**
8       **felony warrant for us for a felony warrant for his arrest,**
9       **then we do have the authority. Yes.**
10  Q.  At that point. But, at the point where you tapped his
11      wallet, okay, you had no authority to remove it, did you,
12      Detective?
13  A.  **We did. We are in a position -- again, this is now a**
14      **subject stop, this isn't a citizen contact, so it's**
15      **completely different --**
16  Q.  So you believe --
17  A.  **-- circumstances.**
18  Q.  So you believe your *Terry* stop --
19  A.  **It was a subject stop. He is completely detained and --**
20  Q.  Listen -- listen to my question. You believe your *Terry*
21      stop at this point allowed you to go into his pockets and
22      remove his property?
23  A.  **I think you're confusing the term *Terry* stop with what**
24      **we're actually conducting here. This is beyond a *Terry***
25      **stop. He is detained. He is not allowed to leave at this**

99

1   **point. We believe that he is our suspect. He has not**
2   **produced any I.D., he's become verbally combative,**
3   **physically combative. He's now stopped. He is not**
4   **leaving. He's -- furthermore, he's going to be arrested.**
5   Q.  Okay. So, you believe, then -- I just want a straight
6       answer -- that you have the authority, when you tapped his
7       wallet, to take it out of his pocket?
8   A.  **In this circumstance, yes.**
9   Q.  Okay. That's -- thank you for finally getting there.
10          So, while you are patting him down and you're
11      holding his hands, and you tap the wallet, you believe you
12      had the authority at that point to remove it from his
13      pocket?
14          MR. KUIPER: I'm going to object because it's been
15      asked and answered, your Honor.
16          MR. GREENE: Your Honor, I'm trying to -- you
17      know he keeps going through a long --
18          THE COURT: Sustained. I think he's answered
19      that.
20          MR. GREENE: All right.
21  BY MR. GREENE:
22  Q.  And you're telling this jury you don't remember whether or
23      not you removed it?
24  A.  **At that point in time I began fighting for my life to**
25      **defend --**

100

KING-000090

1 Q. My question -- my question is: Do you remember removing it?

2      MR. KUIPER: I'm going to object, because that has

3     been asked and answered.

4      MR. GREENE: It has not.

5      THE COURT: I would agree. Sustained. He stated

6     he doesn't remember.

7 BY MR. GREENE:

8 Q. Okay. Now, you talked about having Mr. King in a headlock,

9    correct, with your arm?

10 A. **I never referred to it as a *headlock*.**

11 Q. Well, is it a headlock? When you had your arm around his

12    neck, was it a headlock?

13 A. **I guess I'm not -- I'm not specifically trained in defining**

14    **what a headlock is or isn't. I had my arm and his neck.**

15 Q. You had your arm around his neck?

16 A. **Correct.**

17 Q. And you had his neck here in your arm?

18 A. **Correct.**

19 Q. And you were choking him?

20 A. **I was not choking him.**

21 Q. Well, you had it tightly around his neck?

22 A. **I guess I don't understand where he's going with this.**

23 Q. I'm asking you if you had your arm tightly around his neck.

24    That's a very easy question, Detective.

25 A. **I had -- I had a grip. It's the only grip that I could**

101

1    **attempt to gain control of him because of his --**

2 Q. It's a *yes* or *no* question, Detective. Did you have a tight

3    grip around his neck?

4 A. **I would say, Yes.**

5 Q. Thank you. And a tight grip around somebody's neck can

6    interfere with their airflow, can it not?

7 A. **I guess if it was tight enough, sure.**

8 Q. Okay. You've already acknowledged that it was a tight grip

9    around his neck?

10 A. **Yes.**

11 Q. Thank you. And that's when Mr. King begins to bite you,

12    isn't that correct?

13 A. **No. I explained very specifically before, I attempted to**

14

15 Q. It's --

16 A. **Are you going to let me answer the question or ask another**

17    **one?**

18 Q. It's a *yes* or *no* question. Did he bite you when you had

19    your tight grip around his neck?

20 A. **He was biting me while I had a grip around his neck. Yes.**

21 Q. He did not bite you on your bicep until you put a --

22     MR. KUIPER: I'm going to object. It's been asked

23    and answered. Mr. Greene is --

24     MR. GREENE: It's a different question.

25     THE COURT: Go ahead and complete the question.

102

1 BY MR. GREENE:

2 Q. He did not bite you until you put a tight grip around his

3    neck, isn't that correct?

4 A. **No. He very specifically opened his mouth, lunged at my**

5    **bicep, bit my bicep.**

6 Q. Well, where was your bicep, sir?

7 A. **In front of his facial area on the ground when I was**

8    **attempting to control his head.**

9 Q. Front of his facial area, and this is while your arm is

10    around his neck?

11 A. **No.**

12 Q. Isn't that the only way your arm would -- your bicep, sir,

13    would be in a position?

14 A. **If you're willing to lay on the ground, I'm willing to get**

15    **on top of you and show you exactly the position I was in.**

16 Q. Only if the Judge orders it, and I'm trusting he will not.

17     Don't be tempted.

18     (Laughter)

19     THE COURT: I'm not going to order that.

20     THE WITNESS: I can try and describe it to you

21    better.

22 BY MR. GREENE:

23 Q. Sir, we've established that you had a tight grip around his

24    neck, and that's when he bit you, isn't that correct?

25 A. **That is not correct.**

103

1 Q. He did not bite you before you put your arm around his neck?

2 A. **He did.**

3 Q. So, while your arms were hanging down at your side, he bit

4    you?

5 A. **That's not correct.**

6 Q. Okay. Now, all the while this is taking place, Mr. King is

7    crying out, isn't he not?

8 A. **Actually, Mr. King said very specifically, *You guys***

9    **shouldn't be doing this. I have three buddies down the**

10    **street that can help me. And then he threatened us again**

11    **saying, *You guys shouldn't be doing this. I got three***

12    **buddies that are coming down here and helpin' me.**

13 Q. Wasn't Mr. King crying out, *Call the police?*

14 A. **That was me that was yelling to call the police.**

15 Q. I'm asking you if Mr. King was crying out to call the

16    police.

17     MR. KUIPER: Your Honor, I'll object again.

18    That's been answered. Detective Allen said --

19     THE COURT: Let's go ahead. Was Mr. King calling

20    out --

21 BY MR. GREENE:

22 Q. *Call the police?*

23 A. **I don't know specifically that he was yelling, *Call***

24    **police. I specifically remember that I was telling him**

25    **multiple times that we are the police.**

104

KING-000091

**Page 105**

1 Q. You don't remember if he was calling -- crying out, *Call the*
2 *police?*
3 A. I told you before.
4 Q. Is that your testimony? It's a *yes* or *no* question. Was
5 Mr. King calling out, *Call the police?*
6 A. I don't know that specifically.
7 Q. You don't remember that either?
8 A. And I don't know how he could be when his mouth was
9 completely biting around my bicep and jumping around.
10 Q. Okay. So that's another area where your memory is not
11 clear?
12 A. I was fighting for my life.
13 Q. My question is about your memory. Is that another area that
14 your memory is not clear?
15 A. I would say that is something that I don't recall him
16 specifically saying.
17 Q. Okay. Now you're also claiming that, while you have your
18 arm around Mr. King's neck (indicating), correct, and
19 while --
20 A. It's not the way that you are holding it.
21 Q. Let me finish the question. And while
22 Special Agent Brownback has other parts of Mr. King, that
23 he's able to somehow take handcuffs from one of you?
24 A. I'm not understanding if that's a question. It sounded
25 like a statement.

**Page 106**

1 Q. Well, let's try it this way. You -- you were physically
2 engaged with Mr. King in restraining him, correct?
3 A. Yes.
4 Q. And Special Agent Brownback was physically engaged with
5 Mr. King restraining him, correct?
6 A. Correct. Attempting to handcuff him. Correct.
7 Q. And you are claim that, while you two are physically
8 engaged, attempting to handcuff him, he's able to take
9 handcuffs and start hitting you with them?
10 A. Yes, he was.
11 Q. That's -- that's your claim?
12 A. Yes.
13 Q. Okay. Officers responded to the scene, did they not?
14 A. Yes.
15 Q. Officer Boone, correct?
16 A. Yes.
17 Q. Office Bower [sic]?
18 A. Officer Brower.
19 Q. Officer Brower. They were the first two on the scene?
20 A. Yes.
21 Q. And you told Officer Boone and Officer Brower about being
22 bit, correct?
23 A. Yes.
24 Q. You never said anything to Officer Boone or Officer Brower
25 about being hit with handcuffs, did you?

**Page 107**

1 A. I don't know if I specifically told them. I did tell
2 the --
3 Q. I'm asking you specifically about Officer Boone and
4 Officer Brower. Did you tell them that you had been hit
5 with handcuffs?
6 A. I don't know if I specifically told them. I don't
7 remember.
8 Q. So, you may not have?
9 A. I know I told him some --
10 MR. KUIPER: I'm going to object, your Honor.
11 This -- this has been asked and answered on --
12 THE COURT: Hold on, hold on.
13 MR. KUIPER: -- on a number of occasions. He
14 doesn't recollect.
15 MR. GREENE: Yes. This is -- I'll move on, sir.
16 THE COURT: Move on.
17 BY MR. GREENE:
18 Q. Yeah. So this is another area that your memory is failing
19 and you don't remember?
20 MR. KUIPER: I'm going to object, your Honor.
21 That's argumentative. That's not correct.
22 THE COURT: I -- I agree. That's argumentative.
23 MR. GREENE: Let me rephrase the question.
24 THE COURT: Rephrase.
25

**Page 108**

1 BY MR. GREENE:
2 Q. You don't -- do you remember telling Officer Boone or
3 Officer Brower?
4 A. I do not.
5 Q. Okay. After Mr. King is handcuffed, were you still standing
6 there when he was asked by Officer Brower who he was?
7 A. I was -- I don't believe I was standing next to him, no.
8 Q. Do you remember Mr. King telling Officer Brower that you all
9 were attempting to mug him?
10 A. I was not standing or recall standing next to him, and I
11 did not speak to him directly after.
12 MR. KUIPER: And I would object anyway, because
13 it's hearsay.
14 MR. GREENE: Not by Mr. King.
15 MR. KUIPER: It's by a party-opponent to offer the
16 truth of the matter.
17 Yes, it is.
18 THE COURT: I'll allow the answer. Let's move on.
19 MR. GREENE: Thank you.
20 BY MR. GREENE:
21 Q. Detective, while you are -- I'm going back to now while you
22 have Mr. King, and you've acknowledge he was placed up
23 against your SUV --
24 MR. GREENE: When I hit the microphone, he's
25 wearing headphones, so I can imagine.

KING-000092

BY MR. GREENE:

Q. While he's placed up against your SUV, do you recall Mr. King saying to you, *You're mugging me. Why are you mugging me?*

A. He never said that.

Q. You don't recall that either?

A. I specifically know he never said that.

Q. Okay. Do you recall him telling the bystanders that he was getting mugged and to call the police?

MR. KUIPER: Your Honor, I'm going to object because, again, it's been asked and answered.

MR. GREENE: It's a different question, your Honor.

MR. KUIPER: Not telling him that he said he never heard him say, and that is an answer to -- we can pose it a zillion different time periods. You know, *At 2:38 did he say, Are they mugging me? At 2:39* -- He testified, *I did not hear the defendant say, Are they mugging me.* It's been asked and answered.

THE COURT: I'll allow the question. Go ahead.

MR. GREENE: Thank you.

BY MR. GREENE:

Q. Do you recall Mr. King telling the bystanders that he was getting mugged and to call the police?

A. I do not recall Mr. King ever saying that.

109

Q. You don't recall that either. Okay.

Is that your injury there that day (indicating)?

A. Yes.

Q. It is the injury that you received that day?

A. Yes.

Q. Okay.

MR. GREENE: Thank you.

THE WITNESS: One of several, but that's the specific bite mark. Yes.

MR. GREENE: Thank you.

THE COURT: Mr. Kuiper, redirect.

REDIRECT EXAMINATION

BY MR. KUIPER:

Q. You are not a video- or audio-recording device, are you?

A. Sorry, what?

Q. You're not a video or audio-recording device, are you?

A. I am not.

Q. Is it fair to say that at this juncture you can't tell the jurors every bit of minutia that happened on July 18, 2014?

MR. GREENE: Your Honor, it's leading question, Judge.

THE COURT: I think it's proper redirect.

Go ahead.

BY MR. KUIPER:

Q. Are you telling the jurors that you can't remember every bit

110

of minutia from that day?

A. I cannot.

Q. Do you remember what you had for dinner on July 18, 2014?

A. I cannot remember that.

Q. Okay. Is it fair to say that this was -- or, well, when you get in a fight of that nature where you're struggling, as you described it, for your life, what's your primary concern?

A. My life and my partner's life.

Q. Okay. And, under those circumstances, you're making an extreme effort to get the defendant under control?

A. Yes. I'm not trying to remember exactly what he's saying at that point. We're trying to take him into custody, put handcuffs on him.

Q. You're not able to observe people around you, what they're seeing or what they're doing, because you're engaged in the conflict at hand?

A. Other than, at one point when I felt like we weren't winning the fight and we weren't gaining control of him, at that point in time, as I described earlier, I was specifically looking for help because we did not have a radio.

We couldn't call for more help, so I was specifically looking for people then. Other than that, no, I'm primarily focused on watching him.

111

Q. All right. If he had given you his I.D. or said, *My name is James King, and this is my date of birth,* what would you have done with that information?

MR. GREENE: Objection. Calls for speculation.

MR. KUIPER: No. We're going into the legality or illegality of the stop and what happened.

THE COURT: I'll allow it.

BY MR. KUIPER:

Q. Okay. If he had given you I.D., indicated that, *I'm James King, this is my date of birth, this is my photograph,* what would you have done?

A. Well, I addressed that earlier. I specifically asked him for it. Had he provided it, I would have looked at it to see if it appeared to be a valid Michigan I.D. or any other sort of valid, respectable identification, and compared the photo to his name. And, if it wasn't the name of the person we were looking for, I would have handed it back to him, thanked him for his time.

As I explained before, I would have shown him the photo of the person we were looking for, told him the name of the person we were looking for, hoping that he could provide some understanding and maybe provide some additional information. Our goal as the task force is to arrest very specific violent fugitives.

Q. So, he was detained. But, if you ascertained his identity,

112

KING-000093

**113**

1  was not Aaron Davidson, you would have allowed him to go?
2  A.  It would have been less than a one-minute contact.
3  Q.  He would have never had handcuffs on?
4  A.  He would never have been searched, he would never have been
5  -- the fight never would have happened.  He never would
6  have had handcuffs on him.  That would not have happened.
7  Correct.
8  Q.  Now, if you had the ability to obtain a photograph of what
9  Aaron Davidson looked like on July 14th -- or July 18, 2014,
10  would you have obtained that information as part of your
11  investigation to determine his whereabouts?
12  A.  Absolutely.
13  Q.  But you were working with the best photographs.  You had
14  this 2007 photograph and the one from Facebook, not showing
15  his face?
16  A.  Correct.
17  Q.  You weren't purposely trying to find an old photograph and a
18  photograph where he didn't show his frontal view of his
19  face?
20  A.  No.
21  Q.  Okay.  In fact, you don't even know if Aaron Davidson would
22  look anything similar, hairdo-wise, or anything like that,
23  from 2007 to 2014?
24  MR. GREENE:  It's a leading question.  It's
25  completely inappropriate.

**114**

1  MR. KUIPER:  It's not.  It's, *Do you know?*  He has
2  the option to answer *yes* or *no*.  It's not a leading
3  question.
4  MR. GREENE:  Your Honor, it suggests the answer,
5  totally, in the question.  If he can answer it *yes* or *no*,
6  then the answers just apply to the question and he can just
7  assent to it or not.
8  THE COURT:  I'll sustain the objection.  Let's
9  move on.
10 BY MR. KUIPER:
11  Q.  In fact, do you know if the defendant ever said to anyone,
12  *I'm getting mugged?*
13  A.  I do not know that.
14  Q.  Okay.  And you've testified to what you remember?
15  A.  Correct.
16  MR. KUIPER:  I don't have anymore questions.
17  THE COURT:  Mr. Greene.
18  **RECROSS-EXAMINATION**
19  BY MR. GREENE:
20  Q.  Real quickly.  Basically, very quickly -- we're going to get
21  out of here by noon and not have everyone upset at me -- if
22  you removed his wallet from his back pocket, he could not
23  give you his I.D., could he?
24  A.  If I what?
25  Q.  If you had have removed his wallet from his back pocket, he

**115**

1  could not have given you his I.D., could he?
2  A.  He could have given it to us when I asked him.
3  Q.  Okay.  But, if you had have removed it, he couldn't have
4  given it to you, correct?
5  A.  Had he not attempted to punch my partner and myself --
6  Q.  My question -- listen to my question, Detective.  I'm using
7  English.  If you had have removed the wallet from his back
8  pocket, he could not have given it to you.
9  Now, do you understand that question?
10 A.  Well, you're asking me a leading question that doesn't --
11 Q.  I can ask leading questions.  This is cross-examination.
12  The Judge would object if I couldn't.
13 A.  Can you repeat or rephrase the question?
14  THE COURT:  Excuse me.  Are you saying, Had he
15  removed it?
16  MR. GREENE:  Yes.
17 BY MR. GREENE:
18 Q.  Had the wallet been removed from his back pocket by you,
19  Mr. King could not have given it to you, could he?
20  THE COURT:  I suppose, Mr. Greene, that's assuming
21  I.D. was in the wallet.
22  MR. GREENE:  Well, we'll find that out from other
23  witnesses.
24  THE WITNESS:  So, the question -- repeat it again,
25  please.

**116**

1  BY MR. GREENE:
2  Q.  Had you, if you had have removed the wallet from his back
3  pocket, then Mr. King would not be able to give you that
4  wallet, isn't that correct?
5  A.  If he physically was in possession of his wallet with I.D.
6  in it, then the answer would be, *No.*
7  Q.  So, if it was in your possession, he couldn't have given it
8  to you, because it wouldn't have been in his possession.
9  MR. KUIPER:  It's been asked and answered.
10  THE WITNESS:  It's a confusing question.  I don't
11  know what he's --
12  THE COURT:  I'd --
13  MR. GREENE:  I'll move on.
14 BY MR. GREENE:
15 Q.  And you believe that a person, Mr. King, yelling to
16  bystanders that he's getting mugged and to call police, you
17  think that's minutia?  You call that minutia?
18  MR. KUIPER:  I'm going to -- I'm going to object.
19  There's been no testimony that that actually happened at
20  this particular point.
21  MR. GREENE:  Well, your Honor --
22  THE COURT:  Sustained.  Sustained.  The officer
23  never used the word *minutia*.
24  MR. GREENE:  No.  He did on his questioning.  He
25  asked him about minutia.

KING-000094

1   MR. KUIPER: I asked him whether or not --

2   THE COURT: The objection is sustained.

3   MR. GREENE: Okay.

4   BY MR. KUIPER:

5   Q.   Would that be an important fact?

6   MR. KUIPER: I'm going to object, your Honor.

7   Again, we're going into the memory of someone that was in a

8   fight, as he described it, for life and death. You just

9   don't remember that type of stuff when you're getting hit in

10  the head with a set of handcuffs and --

11  THE COURT: What is the question again?

12  BY MR. GREENE:

13  Q.   My question is, Would it have been important if Mr. King was

14  yelling to bystanders, *Call the police, I'm getting mugged*?

15  THE COURT: Well, you can answer that *yes* or *no*.

16  THE WITNESS: If I'm fighting for my life.

17  BY MR. GREENE:

18  Q.   It's a *yes* or *no*, like the Judge said.

19  A.   The answer is, *No.*

20  Q.   It would not have been important to you?

21  A.   When I'm fighting for my life? No.

22  MR. GREENE: Thank you.

23  THE COURT: Mr. Kuiper.

24

25

117

---

1   **REDIRECT EXAMINATION**

2   BY MR. KUIPER:

3   Q.   Were you mugging the defendant?

4   A.   I was not.

5   Q.   Have you told -- did you give the defendant an opportunity

6   to produce his I.D. before actually searching him and

7   detaining him to ascertain his I.D.?

8   A.   Multiple times.

9   Q.   Multiple times?

10  A.   Yes.

11  Q.   So, if he had his I.D. in his wallet, you weren't

12  prohibiting him from producing that?

13  A.   That's correct. We were asking him to produce it.

14  Q.   Did you or Agent Brownback punch, hit or abuse the defendant

15  at all before he struck Agent Brownback?

16  A.   Did not.

17  Q.   A little bit more specific about what *headlock* meant. You

18  show me. So there is no confusion for the jurors, I'll be

19  Mister -- the defendant. You show the jurors what happened.

20  A.   Sure.

21  MR. GREENE: Your Honor, I'm going to object,

22  because it's clearly beyond the scope of my recross.

23  THE COURT: I'll -- I'll allow it.

24  THE WITNESS: So, again, as you were standing over

25  there (indicating) and your hands were on your head like

118

---

1   this, when I tapped the wallet, said the phrase that I said,

2   you turned and tried to punch Agent Brownback, correct?

3   Then you spun and then you tried to punch me and I tried to

4   gain head control, which is a trained technique that we

5   have.

6   I took him to the ground like such

7   (demonstrating). He went down on the ground. Go ahead and

8   get on the ground. Then at this point in time, being he has

9   no shirt, he was in jeans, he rolls over on his back. Roll

10  over on your back. At that point in time I had -- for the

11  sake of his suit, but -- I had taken his head all the way to

12  the ground and I was trying to still gain control of his

13  head.

14  He rolls him over, and at this point I'm -- now

15  I'm like this, because my hands were previously here

16  (indicating), but he had just spun on me, so now he's like

17  this. I had come down here, and he's still punching here,

18  he's still punching here, and I'm trying to keep this hand

19  away from punching me further, and I'm trying to gain

20  control of it.

21  And I'm braced on the ground like this, and right

22  at this point he lunges forward -- and I very distinctly saw

23  him do it, because he's facing me -- he bites my arm and he

24  has a bite hold on my arm. And at this point, whether it's

25  a responsive or a convulsive grip, I'm now grabbing here,

119

---

1   still trying to prevent him from punching me, and at that

2   point I described to you that I have never been bitten or

3   attempted to be eaten before, and I was stunned and shock

4   and started yelling at him to stop biting me.

5   So, at that point, yes, my arm is wrapped around

6   him. Yes, he's biting me. I'm flexing or clenching my

7   bicep, trying to prevent him from punching me, and at that

8   point he continued to bite me. And at that point, if you

9   walked up, yes, my arm is around his neck as he's biting me.

10  BY MR. KUIPER:

11  Q.   So that's describing the -- what you're describing as a

12  headlock or choke hold.

13  That's what happened right there?

14  A.   Yes. Yes.

15  Q.   All right. You don't know how he got the handcuffs, but you

16  know he got handcuffs and started hitting you on the back of

17  the head?

18  A.   He was punching and swinging, there were items that were --

19  as you can see in the photos, there were items that were

20  strewn all over the ground -- I don't know if he had

21  grabbed it from my belt, I don't know if he had taken it

22  out of Agent Brownback's. I don't know where they came

23  from, I just know they were there, and I saw them and told

24  him to stop hitting me with them.

25  MR. KUIPER: Thank you. I have no further

120

---

KING-000095

1  questions.
2  THE COURT: Mr. Greene.
3  MR. GREENE: It's 12:05. Thank you.
4  THE COURT: Well, we don't necessarily eat lunch
5  at noon. So, certainly, if you have more questions, now is
6  your chance.
7  MR. GREENE: No.
8  THE COURT: All right. You may step down.
9  THE WITNESS: Okay, thank you.
10  THE COURT: Any reason not to excuse?
11  MR. KUIPER: Yes. I have a feeling that maybe he
12  may be needed in rebuttal.
13  THE COURT: All right. Well, Officer, then you
14  are still under oath. Stay in touch with the attorneys.
15  Thank you.
16  MR. GREENE: I would also move that he still be
17  sequestered if he's going to be called as a rebuttal.
18  THE COURT: Certainly. If he's possibly recalled,
19  he'll be sequestered.
20  MR. KUIPER: Rebuttal would be designed to rebut
21  testimony that came in as opposed to repeating the
22  testimony. It's appropriate he stay in the courtroom.
23  MR. GREENE: It is not, your Honor. It is not
24  appropriate for him to hear the --
25  THE COURT: We'll continue with sequestration.

121

1  State your full name, please.
2  MR. PARDEE: Johnny Pardee.
3  THE COURT: Do you solemnly swear or affirm that
4  the testimony you're about to give in this matter will be
5  the truth, the whole truth, and nothing but the truth, so
6  help you God?
7  THE WITNESS: I do.
8  THE COURT: Please be seated.
9  JOHNNY PARDEE,
10  called by the People at 12:03 sworn by the Court, testified:
11  DIRECT EXAMINATION
12  BY MR. KUIPER:
13  Q.  Hello, Mr. Pardee. Will you please spell your last name for
14  the record?
15  A.  P-A-R-D-E-E.
16  Q.  And Mr. Pardee, where were you employed back on July 18th of
17  last year?
18  A.  Speedy Oil Lube on Leonard.
19  Q.  Is that near the intersection of Leonard and Tamarack?
20  A.  Yes, it is.
21  Q.  And about 2:30 in the afternoon, did you notice a scuffle in
22  that vicinity?
23  A.  Yes.
24  Q.  Would you describe for the jurors what you saw?
25  A.  I just pretty much seen two guys on top of another guy and

122

1  they were yelling, *Please help, please help. Somebody hold*
2  *him down. So,* I just ran over there and held him down.
3  Q.  Could you tell whether or not those two people were in law
4  enforcement at all?
5  A.  Yes. You could see their badge.
6  Q.  Okay. And, what did you do? Did you assist them?
7  A.  I did.
8  Q.  What did you do to assist help?
9  A.  I just pretty much grabbed his legs and held him there so
10  they could control him a little better.
11  Q.  Okay.
12  THE COURT: Excuse me before I forget here. You
13  said, *They were yelling.* Who is *they?*
14  THE WITNESS: The two cops were. They were
15  yelling to help them because they needed help.
16  THE COURT: Go ahead.
17  BY MR. KUIPER:
18  Q.  Would you be able to recognize the person that they were
19  having this tussle with if you saw that person?
20  A.  Of course.
21  Q.  Do you see that person in the courtroom?
22  A.  Yeah. He's the second person over there (indicating), or
23  the third, all the way at the end.
24  MR. KUIPER: Can the record reflect the
25  identification of the defendant?

123

1  THE COURT: Yes.
2  BY MR. KUIPER:
3  Q.  Did you see what led up to that -- the scuffle?
4  A.  I did not. I just pretty much heard the -- heard
5  everything and went over there to help.
6  Q.  Okay. And based on what you saw, were you confident that
7  the two -- were the two people that you helped, were they in
8  police uniforms?
9  A.  No, they were not. But you could physically see the badge
10  on their chest.
11  Q.  Okay. Did you see whether or not they had firearms?
12  A.  I did not.
13  Q.  Okay.
14  A.  I wasn't sure.
15  Q.  But you knew, based on what you saw -- or you felt that they
16  were?
17  A.  Oh, yeah. You could tell. You could see their badges
18  flying around. You could definitely tell they were cops.
19  You could hear them say, *We're cops. Please help.*
20  Q.  So you laid on his legs?
21  A.  Yes, I did.
22  Q.  Were they able to get the handcuffs on after you helped?
23  A.  Yeah, they were.
24  Q.  Okay. Other than what you've described here, did you have
25  any other involvement?

124

KING-000096

1   A.   No, not really.  Not at all.
2   Q.   Okay.
3            MR. KUIPER:  Can I have just a second, your Honor?
4            THE COURT:  Sure.
5            MR. KUIPER:  (Confers with the detective)
6   BY MR. KUIPER:
7   Q.   When you sat on this -- the defendant's legs, do you know
8        what his legs were doing?
9   A.   Yeah.  They were pretty much flailing around everywhere.
10       He was trying to get free, pretty much.  They were getting
11       kicked everywhere.
12  Q.   Did you get kick at all?
13  A.   Yeah.  I got kicked in the face, but it wasn't intentional.
14       He was just doing it because of him moving around so much.
15  Q.   Trying to get away?
16  A.   Yeah, pretty much.  But it wasn't intentional by any means,
17       the kick in the face.
18  Q.   He didn't say, *I'm going to kick this dude in the face?*
19  A.   Clearly, it wasn't intentional, because of all the tussling
20       that was goin' on there.
21  Q.   Okay.
22            THE COURT:  Mr. Greene.
23            **CROSS-EXAMINATION**
24  BY MR. GREENE:
25  Q.   Mr. Pardee, what was happening to the guy on the ground?

1   A.   He was pretty much being held down, and they were just
2        pretty much just trying to get him under control.  He was
3        going pretty crazy on the ground.
4   Q.   Did you see them punching him in his face?
5   A.   I seen them punchin' him in the face, yeah.
6   Q.   Were they punching him many, many times?  Were they punching
7        and punching and punching in the face.
8   A.   No.  He was gripped onto their arm.  He was biting their
9        arm.  They were just trying to release.  They said -- they
10       were tellin' him to stop biting him, pretty much.  They
11       were trying to get him off of -- the officers were trying
12       to get him from not biting the officer.
13  Q.   Well, did you see where the arm was?
14  A.   Yeah.  The arm was down here (indicating), and he was
15       literally biting onto his -- his -- pretty much his muscle
16       on his arm.
17  Q.   Did you see his neck in the -- the arm around his neck?
18  A.   I did not see -- I did not see him around his neck, but I
19       did see him biting his arm.
20  Q.   Okay.  Is it something you saw or something you were told?
21  A.   No.  I saw it.  I was right there.  I seen it.
22  Q.   Okay.  Well, if the officer who had the arm around the neck
23       testified that the arm was around the neck, would you
24       disagree with that?
25            MR. KUIPER:  I'm going to object.  We went through

1        the scenario here, and it was pretty clear that it was based
2        on --
3            THE COURT:  Well, just -- just ask him what he
4   saw.
5            MR. GREENE:  Okay.
6   BY MR. GREENE:
7   Q.   Did you hear the defendant yelling?
8   A.   I did.
9   Q.   Was he yelling, *They're mugging me.  Call the police?*
10  A.   Not one bit.  He was just pretty much screaming because he
11       was getting -- he was getting arrested.  I don't know, just
12       pretty much normal -- normal stuff that you would scream at
13       that point, I guess.
14  Q.   So, you didn't hear him --
15  A.   I didn't hear him say anything about police brutality or
16       nothin' like that.  He was biting the officer.  What else
17       were they supposed to do?
18  Q.   Well, let me ask you this:  Did you hear him yelling,
19       *They're mugging me?*
20  A.   No, I did not.
21  Q.   You didn't hear that?
22  A.   That might have been before I came over, but I did not hear
23       that.
24  Q.   Okay.  Thank you.
25            THE COURT:  Mr. Kuiper.

1            MR. KUIPER:  Thank you, Mr. Pardee.  I don't have
2   anymore questions.  He has to be at work at one o'clock, so
3   I --
4            THE COURT:  You are excused.  Thank you very much.
5            THE WITNESS:  Thank you.  I appreciate it.
6            (At 12:08 p.m., witness stepped down)
7            MR. KUIPER:  My next witness isn't here.  I don't
8   think we'll be done with Agent Brownback by one o'clock.
9            Leah Buchanan.
10           THE COURT:  Your full name, please.
11           MS. BUCHANAN:  Leah Buchanan.
12           THE COURT:  Raise your right hand.
13   Do you solemnly swear or affirm that the testimony
14   you're about to give in this matter will be the truth, the
15   whole truth, and nothing but the truth, so help you God?
16           THE WITNESS:  Yes.
17           THE COURT:  Please be seated.
18              LEAH BUCHANAN,
19   called by the People at 12:10 p.m., sworn by the Court,
20   testified:
21              DIRECT EXAMINATION
22   BY MR. KUIPER:
23  Q.   Ms. Buchanan, will you please spell your last name for the
24       record?
25  A.   B-U-C-H-A-N-A-N.

KING-000097

**129**

1  Q.  Ms. Buchanan, were you near the intersection of Tamarack and
2      Leonard back on February 18th of 2014, at approximately --
3          THE COURT:  July.
4          MR. KUIPER:  Excuse me.
5  BY MR. KUIPER:
6  Q.  I'm sorry, July of 2014?
7  A.  Yes.
8  Q.  At about 2:30 in the afternoon?
9  A.  Yes.
10 Q.  Okay.  Do you recollect seeing anything out of the ordinary
11     near there?
12 A.  Yes.
13 Q.  Would you describe for the jurors what that was?
14 A.  I saw three men that, at the time that I was driving down
15     the road, were having an altercation.  So, I pulled into
16     the church parking lot and saw them fighting, and I called
17     911.
18         Then I saw the badges around the police officers'
19     necks and saw that it was police officers and another man.
20 Q.  Okay.  Did you know how that fight or interaction between
21     those men started?
22 A.  No.
23 Q.  Okay.  So, you pulled -- you pulled up kind of midstream?
24 A.  Yeah.
25 Q.  All right.  Did you think, when you first saw it, that the

**130**

1      two officers were beating up the other gentleman?
2  A.  Yes.
3  Q.  Okay.
4          MR. GREENE:  Your Honor, I'm going object for
5      future leading questions.
6          THE COURT:  No.  I'll allow that.  Overruled.
7  BY MR. KUIPER:
8  Q.  When you first saw what was happening there, what did you
9      think was happening?
10 A.  I thought it was police brutality; that they were beating
11     him up, until I saw that he was biting onto the one police
12     officer.
13 Q.  I'm going to ask you just to go way back to the beginning.
14         When you first saw it, did you realize that two
15     police others were involved?
16 A.  No.
17 Q.  Okay.  What did you the think was happening when you first
18     saw it?
19 A.  That somebody was getting their hind end beat with two
20     other people.  And, so I pulled in to see what was going
21     on.
22 Q.  And do you have a phone then?
23 A.  Yes.
24 Q.  What type of phone was it?
25 A.  Just an android, smartphone.

**131**

1  Q.  Did that phone have the ability to video record?
2  A.  Yes.
3  Q.  Did you take any videos?
4  A.  Yes.
5  Q.  When you were taking the videos, at the time that you were
6      taking the videos, did you know that two of the folks
7      involved were police officers?
8          MR. GREENE:  Objection, leading, your Honor.
9          THE COURT:  Overruled.
10 BY MR. KUIPER:
11 Q.  At the time that you took the two videos that we have, did
12     you know that the two people, who you initially thought were
13     beating the crap out of the other guy, did you know they
14     were police officers?
15 A.  Yes.  I saw their badges swinging around their necks.
16 Q.  Okay.  During the course of the first video, did you think
17     the police conduct was wrong?
18 A.  Yes.
19 Q.  Why was that?
20 A.  Why wasn't it wrong?
21 Q.  Why was it wrong?
22 A.  Because, when you are -- from a distance, all you could see
23     was him hitting the one boy.
24 Q.  Okay.  One of the officers hitting the boy?
25 A.  Yes.

**132**

1  Q.  Did you know why he was hitting the boy?
2  A.  Not at first, no.
3  Q.  Okay.  So, I'm going to mark this as Exhibit Number 9 -- or
4      Number 8, I'm sorry.  Did you provide a couple of the videos
5      that you had to law enforcement?
6  A.  Yes.
7          (Exhibit 8 marked)
8          (At 12:15 p.m., video played)
9  BY MR. KUIPER:
10 Q.  Does that look like, at least the beginning of the video,
11     what you shot with your phone?
12 A.  Yes.
13 Q.  Okay.
14         MR. KUIPER:  Your Honor, there are two videos on
15     here, and Mr. Greene knows about them.
16         Mr. Greene, do you have any objection to admission
17     of Proposed Exhibit Number 8, the two videos taken by --
18         MR. GREENE:  The two on that day?  Okay.  No.  No
19     objection, your Honor.
20         THE COURT:  Admitted.
21         (Exhibit 8 admitted)
22         (At 12:15 p.m., video played)
23 BY MR. KUIPER:
24 Q.  This is an accurate depiction of what you saw on that day?
25 A.  Yes, it is.

KING-000098

1  Q.  And that officer on the -- just to the right of the woman
2      with the white shirt on, you could see his badge right there
3      on the right?
4  A.  The one leaning down?
5  Q.  Yeah, leaning down.
6  A.  Yes.
7  Q.  All right.  Do you see a firearm on him at all?
8  A.  I can't see it from this distance.
9  Q.  Now, when you first pulled up, you testified you thought
10     these two guys were just beating up -- it was a random
11     fight?
12 A.  Yes.
13 Q.  Okay.  You were wrong about that?
14 A.  Yes.
15         (At 12:17 p.m., video played)
16 BY MR. KUIPER:
17 Q.  Were you aware that, when they were hitting him in the head,
18     he was biting the officer's bicep?
19 A.  Not at first, no.
20 Q.  Okay.  Did you ever become made aware of that fact?
21 A.  Yes.
22 Q.  Would that impact -- that voice in the background, is that
23     you saying --
24 A.  Yes.
25 Q.  Would that impact your position on whether or not they were

133

1      being brutal?
2  A.  Yes, it does.
3  Q.  How does it impact your --
4  A.  It changes my complete mind about how they were behaving.
5      I would do the same thing.
6  Q.  If you had known that that was going on, would you have
7      given them assistance?
8  A.  Yes.
9  Q.  Again, you didn't see how this started, so you don't know
10     whether or not they identified themselves as officers.  You
11     don't know what was said that led up to this interaction?
12 A.  No.
13         (At 12:18 p.m., video played)
14 BY MR. KUIPER:
15 Q.  Okay.  That was the other -- that was your other video,
16     correct?
17 A.  Yes.  That was the second one I took after I found out what
18     was going on.
19 Q.  Okay.  You told me outside of the court here that you had a
20     third video?
21 A.  Yes.
22 Q.  But an officer told you to delete that?
23 A.  Yes.
24 Q.  What officer was that?
25 A.  I don't know her name.  She was an African-American lady,

134

1      and she told me that I had to delete the videos because she
2      said they were undercover agents and that it could expose
3      them.
4  Q.  And then did you hear any other information from any other
5      officer telling you, No, keep the videos?
6  A.  Yes.  Another officer had approached me and said, No, I do
7      not have to delete the videos.  And then I thought the one
8      video was already deleted and, when I got home I was
9      looking at the phone and saw that it wasn't.
10         And I called the police department for them to
11     send an officer over for me to give them the videos.
12 Q.  Did you give those videos to Detective Smith, who is seated
13     to my right here?
14 A.  Umm, I gave a statement to him, but I don't believe it
15     was -- I don't think it was his phone that I Bluetoothed
16     the videos to.  I don't remember.
17 Q.  Okay.  Do you know the name of the African-American female
18     police officer?
19 A.  No, I do not.  I believe she was the only one there,
20     though.
21 Q.  Does the name Connie Moore ring a bell at all?
22 A.  No.
23 Q.  Okay.
24 A.  I would recognize her if I saw her.  Or at least I know
25     what she looked like that day.

135

1  Q.  But there was one officer here that said, Don't delete
2      those.  Give them to the police department, please?
3  A.  Um-hmm (affirmatively).
4  Q.  Do you -- do you remember anyone asking you to call the
5      police at all?
6  A.  Yes.  The officers that were down on the ground were
7      yelling out to the man, Stop resisting, stop resisting.
8      Somebody call for backup and help, please.
9  Q.  Okay.
10 A.  Because their radio was laying on the ground.
11 Q.  Did you call 911?
12 A.  Yes.
13 Q.  Were you in your vehicle with anyone else?
14 A.  Yes.
15 Q.  Who was in the vehicle with you?
16 A.  Jamie Plouhar and Beth Bridges.
17 Q.  What relation to you are they?
18 A.  They were my daughter's friends.
19 Q.  So, they were able to see a portion of this, as well?
20 A.  Yes.
21 Q.  Did you hear -- if you saw the guy on the ground, would you
22     recognize him?
23 A.  I know what he looked like, yes.
24 Q.  Do you see him in court today?
25 A.  Yes.

136

KING-000099

**Page 137**

1   Q.  Can you point him out for the jury, please?

2   A.  He's sitting over there (indicating).

3   MR. KUIPER:  Can the record reflect that

4   Ms. Buchanan has identified the defendant?

5   THE COURT:  Yes.

6   BY MR. KUIPER:

7   Q.  Did you ever hear him say that he was being mugged?

8   A.  No.

9   Q.  Did you ever hear him ask or yell, *Call police or Call 911*?

10  A.  No.

11  MR. KUIPER:  I don't have anymore questions.

12  Thank you.

13  THE COURT:  Mr. Greene.

14  MR. GREENE:  Your Honor, I need to switch

15  computers again.

16  MR. KUIPER:  (Confers with defense attorney)

17  MR. GREENE:  Can I have a minute, your Honor?

18  THE COURT:  Sure.

19  (At 12:22 p.m., break had but remained in the

20  courtroom)

21  CROSS-EXAMINATION

22  BY MR. GREENE:

23  Q.  Ms. Buchanan, correct?

24  A.  Yes.

25  Q.  Ms. Buchanan, before you recorded those videos, you actually

**Page 138**

1   made a call to 911, didn't you?

2   A.  Yes.

3   Q.  In that call you were telling what you were observing as it

4   was occurring, correct?

5   A.  Um-hmm (affirmatively).

6   MR. GREENE:  Your Honor, I'm going to move for

7   admission of her 911 call instead of --

8   THE COURT:  Any objection to that?

9   MR. KUIPER:  As long as there's some format which

10  it can be preserved for appellate review, if necessary.

11  THE COURT:  Go ahead.

12  MR. GREENE:  We'll burn a disk.

13  (At 12:28 p.m., attempting to play 911 call)

14  MR. GREENE:  Your computer won't play it after all

15  that. I'm going to shut you down. I don't want to mess

16  with your video cart.

17  MR. GREENE:  (Discussion with prosecutor regarding

18  video display)

19  (At 12:28 p.m., 911 call played)

20  BY MR. GREENE:

21  Q.  I want to stop you there. You told 911 that they were --

22  people on top of this man, and this man is screaming, *Call

23  the police, call the police*, correct? Was that your voice?

24  A.  Yes. Yes.

25  Q.  So, the man that you're talking about screaming, *Call the*

**Page 139**

1   *police*, was the people they were on top of, correct?

2   A.  Possibly.

3   Q.  Okay. And, so I want to go back. This is your voice. You

4   recognize that?

5   A.  Yes.

6   Q.  So, this is your call to 911?

7   A.  Yes. I made the call.

8   (At 12:29 p.m., 911 call played)

9   BY MR. GREENE:

10  Q.  Ms. Buchanan, that's how you perceived this as you were

11  observing it, isn't that correct?

12  A.  Yes. From my car. And Jamie, who was sitting next to me,

13  was the one talking in the background, relaying to me what

14  she heard being said.

15  Q.  This is before any of the officers had talked to you and

16  gave you their side of it, isn't that correct?

17  A.  No. The officers did not give me their side of it. When I

18  got out of the vehicle, I could see with my eyes that the

19  man was bit.

20  Q.  You could see that he was bit --

21  A.  Yes.

22  Q.  -- but you don't know why, do you?

23  A.  Why he was bit?

24  Q.  Yes.

25  A.  He was bit by the man that's sitting over at the table.

**Page 140**

1   Q.  Not how, but why?

2   A.  Why he was bit?

3   Q.  You don't know why.

4   A.  I don't know why he was bit, but I know that you don't bite

5   people.

6   Q.  Well, if someone was choking you, would you bite them to

7   stop them from choking you to death?

8   A.  If I was resisting arrest, I wouldn't bite somebody.

9   Q.  Listen to my question. Listen to my question. My question

10  is:  If somebody was choking you, would you bite them to

11  keep them from choking you to death?

12  A.  No, I would not bite somebody.

13  Q.  You would let them choke you to death?

14  A.  I would not bite them, no.

15  Q.  Okay. And this -- this is your actual impression as you

16  arrived and observed this as it was happening, correct?

17  A.  Yes, it is.

18  Q.  Okay. This is not after you've talked to anyone or after

19  you've had any conversations, but instant as it is

20  happening?

21  A.  Yes, as you could see it from the distance from in the

22  vehicle. But when you approached things closer and can see

23  closer, you can see what actually happened.

24  Q.  Wait, wait, wait. There's no question before you, ma'am,

25  listen to my question, okay?

KING-000100

1     At the beginning of this, you make it very clear
2     that the man on the ground, okay, who's seated at the table,
3     is crying, *Call the police, call the police,* isn't that
4     correct?
5  A.  **Actually, Jamie Plouhar, who was sitting next to me that**
6     **you heard in the background, was the one relaying to me.**
7  Q.  She heard him saying, *Call the police?*
8  A.  **Yes.**
9  Q.  Okay. So, he was screaming, *Call the police?*
10 A.  **I don't know if he was or not. I couldn't hear him. She**
11    **was relaying that to me.**
12 Q.  And then we have your comments from your video.
13    (Video played at 12:35 p.m.)
14 By MR. GREENE:
15 Q.  Now I want to pause. This car that you see there --
16 A.  **The white one?**
17 Q.  No, the black car.
18 A.  **Yes.**
19 Q.  Do you recognize that vehicle?
20 A.  **I couldn't tell you from -- now if I did or not. It's been**
21    **over six months.**
22 Q.  So, you don't know anything about that vehicle?
23 A.  **(Shakes head negatively)**
24 Q.  Okay.

141

1  A.  **I was -- no, I don't remember about that vehicle or not.**
2  Q.  Okay. And we hear you, the first words you say on the
3     video, *They're pounding him,* correct?
4  A.  **Yes. And then if you go to my second video --**
5  Q.  Excuse me, ma'am. Listen to my questions, okay? I'll ask
6     the questions. This is now what you are observing, isn't
7     that correct?
8  A.  **Yes.**
9  Q.  This is not what Jamie is telling you in the back seat?
10 A.  **No.**
11 Q.  You get out of the car and you see they are pounding him,
12    correct?
13 A.  **At that point of taking the video, I don't believe they**
14    **were pounding him anymore. The instant oil guy came over**
15    **and held his legs.**
16 Q.  Well, listen to what you say on the video.
17    (At 12:36 p.m. video played)
18    THE WITNESS: Yes, I --
19    (At 12:36 p.m. video still playing)
20 BY MR. GREENE:
21 Q.  After you get out now, and you're taking the video, you're
22    still saying on the video that they were pounding him in the
23    head, correct?
24 A.  **Yes, because they were.**
25 Q.  Okay. Now, did you have an opportunity to be interviewed by

142

1     an officer after they arrived on the scene?
2  A.  **Yes. I was interviewed by an officer after they arrived.**
3     **They asked me to stay.**
4  Q.  Okay.
5  A.  **And I was interviewed after they took him, I believe, down**
6     **to Spectrum.**
7  Q.  Okay.
8     MR. GREENE: Your Honor, may we approach?
9     THE COURT: Sure.
10    (At 12:38 p.m., sidebar outside of reporter's
11    hearing)
12    MR. GREENE: (Confers with prosecutor)
13    (At 12:39 p.m., video played)
14    MR. GREENE: Your Honor, formality. I move for
15    admission of -- and it was your exhibit. Do you want to use
16    yours or mine? We need to admit this before we show it.
17    MR. KUIPER: Your Honor, this is one of the
18    officers involved. I have no problem with Mr. Greene
19    showing it right now. We will admit a copy of the video
20    with all police in-car videos contained on it. We'll admit
21    that as People's Proposed Exhibit Number 9.
22    THE COURT: Looks like it started at Leonard and
23    Turner, and heading westbound on Leonard.
24    MR. GREENE: Westbound on Leonard, in the cool
25    perspective that you rarely get to see.

143

1     THE COURT: It's admitted.
2     (Exhibit 9 admitted)
3     (At 12:42 p.m., in-car video played)
4  BY MR. GREENE:
5  Q.  Did you hear that they were pounding? Did you hear that?
6     Was that you?
7  A.  **No. That wasn't me. I don't think so. Rewind it, and I**
8     **will tell you, because I wasn't understanding that close to**
9     **the road.**
10    MR. GREENE: (At 12:45 p.m., rewinding and playing
11    video)
12    MR. KUIPER: I'm going to object to any statements
13    made by the defendant coming in at this point, because they
14    are hearsay. If he ultimately elects to waive his Fifth
15    Amendment right and testify, then I'm fine with them coming
16    in. But, other than that, they are hearsay under the rules.
17    THE COURT: Mr. Greene.
18    MR. GREENE: Your Honor, I do not believe they are
19    hearsay. At best, they are present sense impression. If
20    it's him expressing what he is experiencing while it's
21    taking place, it's clearly a present sense impression, or
22    could even be considered an excited utterance, which are
23    exceptions to the hearsay rule.
24    THE COURT: I'll sustain Mr. Kuiper's objection.
25    I believe he's correct on the law.

144

KING-000101

1     MR. GREENE: Okay.

2     (At 12:46 p.m., video played)

3     THE COURT: That's the objectionable portion?

4     MR. GREENE: It's all throughout the video, your

5  Honor. It's -- it's just not going to be moved or admitted.

6  And he will be taking the stand, so we will bring it in.

7     MR. KUIPER: If that's going to happen, then I'm

8  fine.

9     THE COURT: Well, with that understanding, then

10  let's proceed. Very good.

11     MR. GREENE: Yeah. He will be taking the stand.

12     THE COURT: Very good. Very good.

13     (At 12:47 p.m. video played)

14  BY MR. GREENE:

15  Q.  That's you talking?

16  A.  Yes, that was me.

17  Q.  Okay.

18     MR. GREENE: Your Honor, there used to be a

19  ledger, but I can't -- I could -- I have tried to forward

20  it.

21     MR. KUIPER: Just so we're clear --

22     (At 12:49 p.m. video played)

23     THE WITNESS: That's not me.

24     MR. GREENE: Excuse me.

25     MR. KUIPER: That -- that is not you, is it?

145

1     THE WITNESS: That's not me.

2     MR. KUIPER: Okay. That's someone else.

3     THE WITNESS: Yep.

4     MR. KUIPER: Do you know who that is?

5     MR. GREENE: You can come back to the -- there are

6  a lot of people talking over each other. We're going to

7  admit under Brower anyway, correct?

8     MR. KUIPER: Yeah, we likely will. But any

9  statements made by anybody who did not identify themselves

10  or isn't subject to examination, I think there ought to be a

11  cautionary instruction, at a minimum, for those.

12     MR. GREENE: Your Honor, we can take this up off

13  the record if you want, but -- or, if you want to do it

14  right now, we can.

15     THE COURT: Well, then, Mr. Kuiper, Mr. Greene,

16  there are some people speaking on here who won't be

17  witnesses?

18     MR. GREENE: That's correct. Not everyone was

19  identify. But, your Honor, I do believe that it all would

20  fall under present sense impression. These are people

21  relating to the officers --

22     THE COURT: Well, ladies and gentlemen of jury,

23  you are not to consider statements made by people on this

24  tape who are not witnesses. I realize that's a little

25  vague, but I think it's something we're going to have to

146

1  cover in final instructions and cover in closing arguments.

2     All we can do at this point is have a general

3  understanding that, again, statements on this that are made

4  by witnesses who testify, you can consider. Statements made

5  by other people identified are not -- are to be disregarded.

6     So, let's move on.

7     (At 12:51 p.m., video played)

8  BY MR. GREENE:

9  Q.  Now, is that you saying you saw no cars around that even

10  remotely looked like a police car?

11  A.  There was no identified police vehicles.

12  Q.  Was that you saying that on the tape?

13  A.  I don't know. Rewind it and let me hear it again, please.

14  If you want me to be 100-percent sure, I would like to hear

15  it one more time.

16     (At 12:51 p.m., video played)

17     THE WITNESS: Yes, that is me.

18  BY MR. GREENE:

19  Q.  So, you looked to see if there were police cars, and there

20  were none?

21  A.  No. There were no police cars that had the sirens on top

22  or anything like that. There were no identified police

23  vehicles.

24  Q.  You thought that was important to tell the officers that at

25  the time?

147

1  A.  I don't recall if they asked me if there were or not.

2     (At 12:52 p.m. video played)

3  BY MR. GREENE:

4  Q.  Now, was that you talking about *open carry*?

5  A.  Yes. And the reason that I said that is because people can

6  open carry, and you never know who's going to shoot at you.

7  And, if you are a detective or a police officer, you have

8  to do what you have to do to make sure that the community

9  is safe.

10  Q.  Ma'am, that's not what you said. You said on the tape that

11  you can open carry and, therefore, you don't know if

12  somebody has a gun whether they're an officer or not, is

13  that correct?

14  A.  Did I say *officer*? If you can rewind it, I'll let you

15  know.

16     (At 12:52 p.m. video played)

17  BY MR. GREENE:

18  Q.  That was you again saying, *I was on the phone with* -- you

19  know -- *when they were pounding this guy*?

20  A.  Yes. I was talking to the lady that was standing next to

21  me. That was not a statement I was giving to the police

22  officers.

23  Q.  You were very close to the officer when you picked up on his

24  mike?

25  A.  But I was talking to the lady that was standing next to me.

148

KING-000102

1  Q.  That is your statement?
2  A.  It's not a statement. It was a conversation I had with the
3      lady that was standing next to me.
4          (At 12:53 p.m., video played)
5  BY MR. GREENE:
6  Q.  Now, is that you saying, *All of them were yelling call for
7      help?*
8  A.  Yes. I said, *Everybody was calling for help.*
9  Q.  Okay. So, including the guy on the ground who was being
10     beaten, he was yelling, calling for help?
11 A.  When I made the 911 call, that is what Jamie told me, yes.
12 Q.  Now you are telling this to the officer, correct?
13 A.  I think I was talking to the lady standing next me still at
14     that point.
15 Q.  That is your voice, though?
16 A.  Yes.
17 Q.  That is you making the statement that they were all calling
18     for help?
19 A.  That everyone was calling for help.
20 Q.  Okay. Thank you.
21 A.  Not even -- not just the people that were on the ground,
22     but the bystanders, also.
23         (At 12:55 p.m., video played)
24 BY MR. GREENE:
25 Q.  Is that you, *One guy is on his back and the other guy is*

149

1      *pounding him in the head?*
2  A.  That sounds like me.
3  Q.  Sounds like you. You recognize your voice?
4  A.  Yes.
5  Q.  So, it is you?
6  A.  It does sounds like me. There's a lot of other voices. If
7      you would like to rewind it and listen it to again, I could
8      verify it.
9  Q.  We would be here a long time.
10 A.  Well, if you want me to be 100-percent.
11 Q.  We'll take your answer.
12         MR. GREENE: Is that okay, your Honor?
13         THE COURT: It is, it is. Yes.
14         (At 12:56 p.m. video played)
15 BY MR. GREENE:
16 Q.  That's you identifying yourself to the officers?
17 A.  Yes.
18 Q.  You are Leah?
19         (At 12:56 p.m., video played)
20         THE WITNESS: Excuse me.
21         (At 12:57 p.m., video still playing)
22 BY MR. GREENE:
23 Q.  Now, is that you saying, *They were pounding his face, and
24     they didn't need to pound his face?*
25 A.  No. I says, *I know you've gotta do what you've gotta do.*

150

1      But they were pounding his face. But could you please not
2      let my phone number and address be known to everybody in
3      here?
4          MR. GREENE: I'm not sure how to skip that. That
5      was the next statement.
6          THE COURT: Let's skip over it.
7  BY MR. GREENE:
8  Q.  Okay. I'm going to go back to the first, and then I'll stop
9      it and try to skip over it.
10 A.  Thank you.
11         MR. GREENE: (At 12:58 p.m. video playing)
12         Your Honor, that's probably as far as that
13     involves this witness.
14         THE COURT: All right. Very good.
15         MR. GREENE: Okay.
16 BY MR. GREENE:
17 Q.  So, even after the officer got there and they were
18     interviewing you, you were still telling them they were
19     pounding his face and they didn't need to pound his face,
20     correct?
21 A.  They were pounding his face, but he bit them and wouldn't
22     let go. So, you have to do --
23 Q.  Who told you that he wouldn't let go?
24 A.  You could see that he wouldn't let go, and they were
25     pounding his face. And you could see the blood down the

151

1      officer's arm.
2  Q.  Never on here do you say anything about him biting him, do
3      you?
4  A.  He was -- bit onto them.
5  Q.  I'm asking you. We're listening to the video, correct?
6  A.  Yes.
7  Q.  And nowhere on there do you see -- say anything about seeing
8      a bite, do you?
9  A.  I did see the bite on the arm.
10 Q.  Listen to my question. You do not say anything on the video
11     about seeing a bite, do you?
12 A.  Not on that part of the video, no. But if you listen to my
13     second video that I took, you can hear that.
14 Q.  Also, on your 911 call you say nothing about bite, correct?
15 A.  No. I was still sitting in my vehicle at that time.
16 Q.  At some point, you sat down with the detectives at your
17     house, correct?
18 A.  That was a while later.
19 Q.  Okay. And that's where you start talking about -- they tell
20     you what happened?
21 A.  No, that's not when I knew that he got bit.
22 Q.  Okay.
23 A.  I knew he got bit right when that happened, because you
24     could see the bite on his arm when he took his shirt off
25     and there was blood on his arm.

152

KING-000103

1  Q.  Okay. So, you knew he had been bit because, when he took

2      his shirt off, you could see it?

3  A.  I don't know if that was exactly when I saw he was bit or

4      not, but I did know he was bit.

5  Q.  Okay. But your recollection here today is seeing it after

6      he took his shirt off?

7  A.  That's when I saw the blood, yes.

8  Q.  Okay.

9          MR. GREENE: I have no further questions. Thank

10     you.

11         THE COURT: Mr. Kuiper.

12         MR. KUIPER: Thank you.

13             REDIRECT EXAMINATION

14 BY MR. KUIPER:

15 Q.  Did any of the officers on-scene ask you to tell them

16     anything other than what you observed?

17 A.  No.

18 Q.  Do you remember meeting with Detective Smith?

19 A.  Yes.

20 Q.  If I said that that happened on September 30th, when you

21     gave the next statement, would that be fairly accurate?

22 A.  It would be in the end of September, yes.

23 Q.  The end of September. Did she -- are you aware that he was

24     recording you when you made that statement?

25 A.  Yes.

153

1  Q.  Okay. Did he tell you what happened, or did he tell you to

2      make a statement or conform your statement to what he wanted

3      to hear?

4  A.  He didn't tell me what happened or make my statement to

5      what he wanted to hear.

6  Q.  Okay.

7          You and I met for the first time today true?

8  A.  Yes.

9  Q.  And what did I tell you to do when you testified?

10 A.  To tell them exactly what I can remember as of today.

11 Q.  To tell the truth?

12 A.  Yes.

13 Q.  Okay. So, no one asked you to testify in any particular

14     fashion that is involved in law enforcement, is that a fair

15     statement?

16 A.  Yes. Nobody asked me to tell anything except for how I

17     foresee it happening.

18 Q.  This -- a video and the videos from the in-car -- all the

19     in-car videos, last approximately 20 minutes after this

20     happened. Did you remain in that location for longer than

21     20 minutes?

22 A.  I honestly don't remember how long I remained in that

23     location.

24 Q.  So -- but there's a certain point, on the day that this

25     happened, on July 18, 2014, where you could see that the

154

1      officer's arm was bit?

2  A.  Yes.

3  Q.  Okay. I take it you don't know with how much force his

4      bicep was bit?

5  A.  No. But as bad as it looked, it had to be with extreme

6      force.

7          MR. GREENE: Objection, your Honor. She's not

8      qualified to give a medical diagnosis about how hard a bite

9      is, looking at it from a distance.

10         THE COURT: Well, I'll allow it. That was her

11     observation.

12         THE WITNESS: I actually went to school for

13     medical assistant.

14 BY MR. KUIPER:

15 Q.  Well, again, you didn't see how this started?

16 A.  No.

17 Q.  Your initial perception was two guys were beating up one

18     guy?

19 A.  Yes.

20 Q.  Two regular citizens were beating up another regular

21     citizen?

22 A.  Yes. When I was driving down the road, that's what it

23     looked like.

24 Q.  Turned out to be wrong about that?

25 A.  Yes.

155

1  Q.  And your initial perception was that these are police

2      officers, but they're just -- they're going to town on this

3      guy and whippin' up on him?

4  A.  Yes.

5  Q.  And, when you made that observation, you didn't know that

6      the guy punching the defendant was having his bicep bitten?

7  A.  Yes. Not at that time, no.

8  Q.  Again, like I asked you on direct examination, did those

9      factors modify your opinion?

10 A.  Yes. Is it, once I knew what he was doing to the police

11     officer, did it modify my perception of how the police

12     officers reacted?

13 Q.  Yes.

14 A.  Yes, that did modify my perception of how the police

15     officers reacted.

16 Q.  But, at the time that you made this statement to the police

17     that's captured on the in-car video and you made the 911

18     call, you were under the impression that the police officers

19     were whipping on this guy for no real reason?

20 A.  Yes. And that's why, if you listen to the second video

21     that I took, you will hear me say that I'm glad that they

22     did what they had to do. Because what if somebody -- what

23     if he would have been somebody who they thought he was, and

24     my children were out and my children got hurt?

25 Q.  So, you just kind of wandered into this situation not

156

KING-000104

1 knowing the circumstances?

2 A. Yep.

3 Q. And they -- they would have had an impact on how you viewed

4 things, if it happens the way that the officers say it did,

5 if you had a chance to witness it from the get-go?

6 A. Um-hmm (affirmatively).

7 THE COURT: Excuse me, is that a *yes*?

8 THE WITNESS: Yes.

9 BY MR. KUIPER:

10 Q. I'm sorry. You can't say um-hmm (affirmatively) or uh-uh

11 (negatively). You have to say *yes* or *no*.

12 A. Yes. Yes.

13 Q. All right.

14 MR. KUIPER: No further questions. Thank you.

15 THE COURT: Mr. Greene.

16 MR. GREENE: Thank you, your Honor.

17 RECROSS-EXAMINATION

18 BY MR. GREENE:

19 Q. On the second video you refer to him as a *felon*, correct?

20 A. I said, *If he was a felon.*

21 Q. Okay. Did you find out that this young man was just walking

22 down the street minding his business --

23 A. His --

24 Q. -- not doing anything wrong?

25 A. His attorney left me one of his, I think -- I don't think

157

1 it was you, because the voice was different -- but had left

2 me a voicemail message saying that, *It was just an innocent*

3 *kid on his way to school,* I believe is what she said.

4 Q. And that this wasn't even the guy the cops were looking for?

5 Did you find out that, also?

6 A. He -- I was told that he mentioned the description and was

7 questioned for an identification.

8 Q. The police tell you that?

9 A. I was told that -- I'm trying to remember when I was told

10 that.

11 Q. Okay. Did you ever find out that he was not doing anything

12 wrong and that he was just -- this came down upon him

13 because of the police interaction with him?

14 A. Can I tell you something?

15 Q. No, you cannot. You can answer my question.

16 A. What do you want me to answer? Could you repeat that,

17 please?

18 Q. My question is: Did you ever find out this was the wrong

19 guy the police were looking for?

20 A. Yes.

21 Q. That he wasn't -- he had not been charged with any offense?

22 A. Yes.

23 Q. He had no warrants out on him?

24 A. I don't know if he had warrants out on him or not.

25 Q. Okay. Well, you knew the guy they were looking for had a

158

1 warrant out for him, correct?

2 A. I don't know if he had a warrant out or if he was somebody

3 they were looking for in suspicion of the home invasion.

4 Q. Okay. But you know that this was not the person they were

5 looking for?

6 A. I did not know that at the time.

7 Q. Okay. You were later -- you later found that out?

8 A. Yes.

9 Q. Okay.

10 MR. GREENE: Thank you.

11 THE COURT: Mr. Kuiper.

12 REDIRECT EXAMINATION

13 BY MR. KUIPER:

14 Q. If officers in plain clothes came up to you and identified

15 themselves as officers and said, *You match the description*

16 *of someone we're looking for, will you show me* --

17 MR. GREENE: Objection, objection. This is

18 totally speculative and totally irrelevant as to what she

19 would do.

20 THE COURT: I'll sustain the objection.

21 MR. KUIPER: It certainly is relevant. He's

22 asking hypotheticals based on --

23 THE COURT: I'll sustain the objection.

24 MR. KUIPER: I don't have anymore questions.

25 MR. GREENE: Nothing further, your Honor. Thank

159

1 you.

2 THE COURT: Thank you. You are excused.

3 (At 1:07 p.m., witness stepped down)

4 THE COURT: Well, ladies and gentlemen of the jury

5 -- oh, Mr. Kuiper, your next witness is after lunch?

6 MR. KUIPER: Sure. I have a couple more

7 witnesses.

8 THE COURT: All right. We'll take a lunch break

9 until 2:15.

10 Ladies and gentlemen, you are excused til then.

11 Again, do not discuss the case in any way with anybody.

12 Don't have any contact with anybody involved in the case.

13 Just set it aside until we're all back in here together later

14 this afternoon. Thank you.

15 (At 1:08 p.m., jury exits courtroom)

16 (At 1:08 p.m., break had)

17 (At 2:25 p.m., jury resumes seats)

18 THE COURT: Be seated. Mr. Kuiper your next

19 witness, please.

20 MR. KUIPER: Thank you, your Honor. I would call

21 Bryan Boone from the Grand Rapids Police Department.

22 THE COURT: State your full name, please.

23 MR. BOONE: Bryan Boone.

24 THE COURT: Raise your right hand.

25 Do you solemnly swear or affirm that the testimony

160

KING-000105

1    that he had a felony warrant, do you remember that clearly?

2  A.   Yes.

3  Q.   So there's no fuzz or haze in your memory pertaining to

4       that?

5  A.   I don't believe so, no.  I remember him saying that.

6  Q.   Okay.

7            MR. GREENE:  Thank you.

8            REDIRECT EXAMINATION

9  BY MR. KUIPER:

10 Q.   Who do you remember saying that to?

11 A.   One of the officers.

12 Q.   One of the guys in plain clothes, or one of the other

13      officers?

14 A.   One of the other officers.

15 Q.   One of the others officers.

16 A.   A uniformed officer.

17 Q.   Did you see two uninformed officers out here earlier?

18 A.   Yes.

19 Q.   Was it either one of those two?

20 A.   No, I don't believe so.  I couldn't tell you.  I don't

21      remember.  I couldn't even tell you who the guy -- who any

22      of the officers or the guy was.  I couldn't tell you who

23      they are if I seen them again.

24            MR. KUIPER:  All right.  Thank you.

25            MR. GREENE:  Nothing further.

                    189

1            THE COURT:  Thank you.  You are excused.

2       (At 3:08 p.m., witness stepped down)

3            THE COURT:  State your full name, please.

4            MR. BROWER:  Glen Brower.

5            THE COURT:  Do you solemnly swear or affirm that

6       the testimony you're about to give in this matter will be

7       the truth, the whole truth, and nothing but the truth, so

8       help you God?

9            THE WITNESS:  I do.

10           THE COURT:  Please be seated.

11                GLEN BROWER,

12 called by the People at 3:08 p.m., sworn by the Court, testified:

13                DIRECT EXAMINATION

14 BY MR. KUIPER:

15 Q.   Officer Brower, will you spell your last name for the

16      record, please?

17 A.   B-R-O-W-E-R.

18 Q.   And where are you currently employed?

19 A.   Grand Rapids Police Department.

20 Q.   How long have you held a position there?

21 A.   Twenty years.

22 Q.   And what capacity are you employed?

23 A.   I'm a West Side Patrol Officer.

24 Q.   Were you employed in that capacity January 18th of last

25      year?

                    190

1  A.   January 18th?

2  Q.   I'm sorry, July 18th.

3  A.   I was.

4  Q.   I'm having problems with my Js here.

5            Do you remember being dispatched to Tamarack and

6       Leonard for a 1039, officer in distress?

7  A.   I was.

8  Q.   Was that approximately 2:30 in the afternoon?

9  A.   It was.

10 Q.   When you arrived on-scene, did you make contact with someone

11      who was later transported to the hospital?

12 A.   I did.

13 Q.   Is that person a gentleman named James King?

14 A.   It is.

15 Q.   Do you see him in court today?

16 A.   I do.

17 Q.   Will you point him out and identify him for the jurors,

18      please?

19 A.   At the defense table.

20 Q.   Can the record reflect that Officer Brower has identified

21      the defendant, your Honor?

22           THE COURT:  Yes.

23 BY MR. KUIPER:

24 Q.   Officer Brower, while riding to get medical check-up for

25      Mr. King, did he say anything to you, not in response to a

                    191

1       question, but did he tell you anything about what happened,

2       of his own volition?

3  A.   Yes, he did.

4  Q.   What did he say?

5  A.   He said, *These guys said they were detectives* --

6            MR. GREENE:  Objection, your Honor.  May we

7       approach?

8            THE COURT:  Yes.

9       (At 3:09 p.m., sidebar had outside of reporter's

10      hearing)

11           THE COURT:  Go ahead, Mr. Kuiper.

12 BY MR. KUIPER:

13 Q.   Please continue, Officer Brower.

14 A.   He said these guys approached, said they were detectives,

15      and said they tried taking his wallet.

16 Q.   Did he indicate to you whether or not he thought he was

17      being robbed?

18 A.   He did, yes.  He said he thought he was being robbed.

19 Q.   And did you ask whether or not they identified themselves?

20 A.   He did.  He said, *Yeah, they said they were detectives, but*

21      *anyone could say that.*  And then he made some reference to,

22      *Anyone can buy a badge.*

23 Q.   Okay.

24           MR. KUIPER:  I don't have any -- well, can I just

25      have a second, your Honor?

                    192

| | |
|---|---|
| 1 | you agree with that, as well? |
| 2 A. | Sure. |
| 3 Q. | We all have made mistakes.  I mean, we might be nice guys, |
| 4 | but occasionally people get angry or make the wrong |
| 5 | decisions.  Would you agree with that general concept? |
| 6 A. | Sure. |
| 7 | MR. KUIPER:  Thank you. |
| 8 | THE COURT:  Mr. Greene. |
| 9 | MR. GREENE:  No further questions.  Thank you very |
| 10 | much. |
| 11 | THE COURT:  Thank you very much.  You are excused. |
| 12 | THE WITNESS:  Thank you. |
| 13 | (At 4:13 p.m., witness stepped down) |
| 14 | MR. KUIPER:  We call Doug Brownback. |
| 15 | THE COURT:  Just how long do you expect him to |
| 16 | take? |
| 17 | MR. KUIPER:  Not as long as Detective Allen. |
| 18 | THE COURT:  I should -- out of courtesy to the |
| 19 | jurors, any of you have like a five o'clock obligation, |
| 20 | speak up. |
| 21 | JUROR SEAT # 12:  Yes. |
| 22 | JUROR SEAT #10:  I have daycare. |
| 23 | THE COURT:  I don't know, maybe -- let's just go |
| 24 | til 5:00.  I think -- |
| 25 | MR. KUIPER:  He'll be recalled as a rebuttal |

217

| | |
|---|---|
| 1 | witness one way or another. |
| 2 | THE COURT:  Any of you have any problems if we go |
| 3 | right til 5:00? |
| 4 | THE JURY:  (Responds negatively) |
| 5 | THE COURT:  All right.  We'll go til 5:00 and cut |
| 6 | it off and pick it up again in the morning. |
| 7 | MR. GREENE:  May I address that issue, sir? |
| 8 | THE COURT:  Pardon me? |
| 9 | MR. GREENE:  Well, if we're going to break up the |
| 10 | direct and cross, I would ask the Court to consider keeping |
| 11 | them together, because it's going to be crucial that the |
| 12 | cross -- they're able to correlate what is said on the cross |
| 13 | with what's said on the direct. |
| 14 | So I would just ask the Court to take that into |
| 15 | consideration. |
| 16 | THE COURT:  We'll go ahead and hear the witness. |
| 17 | Step right over here, please. |
| 18 | State your full name, please. |
| 19 | MR. BROWNBACK:  Douglas Brownback. |
| 20 | THE COURT:  Do you solemnly swear or affirm that |
| 21 | the testimony you're about to give in this matter will be |
| 22 | the truth, the whole truth, and nothing but the truth, so |
| 23 | help you God? |
| 24 | THE WITNESS:  I do. |
| 25 | THE COURT:  Please be seated. |

218

| | |
|---|---|
| 1 | DOUGLAS BROWNBACK, |
| 2 | called by the People at 4:15 p.m., sworn by the Court, |
| 3 | testified: |
| 4 | DIRECT EXAMINATION |
| 5 | BY MR. KUIPER: |
| 6 Q. | Do you go by Agent Brownback? |
| 7 A. | **Special Agent Brownback, yes.** |
| 8 Q. | Would you please spell your last name? |
| 9 A. | **B-R-O-W-N-B-A-C-K.** |
| 10 Q. | Where are you currently employed? |
| 11 A. | **I'm a Special Agent with the FBI in our Grand Rapids,** |
| 12 | **Michigan office.** |
| 13 Q. | And how long have you held a position with the FBI? |
| 14 A. | **Approximately four-and-a-half years.** |
| 15 Q. | What are your current duties? |
| 16 A. | **Right now I'm assigned to the Violent Crime and Fugitive** |
| 17 | **Task Force here in Grand Rapids.** |
| 18 Q. | Were you assigned to that unit back on July 18 of 2014? |
| 19 A. | **Yes, I was.** |
| 20 Q. | Do you remember being with Detective Todd Allen from the |
| 21 | Grand Rapids Police Department, in the vicinity of Leonard |
| 22 | and Alpine, in Grand Rapids, Michigan? |
| 23 A. | **Yes, I was.** |
| 24 Q. | And what were you doing with Detective Allen? |
| 25 A. | **At that point in time, we were conducting surveillance in a** |

219

| | |
|---|---|
| 1 | **Task Force vehicle.  We were trying to locate the** |
| 2 | **whereabouts of a man named Aaron Davidson.** |
| 3 Q. | Did you work at all with Detective Allen to develop a |
| 4 | profile of Mr. Davidson? |
| 5 A. | **Yes, I did.** |
| 6 Q. | And what did you do to develop that profile? |
| 7 A. | **We talked to a number of individuals on the northwest side** |
| 8 | **of Grand Rapids.  There were two clerks; one worked for** |
| 9 | **grocery store, another worked for a gas station.  Both were** |
| 10 | **fairly close to the corner of Leonard Street and Alpine** |
| 11 | **Avenue.** |
| 12 Q. | Did they indicate to you that Mr. Davidson had been seen in |
| 13 | the vicinity on July 17, 2014? |
| 14 A. | **Yes, sir.** |
| 15 | MR. GREENE:  Objection.  Calls for hearsay. |
| 16 | MR. KUIPER:  It's -- it's a foundational question |
| 17 | to show the actions. |
| 18 | THE COURT:  Just a *yes* or *no* answer. |
| 19 | THE WITNESS:  Yes, they did. |
| 20 | BY MR. KUIPER: |
| 21 Q. | Okay.  I'm going to show you what's already been marked as |
| 22 | People's Exhibits 1 and 2.  Do you recognize what those |
| 23 | documents are? |
| 24 A. | **Yes, I do.** |
| 25 Q. | Were those utilized in attempting to capture an image of |

220

KING-000120

1  Mr. Davidson?

2  A.  Yes, they were.

3  Q.  Okay.  Were there any other photographs of Mr. Davidson that

4  you are aware of that you were able to utilize in

5  ascertaining his physical identity?

6  A.  No.  These were the only two that I was aware of.

7  Q.  Okay.  Did you attempt to locate any other photographic

8  depictions of Mr. Davidson?

9  A.  I did not.

10  Q.  When you were in the vicinity of Alpine and Leonard, did you

11  see anyone near the intersection of Tamarack and Leonard

12  that you thought matched the description?

13          MR. GREENE:  Objection. It's leading. He's

14  leading.

15          THE COURT:  Overruled.  Go ahead.

16  BY MR. KUIPER:

17  Q.  Did you see anyone who matched the description of

18  Mr. Davidson?

19  A.  Yes, I did.  I saw a white male, approximately six foot

20  tall, slim build, walking to the east on Leonard Street as

21  Detective Allen and I were driving to the west on Leonard

22  Street.  The individual was wearing blue jeans, had no

23  shirt on, had short hair and was wearing what looked like

24  prescription eyeglasses.

25  Q.  And, did you take any measures, other than that first

221

1  observation of that individual, to determine whether or not

2  he matched the description of Mr. Davidson?

3  A.  Yes, we did.  We were traveling to the west, westbound.

4  Detective Allen was driving.  He stopped, turned around and

5  drove eastbound on Leonard Street, passing the individual

6  who was walking on the sidewalk.

7          At that point we pulled into a parking lot of a

8  church just off of Leonard Street.  That would have been in

9  the pathway of this individual as he was walking towards

10  the east.

11          Then we parked in a parking spot fairly close to

12  the sidewalk there on Leonard Street.

13  Q.  What type of attire did you have on?

14  A.  At that point in time, I had — I called them dungarees,

15  but they're basically just kind of green cargo pants or

16  green jeans.  I had my ballistic vest, bulletproof vest on.

17  On top of that, I had a black Under Armour-style material

18  shirt, as well as my duty-belt weapon; two extra magazines;

19  pair of handcuffs.

20  Q.  Did you have a badge at all?

21  A.  Yes, I did.  I had my FBI-issued badge hanging around my

22  neck.  At that point in time it was underneath my black

23  shirt, tucked in.

24  Q.  Did you ultimately make contact with this person that was

25  walking eastbound on Leonard?

222

1  A.  Yes, we did.  As the individual was approaching our

2  vehicle, we were able to watch him walking towards us.  At

3  that point in time we felt that, based on the description

4  we had from the investigating detective, as well as the two

5  witnesses that had seen him the day before, and the

6  photographs that we had, bears a strong resemblance of

7  Mr. Davidson.

8          So, at that point in time, both Detective Allen

9  and I exited our vehicle.  I walked around the front of the

10  vehicle from the passenger side, and Detective Allen exited

11  out of the driver's-side vehicle and approached Mister --

12  who ended up being Mr. King.

13  Q.  When you exited the vehicle, where was the badge that you

14  were in possession of?

15  A.  As I exited.  As I was walking around the front, I took it

16  out from underneath my shirt and let it just hang — hang

17  at my chest.

18  Q.  And, was your firearm in plain view?

19  A.  No, it was not.  That shirt, along with the ballistic

20  vest, is somewhat tight.  At that point I don't believe I

21  had actually pulled it up and over my firearm at that point

22  in time.

23  Q.  Would you describe the contact with your -- initial contact

24  with Mr. King?

25  A.  Yes, sir.  As I was coming around, Detective Allen made

223

1  contact with Mr. King first.  He asked that he step off the

2  sidewalk, identified himself as a detective with GRPD, or

3  the Grand Rapids Police Department.

4          As I was walking around, Detective Allen was

5  interacting with Mr. King.  Mr. King complied and stepped

6  over towards our vehicle.  At that point in time,

7  Detective Allen told the individual that we were looking

8  for someone and asked him what his name was.

9          Mr. King said, *My name is James.* At that point

10  in time, Detective Allen asked if -- what his last name

11  was, and he just refused to answer.  He just didn't say

12  anything, and he asked what this was about.

13  Q.  Okay.  Did you at any time give your credentials or identify

14  yourself to Mr. King?

15  A.  I did identify myself.  I didn't pull out my FBI

16  credentials.  At this point we were under the assumption

17  that we were talking with somebody who we believed was a

18  violent felon, and so I didn't want to have one of my hands

19  not free by pulling out my credentials.

20          But when he asked what this was about, I said,

21  you know, *I'm with the FBI, and we're looking for an

22  individual. We need to talk to you.*

23  Q.  At any point did you request that he produce identification?

24  A.  Yes.  I asked him if he had any identification, and he

25  said, *No.*

224

KING-000121

1  Q.  At that particular time, did you and Detective Allen decide
2      to detain him to ascertain his identity?
3  A.  Yes, we did.
4  Q.  Would you describe for the jurors how that went down?
5  A.  Umm, Detective Allen asked if Mr. King had any weapons on
6      him. Mr. King said, Yes, he did.
7          At that point in time Detective Allen told
8      Mr. King to put his hands on his head because he needed to
9      pat him down to check to see what this weapon was.
10         Mr. King complied. He put his hands on his head,
11     and at this point he asked, again, what this was about. I
12     told him, We're looking for someone. We're trying to
13     identify a wanted felon, for lack of a better term. We
14     asked if he had any identification, and he said, No, and
15     then Detective Allen proceeded to pat him down.
16         Mr. King had a cell phone in his hand. If I
17     recall, he had earbuds like in his ears that he took out
18     when he first -- when we first approached him and asked him
19     to step off the sidewalk. So, he had a cell phone and his
20     earbuds in his hands.
21 Q.  What did he do with the cell phone and earbuds?
22 A.  Detective Allen, I believe, asked to basically hold those
23     two things, those two items. Mr. King complied.
24     Detective Allen handed those to me so that he could conduct
25     the pat-down to try and determine what this weapon was.

225

1  Q.  At any point before the weapon was discovered, did the
2      defendant identify what type of weapon it was?
3  A.  I'm sorry, could you ask that again?
4  Q.  Did the defendant say what type of weapon he had before it
5      was located?
6  A.  No, he did not.
7  Q.  Did you see whether or not Detective Allen located any
8      weapon?
9  A.  Yes, he did. He located a small -- or I say small, but a
10     folding pocketknife that was clipped inside, I believe, his
11     front pant pocket.
12 Q.  Okay. And what happened after that?
13 A.  Umm, Detective Allen pulled a knife out of his front pant
14     pocket. At this point in time, Mr. King brought his hands
15     down towards his waist.
16         Detective Allen told him to put his hands back up
17     on his head, which he did. Detective Allen
18     asked if this is the knife in question, if this is the
19     weapon that he had asked him about, and Mr. King said, Yes.
20         Detective Allen handed me the knife. So, at that
21     point in time I was holding both the cell phone and the
22     knife that he had taken off of his person.
23 Q.  Were they actually in your hands, the knife and the cell
24     phone?
25 A.  Yes, they were.

226

1  Q.  What happened after -- let me ask you this. Where were you
2      standing in relation to Detective Allen and the defendant?
3  A.  Detective Allen was on the right-hand side of the
4      defendant. I was on the left-hand side. The defendant was
5      in between myself and our task force vehicle, approximately
6      at the driver's door or possibly the driver-side rear
7      passenger door of the vehicle.
8  Q.  Where were his hands?
9  A.  At that point he had put them back up on his head as
10     Detective Allen had told him to do.
11 Q.  What happened after that?
12 A.  Umm, at that point in time Detective Allen continued to pat
13     him down to see if there were any other weapons on him.
14         At that point in time, he, Detective Allen, felt
15     the back side of his pants, felt a wallet, or what he
16     thought was a wallet; removed that item from his pants
17     pocket. As he was holding it, he asked, Is this your
18     wallet. Yes, it is. And he said, So, you don't have any
19     identification in this wallet?
20         And at that point in time, I felt that Mr. King
21     was giving us -- basically not giving us his full name. I
22     felt like he did have identification in that wallet and
23     that identification would be that of Mr. Aaron Davidson,
24     our fugitive that we were looking for.
25         At that point in time, I felt that I needed to

227

1      handcuff him to restrain him so that we could ascertain his
2      identification, if he was actually Mr. Davidson.
3  Q.  What did you do in that regard?
4  A.  I reached with my left hand up towards Mr. King's left
5      hand; with my right hand, I reached back to pull out my
6      handcuffs.
7  Q.  What happened?
8  A.  I reached for his left hand and, as I grabbed it, or as I
9      grabbed for it, he spun around towards me. And then at
10     that point in time I saw his hand come towards me, and I
11     took a step back. His left hand came towards -- came back
12     and towards me. I took a step back, and from there it
13     became an altercation or a fight between Detective Allen,
14     myself, and Mr. King.
15 Q.  So, he took a swing at you?
16 A.  That's what I felt like he was doing. Yes.
17 Q.  Did he connect with you at all?
18 A.  No, I don't believe he did at that point in time.
19 Q.  Okay. In as much detail as you can, describe what happened
20     after he -- he attempted to hit you.
21 A.  At that point in time, things moved rapidly. We quickly
22     went to the ground. I was focused on Mr. King 's hands,
23     because at that point in time, you know, our training is
24     that, you know, a person's hands, when we're dealing with a
25     subject in that way, that person's hands are -- are the

228

KING-000122

1    danger point. So, I needed to focus on those. My focus

2    was trying to get handcuffs on him.

3         Once we were on the ground, I was at his mid-

4    section. Mr. King wasn't wearing a shirt, and it was

5    pretty hot in the middle of July. Things became pretty

6    sweaty pretty quick, between all three of us.

7         I remember at some point, and I don't recall

8    exactly when, but I remember Detective Allen saying

9    something about getting bit, or *Stop biting me*, something

10   to that effect.

11        During this time, I had handcuffs in my hands,

12   trying to get them onto the defendant and -- excuse me, the

13   defendant, Mr. King. At that point, I don't recall exactly

14   how it went, but I was focused on trying to basically get

15   both hands behind his back so I could put the handcuffs on

16   the individual.

17  Q.  At any point were you yelling any commands to the defendant?

18  A.  I gave him multiple commands to put his hands behind his

19    back. At one point I got one of the handcuffs on what I

20   believe was his left hand behind his back, but I was never

21   able to get his right hand behind him.

22        At certain points I'd lose control of that left

23   hand that I had a handcuff on. And so basically he had --

24   his left hand was handcuffed, but he had it free and was

25   able to continue to fight with that hand, as well.

229

1    if this -- if this is this wanted fugitive that we're

2    trying to arrest, and he does have other friends around,

3    there's only two of us, we're having trouble getting

4    control of this individual. If more show up, we were going

5    to be -- we're going to be in a fair amount of trouble.

6  Q.  All right. Did you ask any of the bystanders for help?

7  A.  Yes, we did. I asked that they call the police. I recall

8    both Detective Allen and I telling bystanders to call the

9    police, and then Mr. King telling the same bystanders to

10   call the police.

11        I do remember there was, I think, a couple of

12   people in a van, and it just -- I think it was pretty

13   confusing for them because three men were fighting on the

14   ground, and all three of them were telling them to call the

15   police. So --

16  Q.  Did anyone assist you and Detective Allen?

17  A.  Yes. Eventually, I would say four, five minutes into the

18    fight, an individual came up. At that point in time, I

19   remember Detective Allen saying something about his radio.

20   And then I asked that individual to help me -- or he asked

21   me if I needed help, and I said, *Yes.*

22        And then he helped hold Mr. King's legs down. At

23   that point in time, I didn't have to worry about his legs

24   anymore. I could get control of the one hand that had the

25   handcuff, and then basically pry his other arm out from

231

1  Q.  Were you punched or kicked by the defendant?

2  A.  I believe so. I can't remember, I can't really recall

3    exactly if I was punched or kicked. The fight was -- it

4    was -- it was a fight that we were trying to gain control

5    over him, so I'm not exactly sure what I was getting hit by

6    or with, but I just -- I recall trying to get ahold of

7    his -- of his hands and his arms.

8  Q.  You recall telling him to stop resisting and?

9  A.  I did. I told him to stop -- to stop resisting. I told

10   him to put his hands behind his back. I remember at

11   different points during the fight him being on his stomach,

12   and I'd have control of one arm, and then at other times I

13   could see his face and he was, I would say foaming at the

14   mouth and spitting and basically kind of growling.

15        I don't know if that was in an effort -- if he

16   was just struggling or if he -- I don't know what exactly

17   he was doing at that point in time, but I just recall

18   seeing his face and seeing that coming out of him.

19  Q.  At any time did you notice any bystanders?

20  A.  I -- I guess I was aware there were bystanders around. At

21   one point I recall Mr. King saying that we didn't want to

22   do this, that he had like two or three friends that were in

23   the area, or he had buddies around, that we didn't want to

24   do this.

25        At that point in time, my concern was, you know,

230

1    underneath of him and to his back to get the handcuffs on.

2  Q.  After you got the handcuffs on, what did you do?

3  A.  At that point in time, very shortly thereafter, I heard the

4    sirens of the Grand Rapids Police Department officers

5    coming for assistance. I believe Mr. King was on his

6    stomach, and then I just kind of either sat or knelt on his

7    mid-section to hold him down. My concern was that he could

8    get up and get away.

9        At that point in time I was pretty well

10   exhausted, and I'm sure Detective Allen was, as well.

11        Mr. King seemed like he was physically exhausted,

12   as well. But my concern was him trying to get away or

13   trying to fight again, even with handcuffs on.

14  Q.  Did you receive any medical treatment after this

15    altercation?

16  A.  Yes, I did. I drove the Task Force vehicle down to the

17   hospital. I stayed with Detective Allen until he got

18   treated.

19        At that point in time my boss showed up, my

20   supervisor with the FBI. He directed me to get medical

21   treatment at the hospital. I had some minor scrapes on my

22   hands, a little bit of -- like my chin was a little bit

23   sore and had some scrapes.

24

25        So, they treated those minor injuries, gave me

232

KING-000123

**Page 233**

1     some antibiotics as a precaution, and I was discharged from
2     the hospital.
3  Q.  And, as it turns out, Mr. King did not have a warrant?
4  A.  No. I'm sorry?
5  Q.  Mr. King did not have a warrant for his arrest at that time?
6  A.  No, he did not.
7  Q.  Had he produced identification to you, indicating that he
8     was not Aaron Davidson, what would have happened?
9  A.  It would have been a very short interaction with the
10    individual. We — we stop and talk with people quite
11    often.
12         A lot of times in that sort of situation, we'll
13    ask a person what his name is. If he says what his full
14    name is, we'll ask him if he has any identification. If he
15    has I.D., and it's not the person we're looking for, we'll
16    thank them and — and then usually we'll show them a flier
17    of the person that we're looking for and ask them if they
18    know them or have seen them. And it's usually a fairly
19    short interaction, and then they go on their way and we go
20    about our business.
21         MR. KUIPER: Can just a few seconds, your Honor?
22    (Confers with detective).
23         I don't have anymore questions. Thank you.
24         THE COURT: Mr. Greene.
25

233

**Page 234**

1                CROSS-EXAMINATION
2  BY MR. GREENE:
3  Q.  Special Agent Brownback, am I saying your name correctly,
4     sir?
5  A.  Yes, you are.
6  Q.  Okay. When you observed Mr. King, he was walking down
7     Leonard?
8  A.  Yes, he was.
9  Q.  And he was not committing any felonies?
10  A.  No, he was not.
11  Q.  He was not committing any misdemeanors?
12  A.  No, he was not.
13  Q.  He was not committing any civil infractions?
14  A.  No, he was not.
15  Q.  He was just basically walking down Leonard with his
16    headphones on and his cell phone in his hand?
17  A.  That's correct.
18  Q.  He was not wearing a shirt?
19  A.  That is also correct.
20  Q.  So the waistband of his pants were readily available?
21  A.  That's correct.
22  Q.  Okay. He — when you pulled up and you stopped next —
23    along the sidewalk, you were driving just a regular car,
24    SUV?
25  A.  Yes. It's a black newer model Ford Explorer.

234

**Page 235**

1  Q.  Okay. It's a totally nondescript, no police markings?
2  A.  That's correct.
3  Q.  So you all were also very plainly dressed?
4  A.  Yes. We were wearing street clothes.
5  Q.  You were wearing basically dungarees, you call them?
6  A.  Uh-huh, yes.
7  Q.  Is that --
8  A.  Yes, that's correct.
9  Q.  She's recording, so you have to respond.
10  A.  Yes, that's correct.
11  Q.  Okay. And some type of shirt?
12  A.  Yes.
13  Q.  Okay. And you said you had a vest on?
14  A.  I had a vest on underneath my black shirt. Yes.
15  Q.  Okay. And you very candidly acknowledged to the jury that
16    that vest would have obscured your weapon; you wouldn't see
17    it because of the vest?
18  A.  Yes. We're required — FBI agents are required to have our
19    firearm concealed unless we need it to not be concealed.
20  Q.  Okay. Were you and Detective Allen wearing the same type of
21    vests?
22  A.  I was. We were both wearing a ballistic vests, yes. I
23    believe Detective Allen was also wearing a black over —
24    like a, not a ballistic vest, but like a vest you would
25    wear on top of your clothing.

235

**Page 236**

1  Q.  Okay. So, you got out of your SUV and you approached
2    Mr. King?
3  A.  Yes, that's correct.
4  Q.  And, if I understood your testimony correctly,
5    Detective Allen is the person who approached him, is that --
6  A.  Detective Allen had the first contact with him --
7  Q.  Had first contact?
8  A.  -- as I was walking around the vehicle, yes.
9  Q.  Okay. And Detective Allen had him get off the sidewalk
10    and to move closer to the vehicle?
11  A.  That's correct.
12  Q.  Now, you were looking for an Aaron Davidson?
13  A.  Yes. That's correct.
14  Q.  And you had been involved in the make-ups of the photos,
15    showing Aaron Davidson, the sheets, the rap sheets? You've
16    been involved in the photos on those sheets?
17  A.  I had one. I -- I was in possession of one. I didn't make
18    the actual sheet, no.
19  Q.  Okay. You were in possession of that. That's what's seen
20    here on Exhibit 1, in front of it?
21  A.  Yes, that's correct.
22  Q.  Now, that's photo of Mr. Aaron Davidson from 2007?
23  A.  Yes, that's correct.
24  Q.  And are you telling this jury that that person looks like
25    Mr. King?

236

KING-000124

1   A.   I'm saying that that seven-year-old photo was the only
2        face-shot photo that we had of Mr. King — or of
3        Mr. Davidson, I should say.
4   Q.   So, you didn't know how Mr. Davidson looked in 2014?
5   A.   That was the only Face photo that I had of Mr. Davidson.
6   Q.   Special Agent Brownback, my question is: You did not know
7        how Mr. Davidson looked in 2014?
8   A.   No, I did not.
9   Q.   So, when you see Mr. King walking down the street, you can't
10       say he looked like Mr. Davidson, can you?
11  A.   Well, as a matter of fact, we showed that particular
12       photograph to the two clerks the day before, and they used
13       that photograph to --
14  Q.   I'm not asking you to --
15            MR. GREENE: I'm going to object. I'm not asking
16       for hearsay, so you cannot respond with hearsay to my
17       question.
18            Your Honor, I believe my objection would be
19       non-responsive and also violative of the court rules for
20       hearsay, okay.
21            THE COURT: Just -- just answer Mr. Greene's
22       questions directly.
23            MR. GREENE: Okay.
24            THE WITNESS: Yes, your Honor.
25            MR. GREENE: So.

                        237

1            MR. KUIPER: Can you repeat the question,
2        Mr. Greene?
3   BY MR. GREENE:
4   Q.   You did not know -- we've already established that you did
5        not know how Mr. Davidson looked in 2014.
6   A.   No.
7   Q.   Okay. You also had another photo of Mr. Davidson, correct?
8   A.   Correct.
9   Q.   And that's what's in Exhibit 2?
10  A.   That's correct.
11  Q.   Okay. And it's very hard to make out any facial features
12       there of that photo, is it not?
13  A.   Yes, that's correct. It's mainly showing the top of his
14       head, his nose, and a pair of glasses.
15  Q.   And you cannot say that that photo looked like Mr. King, can
16       you?
17  A.   I can say that the hair was closely cropped, similar to
18       Mr. King's.
19  Q.   Okay. So, you think the hair was similar, and that's --
20  A.   I believe the hair is similar to Mr. King's. Yes.
21  Q.   Okay. As far as facial features, you can't say the facial
22       features were even similar, can you?
23  A.   No. I can't see the facial figures in that photograph
24       there. No.
25  Q.   Okay. Now, you had a wide range of heights attributed to

                        238

1        Mr. Davidson, isn't that correct?
2   A.   That is correct. Yes.
3   Q.   You had anything from 5'10 to 6'3?
4   A.   That's correct.
5   Q.   That's a very wide range, isn't it?
6   A.   Yes, it is.
7   Q.   Okay. So, again, any number of individuals walking down the
8        street could fall within that wide range, could they not?
9   A.   That's correct.
10  Q.   Okay. Yet you decided, along the with Detective Allen, to
11       stop Mr. King?
12  A.   Yes, that's correct.
13  Q.   Now you also very candidly said that your badge was inside
14       your shirt as you got outside the vehicle, correct?
15  A.   Yes, that's correct.
16  Q.   And you then took it outside the shirt?
17  A.   Yes.
18  Q.   You didn't walk up and show this badge to Mr. King, did you?
19  A.   No. I let it hang about chest height on my person.
20  Q.   Just -- you just -- okay.
21            And Mr. Allen, who was with -- Detective Allen,
22       who was with you, told Mr. King to place his hands on top of
23       his head, correct?
24  A.   That's correct.
25  Q.   Now, what kind of stop are you doing at this point?

                        239

1   A.   I'm not sure I understand the question.
2   Q.   Well, you're an agent with the FBI?
3   A.   That's correct.
4            MR. KUIPER: Objection, your Honor. Again, this
5        is a legal question for the type of stop. I believe it's
6        outside of the scope of knowledge of both Special Agent
7        Brownback, as I did -- I believe it was outside of scope of
8        knowledge of Detective Allen.
9            MR. GREENE: Your Honor, that would be the most
10       absurd thing. He's an agent who has to conduct stops within
11       the law. He has to know what the stops are.
12            THE COURT: Mr. Kuiper, anything further on that?
13            MR. KUIPER: Your Honor, it's your job to decide
14       what the law is in this particular case. It's not
15       Special Agent Brownback's duty to know the name of the case
16       that applies to that type of stop. He indicated with his
17       answer that he does not know what Mr. Greene is referring
18       to, nor is it within his scope of knowledge.
19            MR. GREENE: May I, your Honor?
20            THE COURT: Well, rephrase. I mean, certainly the
21       officer is entitled to testify as to what he thought he was
22       doing --
23            MR. GREENE: Thank you, your Honor.
24            THE COURT: -- and it what the justification was
25       for that or the reasoning.

                        240

KING-000125

BY MR. GREENE:

Q. Special Agent Brownback, at this point in your contact with Mr. King, were you not conducting a *Terry* stop?

A. My understanding of a *Terry* stop is that you suspect someone of committing a crime or may have very recently committed a crime. And, no, we didn't think that he had just committed a crime as he was walking down the street.

I thought, as we stopped, that who turned out to be Mr. King was a wanted fugitive that we had valid State of Michigan arrest warrant for.

Q. Well, you had not established that, had you? You had not established that this individual that you're stopping, you had a valid arrest warrant for, did you?

A. I believe that he bore a semblance to that individual and that I wanted to talk to him to see if he had identification on, because I had reason to believe that he was the individual that we were looking for.

Q. You were speculating that he was the individual, isn't that correct, Special Agent Brownback?

A. I was basing my decision to do this based off of witnesses that I had interviewed the day and two days prior, as well as the physical description that they gave me of that individual and the physical description of the individual I saw walking down the street.

Q. You were wrong, weren't you?

241

A. Yes, I was wrong.

Q. Okay. And at that time that you asked Mr. King to put his hands on top of his head, or Detective Allen, you were doing that to check him for weapons?

A. Yes. That's correct.

Q. And he, Mr. King, had responded to your questions about having weapons in the affirmative; that he had a knife on him, isn't that correct?

A. No, he said he had a weapon.

Q. Okay. And that's information that he freely and readily provided to you --

A. Yes, that's correct.

Q. -- upon your question.

So you're now patting him down for a weapon, isn't that correct? That's what Detective Allen is doing?

A. That's correct.

Q. And Detective Allen immediately located the knife in his pocket and removed it?

A. That's correct.

Q. And then Detective Allen further continued to pat him down?

A. Yes, that's correct.

Q. And there were no weapons found at that point on Mr. King, isn't that correct?

A. No, we didn't --

Q. No additional weapons?

242

A. No.

Q. Were there? Are you saying --

A. No. We didn't find any other additional weapons outside of that folding pocketknife.

Q. Okay. At that point, did not Detective Allen reach into his back pocket and remove his wallet?

A. I believe he felt his wallet and felt a bulge, and then he reached in to ascertain what that bulge was, and he pulled out a wallet.

Q. He took the wallet out of his pocket, isn't that correct, Special Agent Brownback?

A. Yes, that's correct.

Q. He knew it wasn't a weapon, because he had completed his check for weapons, isn't that correct?

A. That was part of the check for weapons. Once you find one weapon, you have to assume there is a second, possibly a third weapon. You can't just stop once you find one weapon. You have to keep patting him down until you've done a thorough check to see if he has any weapons.

Q. Well, sir, I was going in sequence. Maybe I need to back up.

He had completed the pat-down for weapons before he removed the wallet, isn't that correct?

A. No, that's not correct.

Q. Well, he knew when he was removing the wallet that it was

243

not a weapon.

A. I can't tell you what Detective Allen knew or did not know.

Q. Did you write a report?

A. Yes, I did.

Q. And as an FBI agent, are you required to be specific and accurate in your reports?

A. I believe so, yes.

Q. And these reports are generated to help people in other positions to make legal decisions?

A. Yes, they are.

Q. So they're very important?

A. Yes.

Q. So you wrote a report in this case?

A. Yes, I did.

Q. I want to hand you your report on Page 2 of Page 3, first paragraph, and ask you to read that to yourself. The type is a little small.

A. The underlined portion?

Q. To yourself. Yes.

A. (Complies)

Q. Okay.

A. Okay.

Q. So, in your report you make it very clear that Detective Allen had felt the back pocket of Mr. King and knew that it was a wallet, and that he removed the wallet

244

KING-000126

**Page 245**

1  from Mr. King's back pocket, is that correct?

2  A.  I don't believe I wrote that he knew that it was a wallet.

3  I believe I wrote that he felt it, and that it was a

4  wallet.

5  Q.  Well, when you wrote that, *He felt the back of his pocket*

6  *and located a wallet*, you're saying exactly what it is,

7  correct?

8  A.  Well, he knew what it was once he pulled it out of his

9  pocket.

10  Q.  Well --

11  A.  With that knowledge, I wrote my report.  So, yes.

12  Q.  So Mister -- Detective Allen removed the wallet from

13  Mr. King's back pocket and began to question him pertaining

14  to the wallet?

15  A.  That's correct.

16  Q.  And, at this point Mr. King was still standing there with

17  his hands on top of his head, is that correct?

18  A.  That's correct.

19  Q.  Okay.  So, now you, Mister -- Detective Allen -- I shouldn't

20  say *you*, but -- Detective Allen has Mr. King's wallet in his

21  hand while Mr. King is standing there with his hands on top

22  of his head?

23  A.  That's correct.

24  Q.  Thank you.

25

**Page 246**

1  Now, there was no legal authority to take that

2  wallet out of his pocket, was there?

3  A.  Umm --

4  MR. KUIPER:  I'm going to object, your Honor.

5  That's a determination for -- a legal determination for the

6  Judge.

7  THE COURT:  Let's leave the word *legal* out of it,

8  and just what basis was there for removing it.  What the

9  rationale was, what the reasoning was.

10  MR. GREENE:  What the Judge asked.

11  BY MR. GREENE:

12  Q.  What's the basis for removing it?

13  A.  We don't know what a bulge is in a pocket until you remove

14  what the item is from the pocket.  So, I can or

15  Detective Allen can feel a bulge in the back pocket of

16  somebody, and we can think it's a wallet.  But until we

17  pull it out, we don't know exactly what that is.

18  Q.  Are you telling this jury that you thought that wallet was a

19  weapon when you -- when it was removed?

20  A.  I'm saying that we don't know what it is until you remove

21  it.

22  Q.  Well, the only thing you are looking for in a pat-down is

23  weapons, isn't that correct?

24  A.  That's correct.

25  Q.  Okay.  And a wallet is not a weapon is it?

**Page 247**

1  A.  That's correct.

2  Q.  Okay.  So what was removed was a wallet, isn't that correct?

3  A.  That's correct.

4  Q.  And it was not that weapon?

5  A.  Yes.  That's correct.

6  Q.  Okay.  But the authority you had -- well, let me get away

7  from *authority*.  What you would be permitted to remove would

8  have been a weapon, isn't that correct?

9  A.  I believe that I would have the authority to remove an item

10  that I didn't know what it was, while I was checking for

11  weapons.

12  I don't believe I'd have the authority to go

13  through the wallet, which we didn't.  But I believe I'd

14  have the authority to remove an item from a man's pocket

15  while I'm checking for weapons, if I don't know for certain

16  what that item is.

17  Q.  You would have to suspect that the item was a weapon,

18  wouldn't you?

19  MR. KUIPER:  Your Honor, I'm going to object.

20  We're getting far -- the reason they had to detain the

21  defendant was to ascertain his identity.  They didn't get to

22  do a complete search.  They didn't get to search down his

23  legs or anything like that because he started fighting with

24  him.

25

**Page 248**

1  I guess -- I mean, the questions are -- excuse me,

2  Mr. Greene -- absurd.  Of course, they have a right to do a

3  complete pat-down to make sure he's not armed any further

4  than the weapon he -- they already found.

5  THE COURT:  Let's move on.  I think he said he

6  didn't know if it was a weapon.

7  MR. GREENE:  Am I able to respond to the

8  objection, sir?

9  THE COURT:  I'm just saying, let's move on.

10  MR. GREENE:  I mean, he's called me absurd.  I

11  would like to respond.

12  THE COURT:  Well, that's argument.

13  MR. KUIPER:  Sorry.

14  THE COURT:  I think I've already instructed the

15  jury before and will again.  What the attorneys say is not

16  evidence.  It's the heat of battle.  So, go ahead,

17  Mr. Greene.

18  MR. GREENE:  May we approach?

19  THE COURT:  Yes.

20  (At 4:55 p.m. sidebar had outside of reporter's

21  hearing)

22  THE COURT:  Ladies and gentlemen, I'll excuse you

23  now until tomorrow morning at 8:30.

24  Again, please do not discuss the case in any way

25  with anybody, don't have any contact with anybody involved

STATE OF MICHIGAN

SEVENTEENTH JUDICIAL CIRCUIT COURT (KENT COUNTY)

THE PEOPLE OF THE
STATE OF MICHIGAN

-v-                              Case No. 14-06945-FH

JAMES LEE KING

                Defendant.
_____/

JURY TRIAL - VOLUME 3 OF 3

BEFORE THE HONORABLE GEORGE S. BUTH, CIRCUIT JUDGE
Grand Rapids, Michigan - Wednesday, February 25, 2015

APPEARANCES:

For the People:          MR. JOSHUA KUIPER 66576
                         Assistant Prosecuting Attorney
                         82 Ionia Avenue, NW, Suite 450
                         Grand Rapids, MI 49503
                         616-632-6710

For the Defendant:       MR. ANTHONY C. GREENE P49303
                         Anthony C. Greene Law Office
                         29 Pearl St NW Ste 231
                         Grand Rapids, MI 49503-3018
                         616-222-8000

Reported by:             Leslie Rydahl, CSR-4078
                         Official Court Reporter
                         Kent County Courthouse
                         180 Ottawa Avenue, NW, Suite 12200
                         616.632.5021

1

## TABLE OF CONTENTS

PAGE

DOUGLAS BROWNBACK

RECROSS-EXAMINATION BY MR. GREENE (CONT)          3
REDIRECT EXAMINATION BY MR. KUIPER                7
RECROSS-EXAMINATION BY MR. GREENE                 14
REDIRECT EXAMINATION BY MR. KUIPER                18
RECROSS-EXAMINATION BY MR. GREENE                 20

PROSECUTION RESTS                                 22
DIRECTED VERDICT                                  22

WITNESSES - DEFENSE:

JAMES KING

DIRECT EXAMINATION BY MR. GREENE                  45
CROSS-EXAMINATION BY MR. KUIPER                   60
REDIRECT EXAMINATION BY MR. GREENE                74

DEFENSE RESTS                                     75

REBUTTAL WITNESSES - PEOPLE:

GLEN BROWER

DIRECT EXAMINATION BY MR. KUIPER                  76
CROSS-EXAMINATION BY MR. GREENE                   78

TODD ALLEN

DIRECT EXAMINATION BY MR. KUIPER                  80
CROSS-EXAMINATION BY MR. GREENE                   82
REDIRECT EXAMINATION BY MR. KUIPER                83
RECROSS-EXAMINATION BY MR. GREENE                 83
REDIRECT EXAMINATION BY MR. KUIPER                85

CLOSING ARGUMENT BY MR. KUIPER                    86
CLOSING ARGUMENT BY MR. GREENE                    100
REBUTTAL ARGUMENT BY MR. KUIPER                   120

INSTRUCTIONS BY THE COURT                         133
CLERK SWORN TO KEEP JURORS                        150
EXHIBITS:          MARKED          ADMITTED

EXHIBIT 10          10          11
EXHIBITS A - D      --          59

2

---

1    Grand Rapids, Michigan

2    Wednesday, February 25, 2015

3    (At 8:51 a.m. - Court in session)

4

5          - - -

6

7    (At 8:51 a.m., jury resumes seats)

8    THE COURT: Be seated. Good morning.

9    THE JURY: Good morning.

10   THE COURT: Mr. Kuiper, we will continue with your

11   witness, Officer Brownback.

12   You may be seated. You're still under oath.

13   I think we were with you, weren't we, Mr. Greene.

14   MR. GREENE: We were, your Honor.

15   THE COURT: All right.

16          RECROSS-EXAMINATION

17   BY MR. GREENE:

18   Q.  Special Agent Brownback, good morning.

19   A.  Good morning.

20   Q.  From the time Mr. King was stopped, he was detained, isn't

21       that correct?

22   A.  Yes, that's correct.

23   Q.  He was not free to leave?

24   A.  No, he was not.

25   Q.  So, he was basically, at that point, in you all's custody.

3

---

1    And, when I say you all, you, as Special Agent Brownback,

2    and Detective Allen's, custody?

3    A.  He was not in custody until I had handcuffs on him behind

4        his back.

5    Q.  Okay. Now, have you studied -- strike that. You're not

6        required to have -- carry an I.D. in Michigan, are you?

7    A.  I'm not familiar with the Michigan, State of Michigan laws

8        as far as carrying I.D.s or not.

9    Q.  You are on the streets detaining people, asking for I.D.,

10       and you don't know what the laws of the State of Michigan

11       are? Is that what you're telling us?

12   A.  I'm stating that I'm not familiar with if there is a law or

13       if there is not a law, as far as whether or not you're

14       supposed to carry an I.D. with you.

15   Q.  And I'm asking you, then, you don't think that's required

16       for you to be able to perform your duty as an agent working

17       on the streets of Michigan?

18       MR. KUIPER: Your Honor, I guess I don't

19   understand the question. Is he calling for speculation?

20   That's what it sounded like.

21       MR. GREENE: Not speculation. I'm asking him,

22   does he need to know what the laws are that pertain to the

23   citizens of Michigan while he's on the streets of Michigan

24   enforcing them.

25       THE COURT: Well, fair question. I'll allow it.

4

---

KING-000129

THE WITNESS:  I -- I need to have a fair
understanding of the laws of the State of Michigan, but I
don't feel that I need to know, verbatim, every law on the
books within the State of Michigan to execute my duties as a
federal agent.

BY MR. GREENE:

Q.   Understood.  But I'm not asking you about every law on the
books in the State of Michigan, I'm asking you specifically
about whether or not you're required to carry an I.D. in the
State of Michigan.

A.   I don't know if that's a law, and I don't think that I
should have to know if that's a law or not, to be able to
do my duties when I'm on the street.

Q.   You were working on a task force in the State of Michigan?

A.   That's correct.

Q.   And this task force was to apprehend violent criminals?

A.   That's correct.

Q.   And these violent criminals were individuals that were
charged with violations of laws of the State of Michigan?

A.   That's correct.

Q.   Okay.  So, when you stopped Mr. King, you, in your mindset,
thought he was a violent criminal?

A.   That's correct.

Q.   Okay.  Mr. King does not have to prove his identity to you,
does he?

5

A.   At that point in time, when we stopped Mr. King, he was
going to need to provide us with identification or some
means to prove who he was, before we were going to release
him.
          At that point in time, I had a reasonable belief
that he was Aaron Davidson, and I needed to verify that
fact.
          The way I went about doing that was I asked him
for his name, or I should say Detective Allen asked him for
his name --

Q.   Let me stop you.

A.   -- and then I asked him for identification.

Q.   Special Agent, you're beyond my question.  My question was,
Mr. King did not have to prove his identity, and you're
saying he did; that, to be released, he had to prove to you
his identity.

A.   Yes.  I believed that he was Aaron Davidson, and he had to
provide me with identification or some other means of
proving that he was not Aaron Davidson, before he was going
to be free to leave.

Q.   Okay.  So, if Mr. King had have been walking down the street
in just his blue jeans and no identification on him, you
would have arrested him and detained him until you could
have established his identity?

A.   Yes, that's correct.

6

Q.   All right.  And you were in the process of arresting
Mr. King when he refused to tell you -- give you his wallet
or stated to you that he did not have identification on him.

A.   I'm sorry, could you restate that?

Q.   You were -- you were -- my bad, sir.  I apologize.  It was a
compound question.
          You were in the process of arresting Mr. King when
he did not provide you that identification?

A.   That's correct.

Q.   All right.

          MR. GREENE:  That's all, your Honor.  Thank you.

          THE COURT:  Mr. Kuiper.

          REDIRECT EXAMINATION

BY MR. KUIPER:

Q.   Special Agent Brownback, yesterday there were some questions
about whether or not the wallet that Detective Allen found
was a weapon or whether or not you knew whether or not it
was a weapon.  Do you recollect those questions that
Mr. Greene asked you?

A.   Yes, I do.

Q.   Are you familiar with the term *artfully concealed weapons*?

A.   Yes, I am.

Q.   What does that term mean?

A.   That term means that --

          MR. GREENE:  Your Honor, I'm going to object.

7

There's no relevance here.  There's no -- there's not a
shred of evidence that Mr. King had an artfully concealed
weapon whatsoever.

          THE COURT:  Overruled.  I'll allow the question.

          THE WITNESS:  An artfully concealed weapon is a
tactic, if you will, used by both law-abiding citizens and
criminals, to basically hide a weapon so as to avoid either
detection from law enforcement or just detection from the
public.

BY MR. KUIPER:

Q.   During your training or experience with the FBI, have you
been trained or seen bulletins regarding certain types of
weapons that are artfully concealed?

A.   Yes, I have.

Q.   Amongst those weapons, are there weapons that are designed
to look like wallets and, in fact, are not wallets?

A.   Yes, there are.

Q.   I'm going to show you what I'm going to have marked as
People's Exhibit Number 10.

          MR. GREENE:  I object to the exhibit, your Honor.
It's not been disclosed prior to today and, two, it's
totally irrelevant to the case.

          MR. KUIPER:  It certainly is relevant, your Honor,
because Mr. Greene was vigorously cross-examining
Special Agent Brownback about the fact that the wallet was

8

KING-000130

1  not a weapon and his beliefs in that regard. That came up
2  yesterday at quarter to 5:00. I didn't have the opportunity
3  to send the illustrative exhibit, Proposed Exhibit Number
4  10, to Mr. Greene, but he was the one that opened the door.
5            MR. GREENE: Your Honor, totally incorrect. They
6  took the wallet out. I was establishing they had no
7  probable cause or reasonable suspicion to remove the wallet;
8  that in a pat-down search, that you can pat for a feel of
9  weapons. It does not authorize an agent or officer to
10  remove items from people's pockets. That's what I was
11  establishing. And if now he's attempting to say he can
12  expand the law and say that he can remove items from
13  people's pocket based on some esoteric belief that there may
14  be weapons out there that fall into that category, it's just
15  absurd, your Honor.
16            There's no evidence whatsoever in this case to
17  support it, and I would ask you to --
18            THE COURT: Well, Mr. Greene, certainly there
19  would be no problem removing a knife or firearm pursuant to
20  a pat-down.
21            MR. GREENE: That's correct, your Honor. That's
22  totally correct. That's what the pat-down is for.
23            THE COURT: Well, I would say that's legitimate
24  redirect, so objection overruled. And certainly you can
25  re-examine him on that.

9

1            But, go ahead, Mr. Kuiper.
2            MR. GREENE: Are you allowing that as
3  demonstrative evidence?
4            THE COURT: I'm allowing this as an exhibit.
5            MR. GREENE: I'm asking the type of exhibit.
6  Demonstrative exhibit? Because it's not an actual exhibit.
7  If anything, it is --
8            MR. KUIPER: I would concede it's demonstrative,
9  your Honor.
10            (Exhibit 10 marked)
11  BY MR. KUIPER:
12  Q. I'm going to show you what's marked as People's Proposed
13  Exhibit Number 10, Special Agent Brownback.
14            MR. KUIPER: Can you hear me?
15            JUROR SEAT #11: Yes, sir.
16  BY MR. KUIPER:
17  Q. Special Agent Brownback, in Exhibit Number 10 there, is that
18  one example of a wallet designed to conceal a firearm?
19  A. Yes, it is.
20  Q. Is that something that you obtained from the Internet?
21  A. Yes, it is.
22  Q. Have you seen similar items to that in FBI bulletins and
23  training?
24  A. Yes, I have.
25            MR. KUIPER: Your Honor at this point I move for

10

1  the Proposed Exhibit Number 10.
2            THE COURT: Mr. Greene, I assume objection?
3            MR. GREENE: Continuing objection, your Honor.
4            THE COURT: Overruled. I'll admit it.
5            (Exhibit 10 admitted)
6  BY MR. KUIPER:
7  Q. Have you also received training, seen bulletins or dealt
8  with items that look like a wallet but contain knives?
9  A. Yes, I have.
10  Q. So, when you testified about whether or not -- well, there
11  was this whole kerfuffle about whether or not you knew
12  whether it was a wallet or a weapon. Does that provide
13  context for your testimony?
14  A. Yes, it does.
15  Q. Now, again, what types of people are you trying to arrest?
16  A. **We primarily investigate fugitive matters that have to do**
17     **with violent criminals. They're usually within the Grand**
18     **Rapids area, but all of our warrants that we execute for**
19     **fugitives are violent matters.**
20  Q. So you're talking about people who, you know, they're not
21     driving on a suspended license, or something like that --
22  A. **That's correct.**
23  Q. -- you're dealing with people that have shot, stabbed,
24     killed, raped, committed home invasions?
25  A. **That's correct.**

11

1  Q. Does that cause you to be on high alert when dealing with
2     people you think may be these individuals?
3  A. **Yes, it does.**
4  Q. You did not absolutely know who the defendant was on July
5     18th of last year, did you?
6  A. **No, I did not.**
7  Q. In fact, that 2007 picture of Aaron Davidson, will you
8     concede you didn't know if he looked similar to that on
9     July 18, 2014?
10  A. **That's correct.**
11  Q. When stopping the defendant, were you relying on all the
12     evidence and the best evidence that you had at your disposal
13     to determine whether or not this person was Aaron Davidson?
14  A. **Yes, I was.**
15  Q. During your experience, have any of the violent fugitives
16     that you've apprehended lied about their name?
17  A. **Yes, they have.**
18  Q. Have they fought with you in order to evade arrest or
19     detection?
20  A. **This was the first time that I had encountered a fight, but**
21     **I have had numerous subjects try and run or elude capture.**
22  Q. Have you had any of them lie to you about their identity?
23  A. **Yes, I have.**
24  Q. If the defendant had provided you with his I.D., and you
25     were able to see it was him and not Aaron Davidson, and

12

1   verified that, would he have been released?
2   A.   Yes, he would have.
3   Q.   Was it fair to say, then, you were detaining him to
4        ascertain his identity?
5   A.   Yes.
6   Q.   Yes?
7   A.   Yes, I was.
8   Q.   At what point -- you said that you placed him under arrest?
9   A.   That's correct.
10  Q.   At what point did that happen?
11  A.   When -- when he had his hands on his head and
12       Detective Allen asked him if he had any identification in
13       his wallet. He turned towards me, and at that point in
14       time my intention was to place him under arrest.
15            In my estimation, he was not fully in custody
16       until after the fight and after I placed handcuffs on both
17       of his wrists.
18  Q.   That's when he turned and took a swing at you?
19  A.   That's correct.
20  Q.   Whatever the law in Michigan is on carrying I.D. or not
21       caring I.D., your duty is to determine who this person is
22       and whether or not it's the person you are looking for,
23       Aaron Davidson?
24  A.   That's correct.
25  Q.   Other than contacting him and verifying his identity, do you

13

1   know any other ways or means that you would be able to tell
2   whether or not this person was Aaron Davidson?
3   A.   No.
4            MR. KUIPER: (Confers with the detective)
5            MR. KUIPER: I don't have anymore questions.
6   Thank you.
7            THE COURT: Mr. Greene.
8            MR. GREENE: Thank you, your Honor.
9                    **RECROSS-EXAMINATION**
10  BY MR. GREENE:
11  Q.   Thank you, your Honor.
12            I'm going to go back to where I was once before.
13       You did write a report in this case?
14  A.   Yes, I did.
15  Q.   And your report was written pretty close to the time that
16       this incident occurred?
17  A.   A few days after, yes.
18  Q.   Okay. And at that time your memory was pretty good on what
19       had taken place just a few days earlier?
20  A.   I would say so, yes.
21  Q.   As an agent of the FBI, you are required to be accurate in
22       your reports?
23  A.   Yes, I am.
24  Q.   Okay. At that time did you -- I would like to have you look
25       at Page 2 of your report, and look at the bottom of

14

1   Paragraph 1, if you will.
2   A.   Okay.
3   Q.   Have you had a chance to review that?
4   A.   Which sentences would you like for me to review?
5   Q.   Just this paragraph (indicating), right in this paragraph
6        right in here.
7   A.   Okay. Okay.
8   Q.   Good. Isn't it a fact, Special Agent Brownback, that you
9        placed in your report that Detective Allen felt the back of
10       King's jean's pocket and located a wallet? Is that what you
11       stated?
12  A.   That's correct.
13  Q.   Is that what you stated, sir?
14  A.   That's correct.
15  Q.   And that, *Detective Allen pulled the wallet from King's back*
16       *pocket and asked King if he had identification in this*
17       *wallet* --
18  A.   That's correct.
19  Q.   *-- without opening it.*
20  A.   That's correct.
21  Q.   That's what you wrote in your report?
22  A.   That's correct.
23  Q.   Now you didn't -- at that point Detective Allen was not
24       looking in the wallet to see if it was some type of weapon?
25  A.   When he pulled it from his pocket, it's readily apparent,

15

1   once it's outside of his pocket, whether or not it would
2   have a firearm or even a knife concealed in it.
3   Q.   Didn't you just testify that, under your -- and I want to
4        use the right phrase -- artfully concealed weapons, that you
5        would have to examine the item to determine whether or not
6        it's artfully concealing a weapon?
7   A.   Once it's outside of his pocket, it would not take a very
8        close examination. You could look at it and be able to
9        tell if it contained a firearm or knife.
10  Q.   Isn't it a fact, Special Agent Brownback, that
11       Detective Allen knew that that was a wallet before he
12       removed it from the pocket?
13            MR. KUIPER: Object to his -- there is no personal
14       knowledge on behalf of what Detective Allen thought.
15       Detective Allen was cross-examined. Special Agent Brownback
16       does not know what was inside his mind and what he thought.
17            It's a question for which he does not have
18       personal knowledge.
19            MR. GREENE: May I respond, Sir?
20            THE COURT: Respond, please.
21            MR. GREENE: He does know what Detective Allen
22       said and how he acted. The fact that they are trying to
23       turn this into something other than a removal of a wallet, I
24       think I should be able to explore.
25            MR. KUIPER: Your Honor, those questions have been

16

17

1    asked and answered, I don't know how many times, during the

2    course of Special Agent Brownback's testimony. He testified

3    about what Detective Allen said about the wallet. We are

4    beating a dead horse here.

5         It's been asked and answered, and those statements

6    we have allowed to come in, even though they are technically

7    hearsay. But he can't testify about what Detective Allen

8    thought. Detective Allen is present to testify.

9         MR. GREENE: Your Honor, redirect.

10         THE COURT: Well, do you know what Detective Allen

11   knew?

12         THE WITNESS: No, your Honor. I -- when he --

13   when he was pulling out the wallet, I don't know what was

14   going through his mind.

15         THE COURT: Fair enough.

16  BY MR. GREENE:

17  Q.  So your testimony here is an attempt to justify

18    Detective Allen removing the wallet, is to claim that he may

19    might have had an artfully concealed weapon?

20  A.  Yes, I am.

21  Q.  There was no weapon in the wallet, was there?

22  A.  Not to my knowledge, no.

23  Q.  If I understood your testimony on redirect, you said that,

24    once it was removed, it was readily apparent that it was not

25    a weapon?

18

1  A.  That's correct.

2  Q.  Okay. So, did he replace it back into the pocket, or did he

3    stand there and begin to question him about whether or not

4    it contained identification?

5  A.  Well, it's -- at that point your client took a swing at me,

6    so I'm not sure what he was going to do with the wallet

7    after that.

8  Q.  Well, you said here that he pulled it from the pocket and

9    asked if he had identification within the wallet.

10  A.  That's correct.

11  Q.  Okay. So, before he asked about identification, did he

12    place it back in the pocket?

13  A.  No. He was holding it.

14  Q.  And he was then holding it in his hand, asking questions

15    about it?

16  A.  That's correct.

17  Q.  Okay.

18         MR. GREENE: Thank you.

19         THE COURT: Mr. Kuiper.

20         REDIRECT EXAMINATION

21  BY MR. KUIPER:

22  Q.  If the defendant had been compliant and you found

23    identification in that wallet indicating that he was James

24    King --

25         MR. GREENE: Objection. Totally beyond the scope

19

1    of my recross, your Honor, and it's a rehashing of questions

2    he just asked on redirect.

3         THE COURT: Overruled. Go ahead.

4  BY MR. KUIPER:

5  Q.  If -- if you had removed a piece of identification

6    indicating that this was James King, and he was compliant

7    with you at that time, would he have been released?

8  A.  Yes, he would have.

9  Q.  And one of the things that you were going to do is determine

10    this person's identity to ensure it was not Aaron Davidson?

11  A.  That's correct.

12  Q.  Was Detective Allen able to complete the search for weapons

13    of the defendant?

14  A.  No, he was not.

15  Q.  Why is that?

16  A.  He was at the back pocket, had the wallet in his hand,

17    asked the question about the identification. At that point

18    the defendant took a swing in my direction, and at that

19    point the fight began.

20         We went to the ground. Detective Allen was not

21    able to pat down the rest of his legs, or his feet, or his

22    boots, to determine if he had a weapon in any of those

23    areas on his person.

24  Q.  Have you been involved in any cases or in any training

25    indicating that people occasionally conceal weapons on their

20

1    legs or ankle area?

2  A.  Yes, I have.

3  Q.  So the search was not completed at the time that

4    Officer Allen tapped and took out that wallet?

5  A.  That's correct.

6  Q.  And quite obviously, from the context of Mr. Greene's

7    question, at least I'm led to believe that there was some

8    long dialogue about what is contained in the wallet. Is

9    that how things transpired?

10  A.  No, it is not.

11  Q.  How quickly -- about how much time elapsed, in terms of

12    seconds, between the time that wallet was tapped and the

13    statement was made, and the time a punch was thrown at you?

14  A.  Probably four or five seconds, if that. If that.

15         MR. KUIPER: Okay. Thank you.

16         THE COURT: Mr. Greene.

17         RECROSS-EXAMINATION

18  BY MR. GREENE:

19  Q.  Detective, I just want to go back to your report. It's

20    accurate?

21  A.  Yes, it is.

22         MR. GREENE: May I approach the witness?

23         THE COURT: Yes.

24         MR. GREENE: Thank you.

25

KING-000133

BY MR. GREENE:

Q. Top of Paragraph 2.

A. (Reviewing)

Q. You've had a chance to review that, Sir?

A. Yes, I have.

Q. Going back to your report, Paragraph 2, Page 2, didn't you not say that you had *grabbed King's left wrist to take him into custody*. And then after you had grabbed his wrist, in your report, you said he threw a swing at you?

A. That's correct.

Q. Okay. So he doesn't swing at you until after you had grabbed his left wrist?

A. That's correct.

Q. Okay. When you grabbed his wrist, that was further detention in the sense of placing him into custody, isn't that correct?

A. I'm not sure it's further detention.

Q. Well, you've --

A. He was -- he was detained. He wasn't free to leave, but he wasn't in custody until I placed handcuffs behind his back.

Q. Okay.

MR. GREENE: Thank you.

MR. KUIPER: No further questions. Thank you.

THE COURT: May this witness be excused?

MR. KUIPER: We'll ask that he remain in the

21

potential that he's a rebuttal witness.

MR. GREENE: Well, as long as he follows the sequestration order.

THE COURT: He'll be sequestered. You are not excused, then, so you can step off the stand for the moment.

(At 9:20 a.m., witness stepped down)

MR. KUIPER: We have no further witnesses. Thank you, your Honor.

THE COURT: Prosecution rests?

MR. KUIPER: Yes.

(At 9:20 a.m., prosecutor rests)

THE COURT: Mr. Greene.

MR. GREENE: Your Honor, I have some motions to make before the defense proceeds.

THE COURT: All right. I'll excuse the jurors for a few moments.

(At 9:21 a.m., jury exits courtroom)

THE COURT: Mr. Greene.

MR. GREENE: Your Honor, this is a motion for directed verdict. It's based on two parts:

One, that the initial stop was unlawful.

THE COURT: You are talking about all three counts here?

MR. GREENE: That's correct, your Honor.

That the initial stop was unlawful; that they

22

had -- we have testimony from Special Agent Brownback that the defendant did not resemble any of the photos; that the photos were old.

We have testimony from Special Agent Brownback that the second photo didn't even show facial features. That, at most, they may have had a similar hairstyle.

Your Honor, we have a person who was not committing any type of violation. They are just walking down the street minding their business. They happen to be a white male, and they happen to fall within the dimensions of 5'10" and 6'.

THE COURT: When you say *they*, you mean *he*, right, one person?

MR. GREENE: One person. Thank you.

THE COURT: One person, the defendant.

MR. GREENE: Yes. Very good. Thank you, your Honor.

He is between 5'10" and 6'3". Your Honor, that's not an articulable suspicion to support this stop. At most, these officers could have instituted what's called a *citizen's contact*. But, in a citizen's contact, a person is free to at any point terminate it or not even engage in it. They could have instituted a citizen's contact, initiated a citizen's contact, and asked if he wanted to talk to him. But they had no particular articulable suspicion that this

23

was the person. This is -- this is as wild as they come.

We don't know what percentage of white males fall within 5'10" and 6'3", who don't even look like the photo.

THE COURT: Let me just ask you before I lose my train of thought here, Mr. Greene. So, under the circumstances as we know, are you saying that your client was entitled to just keep walking?

MR. GREENE: That's correct, your Honor. They could have approached my client and said, *Sir, we'd like to talk to you if you're willing*, and he should have had the option to continue or to engage him. But -- but he was -- he was placed -- he was detained. And there must be reasonable suspicions that a crime -- criminal activity is afoot to be able to detain a person, and there's absolutely no evidence whatsoever that criminal activity was afoot at the time he was detained.

So, if the stop at the onset is illegal, but for the exploitation of that illegality, we never get here. We never get into him being placed, hand on top of his head, him being searched, him basically being treated like he's a criminal when he is a citizen, your Honor, a citizen.

You know, he has constitutional rights, and they were blatantly violated by these two officers. If these officers had have done this correctly, they could have walked up to him and said, you know, *We would like to talk*

24

1 under arrest. And then he said -- at that point he said
2 that the defendant swung at him. But once he had grabbed
3 his arm, they had proceeded from the *Terry* to arrest.
4 THE COURT: All right. Well, Mr. Kuiper, weigh
5 in, please.
6 MR. KUIPER: Your Honor, they certainly
7 articulated facts that indicate that a reasonable person
8 would believe that this defendant was Aaron Davidson. That
9 now just doesn't go from the fact that, *He's not*
10 *Aaron Davidson, so we've got to kick the case.*
11 This certainly is not junk that they're relying
12 on. They have a date that Mr. Davidson was there the day
13 prior, they have his habit and routine that he's there.
14 They have a general physical description of him. The mere
15 fact that they can't obtain, you know, a frontal photograph
16 of his face at the time -- and that photograph does resemble
17 Mr. King with short, dark hair, the same nose structure
18 wearing prescription glasses; he had a thin wife-beater
19 shirt on -- at least Mr. Davidson does -- you have the
20 defendant walking down the street with no shirt on, you have
21 the same build. They're not going to a different location
22 at a different time, stopping someone with a wildly
23 different physical description.
24 In fact, to suggestion that what they are doing is
25 not based on any articulable reasonable facts, is, in fact,

41

1 nonsense. And to suggest that he can just -- the defendant
2 or Mr. Davidson, could just say, *Forget about it. I don't*
3 *want to cooperate with you. I am not going to allow myself*
4 *to be I.D.*, is ridiculous, as well.
5 The police have a duty, and they articulated the
6 facts which they used to stop the defendant to determine his
7 identity. They have that right to detain him to ascertain
8 his identity.
9 That's my argument. Anything else is nonsense. I
10 mean, it's nonsense. To just say, *He has no I.D. on him,*
11 *we'll kick him loose,* that makes no sense at all.
12 THE COURT: Mr. Greene, last word.
13 MR. GREENE: I don't know what constitutional law
14 Mr. Kuiper stated, but what he just said is nonsense, your
15 Honor.
16 You know, it's a serious matter to interfere with
17 a person's constitutional rights in this country. And the
18 courts have made it very, very, very clear that, if you're
19 going to do it, you've got to have sufficient facts to
20 justify it. We don't have that in this case. We have
21 detective -- we have Special Agent Brownback saying, *We have*
22 *no photo that looked like Mr. Davidson.* We have him saying
23 that, at best, he may have had short hair. How many people
24 have short hair? We have the testimony of the -- of the
25 height range. Even if you limit it to 6', can you stop any

42

1 white male 6' with short hair walking down Leonard? The
2 answer is, No, your Honor.
3 There is no reasonable suspicion here. There is
4 none whatsoever. What they did was they went on a fishing
5 expedition, and they should not have done it, and that's
6 what the constitution is here to protect, and we would ask
7 you to so find.
8 THE COURT: All right. Well, the Court has
9 obviously heard all the testimony, and it's under a motion
10 for direct verdict. It's to be viewed in a light most
11 favorable to the non-moving party, the prosecution. A.
12 It's this Court opinion that there is sufficient
13 evidence presented here, if believed by the jury, to sustain
14 verdicts beyond a reasonable doubt on each one of the three
15 counts.
16 So, therefore, motion is denied.
17 Anything further, Mr. Kuiper, before we proceed
18 with defense's case?
19 MR. KUIPER: Nothing further, your Honor. Thank
20 you.
21 THE COURT: All right. Mr. Greene?
22 MR. GREENE: Nothing, other than maybe we could
23 have a chance to run out.
24 THE COURT: Sure. Now just --
25 MR. GREENE: Thank you.

43

1 THE COURT: -- just to tip your hand a little
2 here, you're going to call your client, correct?
3 MR. GREENE: I am, your Honor. He will be my one
4 and only remaining witness.
5 THE COURT: Obviously, you've discussed potential
6 ramifications with him; that he's subject to
7 cross-examination, obviously?
8 MR. GREENE: Yes, sir, your Honor. He is fully
9 aware of the fact that Mr. Kuiper will try to rip him apart.
10 Yes.
11 THE COURT: Mr. King, you understand all that,
12 correct?
13 THE DEFENDANT: Yes, your Honor.
14 THE COURT: You want to exercise your right to
15 testify?
16 THE DEFENDANT: Yes, I do.
17 THE COURT: All right. Very good. We'll take a
18 brief recess, then. And then how long do you expect to
19 take, Mr. Greene?
20 MR. GREENE: Your Honor, I don't think my direct
21 will run a half-hour.
22 THE COURT: Well, let's do this. Let's do your
23 case, any rebuttal from the prosecution, and then we'll take
24 a break before closings to nail down instructions.
25 Okay, very good. We'll take a short recess, then.

44

KING-000139

| | |
|---|---|
| 1 | MR. GREENE: Thank you. |
| 2 | (At 9:53 a.m., break had) |
| 3 | (At 10:09 a.m., jury resumes seats) |
| 4 | THE COURT: Be seated. |
| 5 | Mr. Greene. |
| 6 | MR. GREENE: Your Honor, we call Mr. James King. |
| 7 | THE COURT: State your full name, please. |
| 8 | MR. KING: James King. |
| 9 | THE COURT: Raise your right hand. |
| 10 | Do you solemnly swear or affirm that the testimony |
| 11 | you're about to give in this matter will be the truth, the |
| 12 | whole truth, and nothing but the truth, so help you God? |
| 13 | THE WITNESS: I do, your Honor. |
| 14 | THE COURT: Please be seated. |
| 15 | JAMES KING, |
| 16 | called by the Defense at 10:10, sworn by the Court, testified: |
| 17 | DIRECT EXAMINATION |
| 18 | BY MR. GREENE: |
| 19 | Q.   Mr. King, I'm going to ask you to state your name for the |
| 20 | record. And, even though it's on every legal document in |
| 21 | this case, will you please spell it also for -- |
| 22 | A.   My name is James King. That's K-I-N-G. |
| 23 | Q.   Do you mind if I call you *James*? |
| 24 | A.   No, I do not mind. |
| 25 | Q.   Okay. James, where are you from? |

45

| | |
|---|---|
| 1 | A.   I'm from Posen, Michigan. |
| 2 | Q.   And where is Posen? |
| 3 | A.   Posen is the northeast side of the state by Alpena. |
| 4 | Q.   Why did you come to Grand Rapids? |
| 5 | A.   I came down here to pursue a degree in Computer Science at |
| 6 | Grand Valley State. |
| 7 | Q.   When did you come here? |
| 8 | A.   About two-and-a-half years ago now. |
| 9 | Q.   Upon completion of your studies, what do you plan to do? |
| 10 | A.   I would like to specialize in cyber security. |
| 11 | Q.   What's cyber security? |
| 12 | A.   Cyber security is the practice of good cyber security that |
| 13 | allows organizations to prevent and defend against attacks |
| 14 | which could lead to theft of data, loss of information, |
| 15 | damage to infrastructure. |
| 16 | It's used the world over by governments or |
| 17 | organizations, anyone looking to protect their data. |
| 18 | Q.   Do you also -- do you plan, then, to possibly work for the |
| 19 | government one day? |
| 20 | A.   Yes. That's a career goal of mine. |
| 21 | Q.   Are you currently employed? |
| 22 | A.   Yes, I am currently employed. |
| 23 | Q.   Where -- where do you work? |
| 24 | A.   I work for Iserv. It's a West Michigan Internet service |
| 25 | provider. |

46

| | |
|---|---|
| 1 | Q.   What do you do for them? |
| 2 | A.   I work tech support. |
| 3 | Q.   James, I want to take you back to July 18, 2014. Do you |
| 4 | remember what day of the week that was? |
| 5 | A.   Yes. It was a Friday. |
| 6 | Q.   How did you start your day that Friday? |
| 7 | A.   I woke up early, made breakfast, and made my way to work. |
| 8 | Q.   Where did you work? |
| 9 | A.   I was, at that time, working at Moss Telecommunications. |
| 10 | Q.   What is Moss Telecommunications? |
| 11 | A.   Moss is a Grand Rapids-based telecommunications company. |
| 12 | We do data cabling for schools and hospitals. |
| 13 | Q.   Where did you go to work that day? |
| 14 | A.   I was working at a school in Lakeview. |
| 15 | Q.   Do you remember what your shift was? |
| 16 | A.   Yes. I believe it was 6:00 a.m. till 1:00 p.m. |
| 17 | Q.   So, when you got off at 1:00, what did you do? |
| 18 | A.   I stopped to get my oil changed, and then I made my way to |
| 19 | my house and had lunch. |
| 20 | Q.   After having lunch at your -- well, where is your house? |
| 21 | Let me ask you that first. |
| 22 | A.   My house is on 12th Street. It's right off of Leonard on |
| 23 | the west side of Grand Rapids. |
| 24 | Q.   Okay. After lunch, what did you do? |
| 25 | A.   I started walking towards the Geek Group, which is my |

47

| | |
|---|---|
| 1 | internship. |
| 2 | Q.   James, what is the Geek Group? |
| 3 | A.   The Geek Group is a nonprofit science organization. We |
| 4 | provide the tools and know-how for anyone all over Michigan |
| 5 | and around the world, who wants to come in and learn, and |
| 6 | learn more about science. |
| 7 | Q.   What street were you walking on towards the Geek Group? |
| 8 | A.   I was walking down Leonard Street. |
| 9 | Q.   Where is the Geek Group? |
| 10 | A.   The Geek Group is on 902 Leonard. |
| 11 | Q.   Okay. How much further from the church would the Geek Group |
| 12 | have been? |
| 13 | A.   The Geek Group, my destination is just one block farther |
| 14 | away from the church. |
| 15 | Q.   Almost made it. |
| 16 | How were you dressed? |
| 17 | A.   I was wearing work boots, jeans, and I was carrying my |
| 18 | shirt. |
| 19 | Q.   When you say, *carrying your shirt*, you were shirtless? |
| 20 | A.   That's correct. |
| 21 | Q.   Why? |
| 22 | A.   It was mid-July; very hot that day. It was 90 degrees. |
| 23 | Q.   As you're walking along Leonard towards the Geek Group, what |
| 24 | happened? |
| 25 | A.   I was approached by two men. The first man asked me my |

48

KING-000140

**Page 49**

1      name.

2    Q.   Now, when you say you were approached by two men, where were

3      you?

4    A.   I was on the sidewalk on Leonard.

5    Q.   Where on the sidewalk? Do you have any more specific

6      address? Can you give us -- you know, was there any --

7    A.   Right across from the church. Right in front of the Dutch

8      Reform Church.

9    Q.   Okay. And, when you say you were approached by two men,

10      where did they come from?

11    A.   They were up against their black SUV.

12    Q.   And where was it parked?

13    A.   It was parked in the church parking lot.

14    Q.   Okay. Will you please describe these men to the jury?

15    A.   Yes. Both men were large men, uncut, unshaven, sort of

16      burly-looking men. One had a backwards ball cap. Khakis,

17      jeans; black shirts, jean jacket.

18    Q.   Did these men identify themselves?

19    A.   No, they did not.

20    Q.   Did you have any idea who these men were?

21    A.   No. I had no idea who these men were.

22    Q.   What did the men do?

23    A.   The first man closest to me asked my name, and I told him

24      my name was James.

25    Q.   Then what happened?

**Page 50**

1    A.   He asked if I had a weapon on me.

2    Q.   Did you respond?

3    A.   I did. I responded by saying, *No, I don't have a weapon*

4      *but I do have a pocketknife.*

5    Q.   Were you carrying a knife?

6    A.   Yes, I was.

7    Q.   And why did you have a knife?

8    A.   I used my utility knife for work to cut open boxes.

9    Q.   Where was the knife?

10    A.   It was clipped to my right front pocket.

11    Q.   What happened after you told him that you had a knife?

12    A.   I was then told to place my hands on top of my head.

13    Q.   Did you place your hands on top of your head?

14    A.   Yes, I did.

15    Q.   Now, why did you do that?

16    A.   These men did have — they had small badges around their

17      chest, and I assumed some sort of authority.

18    Q.   So, after you place your hands on top of your head, what

19      happened?

20    A.   Umm, one man stepped behind me and the other stepped in

21      front of me, boxing me in. And then the knife was taken

22      from me.

23    Q.   After they took the knife from you, what happened?

24    A.   They moved me up against their black SUV, and I still had

25      my hands on top of my head.

**Page 51**

1    Q.   While you're up against the SUV, what were they doing?

2    A.   They were standing behind me, and one man began to pat me

3      down.

4    Q.   After he pat you down, what happened?

5    A.   I was asking them who they were. They just told me that

6      they were looking for someone.

7    Q.   What was the next thing that happened after they responded,

8      *We're looking for someone?*

9    A.   My wallet was taken from my back pocket.

10    Q.   Do you remember who took it?

11    A.   No, I do not. I could not see them.

12    Q.   What -- how were you oriented when they took your wallet?

13    A.   I was, I was placed, umm, against their SUV with my hands

14      on my head like this (demonstrating).

15    Q.   When you say, *against it,* how were you facing?

16    A.   I was facing against the SUV, towards it; away from the

17      men.

18    Q.   So, after your wallet was taken, what happened?

19    A.   Umm, I became very suspicious. Them not having identified

20      themselves.. I didn't know who they were. I yelled out,

21      *Are you mugging me?*

22    Q.   What happened when you yelled out, *Are you mugging me?*

23    A.   There was no response from them. But, with my hands on my

24      head like this (demonstrating), I tried to turn to look at

25      them. When I went to make the motion to look at them to

**Page 52**

1      see where my wallet was and what they were doing with it, I

2      was shoved against the vehicle.

3    Q.   So you just tried to look at these two men and someone

4      shoved you back against the vehicle?

5    A.   That's correct.

6    Q.   Then what happened?

7    A.   At that moment I assumed fully that I was being mugged. I

8      did not know who these people were, and I tried to turn

9      around to run away from the scene and was thrown to the

10      ground.

11    Q.   After you're thrown to the ground, what takes place?

12    A.   I began immediately yelling for help, *Call the police, call*

13      *the police. Help. Someone help me. I'm being mugged,* as

14      loud as I could, for anyone that was in the area.

15    Q.   Now, before they took your wallet, did anyone ask you for

16      permission to take your wallet?

17    A.   No, they certainly did not.

18    Q.   They just reached into your back pocket and took it?

19    A.   That's correct.

20    Q.   Did they ever return it to you?

21    A.   No, they did not.

22    Q.   And when you tried to see what they were doing with your

23      wallet, that's when they pushed you back against the

24      vehicle?

25    A.   That's correct. Yes.

KING-000141

**Page 53**

1 Q. Okay. So now you're on the ground. What's taking place?
2 A. A -- a fight ensued. I was trying to run away, umm, but
3 there was a lot going on. Umm, both men were on top of me,
4 holding -- trying to hold me down, pin me down.
5 Q. So they're both on top of you, and you're still trying to go
6 away, get away?
7 A. That's correct.
8 Q. Why were you concerned about them mugging you?
9 A. They hadn't identified themselves. They took my wallet,
10 which had money; debit and social security card. I also
11 had two paychecks on me at the time.
12 Q. So, while they're holding you down, what's the next thing
13 that happened?
14 A. I was still -- I was yelling, yelling for the police,
15 yelling, yelling, calling, *Help, help. Call the police,*
16 until one man started choking me. He put me in a headlock,
17 and it was so tight around my neck that I could no longer
18 yell or breathe.
19 Q. Do you think he put you in a headlock to shut you up?
20 A. At the time, yes, that's exactly what I thought.
21 Q. So, you're in this headlock and it's cutting off your
22 windpipe?
23 A. That's correct, yes.
24 Q. What do you do?
25 A. I actually blacked out. I lost consciousness for a moment.
53

**Page 54**

1 Q. How long do you think you were out?
2 A. Umm, it could have been just maybe 10 to 15 seconds.
3 Q. Then what happens?
4 A. I -- when I came back too, his arm was still around my
5 neck, pressing tighter and tighter. And I did the only
6 thing I could to not have that happen again. In
7 self-defense, I bit into his bicep.
8 Q. Where did you -- where -- where did you bite his bicep?
9 A. Right -- right here on this arm (demonstrating).
10 Q. So, if we're looking at your arm --
11 MR. GREENE: May I approach the witness?
12 THE COURT: Yes.
13 BY MR. GREENE:
14 Q. Where is your neck, looking at his arm? Hold your arm --
15 well, hold my arm. Show me, where is his neck -- where is
16 your neck?
17 A. Inside his --
18 Q. Inside his -- he's tightening it?
19 A. Correct.
20 Q. So you're able to turn and bite him?
21 A. Yes.
22 Q. Why did you bite him?
23 A. That was the only thing I could do to breathe.
24 Q. After you bit him, did he release the -- the choke hold?
25 A. He did. He became very enraged and started punching me in
54

**Page 55**

1 the head.
2 Q. What happens while you are being punched in the head?
3 A. I -- after being hit several times, I lost -- I couldn't
4 move. I was on the ground, pretty much just lying there.
5 Q. What's the next thing you remember taking place?
6 A. I remember being cuffed at that point, and I saw that there
7 were some bystanders, and I yelled out one more time for
8 them to call the police.
9 Q. After you asked them to call the police, what happens?
10 A. The next thing I remember is sirens and actual police
11 officers showing up.
12 Q. So how did you know they were actual police officers?
13 A. They arrived in squad cars and with full uniforms and
14 badges and hats.
15 Q. How were they dressed?
16 A. In navy blue slacks, navy blue uniform; pins and ties.
17 Q. Did you talk to the police?
18 A. Yes, I did.
19 Q. What did you tell them?
20 A. I told them that I thought I was being mugged.
21 Q. When they asked you questions, did you respond?
22 A. Yes, I did.
23 Q. Were you respectful?
24 A. Yes, very respectful.
25 Q. Okay. I believe there is a video of your questioning of --
55

**Page 56**

1 when they arrived.
2 (At 10:23 a.m., video played)
3 BY MR. GREENE:
4 Q. So that was you yelling it out, *No, sir. I thought they*
5 *were trying to mug me?*
6 A. That's correct, sir.
7 Q. So, you were referring to the officer who was questioning
8 you as, sir?
9 A. Yes.
10 Q. Were you trained to be respectful of police officers?
11 A. Yes, I was, sir.
12 Q. Have you always been respectful of police officers?
13 A. Yes, sir.
14 (At 10:26 p.m. video played)
15 BY MR. GREENE:
16 Q. Now, there was a statement. You were talking to officers.
17 Did you ask if they were real police?
18 A. That's correct. That was me.
19 Q. And that's the one -- that was your voice asking if these
20 guys were real police?
21 A. That's correct.
22 Q. And so you were still not certain about the two guys who
23 had -- had approached you?
24 A. That's correct.
25 (At 10:26 a.m., video played)
56

| | |
|---|---|
| 1    BY MR. GREENE: | 1        THE COURT: Admitted. |
| 2   Q.   Now the officer asked you, *What's your name*, and that's you | 2        (Exhibits A - D admitted) |
| 3       responding to him? | 3        MR. GREENE: May I publish the photos, your Honor? |
| 4   A.   Yes, sir, it is. | 4        THE COURT: Yes. |
| 5       **(At 10:27 a.m., video played)** | 5    BY MR. GREENE: |
| 6    BY MR. GREENE: | 6   Q.   These are photos of injuries you received to your face? |
| 7   Q.   Did you hear that, *I'm putting your paychecks by your* | 7   A.   Yes, they are. |
| 8       *wallet*? | 8   Q.   How did you receive those injuries? |
| 9   A.   Yes, I heard that. | 9   A.   From one of the men punching me in the head. |
| 10   Q.   Was that the paychecks that you had received that you were | 10   Q.   And there were photos I think that have already been |
| 11       concerned about? | 11       admitted by the prosecutor.  Is that you laying on the |
| 12   A.   Yes, it was. | 12       ground? |
| 13   Q.   Okay. | 13   A.   Yes, it is. |
| 14       (At 10:27 a.m., video played) | 14   Q.   If you look over here in the corner to the left, are those |
| 15    BY MR. GREENE: | 15       your glasses? |
| 16   Q.   Now, he's asking you a series of questions and you are | 16   A.   Yes, they are. |
| 17       referring back to him as, *No, sir*? | 17   Q.   Is that your cell phone? |
| 18   A.   Yes. | 18   A.   Yes, it is. |
| 19   Q.   Again, you were being respectful of the officer? | 19   Q.   Do you recognize what's over here by the gloves? |
| 20   A.   Yes, sir. | 20   A.   Could you point it out, please? |
| 21   Q.   But these officers, you knew were officers? | 21   Q.   You see the gloves?  Go about six inches to the right of the |
| 22   A.   Yes, I did. | 22       gloves.  Do you see that? |
| 23   Q.   They were in uniform? | 23   A.   I can't see it that clearly.  I'm sorry. |
| 24   A.   That's correct, they were. | 24   Q.   Okay.  This is you again? |
| 25   Q.   Mr. King, were you -- were you injured from this | 25   A.   Yes, it is. |
| <div align="center">57</div> | <div align="center">59</div> |
| 1       altercation? | 1   Q.   This is also you? |
| 2   A.   Yes, I was. | 2   A.   Yes. |
| 3   Q.   I want to show you what's been marked as Defendant's Exhibit | 3   Q.   That's, I believe, you on the stretcher? |
| 4       A through D. | 4   A.   Yes, it is. |
| 5       MR. GREENE: May I approach the witness, your | 5       MR. GREENE: Thank you.  I have no further |
| 6       Honor? | 6       questions. |
| 7       THE COURT: Yes. | 7       THE WITNESS: Thank you. |
| 8    BY MR. GREENE: | 8       THE COURT: Mr. Kuiper. |
| 9   Q.   Will you take a look at these?  I know it's hard for you to, | 9       MR. KUIPER: Thank you. |
| 10       but please -- | 10       **CROSS-EXAMINATION** |
| 11   A.   (Reviewing exhibits) | 11    BY MR. KUIPER: |
| 12   Q.   Do you recognize those? | 12   Q.   Hello, Mr. King. |
| 13   A.   Yes, I do. | 13   A.   Hello, sir. |
| 14   Q.   When were they taken? | 14   Q.   On the 18th of July, did you have identification? |
| 15   A.   The following Monday, three days later. | 15   A.   Yes, I did. |
| 16   Q.   Do they accurately depict your condition as a result of | 16   Q.   And was that in your wallet? |
| 17       this, of this incident? | 17   A.   Yes, it was. |
| 18   A.   Yes, they do. | 18   Q.   And your testimony is somewhat at odds from what |
| 19       MR. GREENE: Your Honor, I move for admission of | 19       Detective Allen and Special Agent Brownback testified.  In |
| 20       Defendant's Exhibits A through D. | 20       particular, you're saying that Detective Allen did not |
| 21       I have shown them to the prosecutor.  I will show | 21       identify himself as a Grand Rapids detective? |
| 22       them again to him. | 22   A.   That's correct. |
| 23       MR. KUIPER: (Reviewing) | 23   Q.   And you're saying that he did not tell you that they were |
| 24       THE COURT: Any objection? | 24       looking for someone with an arrest warrant and wanted to |
| 25       MR. KUIPER: No objection. | 25       verify who you were? |
| <div align="center">58</div> | <div align="center">60</div> |

KING-000143

**Page 61**

1 A. That's correct.
2 Q. Did they ever ask you to tell your last name?
3 A. No, they did not.
4 Q. So you -- they did ask you for your name?
5 A. That's correct, they did.
6 Q. And you told them, *James*.
7 A. Yes, I did.
8 Q. At no time did they say, *What's your last name?*
9 A. That's correct.
10 Q. And you said that initially you thought they had some type
11    of authority because the badges?
12 A. That's correct.
13 Q. You saw both of them with badges?
14 A. I saw one person with a badge.
15 Q. You saw both of the guys testify, right?
16 A. That's correct.
17 Q. Which one of them did you see with the badge?
18 A. I'm sorry, I couldn't -- I couldn't say. I didn't know the
19    difference between the two.
20 Q. You didn't know the difference between the two.
21    It was -- is it fair to say that Leonard, at that
22    time, is -- it's a very busy area?
23 A. Yes, sir, it is.
24 Q. Are there quite a few businesses there?
25 A. Yes, there are.

**61**

**Page 62**

1 Q. What about the foot traffic? What's the foot traffic like
2    on a -- on a Friday in the summer near that location?
3 A. Umm, honestly -- sir, I couldn't say. I usually don't
4    walk, I usually ride my bike.
5 Q. You usually ride your bike.
6    Now, did you have a cell phone on you?
7 A. Yes, I did.
8 Q. Did you voluntarily hand the cell phone over to the
9    officers?
10 A. I believe I did, yes.
11 Q. Did they -- did they ask you about a weapon?
12 A. Yes, they asked me if I had one.
13 Q. And you -- you testified you told them, *Yeah, I have a*
14    *pocketknife.*
15 A. That's correct.
16 Q. And you allowed them to remove the pocketknife?
17 A. Yes, I did.
18 Q. And did you remember Detective Allen testifying that he
19    asked you if that was the weapon you were referring to? Did
20    you tell him, *Yeah, that's the weapon I was talking about?*
21 A. I remember him testifying that. I don't remember saying
22    that or that conversation happening.
23 Q. Okay. Is it your testimony that Detective Allen -- or you
24    heard the testimony from Special Agent Brownback about you
25    taking a swing at him?

**62**

**Page 63**

1 A. That's correct.
2 Q. Did that happen?
3 A. If -- if I -- if my arm went towards him, it was because I
4    was turning around, trying to run.
5 Q. And when you were getting punched in the head, that was when
6    you were biting Detective Allen's arm?
7 A. Yes. It was -- he went -- when I let go of that -- or his
8    -- caused him to let go of that -- that choke, and that's
9    when he started to punch me.
10 Q. You saw the demonstration that Detective Allen did on me.
11    Was that roughly what you remember happening?
12 A. No, it is not.
13 Q. Okay. How was it different?
14 A. Umm, it wasn't in that the choke was fully a choke
15    hold like you would see a wrestler do.
16 Q. Will you demonstrate that on me without choking too hard?
17    (Laughter by jurors)
18    THE WITNESS: Honestly, sir, I'd prefer not to.
19 BY MR. KUIPER:
20 Q. Well, we've had a lot of visual examples here. I want to
21    see -- I want the jurors to be able to see your testimony.
22    MR. GREENE: I'm going to object, your Honor. I
23    don't -- I don't believe -- if the defendant doesn't want to
24    put someone in a choke hold, then he can't be compelled to
25    do that. He's answered the question.

**63**

**Page 64**

1    THE COURT: Well, would it be better to
2    demonstrate it on you? I understand not wanting to have --
3    engage Mr. Kuiper in a choke hold.
4    MR. GREENE: I would volunteer to demonstrate it
5    on Mr. Kuiper.
6    (Laughter)
7    THE COURT: Well, what I would allow is your
8    client to demonstrate it on you, but that's the choice of
9    you and your client. I'm not going to force anything here.
10    MR. GREENE: You know, your Honor, it's still a
11    very emotional event for him, and it's difficult for him to
12    testify. I just think putting him in that position is -- is
13    beyond what this Court needs.
14    THE COURT: All right. Well, let's move on.
15 BY MR. KUIPER:
16 Q. Can you demonstrate using your own arm on yourself?
17 A. Yes. I'll try to do that for you.
18 Q. Okay.
19 A. I guess, umm, to the best of my recollection, and, umm --
20 Q. James let's do this. I'll do it on Detective Smith. I've
21    always wanted to do this to him.
22 A. Okay.
23 Q. I'm Detective Allen. Do you remember which arm he had on
24    you?
25 A. Yes, I believe it was his left arm.

**64**

| | |
|---|---|
| 1 | Q. His left arm (demonstrating). |
| 2 | A. **Yes.** |
| 3 | Q. Like this. And he was choking so you couldn't breathe? |
| 4 | A. **That's correct.** |
| 5 | Q. The officers are saying they're -- you're saying they're not |
| 6 | being truthful about identifying themselves as officers, |
| 7 | right? |
| 8 | A. **I didn't say that, no.** |
| 9 | Q. At least verbally. |
| 10 | A. **How do you mean?** |
| 11 | Q. I mean with their mouths, with language saying, *I'm a* |
| 12 | *detective.* You're saying that they did not do that? |
| 13 | A. **No. At this time they did not identify themselves.** |
| 14 | Q. Do you remember speaking with Officer Brower when you were |
| 15 | being taken to seek med -- receive medical treatment? |
| 16 | MR. GREENE: Objection, your Honor. We've |
| 17 | already -- we've already gone through this. May we |
| 18 | approach? |
| 19 | THE COURT: Sure. |
| 20 | (At 10:39 a.m., sidebar had outside of reporter's |
| 21 | hearing) |
| 22 | THE COURT: All right, ladies and gentlemen, we're |
| 23 | going to take a short break again to discuss something |
| 24 | outside your presence. |
| 25 | You may go back. |

<center>65</center>

| | |
|---|---|
| 1 | (At 10:40 a.m., jury exits courtroom) |
| 2 | THE COURT: We're back on the record here, and you |
| 3 | have an objection, Mr. Greene. |
| 4 | I'll just state for the record, I'm assuming that |
| 5 | Mr. Kuiper wants to get into Officer Brower's report, |
| 6 | subsequent to Mr. King saying, *I thought they were robbing* |
| 7 | *me,* and then Officer Brower asked the defendant, *Did they* |
| 8 | *tell you you were police?* Defendant answered, *They said* |
| 9 | *they were detectives and that they were looking for* |
| 10 | *somebody.* |
| 11 | I assume that's what you want to get at, |
| 12 | Mr. Kuiper? |
| 13 | MR. KUIPER: That is, your Honor. |
| 14 | THE COURT: Anything beyond that? |
| 15 | MR. KUIPER: Yeah, I mean the -- the other |
| 16 | statements that -- |
| 17 | THE COURT: He went on to say, *Anyone can buy a* |
| 18 | *badge. They grabbed my wallet and started going into my* |
| 19 | *pockets, and I thought they were robbing me.* |
| 20 | MR. KUIPER: Yeah. I mean, it's going to be along |
| 21 | the the same lines, your Honor. Depends, in part, on the |
| 22 | answers that Mr. King gives. |
| 23 | THE COURT: All right. Then, Mr. Greene, your |
| 24 | objection? |
| 25 | MR. GREENE: Your Honor, I do not believe it's |

<center>66</center>

| | |
|---|---|
| 1 | admissible because any statement -- two things are going on |
| 2 | here. One, he's in an ambulance. He's just experienced a |
| 3 | terrible event. We don't even know if he's under any kind |
| 4 | of anesthesia or anything administered by the ambulance |
| 5 | operators. |
| 6 | Secondly, these -- this is questioning without |
| 7 | *Miranda.* He's not been mirandized, and he's been |
| 8 | questioned. And now, in violation of his *Miranda* rights, |
| 9 | he's asking to be able to use statements that were allegedly |
| 10 | made in violation of *Miranda* to impeach him. |
| 11 | But, also, the medical concern, your Honor. He's |
| 12 | in an ambulance. He is in an ambulance after having a |
| 13 | serious episode. And, you know, if he's under any kind of |
| 14 | medication, if he's under I.V., if he was under anything, |
| 15 | and we don't know that. Unless he's able to establish that |
| 16 | these statements are made -- are made freely, without any |
| 17 | kind of drug inducement or without any type of -- of |
| 18 | painkillers or something that he may have been hooked up to |
| 19 | in that ambulance, it shouldn't be allowed. |
| 20 | THE COURT: Well, I'll mention that -- and |
| 21 | Mr. Kuiper has mentioned *People v Clark*, 127 Mich App 176. |
| 22 | Just leafing through that, and now I've come up with the |
| 23 | name of the U.S. Supreme Court case 40-some years ago, |
| 24 | *Harrison v New York.* |
| 25 | |

<center>67</center>

| | |
|---|---|
| 1 | So, I will allow Mr. Kuiper to pursue that. It's |
| 2 | not in his case-in-chief, it is the statement that he made |
| 3 | to the officer. I consider it to be voluntary, but in |
| 4 | violation of *Miranda*, but certainly Mr. Kuiper can use it |
| 5 | now on cross-examination. |
| 6 | We can do the appropriate instruction, and I |
| 7 | instructed the jury yesterday that they would, at least at |
| 8 | that point, disregard anything beyond, *I thought they were* |
| 9 | *robbing me.* But now it's appropriate to let Mr. Kuiper |
| 10 | explore it. |
| 11 | That's my ruling. We'll bring the jury back in. |
| 12 | MR. GREENE: One -- one more question. |
| 13 | THE COURT: Sure. |
| 14 | MR. GREENE: Your ruling still stands that nothing |
| 15 | pertaining to what was said at the hospital -- |
| 16 | THE COURT: Yes, yes. |
| 17 | MR. GREENE: -- that's under privilege. |
| 18 | THE COURT: It's nothing -- and we discussed that |
| 19 | two days ago, nothing -- nothing that occurred at the |
| 20 | hospital, no matter who said it or who was listening, |
| 21 | et cetera. |
| 22 | MR. KUIPER: Well, your Honor, those statements, I |
| 23 | mean they were voluntarily made, and I just want to go into |
| 24 | -- again, I mean there is a statement there in the last |
| 25 | paragraph. Do you have a copy of the police report, your |

<center>68</center>

KING-000145

**69**

```
1    Honor?
2           THE COURT: Well, I have the one that Mr. Greene
3    gave me yesterday.
4           MR. KUIPER: It's the last sentence there in that.
5    I believe that is also proper cross-examination. They said
6    that they were detectives and they were looking for
7    somebody.
8           I mean, we've had explicit testimony that they
9    didn't say that they were, you know -- in contradiction to
10   portions of that.
11          MR. GREENE: Your Honor, privilege trumps that.
12   There is a doctor-patient privilege, physician-patient
13   privilege and --
14          MR. KUIPER: It has nothing to do with treatment.
15          MR. GREENE: It is. It doesn't matter. Could
16   be --
17          THE COURT: Well, it, Mr. Kuiper, merely repeats
18   what I'm allowing in, correct?
19          MR. KUIPER: Yeah.
20          THE COURT: I'm going to still keep out anything
21   that happened in the hospital. I think we're treading on
22   thin ice here. But, again, you can use what was said to
23   Officer Brower in the ambulance.
24          MR. GREENE: Then we'll ask for an instruction,
25   your Honor, that it is not considered as substantive
```

**70**

```
1    evidence, but only can be used for purposes of what --
2    judging credibility.
3           THE COURT: We'll use the appropriate instruction,
4    I think it's 4.1.
5           MR. GREENE: Since they came up with the new ones,
6    I don't know.
7           THE COURT: Well, we can -- we can cover that.
8    We'll get the jury back in, get all the evidence in.
9           (At 10:56 a.m., jury resumes seats)
10          THE COURT: Be seated. Mr. Kuiper may continue.
11          MR. KUIPER: Thank you.
12   BY MR. KUIPER:
13   Q.  Picking be up where we left off, Mr. King, do you remember
14       riding with Officer Brower to go seek medical treatment
15       after this?
16   A.  I'm sorry, sir, I do not remember any of the ambulance
17       ride.
18   Q.  Okay. So I take it, then, you don't remember telling him
19       that they said they were detectives?
20   A.  No, sir, I don't remember any of the ambulance ride.
21   Q.  If his report indicates that, do you have any reason to
22       disbelieve that?
23   A.  Umm, I -- the only reason -- I have no reason at all to
24       disbelieve or believe it.
25   Q.  Okay. We're trying to get at the truth now. Do you
```

**71**

```
1    remember telling -- them telling you they were detectives,
2    looking for a fugitive, when they got out of that unmarked
3    vehicle?
4    A.  No, they did not say that.
5    Q.  If Detective Brower's report indicates that and his
6        testimony will be that, you're saying you don't remember
7        making that statement?
8           MR. GREENE: Objection, objection.
9           THE COURT: Hold on.
10          MR. GREENE: It's been asked and answered, your
11   Honor.
12          THE COURT: I'll allow it. Go ahead.
13   BY MR. KUIPER:
14   Q.  You're saying you don't remember making that statement?
15   A.  No, sir, I do not remember that.
16   Q.  Do you remember making a statement to Officer Brower that
17       you thought that they were robbing you?
18   A.  No, sir, I do not.
19   Q.  Do you remember stating to Officer Brower that you stated,
20       Anyone can buy a badge?. Do you remember making that
21       statement at all?
22   A.  No, sir, I don't remember talking to Officer Brower.
23   Q.  Would this have gone differently if they had said, We're
24       officers with the Grand Rapids Police Department and the
25       FBI. We need to ascertain your identity?
```

**72**

```
1    A.  Yes, sir, it would have.
2    Q.  Knowing now that they are officers, would you have handled
3        this situation any differently?
4    A.  Yes, sir, I would have.
5    Q.  What would you have done?
6    A.  I would have complied and gave my I.D.
7    Q.  Okay. Do you remember anyone assisting the officers?
8    A.  No, I do not.
9    Q.  Do you remember anyone coming to your assistance and jumping
10       on the officers at all?
11   A.  No, sir, I do not.
12   Q.  Do you remember the officers telling you to stop struggling?
13   A.  No, sir, I do not.
14   Q.  Do you remember saying we're -- them at any point saying,
15       We're officers. Stop. Stop resisting?
16   A.  No, sir.
17   Q.  Do you remember a set of handcuffs at all?
18   A.  Yes, I do, sir.
19   Q.  Did they try to handcuff you?
20   A.  Yes, sir, they did.
21   Q.  What -- do you remember what hand they tried to handcuff you
22       on?
23   A.  Yes. My left hand.
24   Q.  At what point was that?
25   A.  I was on the ground, and one man had a cuff around me and
```

KING-000146

**73**

1        then closed it with his knee around my wrist.

2  **Q.**  Were you able to get your hand out of his grasp?

3  **A.**  **I -- I don't know, sir.**

4  **Q.**  Do you know whether or not you hit any one of the officers

5        with that -- with the handcuffs?

6  **A.**  **I don't know.  If it happened, it was unintentional.**

7  **Q.**  Well, you were actively trying to get away from these guys,

8        right?

9  **A.**  **That's correct.**

10  **Q.**  So, in that respect, the actions that you were taking, you

11        did have some intent.  You had the intent, like you said, to

12        get away, fair?

13  **A.**  **Yes, intent to flee.**

14  **Q.**  Okay.  So, if these guys were two bad guys, you would have

15        been intending to hit them?

16  **A.**  **No, sir.**

17  **Q.**  No?

18  **A.**  **No, sir.  Just trying to get away.**

19  **Q.**  Do you remember Mr. Pardee's testimony?

20  **A.**  **Yes, sir.**

21  **Q.**  Do you remember kicking him at all?

22  **A.**  **No, sir, I do not.**

23        MR. KUIPER:  No further questions.  Thank you,

24        Mr. King.

25        THE WITNESS:  Thank you, sir.

**74**

1        THE COURT:  Mr. Greene?

2        **REDIRECT EXAMINATION**

3  **BY MR. GREENE:**

4  **Q.**  Did you ever intend to hit anyone in the head with

5        handcuffs?

6  **A.**  **No, I did not, sir.**

7  **Q.**  Did you intentionally ever hit anyone in the head?

8  **A.**  **No, sir.**

9  **Q.**  Your entire effort was just to get away?

10  **A.**  **Yes, it was.**

11  **Q.**  Now you remember speaking to the officer when he first

12        arrived and you're still laying on the ground?

13  **A.**  **That's correct.**

14  **Q.**  And you asked that officer if they were real police

15        officers?

16  **A.**  **Yes, I did.**

17  **Q.**  At that point you still wanted to know who these men were?

18  **A.**  **That's correct.**

19  **Q.**  And at that point you were still seeking that information?

20  **A.**  **Yes.**

21  **Q.**  Okay.  And that was why you were asking that question?

22  **A.**  **Yes, it was.**

23  **Q.**  And it was in a very labored and painful way that you asked

24        that question?

25        MR. KUIPER:  I'm going object, your Honor.  I

**75**

1        mean --

2        MR. GREENE:  I'll rephrase.  I'll rephrase the

3        question.

4        THE COURT:  Rephrase.

5        MR. KUIPER:  I'm going to object to the leading

6        questions, about 600.

7        THE COURT:  Go ahead and rephrase.

8  BY MR. GREENE:

9  **Q.**  At the time you asked that, you were under the influence of

10        what happened to you?

11  **A.**  **That's correct.**

12  **Q.**  Okay.

13        MR. GREENE:  Thank you.

14        THE COURT:  Mr. Kuiper, anything further?

15        MR. KUIPER:  (Confers with detective)

16        I don't have anymore questions.  Thank you,

17        Mr. King.

18        THE WITNESS:  Thank you.

19        THE COURT:  You may step down.  Thank you.

20        (At 11:03 a.m., witness stepped down)

21        MR. GREENE:  Your Honor, the defense rests.

22        (At 11:03 a.m., Defense rests)

23        THE COURT:  I figured you were going say that.

24        Mr. Kuiper disappeared.

25        MR. GREENE:  I'll restate it when he comes in.

**76**

1        THE COURT:  For the record, Mr. Greene, defense

2        rests?

3        MR. GREENE:  That is correct, your Honor.

4        THE COURT:  Very good.  You may be seated.  You're

5        still under oath,

6        **GLEN BROWER,**

7  recalled by the People, previously sworn, testified:

8        DIRECT EXAMINATION

9  BY MR. KUIPER:

10  **Q.**  Officer Brower, I just want to take you into the ambulance

11        ride when you were with the defendant.  Umm --

12        MR. GREENE:  Your Honor, before he asks, I'm going

13        to object on different grounds.  May we approach again?

14        THE COURT:  Sure.

15        (At 11:04 a.m., sidebar had outside of reporter's

16        hearing)

17        THE COURT:  Go ahead, Mr. Kuiper.

18  BY MR. KUIPER:

19  **Q.**  Back to the ride you took to the hospital with Mr. King.  Do

20        you remember when he volunteered to you that he thought he

21        was being robbed?

22  **A.**  Yes.

23  **Q.**  And did you ask a follow-up question of Mr. King?

24  **A.**  I did.

25  **Q.**  What was that?

KING-000147

1    The defendant is charged with the following
2 crimes:
3    Count 1:
4    The defendant is charged with the crime of
5 assaulting, battering, wounding, resisting, obstructing,
6 opposing or endangering a police officer of the Grand Rapids
7 Police Department, Todd Allen, who was performing his
8 duties. To prove this charge, the prosecutor must prove
9 each of the following elements beyond a reasonable doubt:
10    First, that the defendant assaulted, battered,
11 wounded, resisted, obstructed, opposed or endangered Officer
12 Todd Allen. *Obstruct* includes the use or threatened use of
13 physical interference or force or a knowing failure to
14 comply with a lawful command. The defendant must have
15 actually resisted by what he said or did, but physical
16 violence is not necessary.
17    Second, that the defendant knew or had reason to
18 know that the person the defendant assaulted, battered,
19 wounded, resisted, obstructed, opposed or endangered was a
20 police officer performing his duties at the time.
21    Third, that Officer Allen's actions were lawful.
22    An officer does not violate the law by merely
23 approaching an individual on the street or in another public
24 place and asking him if he is willing to answer some
25 questions. The person approached need not answer any

<center>141</center>

1 questions put to him; indeed, he may decline to listen to
2 the questions and may go on his way. He may not be detained
3 even momentarily without reasonable, objective grounds for
4 doing so, and his refusal to listen or answer does not,
5 without more, furnish those grounds.
6    An officer may lawfully conduct an investigatory
7 stop by approaching and temporarily detaining a person for
8 the purpose of investigating possible criminal behavior,
9 even though there is no probable cause to support an arrest.
10 A brief detention does not violate the law if the officer
11 has a reasonably articulable suspicion that criminal
12 activity is afoot. Whether an officer has a reasonable
13 suspicion to make such an investigatory stop is determined
14 on a case by case basis, in light of the totality of the
15 facts and circumstances. A determination regarding whether
16 a reasonable suspicion exists must be based on common sense
17 judgments and inferences about human behavior. An officer
18 who has reasonable cause to believe that the defendant is a
19 person for whom an arrest warrant has been issued may
20 approach and temporarily detain that person for the purpose
21 of investigating if that is the person named in the warrant.
22 Reasonable cause means having enough information to lead an
23 ordinarily careful person to believe that the defendant was
24 the person named in the warrant.
25

<center>142</center>

1    To lawfully arrest a person, an officer must have
2 probable cause to justify the arrest. *Probable cause* to
3 justify an arrest means facts and circumstances within the
4 officer's knowledge that are sufficient to warrant a prudent
5 person, or one of reasonable caution, in believing in the
6 circumstances shown, that the suspect has committed, is
7 committing, or is about to commit an offense.
8    Fourth, that such assaulting, battering, wounding,
9 resisting, obstructing, opposing or endangering caused a
10 bodily injury requiring medical attention or medical care to
11 Officer Allen.
12    In Count 2:
13    The defendant is charged with the crime of assault
14 with a dangerous weapon, felonious assault. To prove this
15 charge, the prosecutor must prove each of the following
16 elements beyond a reasonable doubt:
17    First, that the defendant either attempted to
18 commit a battery on Todd Allen or did an act that would
19 cause a reasonable person to fear or apprehend an immediate
20 battery. A battery is a forceful or violent touching of the
21 person or something closely connected with the person.
22    Second, that the defendant intended either to
23 injure Todd Allen or to make Todd Allen reasonably fear an
24 immediate battery.
25

<center>143</center>

1    Third, that at the time, the defendant had the
2 ability to commit a battery, appeared to have the ability,
3 or thought he had the ability.
4    Fourth, that the defendant committed the assault
5 with a dangerous weapon, handcuffs.
6    A dangerous weapon is any object that is used in a
7 way that is likely to cause serious physical injury or
8 death.
9    Some objects, such as guns or bombs, are dangerous
10 because they are specifically designed to be dangerous.
11 Other objects are designed for peaceful purposes, but may be
12 used as dangerous weapons. The way an object is used or
13 intended to be used in an assault determines whether or not
14 it is a dangerous weapon. If an object is used in a way
15 that is likely to cause serious physical injury or death, it
16 is a dangerous weapon.
17    You must decide from all the facts and
18 circumstances whether the evidence shows that the pair of
19 handcuffs in question here was a dangerous weapon.
20    In Count 3:
21    The defendant is charged with the crime of
22 assaulting, battering, wounding, resisting, obstructing,
23 opposing or endangering a peace officer of the Federal
24 Bureau of Investigation, Douglas Brownback, who was
25 performing his duties. To prove this charge, the prosecutor

<center>144</center>

KING-000164

1  must prove each of the following elements beyond a
2  reasonable doubt:
3        First, that the defendant assaulted, battered,
4  wounded, resisted, obstructed, opposed or endangered
5  Agent Brownback. *Obstruct* includes the use or threatened
6  use of physical interference or force or a knowing failure
7  to comply with a lawful command. The defendant must have
8  actually resisted by what he said or did, but physical
9  violence is not necessary.
10       Second, that the defendant knew or had reason to
11 know that the person the defendant assaulted, battered,
12 resisted, obstructed, opposed or endangered was a peace
13 officer of the Federal Bureau of Investigation performing
14 his duties at the time.
15       Third, that Agent Brownback's actions were lawful.
16 Lawful actions are defined in Count 1 above.
17       So, in considering Count 3, you can refer to the
18 definition of *lawful* in Count 1.
19       When you go to the jury room, you will have your
20 copies of the final jury instructions. You should first
21 choose a foreperson. The foreperson should see to it that
22 your discussions are carried on in a businesslike way and
23 that everyone has a fair chance to be heard.
24       During your deliberations, please turn off your
25 cell phones or other communications equipment until we

145

1  recess.
2        A verdict in a criminal case must be unanimous.
3  In order to return a verdict, it is necessary that each of
4  you agrees on that verdict. In the jury room, you will
5  discuss the case among yourselves, but ultimately each of
6  you will have to make up your own mind. Any verdict must
7  represents the individual considered judgment of each juror.
8        It is your duty as jurors to talk to each other
9  and make every reasonable effort to reach agreement.
10 Express your opinions and the reasons for them, but keep an
11 open mind as you listen to your fellow jurors. Rethink your
12 opinions and do not hesitate to change your mind if you
13 decide you were wrong. Try your best to work out your
14 differences.
15       However, although you should try to reach
16 agreement, none of you should give up your honest opinion
17 about the case just because other jurors disagree with you
18 or just for the sake of reaching a verdict. In the end,
19 your vote must be your own, and you must vote honestly and
20 in good conscience.
21       If you have any questions about the jury
22 instructions before you begin deliberations, or questions
23 about the instructions that arise during deliberations, you
24 may submit them in writing in a sealed envelope to my clerk.
25

146

1        Possible penalty should not influence your
2  decision. It is the duty of the judge to fix the penalty
3  within the limits provided by law.
4        If you want to communicate with me while you are
5  in the jury room, please have your foreperson write a note
6  and give it to my clerk. It is not proper for you to talk
7  directly with the judge, lawyers, court officers, or other
8  people involved in the case.
9        As you discuss the case, you must not let anyone,
10 even me, know how your voting stands. Therefore, until you
11 have returned with a unanimous verdict, do not reveal this
12 to anyone outside the jury room.
13       When you go to the jury room to deliberate, you
14 may take your notes and full instructions. If you want to
15 look at any or all of the exhibits that have been admitted,
16 just ask for them.
17       When you go to the jury room, you will have your
18 written copy of the instructions you have just heard. As
19 you discuss the case, you should think about all my
20 instructions together as the law you are to follow.
21       The defendant is charged with three counts, that
22 is, with the crimes of assaulting, resisting, or obstructing
23 a police officer causing injury; assault with a dangerous
24 weapon; and assaulting, resisting, or obstructing a police
25 officer. These are separate crimes, and the prosecutor is

147

1  charging that the defendant committed all of them. You must
2  consider each crime separately in light of all the evidence
3  in the case.
4        You may find the defendant guilty of all or any
5  one or any combination of these crimes, or not guilty of
6  all.
7        I have prepared a verdict form listing the
8  possible verdicts. I'll read through that with you now, and
9  this will go to the jury room with you.
10       It has the case caption:
11       The People of the State of Michigan versus
12 James Lee King.
13       We, the jury, find the defendant in Count 1
14 either: Not guilty or guilty of assaulting, resisting, or
15 obstructing a peace officer causing injury. Of course,
16 Count 1 involves Grand Rapids Police Officer Todd Allen.
17       Count 2 either: Not guilty or guilty of assault
18 with a dangerous weapon, felonious assault. And that,
19 again, involves Todd Allen.
20       Count 3 either: Not guilty or guilty of
21 assaulting, resisting or obstructing a police officer, and
22 that involves FBI Agent Douglas Brownback.
23       Then there's a place for the foreperson to sign
24 and date.
25

148

KING-000165