```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                FOR THE WESTERN DISTRICT OF MICHIGAN

 3                          SOUTHERN DIVISION

 4      JAMES KING,

 5            Plaintiff,              No.  1:16cv343

 6       vs.

 7      UNITED STATES OF AMERICA, et al.,

 8            Defendants.

 9

        Before:
10
                          THE HONORABLE JANET NEFF,
11                          U.S. District Judge
                            Grand Rapids, Michigan
12                          Tuesday, October 4, 2016
                          Premotion Conference Proceedings
13
        APPEARANCES:
14                   Miller Johnson
                     MR. D. ANDREW PORTINGA
15                   MR. PATRICK MICHAEL JAICOMO
                     250 Monroe Avenue, NW
16                   Suite 800
                     Grand Rapids, MI 49501-0306
17                   616-831-1772
                             On behalf of the Plaintiff;
18                   United States Attorney's Office
                     MS. NICOLE LYNN MAZZOCCO
19                   MR. RYAN COBB
                     330 Ionia Avenue NW
20                   Grand Rapids, MI 49501
                     616-456-2404
21                           On behalf of United States of America;
                     MS. KRISTEN REWA
22                   MS. LINDSAY A. BONDY
                     Grand Rapids City Attorney's Office
23                   300 Monroe Avenue, NW
                     Suite 620
24                   Grand Rapids,MI49503
                     6164563181
25                           On behalf of the Defendant Morris.
        REPORTED BY:  MS. KATHY J. ANDERSON, RPR, FCRR
```

1        October 4, 2016

2             PROCEEDINGS, 9:59 a.m.

3        THE LAW CLERK:  All rise, please.  Court is in

4   session.  You may be seated.

5        THE COURT:  Good morning, everybody.

6        MR. JAICOMO:  Good morning.

7        MS. MAZZOCCO:  Good morning, Your Honor.

8        THE COURT:  This is the date and time set for a

9   premotion conference in case number 1:16cv343, James King

10  versus the United States of America, et al.  Counsel, may I

11  have appearances and introductions.

12        MR. JAICOMO:  Good morning, Your Honor.  Patrick

13  Jaicomo of Miller Johnson for Mr. King.

14        MR. PORTINGA:  Your Honor, Andy Portinga for the

15  plaintiff.

16        MS. MAZZOCCO:  Nicole Mazzocco and Ryan Cobb on behalf

17  of the federal defendants, Your Honor.

18        MS. REWA:  Kristen Rewa on behalf of Officer Morris.

19        MS. BONDY:  Lindsay Bondy also on behalf of

20  Officer Morris.

21        THE COURT:  Thank you.  Let's just preliminarily talk

22  a little bit about what we're here for.  Premotion conference

23  has a number of goals, I guess.  First of all, to determine the

24  exact nature of the dispositive motions that the parties wish

25  to file; second, to determine whether the case is currently

1    ripe for the filing of dispositive motions, to try to sort

2    through the proposals, and in this case there are three; to

3    determine whether they have been adequately vetted to the point

4    where everybody knows exactly what it is they want to do; and

5    to get rid of anything that is unnecessary; and, finally, to,

6    assuming we get through all of those hurdles, to set some

7    briefing schedules.

8            Now, we have an amended complaint of four counts which

9    relate to the individual defendants and the government

10   defendants in various ways.  And I have, I do have some

11   questions, if I can find my written sheet.  Oh, in addition to

12   the premotion conference, we want to talk a little bit about

13   the defendant's joint motion to stay discovery pending

14   resolution of the dispositive motions.

15           The first question that I have is for the government

16   defendant and the Brownback and Allen defendants.  You have

17   indicated that you want to pursue either a motion to dismiss or

18   in the alternative a motion for summary judgment.  And we need

19   to talk about exactly what it is you want there because, partly

20   because of the motion to stay discovery.  If you are pursuing a

21   Rule 12 motion to dismiss exclusively, that puts one cast on

22   the motion to stay discovery, but if you are also pursuing or

23   thinking you might want to pursue a Rule 56 motion for summary

24   judgment, that might have a different cast on the motion to

25   stay discovery.  So I'm interested to know whether you are

1    wedded to both of those alternatives; if you are, in light of

2    the motion to stay, whether you are abandoning the Rule 56

3    motion.  Exactly where are you on your thinking on that?

4             MS. MAZZOCCO:  Your Honor, the Rule 56 motion is

5    largely in the alternative.  We believe that nearly all of the

6    arguments that we are going to be making can be covered by the

7    Rule 12(b) rubric either under Rule 12(b)(6) for failure to

8    state a claim, or Rule 12(b)(1), lack of subject matter

9    jurisdiction.  The evidence that we will principally be citing

10   to we believe is fairly considered part of the complaint.  We

11   have an entire trial record here, Your Honor, that was

12   incorporated into and attached to the plaintiff's SF95 that was

13   filed with the government and was referred to in the complaint,

14   as indeed it must be to get past the subject matter

15   jurisdiction hurdle.  So we believe the SF95 is fair game under

16   a 12(b) standard, and we will largely be relying on items

17   already attached thereto.

18            THE COURT:  But you are holding on to the alternative.

19   Again, what is your, in terms --  I have to tell you the motion

20   to stay discovery has really munged up the works a little bit

21   here.  You are prepared to proceed on the Rule 12 part of your

22   motion, but what?

23            MS. MAZZOCCO:  But we would like to at this time also

24   present the Rule 56 motion in the alternative.  Particularly to

25   the extent that the Court might disagree with us that the SF95

1   ought not to be properly incorporated.  Moreover, Rule 56 will

2   very appropriately force the plaintiff to identify vis-a-vis

3   the affidavit mechanism in that rule what discovery they think

4   is necessary here.

5          We have had a multi-day trial proceeding in which

6   every witness that the plaintiff has identified on their

7   initial disclosures has testified and been cross-examined.  We

8   have the exhibits to that trial.  There is an extensive record

9   here already, Your Honor.  We believe the undisputed facts have

10  already been brought out and identified, and it's our view that

11  based on those undisputed facts, including plaintiff's trial

12  testimony, that we prevail.

13         THE COURT:  Well, let's hear what the plaintiff has to

14  say.

15         MR. JAICOMO:  As to the subject matter jurisdiction, I

16  think that's largely a meritless claim, Your Honor.  In any

17  case, they are stepping outside the pleadings which would bring

18  us under Rule 56.  To the extent that that's permissible, I

19  have the SF form right here and it very clearly incorporates

20  the actions of both the FBI agent and Detective Allen.

21         So I don't think there is any "there" there.  With

22  respect to the other claims, all of them rise or fall on issues

23  of fact.  Yes, the trial transcript and the testimony in that

24  trial will be relevant.  But we need to depose these

25  defendants, we need to do our own investigation, and for what

1    it's worth, we don't at this point have the trial exhibits.

2    Which is one of the things we requested in our initial

3    discovery requests.

4         THE COURT:  And there's been no response to that, as I

5    understand it.

6         MR. JAICOMO:  Other than to file the motion on the

7    30th day.

8         THE COURT:  Okay.  Well, I think what we need to do

9    then is to hear briefly from each of the three sets of

10   defendants, I guess you could say, on their claims for

11   entitlement or their desires to go ahead with dispositive

12   motions, then hear some response from the plaintiff and then

13   we'll go from there.

14        MS. MAZZOCCO:  Your Honor, would you like us to

15   address the motion to stay first or the merits of our

16   dispositive motion?

17        THE COURT:  I think, I really do think what you need

18   to do is incorporate the motion to stay into your claims for

19   the premotion conference.

20        MS. MAZZOCCO:  Certainly.  Would you like to hear from

21   the government first, Your Honor?

22        THE COURT:  Yes, I would.

23        MS. MAZZOCCO:  Okay.  So with regard sort of setting

24   the stage with the motion to stay discovery.  We believe that

25   the Sixth Circuit as well as the Supreme Court has made it

1    crystal clear that where you have a claim of qualified immunity

2    the motion must be resolved before discovery proceeds.

3              And this case is a classic example of why that ought

4    to be so.

5              We have arguments based on the plaintiff's complaint

6    itself, and the undisputed facts, including plaintiff's

7    testimony in the trial, as to why all of these claims ought to

8    fail.  But in particular, the claims against the officers as

9    individuals.

10             So the first point relates to the Section 1983 claims

11   against the two federal task force officers.  There's no

12   factual dispute here --

13             THE COURT:  Well, let's go back a minute.  You say the

14   issue is crystal clear.  I don't really see it that way.  And

15   don't you have some question, at least I have some question

16   based on what I've read so far, I have some question as to

17   whether they both were federal agents, and certainly whether

18   objectively from the position of the, of Mr. King, the

19   plaintiff, whether they were federal agents.  And isn't that a

20   fact question?

21             MS. MAZZOCCO:  It is not, Your Honor.  If you look at

22   even the complaint itself, it refers to the fact that Officer

23   Allen was a deputized marshal.  And plaintiffs have been aware

24   of that all along.  It's included in their SF95, for example.

25   There is no question of fact I believe as to whether or not

1    Task Force Officer Allen was a deputized federal marshal acting

2    in a federal investigation.  And moreover, this particular

3    piece, this 1983-piece, is an issue of subject matter

4    jurisdiction.  So we are under 12(b)(1).  We do anticipate

5    providing Your Honor with an affidavit that includes as an

6    attachment the sworn, the form that one fills out to become a

7    deputized U.S. Marshal, as well as the fact that this is a

8    federal investigation that these gentlemen were engaged in.

9    There is absolutely no question of fact as to that issue.  So

10   we have a federal task force officer and an FBI agent engaged

11   in a federal fugitive investigation with relation to

12   Mr. Davidson here.

13           So the federal character, particularly if you look at

14   the case that we did cite to Your Honor in our premotion

15   conference statement, and then also in the additional cases

16   that we will be providing in our briefing, indicates that where

17   you have a federal task force officer engaged in a federal

18   investigation, there is absolutely no question that there is

19   not a 1983 claim here.  It's too federal in character, Your

20   Honor.  And plaintiffs in their response did not indicate

21   anything that would change that fact.  Now certainly they will

22   have the opportunity as well to respond in their briefing on

23   the 1983 issue.

24           THE COURT:  Okay.

25           MS. MAZZOCCO:  So then the second, the second set of

1   claims would be the qualified immunity claims.  Those would

2   apply to the 1983 claims, if Your Honor were to disagree with

3   us and allow those to move forward, as well as to the Bivens

4   claims against our two federal task force officers.

5          And so here the first piece of the action that we

6   would want to examine would be the stop itself.

7          So here we believe that there was nothing in here to

8   violate the search and seizure clause, Your Honor.  They had,

9   first of all, a right to approach Mr. King and ask some

10  questions which is what they did here.  But even if you wanted

11  to consider the stop a Terry stop, we believe that we had

12  reasonable suspicion and a right under Terry to stop Mr. King

13  in this scenario.

14         THE COURT:  Even though he didn't look anything at all

15  like the guy you were looking for.

16         MS. MAZZOCCO:  He didn't.  That is not correct, Your

17  Honor.  He was a Caucasian gentleman; he was of a thin build;

18  he was in a similar age range as the suspect; he had short dark

19  hair; he had glasses; he was of a similar height; he was in the

20  same location at the same time of day walking in the same

21  direction and wearing very similar clothing.  And that's all in

22  the trial court record, Your Honor, and there is no dispute as

23  to those facts.  I mean they have been testified to; there is

24  no evidence to the contrary.

25         And so you have all of these hits that Mr. King is

1    very similar to Mr. Davidson.  So they had the right to at the

2    very least stop and question him, or to engage in a Terry stop

3    here, Your Honor.

4         So we believe that the stop is clearly constitutional

5    and that none of the elements of qualified immunity can be

6    satisfied by the plaintiff, Mr. King.

7         You know, moreover, they move into, you know, they ask

8    him a couple of questions.  So they ask him what is his name.

9    There is no dispute that he responds James.  He doesn't respond

10   with his full name.  They ask him for his identification.

11   There is no dispute that he told him, you know, I don't have

12   any ID.  There is also no dispute that he initially complied

13   with the officers's instructions and allowed them to begin a

14   pat down.

15        THE COURT:  What's the significance of not having any

16   ID?

17        MS. MAZZOCCO:  Well, Your Honor, one, it raises the

18   officers's level of suspicion that he did not give his full

19   name and did not produce ID.  And then as we move forward, when

20   they feel, when they do the pat down and they recognize, you

21   know, that there is an object, and they pull it out and they

22   realize it's a wallet, those officers then have probable cause

23   to arrest him for violating 18 U.S.C. 1001, which is when you

24   are lying to a federal officer engaged in --

25        THE COURT:  Oh, man, come on.

1    MS. MAZZOCCO:  Absolutely, Your Honor.  I believe the

2    case law will bear us out on that point.  That when you have

3    lied to a federal officer about whether --

4    THE COURT:  Did they even look in the wallet to see if

5    there was identification in there to confirm that he was lying?

6    MS. MAZZOCCO:  They did not have time, Your Honor,

7    because it was at that point immediately when the wallet was

8    removed it's undisputed that Mr. King swings around and flees.

9    THE COURT:  So they didn't know if he was lying.  They

10   didn't know what was in the wallet.

11   MS. MAZZOCCO:  But they certainly had reasonable

12   suspicion, Your Honor, that there was an identification and a

13   very large, you know, wallet which was later borne out as there

14   was ID in the wallet.

15   THE COURT:  Wow.

16   MS. MAZZOCCO:  So, Your Honor, when we look at the pat

17   down we believe that we had a right under Terry to proceed with

18   that pat down.  We believe that was a constitutional procedure,

19   and we also believe that we had a right to remove the wallet.

20   So there was evidence presented at trial that a wallet or a

21   wallet like --

22   THE COURT:  What was the result of the trial?

23   MS. MAZZOCCO:  I'm sorry?

24   THE COURT:  What was the result of the trial?

25   MS. MAZZOCCO:  Not guilty, Your Honor.

1          THE COURT:  Okay.

2          MS. MAZZOCCO:  So when the object in the pants was

3     identified by Task Force Officer Allen, there is reason under

4     Terry to think that you can remove that item because it could

5     be a weapon.  And there was testimony offered at trial by

6     Federal Task Force Brownback that this type of item can conceal

7     a weapon.  So under Terry initially they were removing the

8     wallet, what turned out to be a wallet, to determine whether or

9     not that was a weapon as part of a Terry pat down.  It was at

10    this point, Your Honor, that it's undisputed Mr. King swings

11    around and flees.  So that's the pat down.  We believe that we

12    had a right under Terry to do everything that we did during

13    that piece of the encounter.

14         So then turning to the next portion, taking Mr. King

15    to the ground.  Did we have a right to do that?  And our

16    position is yes.  Absolutely.  When you're looking at excessive

17    force it's a standard of reasonableness here.  We are looking

18    at the severity of the crime, so here we had a felon, or

19    suspected felon that was who we believed the gentleman to be.

20         THE COURT:  What was the underlying felony of the guy

21    you were looking for?

22         MS. MAZZOCCO:  Home invasion.

23         THE COURT:  Okay.

24         MS. MAZZOCCO:  And then secondarily did we have an

25    immediate threat to the safety of others around.  Yes, we

1   believed so.  We had a fleeing felon who had admitted that he

2   had at least one weapon on him, the knife that was found during

3   the initial portion of the Terry search.

4          And the third point is did we have someone who was

5   actively resisting an arrest or fleeing, and, yes, we had both

6   of those things here.  We had a suspect who was fleeing.

7          So considered from the perspective of a reasonable

8   officer as excessive force requires us to do, we had a right to

9   take Mr. King to the ground.

10          Now, the next point is the process that was used to

11  subdue Mr. King and get him into cuffs.  Did we have a right to

12  do that?  And yes, we believe that we did.  First, let's

13  consider Agent Brownback's conduct.  There is no excessive

14  force to be had here, Your Honor.  They haven't identified any

15  particular action on the part of Officer Brownback that they

16  are objecting to.  He was engaged in the lower half of Mr. King

17  during the struggle trying to get the handcuffs on him while he

18  was flailing about.

19          So now let's turn to Task Force Officer Allen.  They

20  have identified principally two things that they object to in

21  Officer Allen's conduct.  The first is what they refer to as a

22  choke hold.  Now we would dispute the factual and in future we

23  would dispute whether or not a choke hold was applied.  But

24  even assuming that it was, Your Honor, let's assume that's what

25  happened.  It is acceptable to use a choke hold in this type of

1    scenario where you have a fleeing and resisting person as

2    Mr. King was here.  That's undisputed.  And then the second

3    piece is the --

4          THE COURT:  Isn't it disputed whether they identified

5    themselves as law enforcement officers?  Didn't Mr. King

6    indicate he did not hear any indication of that?

7          MS. MAZZOCCO:  The extent of the identification is

8    absolutely disputed, Your Honor.  Our folks will say that they

9    identified themselves as federal task officers and that they

10   were seeking to arrest a fugitive, et cetera.  Mr. King says

11   they did not use their words, they did not say those things;

12   that is his position.  But he does admit that they had their

13   badges.  Their badges were visible.  And the photographic

14   evidence that we have in this case, Your Honor, that was part

15   of the trial bears that out.  So everyone agrees that at the

16   very least their badges were visible.

17         And then we also have Mr. King initially complying

18   with the pat down.

19         So we believe that there is no question that Mr. King

20   knew that these were federal officers, whether he believed it

21   or not.

22         So --

23         THE COURT:  He knew it but he didn't believe it?

24         MS. MAZZOCCO:  Well, his position as I understand it,

25   Your Honor, is that he initially complied, and then when they

took his wallet out he thought they were robbing him and that

they were not federal officers.  But there is no dispute, Your

Honor, that the badges were visible, and that he also initially

complied with the pat down.

THE COURT:  It was dark when this happened, right?

MS. MAZZOCCO:  Broad daylight, Your Honor.

THE COURT:  Oh, I thought it was real early in the

morning.

MS. MAZZOCCO:  I believe it was broad daylight, middle

of the day.  I would have to look at the specific time.  I do

not believe it was twilight or early dawn hours.  Middle of the

day, Your Honor.

THE COURT:  Okay.

MS. MAZZOCCO:  I believe.  So then returning to the

second complaint in relation to Task Force Officer Allen's

conduct.  Now, that has to do with the punching.  So there what

happened was, and again this is undisputed, that Mr. King takes

a bite out of Officer Allen's arm, you know, so forcefully that

it went through several layers of clothing, and there is

substantial bruising on the officer's arm.  At that point when

the teeth clamp on the arm, Officer Allen does begin punching

Mr. King.  And as indicated in the trial, you know, as hard and

fast as he could because he needed Mr. King to release that

bite.

So there, again, when you have a person biting an

1    officer in that fashion, it is absolutely permissible to punch
2    them as hard and fast as you can.  Because that level of
3    resistance allows that reciprocal force by Officer Allen.  And
4    again we anticipate that the case law that we will cite to Your
5    Honor in our briefing will bear that out.
6            So then the next federal claim, the next moment in
7    time that we are looking at, is the malicious prosecution
8    claim.  And so here we believe that based on the undisputed
9    facts, there was probable cause to proceed with Mr. King's
10   trial here.  You have Mr. King saw a badge, he responded in
11   part, typical police behavior proceeding with a pat down, he
12   responded to what's your name, he responded to do you have ID,
13   to do you have a weapon?  He places his hands, you know, above
14   his head as one would expect, and then during the pat down when
15   they, you know, pull out the wallet he flees.  And then he
16   proceeds to struggle, bite Officer Allen, continue to try to
17   escape, et cetera.  You know, indeed he was struggling so
18   strongly that the two officers were not able to subdue him.  A
19   third party had to be brought in to help get this particular
20   individual handcuffed.  So we believe there is absolutely
21   probable cause to proceed with the state court proceedings that
22   they brought as to resisting arrest.
23           And so because there was probable cause there can be
24   no malicious prosecution claim under the Constitution.  And
25   that is true, notwithstanding the fact that Mr. King believes

1    that the officers lied as to, you know, identifying themselves

2    as officers.  Even if you take all of those facts out, probable

3    cause still exists.  And for that reason the malicious

4    prosecution claim cannot proceed.

5          So in short, Your Honor, we believe that none of the

6    prongs of qualified immunity can be refuted by the plaintiff.

7    There were no constitutional violations here; if there were

8    constitutional violations they were not clearly established,

9    and then the officers always behaved throughout in an

10   objectively reasonable manner.  So none of those three prongs

11   can be refuted by the plaintiff as the Sixth Circuit has laid

12   them out.

13         So then turning to the next set of claims, Your Honor.

14   The FTCA claims.  Why do we think that we prevail there.

15   Principally for two reasons:  The first reason being that the

16   common law protection that Michigan law provides to law

17   enforcement officers in this type of a scenario steps in here

18   and protects our officers.  This Court recently reached that

19   conclusion in the Valdez case that we have cited.  And the

20   question then becomes were these officers acting during the

21   normal course of their employment; we don't believe there is

22   any dispute to that here.  These were federal task force

23   officers acting to arrest someone that they believed was the

24   fugitive they were looking for.  Second, malice, wantonness, or

25   reckless indifference to the common dictates of humanity.

1    That's the second prong.  Again, for all the reasons we believe

2    that the conduct was constitutional, we believe that this

3    element cannot be satisfied.

4         And then the third point is whether or not their

5    actions were discretionary.  The Michigan case law bears out

6    the fact that when you are choosing to arrest someone and

7    engaging in those type of motions, these are discretionary

8    decisions on the part of the officers.  So we believe that

9    common law protection prevents the FTCA claims from proceeding

10   here.

11        And then turning to the specific tort claims, false

12   imprisonment, false arrest, assault and battery, malicious

13   prosecution, and intentional infliction of emotional distress,

14   we believe, and I can go into further detail if Your Honor

15   would like, that all of those claims fail because again we had

16   constitutional actors here.  You know, there was probable

17   cause.  This is not -- because they were acting in a

18   constitutional and acceptable manner for officers, this conduct

19   was not so outrageous that it reaches the level required for

20   intentional infliction of emotional distress claim.

21        THE COURT:  Okay.  Let me hear from the plaintiff,

22   please.

23        One second, I'm sorry.

24        MS. MAZZOCCO:  Yes, Your Honor.

25        THE COURT:  With regard to the stay issue on

1    discovery, what, if anything, what discovery if any is, would

2    be required or needed to, for the defendant, government, and

3    the two agents to fully proceed on this motion?

4            MS. MAZZOCCO:  Your Honor, I don't believe any

5    discovery would be required to respond to our motion, if that's

6    the question you're asking.

7            THE COURT:  I'm asking whether you need any discovery.

8            MS. MAZZOCCO:  Oh, we do not, Your Honor.

9            THE COURT:  All right.  Thank you.

10           MR. JAICOMO:  So I'll start where they started which

11   was with this issue of discovery, and qualified immunity, and

12   all that stuff.  As we said in our briefing response, the

13   Alspaugh case is very clear.

14           THE COURT:  Talk a little louder, and talk a little

15   slower, please.

16           MR. JAICOMO:  Sure, I apologize.  The Alspaugh case is

17   pretty clear here where it says when you have a well pleaded

18   claim of clearly established law, then discovery is not only,

19   is not only allowed but appropriate.  Here that's the case.  I

20   don't see any basis to conclude that there is no clearly

21   established law here.  We are talking about unreasonable search

22   and seizure and excessive force.  Those claims have been

23   clearly established under the Fourth Amendment; that's the

24   basis for our claims, so that issue until this morning was

25   undisputed.

1       With respect to the rest, everything they throw up

2  involves significant issues of material fact.  So for that

3  reason alone I don't think the motion to stay discovery should

4  prevail.

5       But turning to the substance of their proposed motions

6  to dismiss.

7       THE COURT:  Well, let's go back a minute.

8       MR. JAICOMO:  Sure.

9       THE COURT:  With regard to staying discovery, since we

10  haven't had a Rule 16 in this case yet, would you argue that

11  discovery ought to have no limitations, or that it should be

12  limited in some sense based on the fact that these motions go

13  ahead?

14       MR. JAICOMO:  I think based on the arguments that I'll

15  articulate here momentarily with respect to the fact that all

16  of their claims rise and fall on issues of fact that they ask

17  the Court to substitute their version of facts --

18       THE COURT:  You're going too fast again.

19       MR. JAICOMO:  That they ask the Court to substitute

20  their version of facts for ours, I think for that reason alone

21  there is no basis to stall discovery here because they have not

22  provided any legal argument for why these claims would be

23  dismissed or given summary judgment.

24       THE COURT:  So you would argue that there should be

25  unlimited discovery on any and all aspects of the litigation

1    while the motions are pending.

2            MR. JAICOMO:  Well, I would be more than happy to

3    discuss with opposing counsel and the Court what reasonable

4    limitations should be applied; for example, we haven't

5    requested at this point to depose the defendants.  We would

6    like to do that at some point.  I'm not suggesting that we

7    should be allowed to take any sort of potentially relevant

8    document at this point.  But I think the discovery requests

9    that we have outstanding are fairly limited.  And to the extent

10   that the Court thinks that it would be more reasonable to limit

11   them further, I would be more than happy to have that

12   discussion.

13           THE COURT:  You might be having it with Judge Carmody.

14   I think that probably would be the end result here.  Unless you

15   could reach some accord with defense counsel.

16           MR. JAICOMO:  Sure.

17           THE COURT:  Okay.  Go ahead.

18           MR. JAICOMO:  Turning to the substance of their

19   claims.  Starting with the 1983 claim.  I mean while they would

20   like to characterize this as or Detective Allen as a federal

21   task force officer, it's plain that he is a Grand Rapids police

22   detective; he filed a Grand Rapids police report after this

23   incident which was an arrest in Grand Rapids on a Michigan

24   warrant for a Michigan crime, which led to a Michigan criminal

25   trial and acquittal by a Michigan jury.  Based on those

1   undisputed facts alone, it's very clear that even though

2   Special Agent Brownback is an FBI agent, and even if Detective

3   Allen was properly deputized as a U.S. Marshal, they were still

4   operating under color of state law.

5          As the Sixth Circuit has held, it's your acts that

6   determine whether you are acting under color of state law, not

7   who employs you or what clothing you're wearing.  And that's

8   consistent with the language of 1983 which says acting under

9   color of state law.  So there are a number of cases where joint

10  actions between state and federal officers make the action fall

11  under state law.  I think here it's very clear that they did.

12  We have not seen a single piece of evidence other than bald

13  assertions that there was even an FBI investigation here, but

14  there is no federal crime that's ever been alleged with respect

15  to Mr. Davidson who was the suspect they were looking for.

16  Mr. King was never prosecuted for any federal crimes.  So I

17  think it's difficult to say that there are any facts to support

18  a claim that both Agent Brownback and Detective Allen don't

19  fall under 1983 under these circumstances, and even if there

20  are, it's all issues of fact for the jury to decide.

21         With respect to qualified immunity, again, as we

22  pointed out in our response to the premotion conference

23  request, every single step of the way involves issues of

24  material fact.  And moreover, a lot of the basis for which the

25  government would like to claim qualified immunity is

1    essentially them manufacturing after the particular segment of
2    the interaction backward looking retrospective probable cause.
3    So, for example, to say that because they witnessed him
4    resisting they had probable cause to arrest him.  Well, he
5    didn't resist until they had already violated his
6    constitutional rights in the first place.  And as also pointed
7    out in our response brief, under Michigan law it's a well-known
8    precept that you're allowed to resist an unlawful arrest which
9    is absolutely what was happening here.  But, for instance, the
10   other examples they bring out are the wallet.  So is the wallet
11   sufficient to establish this lying to a federal officer?
12        THE COURT:  Yeah, that's a little beyond the pale as
13   far as I'm concerned.  So you can go on from there.
14        MR. JAICOMO:  Sure.  I would just briefly also point
15   out that they have also used the wallet, at trial Special Agent
16   Brownback said that's a wallet.  And now we are talking about
17   well maybe was it a concealed weapon.  He thought it was a
18   wallet and that was the basis for all of this suspicion,
19   unfounded or not.
20        With respect to Mr. King fitting the description,
21   essentially he was just a white male in the area.  That's it.
22   It could have been me walking down the street in that, I think
23   there was a five or six-year age range, there was a seven-inch
24   height disparity.  There is -- and I can't say with certainty
25   but I'm pretty sure at least one of the officers at trial

1     admitted that he looks nothing like Erin Davidson, the suspect
2     of this crime.
3              So based on that alone, I don't think there was
4     reasonable suspicion for the Terry stop.  Which in fact at
5     trial they said it wasn't a Terry stop; they said we determined
6     that it was, this was Mr. Davidson and we had probable cause at
7     that point to make the arrest.  There wasn't probable cause
8     either.  He doesn't look anything like the guy.  He was just
9     walking down the street.  And these two strangers who look
10    nothing like cops, everyone is on agreement on that, I have a
11    picture here, it's one they attached to their first set of
12    premotion conference requests of the bite.  And it shows
13    Detective Allen in his black sports center T-shirt, no badges
14    in the picture, he's got a goatee, he is wearing a baseball
15    hat.  At the end of the day the reason these officers were
16    dressed like they were and they were driving a black SUV was so
17    people could not tell that they were police officers.  And so
18    now to flip that on its head and say Mr. King should have known
19    that these were cops, I think is just not supported by the
20    facts.  But in any case, raises an issue of fact with respect
21    to the entire chain of reasonable suspicion and probable cause.
22             So then that brings us to the actual use of force
23    against Mr. King.  It is undisputed that he thought he was
24    being mugged and turned to run.  Detective Allen tackled him.
25    Special Agent Brownback held his feet while Detective Allen

1   then choked Mr. King.  And to the extent that these facts are

2   disputed, they are issues of fact that need to be resolved by a

3   jury.  At that point Mr. King, fearing for his life, rightly

4   so, bit Detective Allen who he still thought was a mugger and

5   calling out to bystanders, please call 911, people, there is a,

6   there were witnesses who heard him calling 911, they called 911

7   on his behalf, they did not know that these are police

8   officers.  We do have some footage of the aftermath taken by

9   bystanders who they were literally screaming as the uniformed

10  officers show up.  He is not okay; they were pounding him, they

11  were being brutal, et cetera, et cetera.

12          I mean with respect to the emotional distress claim,

13  it's about as close in a real world scenario that you could

14  have an actual unbiased third party say outrageous.  There were

15  literally two women screaming in the faces of these cops what

16  you were doing was well beyond the pale.

17          So in any case, we also have Detective Allen's trial

18  testimony that he hit James as hard as he could, as fast as he

19  could, and as many times as he could.  Clearly there is an

20  issue of fact there as to whether that force was excessive

21  under these circumstances.

22          If you saw from the pictures in our complaint, James's

23  eyeballs turned black after this incident because of the

24  choking and the beating.

25          So I really don't see how there is any basis for

1    dismissal or summary judgment with respect to the excessive

2    force claim.

3            Some courts have considered deadly choke holds to be

4    deadly force.  I don't see how that could possibly be justified

5    here.

6            Turning to the malicious prosecution.  That's

7    predicated mostly on false statements by the officers that they

8    identified themselves, and in fact at trial Detective Allen

9    stated that when they approached Mr. King Special Agent

10   Brownback pulled out his wallet credential to show James, hey,

11   I'm an FBI agent.  And then when Special Agent Brownback took

12   the stand he said, no, I didn't do that and I would never do

13   that because when I'm approaching a suspect I want both my

14   hands to be free so I can do whatever I need to do.  So we know

15   that there were untruths told at the trial.  It's James's

16   position that these two never identified themselves as

17   officers.  And to the extent that any inference could be drawn

18   by these lanyard badges, first of all, there is no way that you

19   could assume that a bystander on the street would know that

20   they were federal agents even if they were supposed to assume

21   that these were officers.  But as I said earlier, these guys

22   were dressed in plain clothes.  They had goatees, baseball

23   caps, they were wearing jeans, they had a black SUV; nobody

24   knew that these were cops.  Even after the whole fight broke

25   out.

1        So I think that's neither here nor there.

2        With respect to the claim that Special Agent Brownback

3   had no excessive force claim against him, there is absolutely

4   an excessive force claim for someone who essentially holds your

5   arms behind their back while another person pummels them which

6   is effectively what happened here.  Brownback was holding

7   James's legs.  In any case, he was attempting to hold him still

8   while Detective Allen punched him in the face.

9        That's all.  Those are all my comments on the 1983

10  claim.  I'll turn to the FTCA claim unless you have any

11  questions.

12       THE COURT:  Okay.

13       MR. JAICOMO:  With respect to the FTCA claim, as we

14  acknowledge in our response, the Valdez case is a problem.  But

15  we think it's incorrectly decided, and it reaches essentially

16  an absurd outcome based on the language of the FTCA when it's

17  coupled with this common law governmental immunity issue.  And

18  the reason that is because the FTCA specifically says we want

19  to waive our governmental immunity for governmental actors

20  operating in the scope of their employment.  And then you apply

21  the Michigan common law governmental immunity and it has as its

22  element you have to be a governmental employee acting within

23  the scope of your employment.  So the very same actors doing

24  the very same things where the FTCA explicitly waives immunity

25  get to somehow incorporate the state law immunity even though

1    the FTCA applies the standards that would be applied to a

2    private person, not a government actor.

3             THE COURT:  Well, even under Valdez or Valdez, however

4    you pronounce it, which I think was Judge Jonker's opinion,

5    correct?

6             MR. JAICOMO:  That's correct.

7             THE COURT:  He cites the Sanders case which

8    establishes a two-prong test, if you will:  First, that the

9    officers were acting in good faith; but second, which is what

10   seems to be at issue here, is that the officers have reasonable

11   articulable grounds to believe that the suspect is the intended

12   arrestee.  Which I assume the plaintiff is arguing they could

13   not have under the fact situation.

14            MR. JAICOMO:  That's correct, Your Honor.

15            THE COURT:  So even if Valdez or Valdez applies, I'm

16   not sure it swings in the defendant's favor.

17            MR. JAICOMO:  I agree with you.  And I would also

18   point out that for the Valdez case for the governmental

19   immunity to apply they have to be operating in good faith.  We

20   have alleged bad faith here in several different respects,

21   among them the malicious prosecution, lies that were told, and

22   the intentional infliction of emotional distress claim.

23            So then turning to the tort issues again.  I've

24   already said this several times.  These are all issues of fact.

25   It's all he said, he said, they say he did this, he said they

1    did that; I just don't see how that's not an issue for the jury

2    to decide, Your Honor.

3              THE COURT:  Thank you.  Let me now hear from defendant

4    Morris's counsel, please.

5              MS. REWA:  Thank you, Your Honor.  The only claim

6    against Officer Morris is the malicious prosecution claim.

7    Frankly, under the four elements as articulated by the Sixth

8    Circuit, I can proceed without any evidence and prove that the

9    first element of the malicious prosecution cannot be met as a

10   matter of law.  And that is that Officer Morris aided, made,

11   decided, or influenced the prosecution.

12             The facts as alleged in the complaint, even if you

13   accept them as true, cannot establish that element and

14   therefore that claim will fail.

15             Now, one of the other elements in this cause of action

16   as articulated by the Sixth Circuit is the absence of probable

17   cause.  That would require in my estimation evidence that was

18   produced at trial, the trial transcript, to show that no

19   reasonable officer based on the evidence that was presented, no

20   reasonable officer in Officer Morris's position with the

21   interaction or lack of interaction that she had with the

22   criminal trial would have known that there was not probable

23   cause to continue the detention after the charge was made all

24   the way up to trial.

25             That's, that's the point really that is

1    Officer Morris's position.  I can proceed on a 12(b)(6) without

2    evidence, but to the extent the government is going to present

3    information like the criminal trial transcripts, trial

4    exhibits, things of that nature, I'm kind of making a me too

5    argument.  If it's already there, and the Court is already

6    going to look at it, I also want to make that argument for

7    Officer Morris so I can win on two prongs, not just one.  Do

8    you have any questions on that?

9         THE COURT:  I don't.

10        MS. REWA:  Okay.  As it pertains to, you know, what

11   are we calling this motion, what is the standard we are doing.

12   I think it makes sense that we look at Rule 56 now because in

13   my experience if you look at Rule 12(d) where if we are

14   bringing in evidence, either the federal defendants because

15   they have a subject matter jurisdiction, or we are litigating a

16   very specific aspect of the case like probable cause and

17   information that came out in the criminal jury trial, it makes

18   sense to make this determination now of the Court either giving

19   us notice for, okay, you know, the defendants have presented

20   this evidence but they filed a 12(b)(6).  I am now giving you

21   notice you have 30 days because I'm going to convert this into

22   a Rule 56.  In my experience, that's what has happened in the

23   past with motions I filed.  And so I'm kind of hoping we can

24   have this conversation now to sort of short circuit that so we

25   all know what standards the judge wants to rule on these

1    motions so there is no question of what the standards are going

2    to be for the determination of the dispositive motions.

3         And when we look at the discovery disputes.  You look,

4    for example, Rule 56(d) says, "When a dispositive motion is

5    filed and the nonmovant needs additional information in order

6    to overcome that motion, there is a procedure for that."  There

7    is a declaration or affidavit saying, I can't adequately defend

8    myself here against this dispositive motion because I don't

9    have XYZ.  I really haven't heard that yet from plaintiff.  But

10   I just hear everything is rife with questions of fact.  But

11   what are the material questions of fact that we need to know in

12   order to resolve this motion that we are proceeding or hoping

13   to proceed at this instant.  What does plaintiff need to

14   overcome our qualified immunity.  I did hear earlier today

15   trial transcripts.  Okay.  That's something that we can talk

16   about.  So what, what information, what documentation do they

17   need in order to look at the probable cause determination and

18   what people knew when in the course of the criminal trial.

19        And when we are talking particularly about malicious

20   prosecution claim, I think of all -- against all of the

21   defendant officers, I think it's appropriate to look at the

22   trial transcript, the trial documents; that's a discreet set of

23   information that's already established that we all can readily

24   have available to us and provide and produce.  I might be

25   speaking out of turn but I think we can provide trial

1   transcripts.  So let's litigate that, let's litigate within

2   this realm of this limited scope of what was probable cause

3   during the course of the trial.

4       So I guess I would ask the -- put the onus perhaps on

5   the plaintiff to tell us what does plaintiff need in order to

6   overcome or look at being able to defend against our

7   dispositive motions, particularly for those claims that are

8   necessarily tied in to what happened with the criminal trial.

9       THE COURT:  Well, I'm not sure that limitations on

10  discovery have to be quite that narrow.  If we're talking about

11  my case management discretion, I think it may be broader than

12  you suggest.  I have to think about that a little bit.  But I

13  do think that to say that the plaintiff has to specifically

14  delineate exactly what he needs in order to, just in order to

15  defend the motion, I'm not sure that the limitation has to be

16  that stringent.  I don't know.

17      MS. REWA:  I think when we are talking about the issue

18  of qualified immunity, so now again with things like malicious

19  prosecution, it's specific to the officers, it's immunity from

20  suit not just liability.  And so, you know, I would object to

21  having to turn over the GRPD officers's personnel files.  How

22  does that play into what we need now to decide these initial

23  issues of qualified immunity?  And so maybe what we all need to

24  do is kind of sit down and hash out, figure something out.  But

25  I think we, we need to recognize that the officers have a right

to qualified immunity to be determined at the earliest instance
in which it's possible.

Now there might be issues of fact that there are some
things that we are just going to have to litigate.  But I think
some of this, some of these issues, particularly the malicious
prosecution can be resolved very early on with little or no
discovery.

And I will note too that the case cited by plaintiff
in his response in opposition to the discovery brief, and I'm
looking particularly at page ID 189, this is the Alspaugh case,
A-L-S-P-A-U-G-H v McConnell, 643 F.3d 162, 2011.  So if you
read that entire case, what's interesting is in that instance
the government defendants did not allow any discovery.  They
did not produce any discovery against two of the claims that
this prisoner plaintiff brought.  It was an excessive force and
a deliberate indifference in medical care.  It was an Eighth
Amendment case.  The Court found that it was actually
inappropriate based on the facts of the case to rule on the 56
motion for excessive force because there were fact issues for
which discovery was needed so that plaintiff could defend
himself.

But as to the deliberate indifference, the defendants
could already establish as a matter of law that the medical
providers were not deliberately indifferent.  And so the Court
upheld the grant of the dispositive motion on that claim

1    because no amount of discovery was going to save that claim.

2    And I think that's the point here is I think all of

3    the defendants are arguing no amount of discovery is going to

4    save some or all of these claims.  That's certainly my position

5    with Officer Morris.  Particularly where we have as here

6    probable cause I think, and what any of the officers would have

7    known I think rises or falls on what happened at the trial.

8    Are there any further questions?

9    THE COURT:  Not from me, thank you.

10   MS. REWA:  Thank you.

11   THE COURT:  Can you tell me exactly what Officer

12   Morris did?

13   MR. JAICOMO:  Sure.  She instructed two bystanders

14   that they were required to delete footage of the incident.

15   It's very clear on the dash cam footage which only recorded her

16   voice, the car was not facing wherever she was standing, but

17   she clearly stopped two people who were there for the incident,

18   she stood with them and she said something along the lines of

19   no, no, no, we don't need pictures; we are going to tell the

20   story without pictures like we used to do.  And then she orally

21   talked them through deleting the footage and confirmed orally

22   on the tape that they had deleted the two videos.  And in so

23   doing, especially coupled with her statement, it's very clear

24   that her actions were intended to harm Mr. King and cover for

25   the officers who were involved.

1          THE COURT:  Okay.

2          MR. JAICOMO:  And with respect to discovery, I'll just

3     say that when the other side already concedes that some amount

4     of discovery is necessary, I agree with that.  I think, you

5     know, I'm not prepared to argue every jot and tittle of what we

6     need, but, for instance, we definitely would need all the

7     investigatory materials that led them to look for Mr. Davidson

8     and find instead Mr. King.  And all the things like that that

9     we don't have that's not in the trial.  The trial was conducted

10    by a prosecutor against James King.  It doesn't tell some

11    wonderful neutral story.  This was aimed at putting James in

12    prison for a decade.  So to say that we can rely solely on the

13    trial transcript I don't think.

14         THE COURT:  What was he charged with?

15         MR. JAICOMO:  He was charged with assaulting an

16    officer, for the FBI agent, assaulting an officer resulting in

17    bodily injury, for the Grand Rapids police detective, and then

18    assault with a dangerous weapon because they claimed, this is

19    another malicious prosecution basis, one or both of the

20    officers claimed that they were able to clasp one handcuff on

21    James's wrist at some point during this altercation, and that

22    he then attempted to use the handcuff as a weapon.  And, you

23    know, just saying that actually makes me want to point out, for

24    example, if the footage that Officer Morris hadn't ordered

25    destroyed still existed, we could probably see that James

1    wasn't using handcuffs as a dangerous weapon to harm these

2    officers.  So that claim goes out the window.

3             THE COURT:  Okay.  Thank you.  Rita, do you have any

4    questions that haven't been covered?

5             THE LAW CLERK:  No, thank you.

6             THE COURT:  Okay.  Well, I'm sorry.

7             MS. MAZZOCCO:  Your Honor, could we have a brief

8    response?

9             THE COURT:  Sure.

10            MS. MAZZOCCO:  Okay.  Thank you, Your Honor.  Very

11   briefly.  First of all, I just wanted to point out that neither

12   myself nor Officer Morris's counsel has conceded that discovery

13   is necessary to resolve these motions.  Plaintiffs have said

14   that oh, there are these issues of fact, but they haven't had a

15   chance to read our brief yet.  In our brief we will explain to

16   the Court why we are relying only on plaintiff's versions of,

17   version of these events and why because of that our folks are

18   entitled to be dismissed out of this case, Your Honor.  And

19   importantly, Alspaugh or any of the -- none of the other cases

20   that plaintiff cited in their motion to stay actually addressed

21   the issue of whether a stay ought to issue and decided that it

22   shouldn't.

23            The Sixth Circuit in none of those cases has addressed

24   that point in the cases that they are citing.  The cases that

25   we presented show the Court that whether or not we ultimately

1    prevail on the qualified immunity issue, we have a right to

2    have the Court look at our brief, look at the arguments, and

3    then make that determination before we are subjected to

4    discovery.

5            THE COURT:  Well, I guess I don't really agree with

6    that.  I think, again, that within my discretion to manage my

7    docket, I do have the power to deal with that issue before --

8    you may sit down --  before I've read your brief.  And

9    interestingly, Rita found an interesting case I think out of

10   the northern district of --  I think it's Northern District of

11   Ohio, it's unreported, admittedly, but it has some interesting

12   language, and Judge Breen, whom I know a little bit, I do have

13   considerable respect for, but he made the attempt to balance

14   that issue, the issue of whether discovery should proceed under

15   these circumstances.  And I think you might want to take a look

16   at that before you write your brief.  The case is Moore,

17   M-O-O-R-E, versus Henderson County Sheriff's Department, and

18   the 2014 Westlaw number is 1745017.

19           So here's what we're going to do.  First of all, I do

20   think that we can move ahead kind of on a dual track, if you

21   will, with the government and individual defendants, Brownback

22   and Allen, filing a joint brief in support of their motions, to

23   which the plaintiff then can obviously respond.  I think that

24   the Morris defendant should be a separate brief.  You know, we

25   may end up with a single opinion, probably will, but I just

1    think that it will be cleaner to proceed in that way.  The

2    issue of staying discovery, my sense is that it is something

3    that you need to try to hash out and probably will need Judge

4    Carmody's assistance doing that.  And I will say that I'm going

5    to grant it in part and deny it in part.  I'm not going to

6    allow, and I will talk with Judge Carmody about this if you all

7    can't decide what should be under that part of the order, but

8    the, I do think that, again, based on my docket needs to keep

9    this case moving that some discovery ought to be allowed to go

10   forward.  Now I did take a look at the interrogatories, or some

11   of the interrogatories, and requests that were filed.  And I

12   think Judge Carmody would agree with me, some of them are

13   reasonable and apt and some of them are clearly much too broad

14   to be considered, particularly at this stage of the

15   proceedings.

16        So all of that being said, the two defense briefs will

17   be required to be filed, to be served, the motions and briefs

18   within 28 days.  The plaintiff's two responses must be served

19   within 28 days of service of the defendant's briefs.

20   Defendants will then have 14 days to respond to the plaintiff.

21        If at all possible, it would be very helpful to have a

22   joint statement of undisputed material facts.  Now, it may not

23   be possible, I don't know.  It really does seem to me that

24   there are an awful lot of disputed facts here.  And how that

25   will play out in the briefing and decision on the motions, I'm

1    not sure.  But if you can come up with a paragraph by

2    paragraph, numbered paragraphs of facts that nobody disagrees

3    with, simple things like, Mr. King was walking down whatever,

4    Madison Avenue, at 3:00 o'clock in the afternoon of July 15,

5    2015.  Whatever the dates are.  But I think it does two things

6    to do that, to come up with an undisputed material fact

7    statement:  Number one, I think it helps you organize your own

8    thoughts, but number two it really helps us in drafting the

9    opinion.  It serves as kind of a back bone for the statements

10   of facts in the opinion that will come out.

11            Also, I would urge you to come up with a joint exhibit

12   book.  It seems to me that the exhibits here need not be

13   duplicated.  If you are going to, for instance, submit the

14   trial transcripts, please don't give me two.  And talk to one

15   another and collaborate with one another.  And as I say, on the

16   issue of the stay, if you can't agree then somebody is going to

17   have to get before Judge Carmody and get that sorted out.

18            One other thing about the briefing process, and that

19   is that after, and this will be for the individual defendants,

20   the two sets of defendants, once all of your briefs have been

21   exchanged and served on each other, then it is the moving

22   parties, the defendants's obligation to provide chambers with

23   courtesy hard copies of everything that has been exchanged.

24   You'll each be responsible to file electronically with the

25   court your various documents, and certainly your proofs of

1    service when you serve each other.  But the defendants do have

2    that additional duty to provide me with a bundle of everything

3    that has been filed in a particular part of the motion.

4             What have I left out, Rita?

5             THE LAW CLERK:  Do you want to confirm the answer

6    deadline is extended?

7             THE COURT:  Yes.

8             THE LAW CLERK:  Mention oral argument.

9             THE COURT:  Yes.  Answer deadline will be extended

10   until after a decision on the merits of the motions.

11            Do any of you have any questions, comments, concerns?

12            MS. MAZZOCCO:  Your Honor, the government would

13   respectfully request 45 days for our brief.  Mr. Cobb is going

14   to be in Africa, and then also due to the joint statement of

15   facts, we think it would be helpful to have a little bit more

16   time to get that ironed out so our brief can take that into

17   account as well.

18            THE COURT:  I think that's not unreasonable.

19            MS. MAZZOCCO:  Thank you, Your Honor.

20            MS. REWA:  Your Honor, may I ask clarification?  The

21   deadline for the joint statement of facts and joint exhibit

22   list would be the same day as the defendants's briefs?

23            THE COURT:  Correct.

24            MS. REWA:  That would be one global that would cover

25   all of the defendants's briefs filed.

1     THE COURT:  That would be delightful.

2     MS. REWA:  We will try our hardest, Your Honor.

3     THE COURT:  Great.  Good to hear.

4     MR. PORTINGA:  Your Honor, can I ask about timing on

5     the discovery issue?  I understand the Court has denied the

6     motion to stay in part, granted it in part, and we are going to

7     confer on that.  But our discovery was served more than 30 days

8     ago so the time is up.  We want to make sure this doesn't drag

9     on too long.  Can we have some sort of schedule to both confer

10    on this and get in front of Judge Carmody if we are not able to

11    resolve this?

12    THE COURT:  That's fair enough, Mr. Portinga.  I think

13    that 21 days to see if you can collaborate, and if not, then

14    28 days to, well, that's not very much.  35 days to get in

15    front of Judge Carmody.  What you might do is get on her

16    calendar now just in the event that you can't come up to some

17    agreement.

18    MR. PORTINGA:  Thank you, Your Honor.

19    THE COURT:  On discovery.  Anything else?

20    MS. MAZZOCCO:  Your Honor, to that point I just wanted

21    to make sure I understood the scope of the granting in part of

22    the motion to stay discovery.  Is what Your Honor is intending

23    to do to limit discovery to qualified immunity issues only?

24    THE COURT:  No.

25    MS. MAZZOCCO:  Okay.

1          THE COURT:  Anything else?

2          MS. MAZZOCCO:  Then, Your Honor, what is the scope of

3     the ruling?  I'm not sure where we are to draw the line.

4          THE COURT:  Well, again, I think that is --  it's my

5     attempt to punt the issue, and to encourage you to try to limit

6     yourselves to the extent that you can agree and if not, then to

7     --  I'm not giving unfettered discovery.  I don't want to see

8     any attempts to go taking numerous depositions and so on and so

9     forth.  But I think that, again, my purpose is to keep this

10    case moving because if a stay is granted at this point we are

11    going to be dragging this out for heaven knows how long.  So

12    see if you can't among all six of you reach some reasonable

13    accord, and if not, then Judge Carmody will do it for all of

14    us.  Okay.

15         MS. MAZZOCCO:  Thank you, Your Honor.

16         MR. JAICOMO:  Thank you, Your Honor.

17         THE COURT:  Thank you all for your presentations.

18    They were very helpful, and I'm hopeful that the briefing will

19    be as well.  Good.  Thank you.  We are adjourned.

20         THE LAW CLERK:  All rise, please.  Court is adjourned.

21         (Proceedings concluded, 11:04 a.m.)

22

23

24

25

REPORTER'S CERTIFICATE


        I, Kathy J. Anderson, Official Court Reporter for the

United States District Court for the Western District of

Michigan, appointed pursuant to the provisions of Title 28,

United States Code, Section 753, do hereby certify that the

foregoing is a full, true and correct transcript of the

proceedings had in the within entitled and numbered cause on

the date hereinbefore set forth; and I do further certify that

the foregoing transcript has been prepared by me or under my

direction.



                        /s/ Kathy J. Anderson

                        Kathy J. Anderson, RPR, FCRR

                        U.S. District Court Reporter

                        412 Federal Building

                        Grand Rapids, Michigan   49503