## UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  February 25, 2019

Mr. Ryan David Cobb
Office of the U.S. Trustee
330 Ionia, N.W., Suite 202 The Law Building
Grand Rapids, MI 49503-0000

Mr. Patrick M. Jaicomo
Mr. David A. Portinga
Miller Johnson, 45 Ottawa Avenue, S.W., Suite 1100
Grand Rapids, MI 49503

Ms. Nicole Lynn Mazzocco
Office of the U.S. Attorney, P.O. Box 208
Grand Rapids, MI 49501

Mr. Michael Shih
Mr. Mark B. Stern
U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Re:  Case No. 17-2101, *James King v. USA, et al*
      Originating Case No. : 1:16-cv-00343

Dear Counsel,

   The court today announced its decision in the above-styled case.

   Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. Thomas Dorwin

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0027p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

───────────────

JAMES KING,

*Plaintiff-Appellant,*

*v.*                                                              No. 17-2101

UNITED STATES OF AMERICA, et al.,

*Defendants,*

DOUGLAS BROWNBACK; TODD ALLEN,

*Defendants-Appellees.*

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:16-cv-00343—Janet T. Neff, District Judge.

Argued: August 1, 2018

Decided and Filed: February 25, 2019

Before: BOGGS, CLAY, and ROGERS, Circuit Judges.

───────────────

### COUNSEL

**ARGUED:** D. Andrew Portinga, MILLER JOHNSON, Grand Rapids, Michigan, for Appellant. Michael Shih, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** D. Andrew Portinga, Patrick M. Jaicomo, MILLER JOHNSON, Grand Rapids, Michigan, for Appellant. Michael Shih, Mark B. Stern, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

CLAY, J., delivered the opinion of the court in which BOGGS, J., joined. ROGERS, J. (pp. 28–32), delivered a separate dissenting opinion.

---

## OPINION

---

CLAY, Circuit Judge.  James King ("Plaintiff") appeals the district court's order granting summary judgment[1] for Officers Todd Allen and Douglas Brownback (together "Defendants") on Plaintiff's Fourth Amendment claims arising under 42 U.S.C. § 1983 or, alternatively, under the implied right of action set forth in *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971).  The district court also granted summary judgment for two additional defendants, including the United States, who are not parties to this appeal.  With respect to Plaintiff's § 1983 or *Bivens* claims, this Court **REVERSES** the judgment of the district court for the reasons set forth below.

## BACKGROUND

### A.  Factual History

On July 18, 2014, Defendants were searching for a criminal suspect named Aaron Davison.  Police believed that Davison had committed felony home invasion, and the State of Michigan had issued a warrant for his arrest.  Defendants were members of a "joint fugitive task force between the FBI and the City of Grand Rapids."  (R. 30 at PageID #108.)  Defendant Allen was a detective with the Grand Rapids Police and had been assigned to the FBI task force full-time.  Defendant Brownback was a special agent with the FBI.  Neither officer was wearing a uniform as they conducted their search, but both of them were wearing lanyards with their badges displayed over their plainclothes.

Defendants knew that Davison was a 26 year-old white male between 5′10″ and 6′3″ tall with glasses; short, dark hair; and a thin build.  Defendants also knew that Davison had a habit of

---

[1]The district court stated that it was dismissing Plaintiff's claims "under Federal Rule[] of Civil Procedure 12(b)(1) and (b)(6)," but that it was also granting summary judgment for Defendants "to the extent the Court deems it necessary to review [Defendants'] arguments under Rule 56."  (R. 91 at PageID #1006.)  Because the district court did not explain this ambiguity in its ruling, and because the district court explained that its decision "relies on [the parties'] Joint Statement of Facts . . . unless otherwise indicated," (*id.* at 1002), the Court treats the district court's ruling as a grant of summary judgment for Defendants.

buying a soft drink from a particular gas station every day between 2:00 p.m. and 4:00 p.m.  And Defendants had two photographs of Davison.  In the first photograph, the lighting was so dark that Davison appeared as the silhouette of a man playing electric guitar.  The second photograph, a driver's license photo, showed Davison's face clearly, but the photo was seven years old at the time of the search.

Around 2:30 p.m., Defendants saw Plaintiff walking down the street in an area near the gas station where Davison was known to buy his daily soft drinks.  Although Plaintiff was actually a 21-year-old college student who was walking between his two summer jobs, Defendants thought Plaintiff might be their suspect because Plaintiff was a young white male between 5′10″ and 6′3″ and was wearing glasses.  From their unmarked vehicle, Defendants studied Plaintiff's face and decided that there was a "good possibility" that he was Davison. (R. 73 at Page ID #429–30.)  Defendants parked near Plaintiff and approached him. According to Plaintiff, Defendants never identified themselves as police officers.  But Defendants assert that Allen identified himself as a police officer when he first approached Plaintiff.

Defendants started asking Plaintiff questions.  They asked Plaintiff who he was, and Plaintiff truthfully answered that his name was James.  Defendants then asked Plaintiff for identification, and Plaintiff said that he had none.  Defendants told Plaintiff to put his hands on his head and to face their vehicle.  Plaintiff later testified that he complied because Defendants "had small badges around their chest, and [he] assumed [Defendants had] some sort of authority."  (*Id.* at PageID #474, 477.)  Defendants asked Plaintiff if he was carrying any weapons, and Plaintiff told them that he had a pocketknife.  Detective Allen removed the pocketknife from Plaintiff's pocket, commented on the size of Plaintiff's wallet, and then removed that, too, from Plaintiff's pocket.  Plaintiff asked, "[a]re you mugging me?" and attempted to run away, but Detective Allen tackled him, grabbed Plaintiff's neck, and pushed him to the ground.  (*Id.* at PageID #474.)  Plaintiff yelled for help and begged passersby to call the police.  Detective Allen then put Plaintiff in a chokehold, at which point, Plaintiff claimed, he lost consciousness.  Several seconds later, when Plaintiff came to, he bit into Detective Allen's arm.  Detective Allen then started punching Plaintiff in the head and face "as hard as [he] could, as fast as [he] could, and as many times as [he] could."  (*Id.* at PageID #433.)  Plaintiff attempted

to escape and to fight back and eventually released his bite. But he could not get away; the fight continued for over sixty seconds.

As Detective Allen continued to punch Plaintiff in the head and face, several bystanders called the police and began filming the incident. Numerous police officers arrived on the scene, one of whom ordered the bystanders to delete their videos because the videos could reveal the identities of undercover FBI agents. Some of the bystanders deleted their videos, and footage of the actual altercation was never discovered. The surviving footage from immediately after the incident includes one bystander who can be heard saying, "I was worried. . . . They were out of control pounding him. . . . They were pounding his fa--head for no reason; they were being brutal." (Ex. 6, Timestamp 0:47–1:11.) A bystander who called 911 told the operator "[t]hey're gonna kill this man. . . . We can't see the victim now. They're over top of him. They look like they're suffocating him. . . . I understand they have badges on, but I don't see no undercover police cars, no other—backup, no nothing." (Ex. 18, Timestamp 1:43–3:21.)

Plaintiff was transported from the scene to the emergency room, where he received medical treatment. The emergency room doctors concluded that Plaintiff's injuries did not require him to be admitted for further treatment, and they released him with a prescription for painkillers. Upon Plaintiff's discharge, police arrested him and took him to Kent County Jail. Plaintiff spent the weekend in jail before posting bail and visiting another hospital for further examination. Prosecutors pursued charges against Plaintiff, but a jury acquitted him of all charges.

**B. Procedural History**

Plaintiff brought this suit alleging that Defendants violated his clearly established Fourth Amendment rights by conducting an unreasonable seizure and by using excessive force. Plaintiff also asserted a claim against the United States. The district court found that it lacked subject-matter jurisdiction to hear Plaintiff's claim against the United States, and it granted summary judgment for Defendants on the basis that Defendants are entitled to qualified immunity. Plaintiff then filed this timely appeal of his claims against Defendants.

## DISCUSSION

### A. The Federal Tort Claims Act Judgment Bar Does Not Preclude Plaintiff's Claims Against Defendants

The Court requested supplemental briefing on whether the judgment bar of the Federal Tort Claims Act ("FTCA"), *see* 28 U.S.C. § 2676, prohibits Plaintiff from maintaining his § 1983 or *Bivens* claims against Defendants. After considering the parties' arguments and examining the governing statutes and case law, the Court concludes that the FTCA does not preclude Plaintiff's claims.

#### 1. Analysis

##### a. Standard of Review

This Court reviews the application of the FTCA judgment bar *de novo*. *See United States v. Kuehne*, 547 F.3d 667, 678 (6th Cir. 2008) ("Because this issue is a matter of statutory interpretation, we conduct *de novo* review." (quoting *United States v. VanHoose*, 437 F.3d 497, 501 (6th Cir. 2006))).

##### b. Relevant Legal Principles

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) (citing *Loeffler v. Frank,* 486 U.S. 549 (1988)). Sovereign immunity is jurisdictional in nature. *Id.*

"In 1946, Congress passed the FTCA, which waived the sovereign immunity of the United States for certain torts committed by federal employees." *Id.* at 475–76. The FTCA's waiver provides "subject matter jurisdiction for plaintiffs to pursue state law tort claims against the United States." *Milligan v. United States*, 670 F.3d 686, 692 (6th Cir. 2012) (citing 28 U.S.C. § 1346(b)(1)). "Section 1346(b) [of the FTCA] grants the federal district courts jurisdiction over a certain category of claims for which the United States has waived its sovereign immunity and 'render[ed]' itself liable." *Meyer*, 510 U.S. at 477 (quoting *Richards v. United States*, 369 U.S. 1, 6 (1962)). "A claim comes within this jurisdictional grant" only if it is:

[1] against the United States, [2] for money damages, . . . [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

*Id.* (quoting 28 U.S.C. § 1346(b)).  If a claim fails to satisfy these six elements, it is not "cognizable" under § 1346(b) and does not fall within the FTCA's "jurisdictional grant."  *Id.*

The FTCA's judgment bar provision precludes a plaintiff from bringing additional claims concerning the "same subject matter" as an FTCA claim after judgment is entered on the FTCA claim.  28 U.S.C. § 2676.

"A dismissal for lack of subject-matter jurisdiction does not trigger the § 2676 judgment bar.  Put bluntly, in the absence of jurisdiction, the court lacks the power to enter judgment." *Himmelreich v. Fed. Bureau of Prisons*, 766 F.3d 576, 579 (6th Cir. 2014); *see also Meyer*, 510 U.S. at 478 (holding that if a claim "is not cognizable under § 1346(b), the FTCA does not constitute [a plaintiff's] 'exclusive' remedy" because the FTCA's judgment bar does not apply).

### c.  Application to the Matter at Hand

As explained below, the district court dismissed Plaintiff's FTCA claim for lack of subject-matter jurisdiction. Because the district court did not reach the merits of Plaintiff's FTCA claim, the FTCA's judgment bar does not preclude Plaintiff from pursuing his claims against Defendants.

"The FTCA waives sovereign immunity where state law would impose liability against a private individual." *Milligan*, 670 F.3d at 692 (citing *Myers v. United States*, 17 F.3d 890, 894 (6th Cir. 1994)).  Under Michigan law, a government employee is entitled to qualified immunity for intentional torts if he or she establishes that:

(1) the employee's challenged acts were undertaken during the course of employment and that the employee was acting, or reasonably believed he was acting, within the scope of his authority, (2) the acts were undertaken in good faith, and (3) the acts were discretionary, rather than ministerial, in nature.

*Odom v. Wayne Cty.*, 760 N.W.2d 217, 218 (Mich. 2008) (adopting test articulated in *Ross v. Consumers Power Co.*, 363 N.W.2d 641 (Mich. 1984)).  The district court found that Plaintiff failed to satisfy the *Odom/Ross* test.  According to the district court, the undisputed facts indicated that Defendants' conduct occurred during the course of their employment and within the scope of their authority, was not undertaken with the requisite malice required under Michigan law, and was discretionary.  (Dist. Ct. Op. at PageID #1029–30.)  Because Plaintiff failed to state a claim against the United States under Michigan law, the district court held that the United States was "entitled to immunity under the FTCA."  (*Id.* at PageID #1030.)

The FTCA does not bar Plaintiff from maintaining his claims against Defendants because the district court lacked subject-matter jurisdiction over Plaintiff's FTCA claim.  Plaintiff failed to satisfy the sixth element of the *Meyer* test—he failed to allege a claim "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  *Meyer*, 510 U.S. at 477.  Because Plaintiff failed to state a FTCA claim, his claim did not fall within the FTCA's "jurisdictional grant."  *Id.*  And because the district court lacked subject-matter jurisdiction over Plaintiff's FTCA claim, the district court's dismissal of his FTCA claim "does not trigger the § 2676 judgment bar."  *Himmelreich*, 766 F.3d at 579.

Few circuit courts of appeals have addressed whether the FTCA's judgment bar applies when a district court dismisses a plaintiff's FTCA claims for lack of subject-matter jurisdiction.  But the D.C. Circuit reached the same conclusion that this Court reaches here—the FTCA's judgment bar does not apply to dismissals for lack of subject-matter jurisdiction.  *See Atherton v. Jewell*, 689 F. App'x 643, 644 (D.C. Cir. 2017) (holding that because the district court "correctly determined that it lacked subject-matter jurisdiction" under the FTCA, the FTCA's judgment bar "is not a basis for the denial of appellant's motion to amend the complaint" to include a *Bivens* claim) (citing *Simmons v. Himmelreich*, 136 S. Ct. 1843, 1847–49 (2016)).  The Ninth Circuit reached a similar conclusion in *Pesnell v. Arsenault*, 543 F.3d 1038 (9th Cir. 2008), *abrogated by Simmons v. Himmelreich*, 136 S. Ct. 1843 (2016), where it held that the FTCA's judgment bar did not preclude a plaintiff from pursuing *Bivens* claims after the district court dismissed his FTCA claims for lack of subject-matter jurisdiction.  *Arsenault*, 543 F.3d at 1041.  However, the

Ninth Circuit stated that the plaintiff's *Bivens* claims "are barred to the extent that they rest upon the same misrepresentations alleged" in the FTCA action dismissed for lack of subject-matter jurisdiction. *Id.* at 1042. This holding is clearly wrong. If a federal court lacks subject-matter jurisdiction, it lacks the power to hear a case. *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868). Therefore, its dismissal for lack of subject-matter jurisdiction does not have any preclusive effect. *Himmelreich*, 766 F.3d at 580.

The government contends that the district court denied Plaintiff's FTCA claim on the merits because it found that Defendants failed to act with malice as required to defeat qualified immunity under Michigan law. The Court rejects this argument. The district court could not, as a matter of law, decide the merits of Plaintiff's FTCA claim—it lacked subject-matter jurisdiction over that claim. *Himmelreich*, 766 F.3d at 580. It is true that the district court analyzed Michigan law to determine whether Plaintiff stated a FTCA claim. But stating a claim under state law is a *jurisdictional prerequisite* without which the FTCA's waiver of sovereign immunity does not apply. *Meyer*, 510 U.S. at 477. Therefore, the district court's conclusion that Plaintiff failed to state a claim under Michigan law was not a disposition on the merits. In fact, it was the opposite—it *precluded* the district court from exercising subject-matter jurisdiction over the FTCA claim and *prevented* the district court from reaching a decision on the merits. *Haywood v. Drown*, 556 U.S. 729, 755 (2009) ("Subject-matter jurisdiction determines only whether a court has the power to entertain a particular claim—a condition precedent to reaching the merits of a legal dispute."); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." (quoting *McCardle*, 74 U.S. (7 Wall.) at 514)).

The Supreme Court's opinion in *Simmons v. Himmelreich*, 136 S. Ct. 1843 (2016), does not change the result. In *Simmons*, the Supreme Court affirmed the Sixth Circuit's ruling and held that the judgment bar does not apply where an FTCA claim was dismissed because it fell within an enumerated "[e]xception." *Id.* at 1845. While *Simmons* was decided on narrower grounds than *Himmelreich*, it does not conflict with the unequivocal rule in this Circuit that

"[a] dismissal for lack of subject-matter jurisdiction does not trigger the § 2676 judgment bar." *Himmelreich*, 766 F.3d at 579.

Defendants argue that footnote 5 in *Simmons* supports their position.  This argument fails to persuade the Court.  Footnote 5 explains that "the [FTCA's] judgment bar provision functions in much the same way" as the "common-law doctrine of claim preclusion."  *Simmons*, 136 S. Ct. at 1850 (internal citations and quotations omitted).  It is well-established that "a dismissal for a lack of subject-matter jurisdiction carries no preclusive effect."  *Himmelreich*, 766 F.3d at 580 (citing *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 382 (1985)).  Thus, Defendants fail to appreciate that footnote 5 actually undermines their argument: because the district court dismissed Plaintiff's FTCA claim for lack of subject-matter jurisdiction, its dismissal does not carry any preclusive effect.  *See id.*  Therefore, under the logic of footnote 5, the FTCA judgment bar does not prevent Plaintiff from pursuing his claims against Defendants.

The cases that Defendants rely on are inapposite.  In *Harris v. United States*, 422 F.3d 322 (6th Cir. 2005), the district court rejected the plaintiff's FTCA claim on the merits after a bench trial.  *Id.* at 324.  This Court held that the FTCA's judgment bar precluded further adjudication of the plaintiff's *Bivens* claims against the individual defendants. *Id.* at 324–25.  In *Serra v. Pichardo*, 786 F.2d 237 (6th Cir. 1986), the district court granted judgment for the plaintiff on the merits of his FTCA claim.  *Id.* at 237.  This Court held that the decision on the merits prevented the plaintiff from maintaining a *Bivens* action against the individual defendants. *Id.* at 238. Defendants' analogy to *Harris* and *Serra* fails.  Here, unlike in those cases, the district court did not reach the merits of the FTCA claim.

## 2.  Conclusion

Because the district court dismissed Plaintiff's FTCA claim for lack of subject-matter jurisdiction, the FTCA's judgment bar provision does not preclude Plaintiff from pursuing his remaining claims against Defendants.

No. 17-2101                          *King v. United States*                          Page 10

## B.  Qualified Immunity Does Not Shield Defendants

### 1.  Standard of Review

This Court "review[s] a grant or denial of summary judgment *de novo*, using the same Rule 56(c) standard as the district court." *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In deciding a motion for summary judgment, this Court views the factual evidence and draws all reasonable inferences in favor of the non-moving party. *Nat'l Enters. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997).  In order to defeat a motion for summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact.  *Klepper v. First Am. Bank*, 916 F.2d 337, 341–42 (6th Cir. 1990) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### 2.  Analysis

Plaintiff argues that the district court erred when it granted summary judgment for Defendants because the evidence leaves material facts in dispute as to whether Defendants are entitled to qualified immunity.  The doctrine of qualified immunity shields government officials "from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The qualified immunity analysis involves a two-step inquiry: (1) whether, viewing the record in the light most favorable to the plaintiff, a constitutional right has been violated; and (2) whether the right at issue was "clearly established" at the time the constitutional violation occurred.  *Id.*

The Court will first analyze qualified immunity in the context of Plaintiff's unreasonable search and seizure claims.  The Court will then turn to Plaintiff's excessive force claims.  As explained below, the district court erred by finding that qualified immunity shielded Defendants in regard to both sets of claims.

### a.  Unreasonable Search and Seizure Claims

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"  U.S. Const. amend. IV.  "A warrantless search or seizure is '*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'"  *United States v. Roark*, 36 F.3d 14, 17 (6th Cir. 1994) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  The Supreme Court has identified three types of reasonable, and thus permissible, warrantless encounters between the police and citizens: (1) consensual encounters, which may be initiated by a police officer based on a mere hunch or without any articulable reason whatsoever; (2) investigative stops (or *Terry* stops), which are temporary, involuntary detentions that must be predicated upon "reasonable suspicion;" and (3) arrests, which must be based upon "probable cause."  *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008) (citing *United States v. Alston*, 375 F.3d 408, 411 (6th Cir. 2004)).  Under this framework, an individual is free "to ignore the police and go about [his or her] business," *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000), unless a police officer has at least reasonable suspicion that the individual has committed, or is about to commit, a crime.  *See Family Serv. Ass'n ex rel. Coil v. Wells Twp.*, 783 F.3d 600, 604 (6th Cir. 2015).

In this case, Plaintiff argues that Defendants acted unreasonably when they (1) performed an investigative stop, (2) performed a protective search, and (3) stopped Plaintiff's attempt to run away.  The Court analyzes each argument in turn.

### i.  *Reasonableness of the Investigative Stop*

As a threshold matter, Defendants could have arrested Plaintiff without running afoul of the Fourth Amendment if they had reasonably mistaken Plaintiff for Davison.  "Arrest warrants in the hands of a police officer, unless facially invalid, are presumed valid."  *Fettes v.*

*Hendershot*, 375 F. App'x 528, 532 (6th Cir. 2010). "[P]olice and correction employees may rely on facially valid arrest warrants even in the face of vehement claims of innocence by reason of mistaken identity or otherwise." *Masters v. Crouch*, 872 F.2d 1248, 1253 (6th Cir. 1989) (citing *Baker v. McCollan*, 443 U.S. 137, 145 (1979)). "[W]hen the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest." *Hill v. California*, 401 U.S. 797, 802 (1971) (internal citations and quotation marks omitted); *see also Fettes*, 375 F. App'x at 532; *Ingram v. City of Columbus*, 185 F.3d 579, 595 (6th Cir. 1999).

But Defendants do not argue that they reasonably mistook Plaintiff for Davison. Instead, they argue that they reasonably *suspected* that Plaintiff *might be* Davison, thereby justifying an investigative stop.[2] "[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *United States v. Hensley*, 469 U.S. 221, 229 (1985). Reasonable suspicion is:

> more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard. If an officer possesses a particularized and objective basis for suspecting the particular person . . . based on specific and articulable facts, he may conduct a *Terry* stop.

*Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)) (citations and internal quotation marks omitted).

Defendants assert that they had reasonable suspicion to believe that Plaintiff was Davison. However, the undisputed facts do not show that the officers' suspicion was reasonable under the totality of the circumstances. The foundation of Defendants' suspicion was a physical description of Davison, which described him as a 26-year old white male with a height between 5′10″ and 6′3″, short dark hair, glasses, and a thin build. But given the broad swath of the population that matches this physical description and the requirement that reasonable suspicion

---

[2]The parties dispute whether the encounter between Plaintiff and Defendants began as an investigative *Terry* stop or instead as a consensual encounter, but this dispute is ultimately inconsequential because, as explained *infra*, there is a genuine dispute of material fact as to whether the officers had reasonable suspicion, even by the point that the encounter escalated to what was alleged to constitute a *Terry* stop.

be based on a "particularized and objective basis for suspecting [a] *particular* person," *Dorsey*, 517 F.3d at 395 (emphasis added), this physical description of Davison alone would not have given Defendants a reasonable suspicion that *anyone*, let alone Plaintiff, was Davison.

Building on their physical description of Davison, the officers had information about one of Davison's habits. Defendants knew that "[a]lmost every day between 2:00 pm and 4:00 pm, he bought a soft drink from the Shell gas station at the intersection of Leonard Street and Alpine Avenue." (Def. Br. 3–4.) This information arguably could have provided Defendants with a reasonable basis to detain and request identification from any individual who matched Davison's physical description and bought a soft drink consistent with Davison's habit. *See Family Serv. Ass'n*, 783 F.3d at 604 (explaining that officers may request identification if relevant to purpose of *Terry* stop); *United States v. Orsolini*, 300 F.3d 724, 730 (6th Cir. 2002) ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983))). But that is not what happened. Defendants cite no evidence to show that Plaintiff bought a soft drink or even entered the relevant gas station, which was located at the intersection of Leonard and Alpine Streets. Rather, Defendants say that they merely found Plaintiff "*near* the intersection of Leonard and Alpine" at 2:30 p.m. while Plaintiff was "walking down Leonard Street." (Def. Br. at 4.) In fact, Plaintiff was several blocks away from the relevant intersection. Thus, Defendants could not have mistaken Plaintiff for Davison based, in part, on Davison's habit. Although Defendants found Plaintiff in the general neighborhood where they thought Davison might be found, Defendants also do not cite any cases suggesting that officers may detain everyone in an entire neighborhood who matches the vague physical description of a criminal suspect. Fourth Amendment case law has clearly established the contrary. *See Dorsey*, 517 F.3d at 395.

Further building on their description of Davison, the officers had two photographs:

 

The first of these photographs depicts the silhouette of a man playing an electric guitar. The man is wearing sunglasses, his head is tilted downward, and there is insufficient light to discern identifying characteristics. This photograph adds nothing to the physical description of Davison and therefore did not provide additional support for the *Terry* stop.

The second photograph—a 2007 driver's license photo—depicts Davison's face clearly. Obviously, Plaintiff, whose photograph appears below, is not a match to the driver's license photo:



Defendants admit that they "did not know how Mr. Davison looked in 2014," (R. 74-1 at PageID #610), but they suspected that he "look[ed] more like the [silhouette] photo" than the driver's license photo.  (R. 73 at PageID #428).  Defendants' theory seems to be that they could have detained anybody who remotely resembled Davison's old driver's license photograph, given that Davison could have changed his appearance in the intervening seven years.   But whether Plaintiff resembles the photograph is a question of fact.   *See Ingram*, 185 F.3d at 596 ("[A] genuine issue of fact existed as to whether the officers' mistake in identifying [the plaintiff] as [a particular fugitive] was a reasonable one."); *Thomas v. Noder-Love*, 621 F. App'x 825, 830 (6th Cir. 2015) ("[D]eciding whether the man in the Footage Photo and the man in the Booking Photo looked similar in appearance . . . raises issues of fact that are only properly resolvable at trial.").   A jury could reasonably conclude that Plaintiff bears no resemblance whatsoever to Davison's driver's license photograph, in which case the photograph could not have supported reasonable suspicion for a *Terry* stop.

Finally, Defendants assert that their reasonable suspicion was cemented when Plaintiff "declined to supply has last name and denied possessing any identification."  (Def. Br. 21.)  But there is no evidence in the record to show that Defendants asked Plaintiff for his last name, so he could not have "declined" to provide it.[3]   Moreover, it would not have been suspicious, as a matter of law, for Plaintiff to refuse to cooperate with Defendants' investigation.   *Family Serv. Ass'n*, 783 F.3d at 604 ("Refusing to answer an officer's questions during an officer's attempt to conduct a consensual encounter does not create reasonable suspicion for a *Terry* stop.").   Thus, unless Defendants already had reasonable suspicion that Plaintiff was Davison when they approached him, Plaintiff's simple refusal to cooperate was not suspicious and could not provide grounds for a *Terry* stop.   *See id.*

Thus, under the totality of the circumstances, the following factors supported Defendants' suspicion that Plaintiff was Davison: Plaintiff matched a rather incomplete physical description

---

[3]Plaintiff also argues that Defendants' suspicion, if any, should have been dispelled when Plaintiff stated that his name was "James" because the suspect's name was not James.  But if Defendants reasonably suspected that Plaintiff matched the photo of Davison, Defendants were not required to believe Plaintiff's assertions that his name was James.  *See Masters*, 872 F.2d at 1253.  As further explained in this opinion, Plaintiff's response to being asked for his name was largely inconsequential—unless, of course, his answer had been "Aaron."

of Davison that did not include any defining characteristics; Defendants saw Plaintiff walking during the afternoon in a neighborhood near where Davison was known to buy soft drinks in the afternoon, but Plaintiff had not purchased a soft drink; and Defendants may have reasonably suspected that Plaintiff resembled a seven-year-old driver's license photograph of Davison—or a photograph that did not show Davison's face.   The first two factors together could not have provided a "particularized and objective basis for suspecting [a] particular person," because they could describe any number of people in the neighborhood where Plaintiff was walking.   *See Dorsey*, 517 F.3d at 395.   Thus, under clearly established law, Defendants needed more; they needed to find someone who resembled the photographs of Davison.   Because there is a genuine dispute about whether a reasonable officer could conclude that Plaintiff resembled the photographs, the district court erred in granting Defendants' motion for summary judgment on the basis of qualified immunity.

In granting Defendants qualified immunity, the district court correctly explained that "'certainty' is not 'the touchstone of reasonableness under the Fourth Amendment'" (R. 91 at PageID #1016 (quoting *Hill*, 401 U.S. at 803–04)) and that "the reasonableness inquiry includes some 'latitude for honest mistakes' . . . in the difficult task of finding and arresting fugitives." (*Id.* (quoting *Maryland v. Garrison*, 480 U.S. 79, 87 (1987))).   Indeed, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'"   *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).   But this standard does not become more forgiving as the quality of evidence (or of police work) decreases.   Rather, as the description of a suspect becomes less reliable—due to the passage of time or otherwise—an officer's reliance on that description becomes objectively *less* reasonable and *less* likely to support a warrantless detention, arrest, or search.   When officers mistake a person for a criminal suspect, the officers' "subjective good-faith belief" is irrelevant; the mistake must be "understandable" and based on "sufficient probability."   *Hill*, 401 U.S. at 804; *see Illinois v. Gates*, 462 U.S. 213, 232 (1983) (explaining that the Fourth Amendment inquiry requires "the assessment of probabilities in particular factual contexts").

In support of the district court's logic, Defendants explain that their mistake was reasonable because "[d]espite their best efforts, the officers 'did not know how . . . Davison looked in 2014' because they could not find a recent image of his face."   (Def. Br. 23.)   But

Defendants' logic is faulty; the old age of a suspect's photograph cannot *increase* its reliability or, in turn, the chances of finding a match.   The less an officer knows about a suspect's appearance, the less reasonable it is for the officer to suspect that any particular person matches that appearance.   *See Dorsey*, 517 F.3d at 395.   The greater difficulty in accurately identifying anyone as Davison decreases, not increases, the reasonableness of any particular suspicion. Under the totality of the circumstances, the only way for Defendants to have had reasonable suspicion that Plaintiff was Davison was if Defendants' belief that Plaintiff resembled Davison's old driver's license photograph was "understandable" in light of the other identifying information available to Defendants at the time.   *See Hill*, 401 U.S. at 804.   This is a question for the jury.

### ii.  *Reasonableness of the Protective Search*

Plaintiff also argues that Detective Allen violated his Fourth Amendment right to be free from unreasonable searches when he frisked Plaintiff for weapons and removed Plaintiff's wallet from his pocket.[4]

For a protective search conducted during a *Terry* stop to be reasonable, "the police officer must reasonably suspect that the person stopped is armed and dangerous."   *Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009).   The officer "must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous."   *Sibron v. New York*, 392 U.S. 40, 64 (1968).   Based on such suspicion, "the officer may conduct a limited search for concealed weapons."   *United States v. Strahan*, 984 F.2d 155, 158 (6th Cir. 1993).   As applicable to this case, "*Terry* allows only an examination for concealed objects and forbids searching for anything other than weapons."   *Id.* (citing *Ybarra v. Illinois*, 444 U.S. 85, 92–94 (1980)).   "If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry*."   *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993).

Plaintiff does not dispute that Defendants could have reasonably believed he was armed and dangerous, assuming of course that Defendants reasonably believed that he was Aaron

---

[4]If Defendants lacked reasonable suspicion to conduct a *Terry* stop, clearly established law provides that this frisk was unreasonable in its entirety.   *Sibron v. New York*, 392 U.S. 40, 64 (1968) ("The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries.").

Davison.[5]  Rather, Plaintiff argues that Detective Allen exceeded the scope of a lawful protective search when he removed Plaintiff's wallet from the back pocket of Plaintiff's pants.

The Supreme Court has recognized that officers' training enables them to identify objects with particularity during protective frisks.  In *Dickerson*, for instance, the Supreme Court articulated the so-called "plain touch" doctrine: "[i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context."  *Id.* at 375–76. This Court has elaborated on the plain touch doctrine and the relevance of an officer's training to investigatory decisions made during a frisk:

> In assessing whether an object's incriminatory nature is immediately apparent, the court must look to three factors, none of which is necessary but each of which is instructive.  These factors are: (1) a nexus between the seized object and the [suspected criminal activity]; (2) whether the intrinsic nature or appearance of the seized object gives probable cause to believe that it is associated with criminal activity; and (3) whether the executing officers can at the time of discovery of the object on the facts then available to them determine probable cause of the object's incriminating nature.

*United States v. Pacheco*, 841 F.3d 384, 395 (6th Cir. 2016) (quoting *United States v. Garcia*, 496 F.3d 495, 510 (6th Cir. 2007)) (citations and internal quotation marks omitted).

Applying these principles, removing Plaintiff's wallet was not "necessary to determine if the suspect [was] armed" and was therefore unreasonable based on clearly established law.  *See Dickerson*, 508 U.S. at 373.  Detective Allen admits that the object in Plaintiff's pocket looked like a wallet, felt like a wallet, and was located where one would expect to find a wallet.  And nothing related to the circumstances of the investigative stop or to the crime that Davison was suspected of committing created a reasonable suspicion that the wallet might be something other than what it immediately appeared to be.  Detective Allen points to the existence of razor blades

---

[5]Before the frisk, Plaintiff told Defendants that he was armed with a pocket knife.  Because Plaintiff does not press the issue, the Court does not analyze whether Plaintiff's admission to possessing a pocket knife, combined with reasonable suspicion that Plaintiff was Davison, would give rise to reasonable suspicion that Plaintiff was armed and dangerous.

and artfully concealed weapons—weapons "that are designed to look like wallets but in fact are not"—but he does not suggest that there was reason to believe that Plaintiff (or Davison) might have been carrying a razor blade or an artfully concealed weapon. (Def. Br. 27.) In the context of reasonable suspicion, which requires a "particularized and objective basis" for suspicion "based on specific and articulable facts," *Dorsey*, 517 F.3d at 395, the fact that razor blades exist does not give rise to a reasonable inference that there is a razor blade in any particular person's wallet. The same analysis applies to artfully concealed weapons. Indeed, if an officer's suspicion that a suspect is armed and dangerous were sufficient to *also* reasonably suspect that every object in a suspect's pocket either contains a razor blade or is an artfully concealed weapon, then there would be no practical distinction between a protective search and a search incident to arrest. *Cf. United States v. Robinson*, 414 U.S. 218, 236 (1973) ("Since it is the fact of custodial arrest which gives rise to the authority to search, it is of no moment that [the officer] did not indicate any subjective fear of the respondent or that he did not himself suspect that respondent was armed.").

Defendants argue that removing Plaintiff's wallet was reasonable and cite several cases in support of their assertion, but these cases are easily distinguishable. In *Strahan*, 984 F.2d at 158, we concluded that an officer was justified in reaching into Strahan's pockets when the officer reasonably believed that Strahan was armed because the officer: (1) was familiar with Strahan; (2) had a reliable tip that Strahan was armed; and (3) felt a bulge in Strahan's pocket during the frisk, which could have been a weapon. In *United States v. Brown*, 310 F. App'x 776, 781 (6th Cir. 2009), we concluded that an officer did not violate the Fourth Amendment by taking Brown's wallet from his pocket when the officer was alone, it was late at night, and Brown was acting nervous and made a furtive gesture towards his back pocket as he tried to leave the scene. In *United States v. Muhammad*, 604 F.3d 1022, 1026–27 (8th Cir. 2010), the Eighth Circuit concluded that removing Muhammad's wallet was permissible when the officer felt a four-inch by three-inch hard object in Muhammad's pocket, the officer could not tell what the object was, and Muhammad had been detained for his suspected participation in an armed robbery that had taken place less two hours earlier. Here, by contrast, Defendants were working together in broad daylight and did not suspect Plaintiff's wallet was a weapon.

Accordingly, the district court erred when it concluded that "[n]othing in Plaintiff's allegations supports the proposition that Allen's 'search' was any broader than necessary to ensure that Plaintiff did not have access to a weapon." (*See* R. 91 at PageID #1018.) Detective Allen's interest in searching the contents of Plaintiff's pocket to avoid "unnecessary risks in the performance of [his] duties" was minimal given that Detective Allen could not have reasonably suspected that the wallet was anything other than a wallet. *See Terry*, 392 U.S. at 23. Under clearly established law, removing Plaintiff's wallet during a protective search was unreasonable even if the protective search was reasonable at its inception. *See Dickerson*, 508 U.S. at 373.

### iii. Stopping Plaintiff's Attempt to Flee

Assuming that Defendants had detained Plaintiff upon reasonable suspicion and that they had properly identified themselves as police officers, it was not unreasonable for Defendants to attempt to stop Plaintiff's flight. As the Supreme Court has explained:

> [U]nprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not "going about one's business"; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the [Fourth Amendment].

*Wardlow*, 528 U.S. at 125. Plaintiff is therefore incorrect to the extent that he suggests that the Fourth Amendment compelled Defendants to permit him to flee from his detention, again, assuming that the detention was lawful. But if a jury determines that Plaintiff reasonably believed he was being mugged rather than being detained by police officers, then extending the detention after Plaintiff attempted to flee was just as unreasonable as detaining Plaintiff in the first instance.

### b. Excessive Force Claim

Plaintiff next asserts that Defendants used excessive force in their attempt to prevent his flight. An excessive force claim may be analyzed under the Fourth, Eighth, or Fourteenth Amendment: "the applicable amendment depends on the plaintiff's status at the time of the incident: a free citizen in the process of being arrested or seized; a convicted prisoner; or someone in 'gray area[s]' around the two." *Coley v. Lucas Cty.*, 799 F.3d 530, 537 (6th Cir. 2015) (quoting *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013)). Where a free citizen

claims that a government actor used excessive force during the process of an arrest, seizure, or investigatory stop, the applicable analysis is governed by the Fourth Amendment. *Id.*

"[T]he right to be free from the excessive use of force is a clearly established Fourth Amendment right." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004) (quoting *Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001)). The Supreme Court has explained that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Rather, "the question is whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396. Therefore, to determine whether the use of force in a particular situation was reasonable, this Court must look to the totality of the circumstances. *See id.*; *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996) (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). In doing so, the court must assume "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. The analysis of whether an officer's use of force was reasonable is guided by the following three factors: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Sigley v. City of Parma Heights*, 437 F.3d 527, 534 (6th Cir. 2006).

Excessive force cases typically require this Court to "analyze the events in segments." *Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002) (citing *Dickerson*, 101 F.3d at 1161–62). In *Phelps*, for instance, this Court analyzed three separate segments: first, the officer arrested Phelps and placed him in handcuffs; second, the officer took Phelps to the police station for booking; and third, the officer tackled Phelps to the ground, sat on top of him, and beat him in response to a gesture by Phelps that the officer claimed he perceived to be threatening. *See id.* at 301–02.

Plaintiff alleges that Defendants used excessive force in two distinct segments of their encounter.  First, Plaintiff alleges that Detective Allen used excessive force by continuing to beat Plaintiff even after he was subdued.  Any level of violent force that an officer uses against a subdued detainee is excessive as a matter of clearly established law.  *See Champion*, 380 F.3d at 902 (citing cases for the proposition that this Court has "consistently held that various types of force applied after the subduing of a suspect are unreasonable and a violation of a clearly established right"); *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994) (holding and continuing to spray mace in the face of an incapacitated arrestee, if proven, would be unreasonable as a matter of law); *Darnell v. Caver*, No. 97–5297, 1998 WL 416000, at *3 (6th Cir. July 7, 1998) (unpublished) (after suspect thrown to ground, unreasonable for officer to lift suspect's head and let it drop to pavement).  But Plaintiff's allegation has no merit—there is no evidence to support it. Plaintiff suggests, without support, that he was subdued the moment that he released his bite. (*See, e.g.*, Pl. Br. 45 ("[A] reasonable jury could conclude that Allen beat [Plaintiff] after [Plaintiff] released his bite."))  But Detective Allen testified during Plaintiff's criminal trial that he "couldn't gain control of [Plaintiff]" and that he "felt like [he] was losing the fight" until a nearby pedestrian provided assistance.  (R. 73 at PageID #435.)  Detective Allen stated that the incident ended only after the pedestrian "control[ed] [Plaintiff's] legs, at [which] point we were able to put the handcuffs on him."  (*Id.*)  The pedestrian also testified that Defendants needed his assistance to subdue Plaintiff.  (*Id.* at PageID #448.)  Plaintiff presents no evidence to show that he stopped resisting when he stopped biting, and he fails to refute extensive testimony indicating that three people were struggling to subdue him even after he released his bite.[6]  Accordingly, Plaintiff has failed to show that Detective Allen used excessive force after Plaintiff was subdued.

Second, Plaintiff alleges that Defendants used excessive force in subduing him.  This Court agrees, especially because a jury could find that Defendants failed to identify themselves as police officers.[7]  It is impossible to resist an arrest (or detention) without knowing that an

[6]Plaintiff states in his reply brief that he disputes whether the pedestrian helped Defendants subdue him. However, Plaintiff does not explain his dispute, nor does he cite any evidence that tends to show that Defendants continued to use force after Plaintiff was subdued.

[7]Detective Allen was primarily responsible for the use of force, but Officer Brownback participated in the *Terry* stop, was present throughout the encounter, did not intervene once the encounter became violent, and at some

arrest (or detention) is being attempted. *Metiva*, 31 F.3d at 385 ("[W]hether plaintiff was actively resisting arrest or attempting to evade arrest is contested as plaintiff alleges he was never told he was under arrest or why he was being further detained after submitting to two pat-down searches."). If a jury were to find that Defendants failed to properly identify themselves, then Plaintiff's flight did not constitute "actively resisting arrest or attempting to evade arrest by flight" as a matter of law. *Id.* Indeed, Plaintiff says that he ran away only after asking whether Defendants were mugging him. If a jury were to credit Plaintiff's testimony, then neither Defendant is entitled to qualified immunity because any reasonable officer would have known, based on clearly established law, that applying force—tackling Plaintiff to the ground, holding him down, choking him, and beating him into submission—was unreasonable under the circumstances.[8]  *See id.*; *Atkins v. Twp. of Flint*, 94 F. App'x 342, 349 (6th Cir. 2004) (concluding that "a reasonable officer would ordinarily inform a suspect . . . that he was being arrested" for a low-level crime, especially when "there was no reason not to tell him he was under arrest"); *Griffith v. Coburn*, 473 F.3d 650, 657 (6th Cir. 2007).

But regardless of whether the force was justified at its inception, Detective Allen's use of a chokehold, if proven, would be excessive under clearly established law. The use of a chokehold constitutes deadly force. *See Coley*, 799 F.3d at 540. When a suspect resists arrest by "wrestling [himself] free from officers and running away," officers may reasonably use force, but such conduct "does not justify deadly force, especially when the struggle has concluded and the suspect is in flight." *Bouggess v. Mattingly*, 482 F.3d 886, 891 (6th Cir. 2007). Thus, "[t]he use of a chokehold on an unresisting—and even an initially resistant—detainee" constitutes

---

point joined Detective Allen in subduing Plaintiff. Without resolving the parties' factual disputes, the Court cannot conclude that Officer Brownback is entitled to qualified immunity for any portion of the encounter.

[8]Even if Defendants reasonably suspected that Plaintiff was Davison, Davison's suspected crime was not one for which it might have been reasonable for Detective Allen to tackle Plaintiff to the ground without explanation. Davison's suspected crime was home invasion, which the evidence indicates was a non-violent crime, if moderately severe. The degree of home invasion Davison allegedly committed is unclear. The lowest level of home invasion is a felony punishable by imprisonment for up to five years, a fine of up to $2,000, or both. MCL § 750.110a(7). This degree of home invasion does not necessarily require a perpetrator to commit an act of violence or to interact with others. *Id.* at § 750.110a(3). Thus, viewing the evidence in the light most favorable to Plaintiff, Defendants had no reason to think that Plaintiff was a particularly dangerous criminal and no reason to tackle him to the ground without announcing themselves.

excessive force. *Coley*, 799 F.3d at 540.**9**  Therefore, any officer should have known based on clearly established law that using a chokehold when Plaintiff was attempting to run away was objectively unreasonable.  Detective Allen argues that "the Constitution does not prohibit officers from using this technique [a chokehold] to restrain a suspect just seconds after the suspect attempts to punch an officer and to flee." (Def. Br. 32.)  Although *Bouggess* addressed an officer's use of his firearm, rather than a chokehold, the principle from *Bouggess* applies to the instant case.  *Bouggess* clearly established that using deadly force, when the struggle has concluded and a suspect is fleeing, is excessive and unconstitutional.  *See Bouggess*, 482 F.3d at 891.  The district court therefore erred by granting Detective Allen qualified immunity as to his use of force.

Therefore, neither Defendant is entitled to qualified immunity on Plaintiff's excessive force claims.

### C.  The District Court Correctly Held that Plaintiff's Claims Against Detective Allen are *Bivens* Claims Rather than § 1983 Claims

#### 1.  Standard of Review

This Court reviews *de novo* the purely legal question of whether a cause of action arises under § 1983 or instead under the implied right of action recognized in *Bivens*, 403 U.S. 388. *See United States v. Graham*, 484 F.3d 413, 416 (6th Cir. 2007); *Rodgers v. Banks*, 344 F.3d 587, 593 (6th Cir. 2003).

#### 2.  Analysis

As explained below, the Court concludes that the district court correctly held that Plaintiff's claims against Detective Allen are *Bivens* claims rather than § 1983 claims.

---

**9**Although *Coley* was published after the events giving rise to this case, this Court recognized in *Coley* that prior cases made it "abundantly clear" that "[c]hokeholds are objectively unreasonable where . . . there is no danger to others."  *Coley*, 799 F.3d at 541.

### a.  Relevant Legal Principles

To bring a claim under § 1983, the plaintiff must allege: "1) the defendant acted under color of state law; and 2) the defendant's conduct deprived the plaintiff of rights secured under federal law." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (citing *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998)).  "The ultimate issue in determining whether a party is subject to liability under 42 U.S.C. § 1983 is whether the alleged infringement of federal rights is 'fairly attributable to the state.'" *Crowder v. Conlan*, 740 F.2d 447, 449 (6th Cir. 1984) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).  The question of fair attribution involves a two-step inquiry: "[f]irst, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the [S]tate or by a person for whom the State is responsible." *Lugar*, 457 U.S. at 937.  In addition, "the party charged with the deprivation must be a person who may fairly be said to be a state actor.  This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." *Id.*

A defendant's actions performed pursuant to a "'mixed' federal and state program may . . . be actions 'under color of state law.'" *Rowe v. Tennessee*, 609 F.2d 259, 266 (6th Cir. 1979). The "evaluation of whether particular conduct constitutes action taken under the color of state [or instead federal] law, must focus on the actual nature and character of that action." *Schultz v. Wellman*, 717 F.2d 301, 304 (6th Cir. 1983).  In *Schultz*, for instance, this Court explained that the decision by a defendant officer in the Kentucky Air National Guard to terminate a lower-level officer was made under color of state law, not federal law, because "[o]fficers in the National Guard . . . are officers of the state militia until called into active federal duty," and because terminations from the National Guard "are ordered by the state Adjutant General, a state officer, and must be approved by the Governor of the state." *Id.* at 305.

### b.  Application to the Matter at Hand

Plaintiff's claims against Detective Allen may not be brought under § 1983 because Detective Allen's conduct is fairly attributable only to the United States and not to the State of

Michigan.**10** Although Detective Allen was a detective with the Grand Rapids Police and was therefore employed by the state, Detective Allen was working full time with an FBI task force at the time of the incident at issue.  Plaintiff has not alleged or demonstrated that the state was involved in authorizing or administering the task force; instead, it appears that the FBI managed the operation with the benefit of state resources.  Detective Allen's "official character" at the time of the incident was therefore "such as to lend the weight of the [United States] to his decisions."  *See Lugar*, 457 U.S. at 937.  As a deputized federal agent, Detective Allen carried federal authority and acted under color of that authority rather than under any state authority he may have had as a Grand Rapids Police detective.  *See Guerrero v. Scarazzini*, 274 F. App'x 11, 12 n.1 (2d Cir. 2008) ("[B]ecause Scarazzini and McAllister were federally deputized for their Task Force work, this claim was properly brought . . . as a *Bivens* action."); *Majors v. City of Clarksville*, 113 F. App'x 659, 659–60 (6th Cir. 2004) (explaining that a § 1983 claim brought against police officers serving with a DEA task force was "in reality a *Bivens* claim under the Fourteenth Amendment").

Plaintiff argues that Detective Allen acted under color of state law because the task force was enforcing a state warrant for Davison's arrest at the time the events giving rise to this case took place.  But Plaintiff fails to explain why the "nature and character" of a task force should change based on whether the task force chooses to pursue a state fugitive or a federal fugitive. *Schultz*, 717 F.2d at 304.  Plaintiff points out that "Davison had committed no federal crime" and therefore "the officers had no authority independent of Michigan state law to *arrest* Davison." (Pl. Br. 61.)   However, the nature and character of a cooperative federal-state program is determined by the source and implementation of authority for the *program*, not for the particular work that the agency chooses, in the exercise of its authority, to perform on a given day.  *Cf. id.* at 305 ("That an agency of the state chooses to utilize federal substantive and procedural rules in the exercise of its state law authority does not transform the state law character of its actions."). Thus, as long as the task force's decision to apprehend Davison was made by virtue of an exercise of federal authority, which Plaintiff does not contest, Detective Allen remained a federal

---

**10**Detective Allen's potential liability is unchanged by whether Plaintiff's claims properly arise under *Bivens* or § 1983.  *See Butz v. Economou*, 438 U.S. 478, 500–04 (explaining that liability for an actionable claim under *Bivens* is indistinguishable from an analogous claim under § 1983).

agent in the pursuit of a state fugitive.  Therefore, the district court correctly concluded that Plaintiff's claims against Detective Allen are *Bivens* claims and not § 1983 claims.

## CONCLUSION

For the reasons explained above, the Court **REVERSES** the district court's findings that (1) the FTCA judgment bar precludes Plaintiff's remaining claims and that (2) Defendants are entitled to qualified immunity, **VACATES** the district court's judgment in favor of Defendants, and **REMANDS** for proceedings consistent with this opinion.

---------------------

## DISSENT

---------------------

ROGERS, Circuit Judge, dissenting.   The district court's dismissal of King's FTCA claims against the United States based on the presence of state-law governmental immunity constitutes a "judgment" under 28 U.S.C. § 2676, such that the FTCA's judgment bar precludes King's claims against Allen and Brownback.

The FTCA's judgment bar provides:

> The judgment in an action under section 1346(b) of this title shall constitute a complete bar to any action by the claimant, by reason of the same subject matter, against the employee of the government whose act or omission gave rise to the claim.

28 U.S.C. § 2676.   King had sued the United States under 28 U.S.C. § 1346(b) based on the allegedly tortious acts of Todd Allen and Douglas Brownback.   The district court dismissed King's FTCA claims on state-law grounds.   King did not challenge the dismissal of his FTCA claims on appeal, so the decision was final for the purposes of the FTCA's judgment bar.   *See Serra v. Pichardo*, 786 F.2d 237, 239, 242 (6th Cir. 1986).   Moreover, King does not dispute that the additional claims against Allen and Brownback arise from the same "subject matter" as his FTCA claims.   A judgment for or against the United States on an FTCA claim bars claims based on the same subject matter, "even when 'the claims [a]re tried together in the same suit and [ ] the judgments [ ] entered simultaneously.'"   *Harris v. United States*, 422 F.3d 322, 334 (6th Cir. 2005) (quoting *Serra*, 786 F.2d at 241).   The district court's order in favor of the United States on King's FTCA claims accordingly triggers the judgment bar and requires the dismissal of King's additional claims against Allen and Brownback.

Although the district court's order established that the district court lacked subject matter jurisdiction over the FTCA claims, this is because merits determinations under the FTCA are jurisdictional in that they implicate the sovereign immunity of the United States.   The dismissal still amounted to a "judgment" under 28 U.S.C. § 2676.   Indeed, the district court dismissed King's FTCA claims against the United States based on determinations that are legally

indistinguishable from determinations that the Supreme Court has identified, albeit in dictum, as triggering the judgment bar.  In *Simmons v. Himmelreich*, 136 S. Ct. 1843, 1849 (2016), the Court explained that the judgment bar applies when FTCA claims are dismissed "because the [defendants] were not negligent, because [the plaintiff] was not harmed, or because [the plaintiff] simply failed to prove his claim."  Such dismissals are under § 1346(b), which lifts the sovereign immunity of the United States by granting jurisdiction over a cause of action for money damages against the government in certain limited circumstances.[1]  According to the Court, "it would make little sense to give [the plaintiff] a second bite at the money-damages apple by allowing suit against the employees" to proceed in such a case.  *Id.*  The hypothetical dismissals "would have given [the plaintiff] a fair chance to recover damages" for the alleged constitutional violations, such that applying the judgment bar to preclude litigation over claims arising from the same subject matter would be appropriate.  *Id.*

This is precisely what happened in King's lawsuit.  The district court dismissed King's FTCA claims against the United States because it determined that Michigan governmental immunity protected Allen and Brownback from liability for their alleged torts.  According to the court, "the parties' undisputed facts support the finding that [Allen and Brownback's] actions were not undertaken with the malice required under Michigan law."  The district court's dismissal of King's FTCA claims was based on an assessment of their merits under Michigan law.  Such a dismissal is warranted by the limits set out in § 1346(b), like those in the *Simmons* dictum.  Under § 1346(b), the FTCA creates a cause of action against the United States "for injury or loss of property, or personal injury or death," only where "the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

---

[1] 28 U.S.C. § 1346(b) provides:

> Subject to the provisions of chapter 171 of this title, the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

It is true that a merits-based dismissal under the limits of § 1346(b) is jurisdictional; the terms of § 1346(b) explicitly grant jurisdiction to the district courts for such claims against the government.  But that cannot be sufficient to preclude application of the FTCA judgment bar because that would effectively nullify the judgment bar with respect to cases where the FTCA judgment was in favor of the government.  Every case that determines that the elements of the cause of action are not met is at the same time a determination that the government's immunity is not waived and that there is accordingly no jurisdiction.  This is true even of a judgment entered after trial.  *See, e.g., Harris*, 422 F.3d at 324–25; *Serra*, 786 F.2d at 241–42.  But as the Supreme Court reasoned in *Simmons*, such cases *are* subject to the FTCA judgment bar.  *See Simmons*, 136 S. Ct. at 1849.

The actual holding in *Simmons* was that the FTCA's judgment bar does not apply when a judgment is rendered for or against the United States based on one of the FTCA's "Exceptions" set out in 28 U.S.C. § 2680, such as the discretionary function exception.  *Id.* at 1847–48.  The Court relied upon the "plain text" of the FTCA for that conclusion.  *Id.*  The plain text provision dictates that the judgment bar does not apply to cases excepted under 28 U.S.C. § 2680.[2]  But the plain text applied in *Simmons* by its terms does not apply to dismissals based on the limits of § 1346(b), such as the dismissal in this case and the dismissals explicitly distinguished in the Court's dictum.  *See id.*

Our decision in *Himmelreich v. Fed. Bureau of Prisons*, 766 F.3d 576 (6th Cir. 2014), does not require holding that dismissals under § 1346(b) preclude application of the judgment bar.  That decision was the very court of appeals decision affirmed on different grounds in *Simmons*.  In *Himmelreich*, we determined that "[a] dismissal for lack of subject-matter jurisdiction does not trigger the § 2676 judgment bar," because "in the absence of jurisdiction, the court lacks the power to enter judgment."  766 F.3d at 579.  In its review of our *Himmelreich*

---

[2]The Supreme Court determined:

The "Exceptions" section of the FTCA reads: "[T]he provisions of this chapter"—Chapter 171— "shall not apply to . . . [a]ny claim based upon . . . the exercise or performance . . . [of] a discretionary function or duty."  § 2680(a).  The judgment bar is a provision of Chapter 171; the plain text of the "Exceptions" section therefore dictates that it does "not apply" to cases that, like Himmelreich's first suit, are based on the performance of a discretionary function.

136 S. Ct. at 1847–48.

decision, the Supreme Court in *Simmons* affirmed on narrower grounds, and in dictum reasoned in a way that logically requires application of the judgment bar in this case. *See Simmons*, 136 S. Ct. at 1849. We can hardly be bound by a rationale that the Supreme Court rejected on review of the very case in which we set it forth, in favor of a more limited rationale (the plain text of § 2680) that flatly does not apply in the case before us.

It could be argued that the Supreme Court's language regarding § 1346(b) dismissals is dictum, whereas our previous decision in that very case—more broadly reasoning that neither § 2680 dismissals nor § 1346(b) dismissals implicate the judgment bar—is holding, and thus still binding on subsequent panels in the Sixth Circuit. Such an argument is anomalous, however, and at bottom inconsistent with the theory of stare decisis. "Dicta" encompasses elements of an opinion that are not necessary for the resolution of the case. To discern the difference between holding and dictum, we cannot simply rely on what a given decision purports to hold. Rather, we determine whether the purported holding was actually necessary for the resolution of the case. A subsequent decision issued by a reviewing court in that same case may inform whether the purported holding of the lower court was in fact necessary. When a lower court rules on a particular theory and the reviewing court affirms on narrower grounds, the affirmance can indicate that the broader portion of the lower court's theory was unnecessary and therefore dictum—even if the lower court did not recognize it as such at the time of the decision.

The litigation in *Simmons* illustrates the point. When we decided *Himmelreich*, we purported to hold that any dismissal of an FTCA claim for lack of subject matter jurisdiction—which would presumably include dismissals under both § 1346(b) and § 2680—would not trigger the judgment bar. *See* 766 F.3d at 579. On appeal, the Supreme Court determined that the case could be resolved on narrower grounds and affirmed on a theory that precluded the judgment bar from applying to § 2680 dismissals (the type of dismissal before it), while *permitting* in dictum the application of the judgment bar to § 1346(b) dismissals. *See Simmons*, 136 S. Ct. at 1849. Once the Supreme Court made the final decision in the *Himmelreich* litigation in *Simmons*, the analysis in the court of appeals decision, to the extent that it encompassed § 1346(b) dismissals, was effectively rendered dictum, if it was not already dictum.

No. 17-2101                      *King v. United States*                      Page 32

It was no longer necessary for the ultimate resolution of the case, since the dismissal of the FTCA claim in *Himmelreich* was based on § 2680 and not § 1346(b).

The Supreme Court, in other words, took away from the Sixth Circuit opinion any relevance that its § 1346(b)-related analysis may have had to the resolution of the case before it, rendering it the equivalent of dictum with respect to subsequent cases. The Supreme Court did so, moreover, before the *Himmelreich* litigation was final.

This leaves us with Sixth Circuit dictum that precludes the application of the judgment bar to § 1346(b) dismissals, and well-considered subsequent Supreme Court dictum that permits the application of the judgment bar to § 1346(b) dismissals. The Supreme Court dictum is far more compelling than our previous inconsistent dictum, and should be followed.

Accordingly, King's claims against Allen and Brownback, as sympathetic as they are, are precluded by the FTCA judgment bar.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 17-2101

JAMES KING,

     Plaintiff - Appellant,

     v.

UNITED STATES OF AMERICA, et al.,

     Defendants,

DOUGLAS BROWNBACK; TODD ALLEN,

     Defendants - Appellees.

> **FILED**
> Feb 25, 2019
> DEBORAH S. HUNT, Clerk

Before:  BOGGS, CLAY, and ROGERS, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, IT IS ORDERED that the district court's findings that the Federal Tort Claims Act judgment bar precludes Plaintiff's remaining claims, and that Defendants are entitled to qualified immunity are REVERSED, its judgment in favor of Defendants is VACATED, and the case is REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk